IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) CASE NO. 1:18-CR-45
) DAY 1
TIMOTHY JERMAINE PATE, )
)
Defendant. )
-----------------------------

TRANSCRIPT OF JURY TRIAL, VOL. I
JURY VOIR DIRE AND SELECTION
PRELIMINARY INSTRUCTIONS
OPENING STATEMENTS
TESTIMONY
**BEFORE THE HONORABLE R. STAN BAKER**
United States Courthouse
600 James Brown Boulevard
Augusta, GA
October 15, 2019

COURT REPORTER: Kelly A. McKee, CCR, RMR, CCP, RDR
United States Court Reporter
P. O. Box 8552
Savannah, GA 31412
912-650-4065

(Proceedings reported by mechanical stenography, transcript produced by computer-aided transcription.)

APPEARANCES OF COUNSEL

FOR THE UNITED STATES OF AMERICA:

CHRISTOPHER HOWARD, Esq.
JOSEPH McCOOL, Esq.
U. S. ATTORNEY'S OFFICE - SAVANNAH
22 Barnard Street, Suite 300
P. O. Box 8970
Savannah, GA 31401
912-652-4422
Email: christopher.howard@usdoj.gov

FOR THE DEFENDANT:

JUSTIN D. MAINES, Esq.
THE NYE LAW GROUP
2008 Whitaker Street
Savannah, GA 31401
912-358-8485
Email: Jd@thenyelawgroup.com

# I N D E X


| | PAGE |
|---|---|
| Roll Call | 14 |
| Jury Voir Dire | 46 |
| Jury Selection | 94 |
| Court's Initial Instructions | 116 |
| OPENING STATEMENTS | |
| By Mr. Howard For the Govt. | 127 |
| By Mr. Maines For the Dft | 133 |
| GOVERNMENT'S WITNESSES | |
| JAMIE HODGE | |
| Direct Examination by Mr. Howard | 137 |
| Cross-Examination by Mr. Maines | 195 |
| Redirect Examination by Mr. Howard | 205 |
| Certificate of Reporter | 215 |


# E X H I B I T S


| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 1-01 | First page of complaint filed by Timothy Jermaine Pate on October the 10th, 2017 | 142 | 136 |
| No. 1-02 | motion to proceed without payment of fee | 147 | 136 |
| No. 1-03 | Motion for court order of tax records | 148 | 136 |
| No. 1-04 | Motion for court order of bank records | 149 | 136 |
| No. 1-05 | Court Order dated October 2017 denying Mr. Pate's motions | 149 | 136 |

# E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 1-06 | United States motion to dismiss and memorandum of law in support thereof dated December 21, 2017 | 149 | 136 |
| No. 1-07 | Response by Timothy Pate to Government's Motion to Dismiss | 151 | 136 |
| No. 1-08 | Motion for arrest warrant filed by Timothy Jermaine Pate | 154 | 136 |
| No. 1-09 | Order signed by BKE denying Pate's motion to arrest the IRS commissioner | 155 | 136 |
| No. 1-1 through 1-48 | | | 136 |
| No. 1-10 | Response to Order of denial of arrest warrant | 155 | 136 |
| No. 1-11 | Affidavit of truth for claim filed by Timothy Pate | 155 | 136 |
| No. 1-12 | Motion for default judgment in order for payment | 157 | 136 |
| No. 1-13 | Affidavit of truth for claim | 159 | 136 |
| No. 1-14 | Affidavit of judgment for Claim and notice of lien | 160 | 136 |
| No. 1-15 | Affidavit of judgment for Claim and notice of lien | 160 | 136 |
| No. 1-16 | Affidavit of Notice of Presentment filed by T.J.P. on 3/2/18 | 160 | 136 |

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 1-17 | affidavit of lien and notification of lien | 161 | 136 |
| No. 1-18 | Affidavit of notice of presentment | 164 | 136 |
| No. 1-19 | Affidavit of Demand For Payment | 165 | 136 |
| No. 1-20 | Affidavit for Arrest Warrant | 165 | 136 |
| No. 1-21 | Affidavit of Response | 165 | 136 |
| No. 1-22 | Affidavit of Truth and Notice of Intent | 167 | 136 |
| No. 1-23 | Affidavit of Judgement for Claim and Notice of Lien against Eric Mines Thorson | 167 | 136 |
| No. 1-24 | Affidavit Warrant of Arrest against BRIAN KEITH EPPS | 168 | 136 |
| No. 1-25 | Affidavit Warrant of Arrest against CV JOHN ANDREW KOSKINEN | 168 | 136 |
| No. 1-26 | Affidavit of Notification | 168 | 136 |
| No. 1-27 | Affidavit of Claim | 171 | 136 |
| No. 1-28 | Order from Judge Brian Epps | 171 | 136 |
| No. 1-31 | Timothy Pate's Response to Court Order | 171 | 136 |
| No. 1-35 | Affidavit of Lien and Notification of Lien | 172 | 136 |

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 1-36 | Affidavit of Lien and Notice of Lien against Eric Mines Thorson | 173 | 136 |
| No. 1-37 | Affidavit of Lien and Notice of Lien against Jacob Lew | 174 | 136 |
| No. 1-39 | Affidavit Proof of Claim and Proof of Lien | 174 | 136 |
| No. 1-40 | Affidavit of Claim | 176 | 136 |
| No. 1-41 | Affidavit of Settlement of Case | 179 | 136 |
| No. 1-42 | Affidavit of Claim | 181 | 136 |
| No. 1-43 | Affidavit of Claim | 182 | 136 |
| No. 1-44 | Affidavit of default judgment and notice of lien | 182 | 136 |
| No. 1-45 | Affidavit of default judgment and notice of lien | 183 | 136 |
| No. 1-46 | Judge Hall's Order granting the Government's Motion to Dismiss case | 184 | 136 |
| No. 1-48 | Notice of claim of maritime lien against the U.S. M/V SUSAN D. BARRETT | 184 | 136 |
| No. 2-1 | Affidavit to Accept All Charges for Value and Honor in Exchange for Value and Honor, filed by T.J.P. | 191 | 136 |
| No. 2-2 | Affidavit of Default Judgement filed by T.J.P. | 192 | 136 |

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 2-3 | Affidavit of Presentment of Liability filed by T.J.P. | 195 | 136 |
| No. 3-1 | United States' Motion to Expunge Liens | 186 | 136 |
| No. 3-1 through 3-9 | | | 136 |
| No. 3-6 | Mr. Pate's Affidavit of Response to Court Order | 188 | 136 |
| No. 3-7 | Decision by Court dated 5/15/2019 | 189 | 136 |
| No. 3-9 | Affidavit of Presentment of Settlement | 189 | 136 |
| No. 4-1 through 4-5 | | | 136 |
| No. 5 - 73 | | | 136 |
| No. 19 | Photo of Timothy Jermaine Pate | 143 | |

**P R O C E E D I N G S**

**(9:26 a.m.)**

**(In USMS Holding Cell)**

THE COURT: We are on the record in *United States of America vs. Timothy Jermaine Pate*, which is 1:18-CR-45. We are in the Marshal holding cell at the United States Courthouse here in Augusta, Georgia. We have this case set down for a jury selection and trial this morning. The United States Marshal has Mr. Pate here in the holding cell, and they are prepared to escort him to the courtroom for his trial. We have counsel present as well.

Counsel, if you would, please, state your presence on the record.

MR. HOWARD: Your Honor, for the government it's AUSA Chris Howard, joined by Joseph McCool from our office.

MR. MAINES: And Attorney Justin Maines for Mr. Pate.

THE COURT: And, of course, Mr. Pate's here. Mr. Pate is lying down in the cell, but I see his eyes are open. It appears he's able to hear what we're saying. He's not making any eye contact or anything like that with the Court.

Mr. Pate, it's my understanding that you have expressed to your counsel and to the United States Marshal Service that you do not wish to come out of the cell and to participate in your trial. It's additionally my understanding that you don't want to put on the clothes that have been provided for you, the

plain clothes, which, of course, you have the right to wear during trial.

THE DEFENDANT: Sir, isn't it true that the judge had forged my signature on the not guilty plea? Isn't that true?

THE COURT: So, Mr. Pate --

THE DEFENDANT: No, you don't want to respond to that.

THE COURT: -- is speaking over the Court at this time.

THE DEFENDANT: I'm not Mr. Pate. I'm Akenaten Ali. Didn't the judge forge my signature on the not guilty plea?

THE COURT: So --

THE DEFENDANT: Yeah.

THE COURT: -- Mr. Pate --

THE DEFENDANT: Exactly.

THE COURT: -- is speaking over everyone at this time. Mr. Pate --

THE DEFENDANT: Did the judge --

THE COURT: -- what I'm trying to do right now --

THE DEFENDANT: Did the judge enter a not guilty plea --

THE COURT: Please be quiet, sir.

THE DEFENDANT: No, sir. Did the judge enter a not guilty plea -- did he forge my --

THE COURT: Mr. Pate --

THE DEFENDANT: Did he forge my signature?

THE COURT: Mr. Pate, it's my time to talk --

THE DEFENDANT: Did the judge forge my signature? The

judge forged my signature. Didn't I tell you that I would accept all charges for value in exchange for value and honor? Didn't I?

THE COURT: All right. Madam Court Reporter --

THE DEFENDANT: Yeah, exactly.

THE COURT: -- I'm going to ask you to please transcribe my voice at this time --

THE DEFENDANT: No, sir.

THE COURT: -- and not Mr. Pate's as he is interrupting us.

THE DEFENDANT: I don't accept the Court's jurisdiction. I don't accept the Court's jurisdiction.

THE COURT: Mr. Pate, you have the right to attend your trial. You have the right to see --

THE DEFENDANT: I'm not a U. S. Citizen.

THE COURT: -- and to hear all of the witnesses against you. You have the right to have those witnesses cross-examined by your attorney. You have the right to be present during the trial. Do you wish to participate in the trial? Do you wish to be present during the trial, sir?

THE DEFENDANT: I accept all charges for value and honor in exchange for value and honor.

THE COURT: Mr. Pate, that's not responsive to my question. Do you wish to participate --

THE DEFENDANT: Do you want to respond to my question?

THE COURT: It appears to the Court --

THE DEFENDANT: Isn't it true that the judge forged my signature on the not guilty plea?

THE COURT: It appears to the Court that Mr. Pate does not wish to --

THE DEFENDANT: You cannot force jurisdiction.

THE COURT: -- participate in his trial. We will --

THE DEFENDANT: You're trying to force jurisdiction.

THE COURT: We will --

THE DEFENDANT: You are a court of commerce --

THE COURT: -- proceed with the trial in your absence, Mr. Pate. You're not going to be present if you don't come out.

THE DEFENDANT: I'm not Mr. Pate.

THE COURT: He does not even acknowledge that he's Mr. Pate. Do you want to come out of this cell and participate in your trial, sir?

THE DEFENDANT: Sir, I don't have a trial. I have no business with the Court other than endorsing an instrument, and the United States has not presented an instrument.

THE COURT: Do I take it from that that you do not want to participate in your trial? Is that correct, sir?

THE DEFENDANT: Sir, I have no business with you and I don't have to respond to you.

THE COURT: Okay. He's made it very clear that he does not want to participate in his trial. As a precautionary

measure, Counsel, we will have a video feed going to the cell where Mr. Pate can watch the trial. He'll be able to hear the trial.

Of course, in order to prevent him from interrupting the trial as he has done in past hearings, we will not be able to hear him.

THE DEFENDANT: I don't want that attorney. I did not sign an agreement with the Court.

THE COURT: Of course, Mr. Maines, you will be given the opportunity to speak with Mr. Pate during recesses in the trial to remind him of his right to be present during the trial and to see if he wants to participate in the trial.

THE DEFENDANT: I don't consent to a trial. There's no need for any of you to come talk to me. I do not consent to the jurisdiction of your commercial court, sir.

THE COURT: Additionally, the Court notes that the technology may give out, Mr. Pate.

THE DEFENDANT: You are --

THE COURT: If the technology gives out, that is not a reason to stop the trial.

THE DEFENDANT: You forged my signature.

THE COURT: So we're going to proceed with the jury selection at this time.

Mr. Pate, you've got the right to be present --

THE DEFENDANT: I don't consent to a trial.

THE COURT: We want to be certain that you're aware of that. But Mr. Pate chooses not to be present.

THE DEFENDANT: And Benjamin Cheesbro, he forged my signature.

THE COURT: We'll be in recess until we begin with jury selection.

(Proceedings stood in recess from 9:26 a.m. until 9:34 a.m.)

THE CLERK: All right. Good morning, everyone. Thank you all for being here and being on time. It's a little warm. I assure you all we have the AC cranked up full blast, and I hope by the time we get through this it will be nice and comfortable. So bear with us on that. We had a holiday yesterday, and the AC was not running yesterday, but it's hopefully kicking back in for us.

A couple of things before I start, I'm going to start off by doing the roll call. I know you checked in up at the clerk's office, but we're going to call roll here in just a second. Before I do that, I just wanted to say we're a full crowd in here this morning. If anybody has trouble hearing anything anybody is saying, please kind of pop your hand up, let us know. We've got headphones for anybody who might need a little help hearing. They work really well. I tried them out yesterday. So let us know. I'll try and stick close to the microphone, too. And everybody else will. The other thing is you should -- we're going to take a break.

(Technical difficulties)

THE CLERK: As I was saying, when you guys checked in at the clerk's office, they should have given you a piece of paper and a notepad and pencil. Please keep those handy with you. The first thing I'm going to ask you guys to kind of write down on that notepad is, before, when you got your juror summons, it probably came with a number, but as I call the roll, I'm going to be giving you a different number, and that's going to be your juror number. Anytime you answer or respond to any questions, I'm going to ask that you stand, and when you're called upon, state your name and that juror number so that we know who you are before you respond. So that'll probably be the first piece of information that you're going to want to write down.

With all that being said, we'll go ahead and get started, and I'm going to call the roll. And I apologize in advance if I do not pronounce everyone correctly. John Albrecht, Juror Number 1. Dean Amelsberg.

PROSPECTIVE JUROR AMELSBERG: That's right. Here.

THE CLERK: Juror Number 2. Andrew Anderson, Juror Number 3. William Bass.

PROSPECTIVE JUROR BASS: Here.

THE CLERK: Juror Number 4. If you all will, just say present instead of raising your hand. Stand and say present, please. Jared Beam.

PROSPECTIVE JUROR BEAM: Present.

THE CLERK: Juror Number 5. Brett Beckman.

PROSPECTIVE JUROR BECKMAN: Present.

THE CLERK: Juror Number 6. Vanessa Blyden.

PROSPECTIVE JUROR BLYDEN: Present.

THE CLERK: Juror Number 7. Allen Brown.

PROSPECTIVE JUROR BROWN: Present.

THE CLERK: Juror Number 8. Lacoria Brown.

PROSPECTIVE JUROR BROWN: Present.

THE CLERK: Juror Number 9. Trisha Burks.

PROSPECTIVE JUROR BURKS: Present.

THE CLERK: Juror Number 10. Nancy Calhoun.

PROSPECTIVE JUROR CALHOUN: Present.

THE CLERK: Thank you. Juror Number 11. McKenzie Carter.

PROSPECTIVE JUROR CARTER: Present.

THE CLERK: Thank you. Juror Number 12. Tracy Clark.

PROSPECTIVE JUROR CLARK: Present.

THE CLERK: Good morning. Juror Number 13. Dwan Clark Johnson.

PROSPECTIVE JUROR JOHNSON: Present.

THE CLERK: Thank you. Juror Number 14. Kenneth Clayborne.

PROSPECTIVE JUROR CLAYBORNE: Present.

THE CLERK: Good morning. Juror Number 15. Sheila Cook.

PROSPECTIVE JUROR COOK: Present.

THE CLERK: Good morning. Juror Number 16. Catherine Culbreath.

PROSPECTIVE JUROR CULBREATH: Present.

THE CLERK: Good morning. Juror Number 17. Michael Curley.

PROSPECTIVE JUROR CURLEY: Present.

THE CLERK: Thank you. Juror Number 18. Melanie Davis.

PROSPECTIVE JUROR DAVIS: Present.

THE CLERK: Thank you. Juror Number 19. Mary Duckworth.

PROSPECTIVE JUROR DUCKWORTH: Present.

THE CLERK: Good morning. Juror Number 20. Danielle Dupree.

PROSPECTIVE JUROR DUPREE: Present.

THE CLERK: Good morning. Juror Number 21. Robert Dye.

PROSPECTIVE JUROR DYE: Present.

THE CLERK: Good morning. Juror Number 22. McKenzie Forest.

PROSPECTIVE JUROR FOREST: Present.

THE CLERK: Hey there. Juror Number 23. Cynthia Fountain.

PROSPECTIVE JUROR FOUNTAIN: Present.

THE CLERK: Good morning. Juror Number 24. Carolyn Free.

PROSPECTIVE JUROR FREE: Present.

THE CLERK: Thank you. Juror Number 25. Misty Gibson.

PROSPECTIVE JUROR GIBSON: Present.

THE CLERK: Good morning. Juror Number 26. Patra Griffitt.

PROSPECTIVE JUROR GRIFFITT: Present.

THE CLERK: Good morning. Juror Number 27. Olivia Grim.

PROSPECTIVE JUROR GRIM: Present.

THE CLERK: Good morning. Juror Number 28. Trinetta Harden.

PROSPECTIVE JUROR HARDEN: Present.

THE CLERK: Good morning. Juror Number 29. Stephen Harris.

PROSPECTIVE JUROR HARRIS: Present.

THE CLERK: Good morning. Juror Number 30. Tiffany Hawkins.

PROSPECTIVE JUROR HAWKINS: Present.

THE CLERK: Good morning. Juror Number 31. Jemetrice Heard.

PROSPECTIVE JUROR HEARD: Present.

THE CLERK: Good morning. Juror Number 32. Timothy Jenkins.

PROSPECTIVE JUROR JENKINS: Yes, ma'am. Present.

THE CLERK: Good morning. Juror Number 33. Laura

Kadlewicz.

PROSPECTIVE JUROR KADLEWICZ: Present.

THE CLERK: Juror Number 34. Was I close? Debra Kilpatrick.

PROSPECTIVE JUROR KILPATRICK: Present.

THE CLERK: Good morning. Juror Number 35. Michael Laird.

PROSPECTIVE JUROR LAIRD: Present.

THE CLERK: Good morning. Juror Number 36. Cindy Lavengood.

PROSPECTIVE JUROR LAVENGOOD: Present.

THE CLERK: Good morning. Juror Number 37. Carlos Lewis.

PROSPECTIVE JUROR LEWIS: Present.

THE CLERK: Thank you. Number 38. Tina Lingwai.

PROSPECTIVE JUROR LINGWAI: Present.

THE CLERK: Good morning. Juror Number 39. Stanley Mack.

PROSPECTIVE JUROR MACK: Present.

THE CLERK: Thank you. Juror Number 40. Derek Martin.

PROSPECTIVE JUROR MARTIN: Present.

THE CLERK: Good morning. Juror Number 41. Rebecca Martin.

PROSPECTIVE JUROR MARTIN: Present.

THE CLERK: Good morning. Juror Number 42. Dennis

McAlister.

PROSPECTIVE JUROR McALISTER: Present.

THE CLERK: Good morning. Juror Number 43. Roderick McBride.

PROSPECTIVE JUROR McBRIDE: Present.

THE CLERK: Good morning. Juror Number 44. Melissa McCook.

PROSPECTIVE JUROR McCOOK: Present.

THE CLERK: Good morning. Juror Number 45. Christopher McElveen.

PROSPECTIVE JUROR McELVEEN: Present.

THE CLERK: Thank you. Juror Number 46. James Menger.

PROSPECTIVE JUROR MENGER: Present.

THE CLERK: Thank you. Good morning. Juror Number 47. Talina Mobley.

PROSPECTIVE JUROR MOBLEY: Present.

THE CLERK: Thank you. Juror Number 48. Howard Modrell.

PROSPECTIVE JUROR MODRELL: Good morning.

THE CLERK: Juror Number 49. Debra Newbern.

PROSPECTIVE JUROR NEWBERN: Present.

THE CLERK: Good morning. Juror Number 50. Whitney Newton.

PROSPECTIVE JUROR NEWTON: Present.

THE CLERK: Good morning. Juror Number 51. Paul

Oatman. Paul Oatman. Paul Oatman, Juror Number 52, is not present.

Motunrayo Olaiya.

PROSPECTIVE JUROR OLAIYA: Present.

THE CLERK: How do you pronounce your last name?

PROSPECTIVE JUROR OLAIYA: Olaiya.

THE CLERK: Olaiya. Okay. Juror Number 53. Good morning.

PROSPECTIVE JUROR OLAIYA: Good morning.

THE CLERK: Lorna Patrick.

PROSPECTIVE JUROR PATRICK: Present.

THE CLERK: Thank you. Juror Number 54. Mildred Rhymes.

PROSPECTIVE JUROR RHYMES: Present.

THE CLERK: Good morning. Juror Number 55. Michelle Rooney.

PROSPECTIVE JUROR ROONEY: Present.

THE CLERK: Good morning. Juror Number 56. Warren Shubert.

PROSPECTIVE JUROR SHUBERT: Present.

THE CLERK: Good morning. Juror Number 57. Brittany Sloan.

PROSPECTIVE JUROR SLOAN: Present.

THE CLERK: Good morning. Juror Number 58. Michael Smith.

PROSPECTIVE JUROR SMITH: Present.

THE CLERK: Thank you. Juror Number 59. Mitchell Spell.

PROSPECTIVE JUROR SPELL: Present.

THE CLERK: Thank you. Juror Number 60. Charlotte Thompson.

PROSPECTIVE JUROR THOMPSON: Present.

THE CLERK: Thank you. Juror Number 61. Gabrielle Vincenzetti.

PROSPECTIVE JUROR VINCENZETTI: Present.

THE CLERK: Good morning. Juror Number 62. Scott Wilkerson.

PROSPECTIVE JUROR WILKERSON: Present.

THE CLERK: Thank you. Juror Number 63. Clint Williford.

PROSPECTIVE JUROR WILLIFORD: Present.

THE CLERK: Good morning. Juror Number 64. Angela Willingham. Angela Willingham, Juror Number 65, is not present.

Billy Wilson.

PROSPECTIVE JUROR WILSON: Present.

THE CLERK: Good morning. Juror Number 66. Ricky Wyche.

PROSPECTIVE JUROR WYCHE: Present.

THE CLERK: Good morning. Juror Number 67. Sherid Wynn.

PROSPECTIVE JUROR WYNN: Present.

THE CLERK: Good morning, Juror Number 68. Is it Sharee?

PROSPECTIVE JUROR WYNN: Sherri.

THE CLERK: Sherri. Sorry. All right. Is there anyone present whose name I did not call? Anyone at all? No response. Great.

Okay. If everybody will please stand for me, we're going to swear you in, give you the oath.

(Prospective Jurors Sworn)

PROSPECTIVE JURORS: I do.

THE CLERK: Thank you. You may be seated. Is there anyone present this morning who did not answer "I do" to the oath? No. Great. No responses to that question.

I'm going to go through and start asking a series of questions. Please just remember, whenever you have a response, what we're going to do is we're going to have the officers -- are we going to do a microphone? We usually have people just come up to the lectern, but we're going to have a microphone passed around, so just through that process, if you have an affirmative response, a response to any question, just raise your hand and wait for the officers to come around and give you a microphone. And, again, once you have the microphone, please state your name first and that juror number that I just gave you. Okay?

Are each of you citizens of the United States?

PROSPECTIVE JURORS: Yes.

THE CLERK: If the answer is no, please raise your hand. (No response.) Are each of you at least 18 years of age or older?

PROSPECTIVE JURORS: Yes.

THE CLERK: If the answer is no, please raise your hand. (No response.) It sounds like everyone is 18 years old.

Have each of you resided for a period of at least one year within the following counties which comprise the Augusta Division of the Southern District of Georgia? And those counties are Burke, Columbia, Glascock, Jefferson, Lincoln, McDuffie, Richmond, Taliafarro, Warren and Wilkes. If the answer is no, please raise your hand. I have no responses to that question. And I apologize on the record for mispronouncing that county, everyone.

Do any of you presently have any charge pending against you or have you ever been convicted in any state or federal court of a crime punishable by imprisonment for more than one year? If the answer is yes, please raise your hand. I do not see any hands responding to that question.

Are each of you able to read, write and understand the English language? If the answer is no, please raise your hand. I have no responses to that question.

Are any of you incapable by reason of physical or mental

infirmity to render satisfactory jury service at this time? If the answer is yes, please raise your hand. I have no responses to that question.

Are any of you members in the active service with the Armed Forces of the United States? If the answer is yes, please raise your hand.

PROSPECTIVE JUROR FOUNTAIN: Cynthia Fountain, Juror 24. I'm in the U. S. Army Reserves.

THE CLERK: And you're active in the U. S. Army Reserves?

PROSPECTIVE JUROR FOUNTAIN: I am.

THE CLERK: Okay. Thank you. Anyone else?

PROSPECTIVE JUROR WILSON: Billy Wilson, Juror 66. I'm in the Army Reserves.

THE CLERK: Active in the U. S. Army Reserves. Juror Number 66. And that was Billy Wilson. Anyone else? Okay.

Are any of you members of the fire or police departments of any state, district, territory or possession or subdivision thereof? You're holding a paid position, not voluntary. If you answer yes to that question, please raise your hand. I have no responses to that question.

Are any of you elected or appointed public officers in the executive, legislative or judicial branches of the government of the United States or any state, district, territory or position or subdivision thereof who are actively

engaged in the performance or official duties of that job? If the answer is yes, please raise your hand. I have no responses to that question.

Are any of you members of a volunteer safety group who serve without compensation as firefighters or members of a rescue squad or ambulance crew for a public agency? If the answer is yes, please raise your hand. I have no responses to that question.

Is there anyone here who has an excuse as to why they cannot serve during this term of court? If the answer is yes, please raise your hand.

THE CSO: Have a response here.

THE CLERK: We'll start from this side of the room and we'll make our way around, please.

PROSPECTIVE JUROR CLAYBORNE: Ken Clayborne, Juror 15. I know you talked about the mental infirmities. I feel I'm okay, but I've been dealing with my own personal issues with my family; and right now I'm just trying to self-medicate myself, but also I'm seeking help at a therapist and a doctor to try to alleviate this. Doesn't mean I don't want to serve. It's just that right now just might not be the greatest time for me at this point.

THE CLERK: You feel at this time you would like to be excused from service, at this time?

PROSPECTIVE JUROR CLAYBORNE: Yeah, it's just -- I go

back and forth. My anxiety has been a problem. And it's just gotten worse. It's been a buildup since I moved down here.

THE CLERK: Okay.

PROSPECTIVE JUROR CLAYBORNE: So it's been -- it's been tough. It's been really tough.

THE CLERK: Okay. I appreciate that. Thank you. Anyone else on this side of the room? No?

Okay. We'll start --

PROSPECTIVE JUROR BEAM: Jared Beam, Juror Number 5. I have a divorce proceeding on the 17th. I didn't know if that would prohibit me from serving.

THE CLERK: Okay. So you have an appearance in another court?

PROSPECTIVE JUROR BEAM: Yes, ma'am.

THE CLERK: On the 17th?

PROSPECTIVE JUROR BEAM: Yes, ma'am.

THE CLERK: Okay. We'll make note of that. Thank you.

PROSPECTIVE JUROR MOBLEY: Talina Mobley, Juror 48. I'm a stay-at-home mom, and I homeschool my oldest.

THE CLERK: Okay.

PROSPECTIVE JUROR MARTIN: Rebecca Martin, Juror 42. I do homeschool my three children, my oldest which has autism, ADHD and ODD.

THE CLERK: Thank you.

PROSPECTIVE JUROR COOK: My name is Sheila Cook. I'm

Juror 16. Let me start off by saying I have no problem with serving. I have served in the past. Right now I've got a brother in the hospital, been there since September 15th, and basically he's fighting for his life. And I'm also a caretaker for an 86-year-old lady. So my main concern is my brother right now.

THE CLERK: I understand. I'm sorry to hear that. You'd like to be excused for this service?

PROSPECTIVE JUROR COOK: I would.

THE CLERK: Okay. Anyone else? (No response.)

Okay. Based on those answers that you've all given, you're generally qualified as jurors. So in a few moments -- we're going to take a little bit of a break. In a few moments the judge is going to come out. He'll address any of those responses or requests to be excused, and he'll also have additional questions for everyone. So if you all will just sit tight for just a minute and we'll be right back with you all.

(Proceedings stood in recess from 9:55 a.m. until 10:11 a.m.)

(Call to Order)

THE COURT: Good morning, everyone.

Ms. Hammock, please call our case.

THE CLERK: Yes, sir. Case Number 1:18-CR-45, *United States of America vs. Timothy Jermaine Pate*. We have Christopher Howard and Joseph McCool for the government, Justin Maines for the defendant.

MR. HOWARD: Government's ready to proceed, Your Honor.

MR. MAINES: Defense is ready.

THE COURT: Thank you, Counsel.

Ladies and Gentlemen, as residents of the Augusta Division of the United States District Court for the Southern District of Georgia, you've been selected at random -- and we promise it is at random -- to serve as jurors this week. I want to thank you on behalf of the Court for your willingness to serve and for your attendance here this morning. I know that you all have busy lives, and it is important and it is appreciated that you've put those lives aside to be with us this morning.

The clerk advises me that each of you has the requisite qualifications to serve as a juror in this court. Let me assure you at the outset that this call upon your time is part of your obligation of citizenship in our great country. The law provides that no one may avoid fulfilling this obligation except under the most pressing of circumstances.

Service on the jury affords you the opportunity to be a direct participant in the judicial process, the process by which the liberties and legal affairs of your fellow men and women are determined and protected under our constitutional form of government.

We hear both civil and criminal cases in this court. You are being asked this morning to perform one of the highest

duties of citizenship, and that is to sit in judgment of facts which will resolve a criminal case.

Let me assure you that short of serving your country as a member of the Armed Services, there is truly no more direct and consequential way for you to serve this great country than to serve as a juror. Our system of governance would literally grind to a halt and devolve into chaos if it weren't for men and women like you who were willing to answer this most honorable call for service.

Let me also assure you that the demand on your time will not be unreasonably or unduly prolonged. I will make every effort to be certain that your time is not wasted and that you are treated with the courtesy and the dignity that should be afforded to individuals performing such an important duty as you are performing today.

Counsel for the government and for the defense have informed the Court that they expect this trial to last about four days. Sometimes that estimate is a little bit too short or sometimes it's a little bit too long, but that's the estimate at this point, that it's going to be about four days.

I realize that service on a jury panel is not convenient. I also realize there's instances where service would be much more convenient at another time, but a mere inconvenience that will not constitute a great hardship to an individual or individual's family is not an excuse for not

serving on a jury. It is only under the hardship provision that the Court can excuse a juror for good cause.

Madam Clerk, are there any prospective members that have circumstances that they have identified that may amount to such a hardship? In other words, I understand that they may not necessarily be seeking to be excused from serving in this case, but they have circumstances that they want to bring to the Court's attention. Is there anyone that we need to hear from at this time?

THE CLERK: Yes, sir. We have a few.

THE COURT: Okay.

THE CLERK: If you will, as I call your name, just please stand, and we'll have a microphone brought to you. Number 24, Cynthia Fountain.

THE COURT: Ms. Fountain, if you'll please stand. Let's just do them one at a time as you call them out, Ms. Hammock.

Ms. Fountain -- Ms. Hammock, is there anything you need me to know?

Ms. Fountain, do you have a reason that it would be an undue hardship for you to be able to serve on our jury?

PROSPECTIVE JUROR FOUNTAIN: No, sir.

THE COURT: Thank you, ma'am. I appreciate it.

THE CLERK: Number 66, Billy Wilson.

THE COURT: We've got a packed courtroom today, so we'll stay in the ring. Thank you, Mr. Wilson. Do you have a reason

that you will not be able to serve on the jury?

PROSPECTIVE JUROR WILSON: No, sir.

THE COURT: Thank you, Mr. Wilson.

THE CLERK: Number 15, Kenneth Clayborne.

THE COURT: Good morning, Mr. Clayborne. Do you have an issue that you would not be able to serve on our jury?

PROSPECTIVE JUROR CLAYBORNE: Based on what you said, no, at this time.

THE COURT: Okay. Thank you, Mr. Clayborne.

THE CLERK: Juror Number 5, Jared Beam.

THE COURT: Mr. Beam, do you have an issue that needs to be brought to the Court's attention?

PROSPECTIVE JUROR BEAM: Yes, sir. I have a divorce proceeding in Richmond County day after tomorrow.

THE COURT: Well, I imagine we will be in court day after tomorrow, and I wouldn't want that judge upset with me that I ruined his calendar or her calendar by having you here on this jury. So we'll put your name back into the jury pool, and rest assured, I'm sure we'll see you again soon.

PROSPECTIVE JUROR BEAM: Yes, sir.

THE COURT: But you're excused. You have no further obligation this week to the Court.

PROSPECTIVE JUROR BEAM: Thank you.

THE COURT: Thank you, Mr. Beam.

THE CLERK: Juror Number 48, Talina Mobley.

THE COURT: Ms. Mobley, is there an issue that needs to be brought to the Court's attention?

PROSPECTIVE JUROR MOBLEY: Yes, sir. I am a homeschool mom of three children. Well, my youngest is nine months, so he doesn't count.

THE COURT: Understood. Well, I appreciate the difficulties of motherhood, and I understand what you're doing to educate your children there, but that won't rise to the level of an undue hardship where you won't be able to serve on the jury, so, ma'am, I'm going to ask you to stay with us. Thank you.

THE CLERK: Juror Number 42, Rebecca Martin.

THE COURT: Yes, ma'am, Ms. Martin.

PROSPECTIVE JUROR MARTIN: Yes. I also homeschool, but it's because my child has autism. I homeschool all three, and my oldest has autism, ADHD and ODD.

THE COURT: And the special needs child you have, that is somewhat of a -- more of an extenuating circumstance than we typically have with someone who has a homeschooled child. Is that a child that would be difficult for you to be able to find alternative care for that child?

PROSPECTIVE JUROR MARTIN: Yes, sir, because I have no family here, so my husband has to take time off work, and he has a work trip next week. So I have no one -- if it goes into next week, I have no one to watch the children.

THE COURT: Okay. Well, we don't anticipate it going into next week, but that's a possibility, so perhaps it would be better for you to serve a time period where it's a shorter trial and your husband would be able to take that task. Is that right?

PROSPECTIVE JUROR MARTIN: Yes, sir.

THE COURT: You may welcome him taking that task for a couple days, I would imagine. Sounds like you have a lot on your hands.

PROSPECTIVE JUROR MARTIN: Yes, sir.

THE COURT: Well, ma'am, I'll excuse you at this time. Thank you. You have no further obligation for this week.

PROSPECTIVE JUROR MARTIN: Thank you.

THE COURT: Ms. Hammock.

THE CLERK: Juror Number 16, Sheila Cook.

PROSPECTIVE JUROR COOK: Good morning, Judge.

THE COURT: Good morning, Ms. Cook.

PROSPECTIVE JUROR COOK: I don't know if this falls under hardship or not. I got a brother in the hospital, been there since September 15th, and he's fighting for his life. He's out there at Augusta University in a trauma unit. And it's a thing that we go day by day. He's had five surgeries. He's got an open wound in his belly, and he's got fissures. He's got infection and inflammatory. He's got blood in his bloodstream. So I want to be able to focus. I have served. I have no

problem serving. It's just like it was a bad time. So that's where I'm at.

THE COURT: And the issues that your brother has gone through, I can tell that has had an emotional toll on you. Is that right?

PROSPECTIVE JUROR COOK: It has. He's all I got left.

THE COURT: Yes, ma'am. And if you were to have to sit in a case like this, regardless of what the case is, it would be difficult for you to focus; is that right?

PROSPECTIVE JUROR COOK: I feel most definitely right now it would be.

THE COURT: All right, ma'am. I'm going to excuse you from service on the jury. I'm sure we'll be calling you at another time, and I hope at that time that the issues that your brother -- medical issues your brother has will be resolved and that everybody in your family will be back in good health. Okay? Thank you, ma'am.

PROSPECTIVE JUROR COOK: Thank you so much.

THE COURT: You're excused. Thank you.

Ms. Hammock, anybody else?

THE CLERK: That's all, sir.

THE COURT: Are there any members of the jury panel that perhaps didn't identify an issue to the clerk earlier, but now you think of an issue that would -- that you know of right now that would prevent you from being able to serve in this case?

Feel free to speak. I see a hand in the back.

Ma'am, if you'll do this for me before you speak in that microphone -- well, go ahead and stand up and get the microphone. The first thing to tell me is your name and your juror number, please.

PROSPECTIVE JUROR VINCENZETTI: Gabrielle Vincenzetti, Juror Number 62.

THE COURT: Yes, ma'am.

PROSPECTIVE JUROR VINCENZETTI: I'm not sure if this case will go into the weekend, but I am maid of honor in a wedding on Saturday.

THE COURT: We wouldn't keep you from that. I don't want a judge mad at me, and I don't want a bride mad at me either. So we won't have court on the weekend.

PROSPECTIVE JUROR VINCENZETTI: Okay.

THE COURT: Thank you for letting us know that. Anybody else? Yes, sir.

PROSPECTIVE JUROR MACK: Again, I'm not sure if this is a situation --

THE COURT: What's your juror number and name, please?

PROSPECTIVE JUROR MACK: I'm sorry. Stanley Mack, Juror Number 40.

THE COURT: Okay.

PROSPECTIVE JUROR MACK: I own a local personal care home, which I'm short-staffed right now, which we could probably

make that work, but I have a 22-year-old autistic son at home. And I try to keep myself kind of freed up for him when he has those moments of anxiety where he's afraid and everything like that.

THE COURT: Do you think, given the high obligation of jury service, sir, that you'd be able to find someone else to take care of those issues if it did arise while you're serving on a jury?

PROSPECTIVE JUROR MACK: The only thing bad is I can't know when it will happen, but I will surely try. I have no problem with that. Like I say, I have no problem serving. I just wanted to let the Court know that that is a possibility.

THE COURT: Well, thank you, sir, for letting us know that. It sounds like we can keep you here, but as the questions progress, if there's anything else you want to let me know, you let me know. Okay?

PROSPECTIVE JUROR MACK: Sure will. Okay.

THE COURT: Thank you. Yes, sir.

PROSPECTIVE JUROR MENGER: James Menger, Juror 47. Really just a question really of information. I have a funeral on Wednesday evening, a Memorial service, at 6 p.m. for a matriarch in my parish. I'm the priest in charge of Saint Mary the Virgin on 12th Street. And would court usually be out by 6:00?

THE COURT: We ordinarily would be, and certainly if a

juror has an obligation like that, we'll make certain that we are out by then.

PROSPECTIVE JUROR MENGER: Then I'm fine. Thank you.

THE COURT: Thank you, sir. All right. Anyone else at this time? (No response.)

Okay. Let me start off by introducing you to the Court's personnel with whom you're working and their respective duties. First, seated to your left, to my right in front of me, is Ms. Pam Hammock. Ms. Hammock is our courtroom deputy clerk for this court. During this trial Ms. Hammock will be in charge of all operational matters. You'll see -- for example, if you are a jury member, you'll see her swear witnesses in, things like that. She helps the attorneys handle the exhibits.

Seated to her left directly in front of me is Ms. Elizabeth Slater. Ms. Slater is the Court's director of operations, and she'll be assisting Ms. Hammock during the jury selection process.

Seated to Ms. Slater's left and to my left, to your right, is our courtroom deputy -- excuse me, our court reporter, Ms. Kelly Dorsey. Ms. Dorsey is the official court reporter for this trial. She'll transcribe everything that occurs during this trial. She's transcribing everything that I say right now, and she'll transcribe the questions that I propound to you and your answers and all matters of record in this case.

To my right is Mrs. Megan Manly. Ms. Manly is my law

clerk. She makes me seem a lot smarter than I am. You will see her coming and going and assisting the Court with legal matters during the trial of this case.

You'll also notice a number of court security officers and marshals present in the courtroom. These marshals and security officers are always present in every case, no matter what kind of case we hear, whether it's a civil case or a criminal case. They enforce the Court's orders. They are in charge of the jury. During your jury service, if you desire to inquire about any matters touching upon your personal welfare apart from any issues that are a part of this case, make those inquiries known to the security officers, and they'll call them to my attention and I'll hear from you if necessary. Okay?

Although each of you are qualified to serve as jurors in this court, shortly I'm going to ask you questions to determine your qualifications to serve as jurors in this particular case. This part of the case is known as the voir dire or voir dire examination. These are old French words that literally mean to speak the truth. And that's all that we ask of you as prospective jurors during this process is to speak the truth to the questions that I propound to you during this process.

Under your oath as a prospective juror, you've agreed to truthfully answer those questions concerning your qualifications. Please understand at the outset these questions are not for the purpose of prying into your personal affairs or

for getting information about you that we don't need. They're only intended to assist the Court and the lawyers in this case in selecting a fair and impartial jury. That is the goal of this whole process.

The voir dire examination is a means of determining if your decision in a case would be in any way influenced by any opinions which you now hold or by some personal experience that you've had in the past, or by any personal knowledge that you have of the lawyers, the parties, the witnesses or any of the issues that are involved in this case.

Again, the object is to get a jury that will impartially try the issues of this case based upon the evidence presented in the courtroom and only that evidence without being influenced by any other factors.

In a few moments -- this is how we're going to proceed. In a few moments I'm going to ask one or two questions of all of you. And if there are any affirmative answers to that question, then we'll take that up. Then the clerk is going to randomly select some of you to form a panel from which the jury will be selected. Again, I promise it is random. So some of you, a number of you will be selected to form a panel.

After a brief voir dire examination during which I'll ask questions of just the panel members, then the jury will be selected from that panel.

As I ask questions from members of the entire panel,

there may be a reason that we need to excuse a member of the panel for cause and replace that person with someone who wasn't selected from the panel, as I'll explain in more detail in a moment. But once we have a panel member that there are no excuses for cause on, each side, the government and the defense, will be permitted to exercise a set of what we call peremptory challenges to potential jurors.

Peremptory challenges allow the lawyers to ask that a certain number of those in the panel be challenged or excused without giving any real reason therefor. Now, if you're challenged throughout this process or if you're excused by either side or by the Court, please do not be offended. Do not feel that your honesty or your integrity is being questioned. I can assure you that it is not.

I can tell you this is not exactly a scientific process that we are endeavoring to engage in. We're just trying to find a fair and impartial jury. I often tell folks that if you were selecting a set of referees to officiate a Georgia Bulldog football game, if you were for the University of Florida, you would not want me on that panel, okay, because as much as I may try, it would be hard for me to say that anybody from the University of Georgia was offsides on a particular play. All right?

Same here. We're just trying to see whether there's any bias, whether there's any prejudice, that type of thing, but

also just trying to see how we can get the most fair and impartial jury from the panel that we can.

So to begin the voir dire process, what I'm going to do now is I'm going to summarize pertinent portions of the superseding indictment in this case. The indictment is simply a document that sets forth the charges against the defendant. The indictment is not to be considered by you as evidence at all. It's merely an accusation against a defendant. You must not consider it as evidence of a defendant's guilt. You should not be influenced in any way by the fact that an indictment has been filed against Mr. Pate, the defendant.

So I'm going to summarize for you the indictment now. Counts 1 and 2 of the indictment charge filing false retaliatory lien against a federal official in violation of 18 United States Code Section 1521. In those two counts the grand jury charges that on or about March the 6th, 2018, in Richmond County, the defendant filed a public record with the United States District Court for the Southern District of Georgia, two documents entitled Notice of Claim of Maritime Lien. The grand jury alleges that those are false liens and encumbrances against the real and personal property of officers and employees of the United States. The grand jury goes on to allege that in filing those, the defendant knew or had reason to know that such liens and encumbrances were false and contained false information. Specifically, those liens allegedly included a statement that

the individuals whose abbreviations are listed below owed a debt to the defendant in the following amount:

As to Count 1, the grand jury alleged that the false lien was filed against a government employee or official whose initials are J.A.K., and the lien amount was 33 million dollars.

As to Count 2, the grand jury alleged that the false lien was filed against a government employee or official whose initials are B.K.E. and that the lien amount was 15 million dollars.

Counts 3 through 5, in those counts the grand jury again alleges that the defendant committed the offense of filing a false retaliatory lien against a federal official in violation of 18 United States Code Section 1521.

There the relevant date or the alleged date is May the 1st, 2018, again, in Richmond County, within the Southern District of Georgia. And in those counts the grand jury alleges that the defendant filed in a public record documents entitled notice of claim of maritime lien, and the grand jury claims that those are false liens and encumbrances against the real and personal property of officers and employees of the United States.

The alleged government officials and lien amounts in those counts, Counts 3 through 5, are as follows:

Count 3, the government employee or official's initials is D.D.D., and the lien amount is 15 million dollars. Count 4,

the official's initials are E.M.T., and the lien amount was 15 million dollars. 5, the official's initials are J.J.L., and the lien amount is 15 million dollars.

Counts 6 through 10 also allege filing false retaliatory lien against a federal official in violation of that same Code Section 1521. The date alleged in that count is May 7th, 2018, and, again, the place alleged is Richmond County, within the Southern District of Georgia. There the grand jury alleged the filing of false -- with the Richmond County Clerk of Superior Court three Form UCC-1 Financing Statements, and the grand jury alleged that those were false liens.

The government official initials in Count 6 are J.A.K., and the lien amount is 33 million dollars. Count 7, the government official's initials are B.K.E., and the lien amount is 15 million dollars. Count 8, the government official's initials are J.J.L., and the lien amount is 15 million dollars. Count 1, the government -- excuse me. Count 9, the government employee's initials is E.M.T., and the lien amount is 15 million dollars. Count 10, the government employee's initials are D.D.D., and the lien amount is 15 million dollars.

Now, Counts 11 through 15 allege false bankruptcy declaration in violation of 18 United States Code Section 152(3). There the -- in those counts the grand jury alleges that on or about May 21st, 2018, in Richmond County, within the Southern District of Georgia, that the defendant knowingly and

fraudulently made a material false declaration, certificate, verification statement under penalty of perjury in and in relation to a case under Title 11; specifically, *In Re: Timothy Jermaine Pate*, by submitting an involuntary petition, falsely and fraudulently named the individuals listed below by their initials as debtors, and that the defendant as a creditor, in which the petition the defendant claimed the individuals listed below owed him the amounts listed and that such debt was not the subject of a bona fide dispute or liability; and the grand jury alleges that at that time the defendant knew the claimed debt was neither owed to him nor undisputed as to each count.

Now, Count 11, the named debtor is J.A.K., and the amount claimed is 33 million dollars. Count 12, the named debtor is J.J.L., and the amount claimed is 15 million dollars. Count 13, the named debtor is B.K.E., and the claimed amount is 15 million dollars. Count 14, the named debtor is D.D.D., and the claimed amount is 15 million dollars. And Count 15, the named debtor is E.M.T., and the claimed amount is 15 million dollars.

Now, in Counts 16 through 18, the grand jury alleges false -- filing false retaliatory lien against a federal official; and, again, that's that statute 18 United States Code Section 1521 that the grand jury invoked as to these counts. The grand jury claims that these were filed, these false liens were allegedly filed on June the 15th, 2018, in Richmond County,

within the Southern District of Georgia.

The grand jury claims that the defendant filed in the public record with the United States District Court for the Southern District of Georgia three documents entitled notice of claim of maritime lien, and they claim that those filings were false.

Count 16, the grand jury alleges that the government official is L.B.R., and the lien amount is 15 million dollars. Count 17, the grand jury alleges that the government official's initials are B.K.E., and the lien amount is 100 million dollars. Count 18, the government employee or official's initials is S.D.B., and the lien amount is 33 million dollars.

Now, Counts 19 through 21 are, again, filing false retaliatory lien against federal officials, in violation of Section 1521. The grand jury claims that the defendant filed false retaliatory liens on or about June 18th, 2018, in Richmond County, within the Southern District of Georgia, by filing with the Richmond County Clerk of Superior Court two Form UCC-1 Financing Statements. And, again, the grand jury claims that those are false liens or encumbrances against the real property and person of officers and employees of the United States Government.

Count 19, the government employee or official is S.D.B., and the lien amount is 33 million dollars. Count 20, the government official or employee is L.B.R., and the lien amount

is 15 million dollars. Count 21, the government employee or official is B.K.E., and the lien amount is 100 million dollars.

So, again, that's a summary of the indictment, but, again, that's just what the grand jury alleges in the case, and you shouldn't take anything from the fact that an indictment has been filed in the case as evidence of guilt one way or the other in this case. Okay? But I just wanted to give you a summary of the indictment so that you can respond to me about whether you know anything about this case.

Having read that lengthy summary and it being really hot in here, what we're going to do is we're going to stand up for about 15 seconds so all of us can stretch our legs for a second, and then we'll get into the part of the process that we're asking the questions.

All right. Ladies and Gentlemen, you've now heard the very basic subject matter of this case. As I said, I'm going to ask a couple of questions of all of you, and then we're going to select our panel after we deal with any affirmative responses.

Having heard the very basic subject matter of this case, do any of you prospective jurors know anything about this case either through your own personal knowledge or by discussion of the case with anyone or by reading or hearing anything about the case through any form of media or otherwise? If you know anything about this case or if your answer to that question is in the affirmative, please raise your hand.

Okay. The record will reflect none of the defendants (sic) have answered in response to that question.

Do any of you prospective jurors have any special disability or condition, hearing, sight or otherwise, which would render you incapable of performing your duty as a juror in the case? If so, please raise your hand.

We have one juror in the back row who's raised her hand. What is your name and your juror number, please?

PROSPECTIVE JUROR GRIM: Olivia Grim, Number 28. I have ADHD that has persisted into adulthood as well as early onset tinnitus. It makes it difficult to focus for longer periods of time.

THE COURT: The difficulty that you have in focusing for a long period of time, I appreciate you bringing that to our attention. Are you able to, through medication or otherwise, able to get over that and be able to pay attention or is it something that you feel like would be truly an obstruction in the case?

PROSPECTIVE JUROR GRIM: I do have medication that I am currently not taking due to the side effects --

THE COURT: Understood.

PROSPECTIVE JUROR GRIM: -- of the medication, but I could for the short period of time.

THE COURT: But this trial -- you know, we'll -- as I said, I'll make all efforts to make -- to not waste anyone's

time, but you will have to sit as a juror from approximately 9:00 in the morning till 5:00 in the evening, with breaks, certainly a break in the morning, a break for lunch and a break in the afternoon. Would you be able to do that?

PROSPECTIVE JUROR GRIM: I believe I would be able to try my best.

THE COURT: And I know that you'll try your best, but I just want -- and feel free to be honest --

PROSPECTIVE JUROR GRIM: Yes, sir. I apologize.

THE COURT: That's okay.

PROSPECTIVE JUROR GRIM: Yes, I'm going to say.

THE COURT: You're certain there?

PROSPECTIVE JUROR GRIM: Yes, sir.

THE COURT: Okay. Thank you for your candor with us. We certainly appreciate it.

Yes, sir.

PROSPECTIVE JUROR CLAYBORNE: Ken Clayborne, Juror 15. Yeah, basically what I've been going through is severe, severe anxiety, and it's hard for me to focus at times. It was unbearable to come down here today. And I want to serve, and I've served before in Illinois. But with the combination of things that have been going on in my life and my father and his health, it's just -- it's kind of exacerbated itself over a period of time.

So my ability to focus is just -- it's one minute it's

fine and the next minute, you know, it's not there. It was hard for me to even -- even when you gave your summary it was hard for me to even follow it, just because I just wasn't -- so my thing was, with medication, which I've been seeing a therapist and a doctor, I've been trying to tweak that so, you know, I can stabilize myself.

THE COURT: So, Mr. Clayborne, it sounds like this week wouldn't be a good week for you because you're in the midst of trying to figure some things out. But later on might be a better time for you; is that right?

PROSPECTIVE JUROR CLAYBORNE: Oh, absolutely. Absolutely.

THE COURT: So we'll put you in the jury pool and call you for another week, but it sounds like if you weren't able to focus -- and I appreciate you being honest with me. If you were unable to focus during that summary, then it would be hard to focus on testimony; is that right?

PROSPECTIVE JUROR CLAYBORNE: Yeah, yeah.

THE COURT: All right. You're excused. Thank you, sir. Anyone else? (No response.)

Okay. At this point in time the clerk is going to randomly select the requisite number of you to form a panel from which we will select the jury. We have a tight courtroom, and I understand it's warm in here as well, but in order to shift everyone around and get the panel members seated correctly, the

court security officer and the clerk will direct you on where you need to be seated. But when your name is called, if you'll come forward and follow their directions.

Ms. Hammock. All right. Ms. Hammock, go ahead.

THE CLERK: Yes, sir. Juror Number 38, Carlos Lewis.

THE CSO: Mr. Lewis.

THE CLERK: Juror Number 49, Howard Modrell. Juror Number 29, Trinetta Harden. Juror Number 63, Scott Wilkerson. Juror Number 33, Timothy Jenkins. Juror Number 68, Sherid Wynn. Juror Number 39, Tina Lingwai. Juror Number 59, Michael Smith. Juror Number 66, Billy Wilson. Juror Number 67, Ricky Wyche. Juror Number 7, Vanessa Blyden. Juror Number 55, Mildred Rhymes. Juror Number 56, Michelle Rooney. Juror Number 41, Derek Martin. Juror Number 9, Lacoria Brown. Juror Number 11, Nancy Calhoun. Juror Number 51, Whitney Newton. Juror Number 60, Mitchell Spell. Juror Number 12, McKenzie Carter. Juror Number 48, Talina Mobley. Juror Number 61, Charlotte Thompson. Juror Number 45, Melissa McCook. Juror Number 43, Dennis McAlister. Juror Number 25, Carolyn Free. Juror Number 13, Tracy Clark. Juror Number 24, Cynthia Fountain. Juror Number 34, Laura Kadlewicz. Juror Number 37, Cindy Lavengood. Juror Number 3, Andrew Anderson. Juror Number 6, Brett Beckman. Juror Number 36, Michael Laird. And Juror Number 57, Warren Shubert.

THE CSO: The remainder of you all, if you all will find

yourself a seat anywhere in the rows behind there.

THE COURT: Is there any chance that you all could squeeze in and make room for those that are standing? Thank you, Ladies and Gentlemen. You all handled that perfectly. If everybody moved with that courtesy and that efficiency on the roads, we would never have a traffic jam. Such a tight space, to be able to get a panel seated was impressive.

First, Ladies and Gentlemen, those of you who were not called to this panel, let me speak to you. You are not off the hook yet. Okay? You still need to pay close attention to these proceedings and particularly to the questions that I ask to the panel members. You do not need to answer any questions right now, but pay close attention to the questions that I ask, because if any panel member needs to be removed from the panel during this process, then we will have to substitute that panel member with one of you. We'll randomly draw from those of you who are not on the panel to take their place. And the first question I will ask you is whether you would have answered yes to any of the questions asked up to that point. So we've given each of you a notepad. So for those of you who are not members of the panel, as we go along and ask the panel members questions, if you would have answered yes to any of those questions, make a note of that on your notepad so that you can remember to let us know in case we need to place you on the panel. Okay?

Now, those of you who are panel members, in other words, those whose names Ms. Hammock just called and who are seated over here to my left and on the front row there, I'm going to have certain questions that I'm going to address to you. If you have any answers to any of my questions, as I ask the question and you feel you need to answer it, please raise your hand. I will identify you, and a security officer will bring a microphone to you.

Now, once you have the microphone, no matter how many times you would have already answered a question for us, always stand and always give us your name and your juror number first. Somebody's going to forget it, and we'll all remind you, but make certain to always give us your name and your juror number first, no matter how many times you might answer a question. The reason is that the lawyers that are sitting here selecting this case and the clerks here that are keeping track of answers, they're doing the best to keep track of all of your answers, but all they've got is a sheet of paper that's got your name and a number on it, and they need to be able to identify you properly each time that you might answer a question. Okay.

So, again, if you feel the need to answer, once I recognize you and you have the microphone, always stand and give us your name before you answer.

Also, if any question I ask you makes you particularly uncomfortable -- it's never comfortable to talk about ourselves;

right? But if any question that I ask you makes you particularly uncomfortable or for any reason you feel the need to answer a particular question outside the earshot of the entire courtroom, let me know and I'll give you the opportunity to answer the question here at the bench with me and the lawyers.

Now, Counsel, following any answers by any panel member, if you want to follow up with that panel member on that answer briefly, just let me know. Also, Counsel, if you need to discuss any panel member or any answer, including any motion to remove a panel member with the Court, you should let me know following the answer and before we ask another question so that we can do it at that time. Okay?

All right. Members of the panel, the United States is being represented in this case by Assistant United States Attorneys Christopher Howard and Joseph McCool.

Mr. Howard and Mr. McCool, if you'll please stand.

Are any of you related by blood or marriage to Mr. Howard or Mr. McCool? Anyone? All right. There's no answers to that question.

Do any of you know either of them? Any prospective jury members know either Mr. Howard or Mr. McCool?

All right. The United States Attorney in this district is Mr. Bobby Christine. Do any of you closely know Mr. Christine? I'm not just asking if you know of him. But do

any of you closely know Mr. Christine or are any of you related to him by blood or marriage? If so, please raise your hand.

Mr. Howard, if you would, please read the names of the Assistant United States Attorneys in the Southern District of Georgia.

And, panel members, listen carefully to those names because you might imagine what I'm going to ask you at the end is do you closely know any of them or are you related to any of them by blood or marriage. Okay? Mr. Howard, would you read the names, please.

MR. HOWARD: Joshua Bearden; John Thomas Clarkson, Xavier Cunningham; Justin Davids; David Estes; E. Greg Gilluly, Jr.; Tania Groover; John Harper, III; Matthew Josephson; Jennifer Kirkland; Karl Knoche; Steven Lee; Woelke Lightheart; Marcela Mateo; Bradford Patrick; Frank Pennington; Jonathan Porter; Mary Robichuax; Patrick Schwedler; Jennifer Solari; James Stuchell; Jason Blanchard; Nancy Greenwood; Tara Lyons; Michael Marchman; Alejandro Pascual; Patricia Rhodes; Shannon Statkus and Hank Syms.

THE COURT: All right. Members of the panel, having heard those names, do any of you know any of these individuals closely or are you related to any of those individuals? We have an answer. Let me get you the microphone, sir.

PROSPECTIVE JUROR JENKINS: I can talk out loud. Timothy Jenkins, Juror 33.

THE COURT: If you wouldn't mind, Mr. Jenkins, let me get you the microphone because that way it goes into the thing where Ms. Dorsey can hear it.

PROSPECTIVE JUROR JENKINS: I got you.

THE COURT: You do have a loud voice, but we'll get you that microphone. Okay. Go ahead.

PROSPECTIVE JUROR JENKINS: Timothy Jenkins, Juror 33. Was the name Jason Beard? Or the Beard name.

THE COURT: Joshua Bearden.

PROSPECTIVE JUROR JENKINS: It was Joshua? That's not it. I thought it was Jason Beard.

THE COURT: Okay. All right. Does anyone closely know or are you related to any employee of the United States Attorney's Office that you know of?

Okay. There's an answer on the front row here. Let me get you a microphone, ma'am.

PROSPECTIVE JUROR KADLEWICZ: Laura Kadlewicz, Juror Number 34. My cousin is a clerk at the United States Attorney's Office in Massachusetts, in Springfield.

THE COURT: Would the fact that your cousin is a clerk at that U. S. Attorney's Office in Massachusetts, would that affect your ability to serve impartially in this case at all?

PROSPECTIVE JUROR KABOWICZ: No, I haven't talked to her in like 20 years.

THE COURT: Thank you, ma'am.

All right. Ladies and Gentlemen, the defendant in this case is Mr. Timothy Jermaine Pate. Are any of you related to Mr. Pate or members of his immediate family by blood or marriage or do any of you know him in any way? There's no answers to that question.

Mr. Pate is represented in this case by Mr. Justin Maines.

Mr. Maines, would you please stand. Are any of you related by blood or marriage to Mr. Maines or do you closely know him or have any relationship with him in any way?

Thank you, Mr. Maines. You may have a seat. Didn't look like there were any responses to that question.

All right. The prosecution in this case has been assisted by some law enforcement agents.

Mr. Howard, if you have a list of those agents, please read them to the jury.

MR. HOWARD: Your Honor, the agents in this case, including the individual who's seated at counsel table, is Jeffrey Hale with the IRS. An additional one is Charles Brant with the United States Marshal Service, and Wally Taylor with the Federal Bureau of Investigation, and Trip Godby, also with the Federal Bureau of Investigation.

THE COURT: Members of the panel, you can probably anticipate my question, but do any of you closely know those individuals? Are you related to them or do you have any

relationship with them in any way? Yes, ma'am.

PROSPECTIVE JUROR CARTER: My husband is best friends with --

THE COURT: If you would, hold that microphone.

PROSPECTIVE JUROR CARTER: McKenzie Carter, Juror Number 12. My husband is best friends with Trip Godby that he said. So we're really close with their family.

THE COURT: Would the fact that you're really close with their family, would that influence your ability to serve as a juror in this case?

PROSPECTIVE JUROR CARTER: Yes.

THE COURT: I'm going to excuse this juror for cause. Any objection to that by either side?

MR. HOWARD: None from the government.

MR. MAINES: No, Your Honor.

THE COURT: You're excused. Thank you. All right. Those of you who were not selected as a panel member, I told you you're going to have to pay attention because this moment may come.

Ms. Hammock, would you please randomly select someone to replace that prospective juror on the panel?

THE CLERK: Juror Number 1, John Albrecht.

THE COURT: Thank you, sir. Make sure I'm pronouncing your last name correctly. Is it Albrecht?

PROSPECTIVE JUROR ALBRECHT: Albrecht.

THE COURT: Albrecht. If you will, please stand, sir. Would you have answered in the affirmative to any of the questions that I've asked thus far?

PROSPECTIVE JUROR ALBRECHT: No. I didn't know anybody.

THE COURT: Okay. Thank you, sir. You're now a member of the panel, so if you have any response to any further questions, just raise your hand and let us know.

Mr. Howard, if you will, please read the names of those witnesses who may possibly testify in this case.

MR. HOWARD: Your Honor, the potential witnesses are Jamie Hodge, Brian Epps, Christina Toole, Charlene Burke, Susan Barrett, Lucinda Rauback, Thomas Bolus, Denise Davis, Tara Durrant, Brianna Taylor, Jeffrey Hale, John Koskinen, Lilly Ruth Temples, Wallace Taylor, Michael Smith, Jacob Lew, Eric Thorson, Charles Brant, Tim Shoemaker, Crystal Scarboro, Thomas Jones and Danny Patel.

THE COURT: All right. If any of you know any of those individuals in any capacity, prospective juror members, please raise your hand. Okay. There are no responses to that question at all.

Mr. Maines, are there any additional witnesses or individuals that we need to ask the panel about?

MR. MAINES: Your Honor, Ms. Antionette Pate.

THE COURT: Ms. Antionette Pate. Do any prospective juror members know Ms. Antionette Pate? If so, please raise

your hand. (No response.)

Thank you, Mr. Maines. You may have a seat.

As I said earlier, my name is Stan Baker, and I will, of course, be the trial judge in this case. And as I discussed earlier, I'll be assisted in this case by my courtroom deputy clerk, Ms. Pam Hammock; my court reporter, Ms. Kelly Dorsey; and my law clerk, Megan Manly; as well as my director of operations, Ms. Elizabeth Slater. Are any of you related to any of us or any members of our immediate family or do you know any of us in any way? If so, please raise your hand. Okay. I don't see any raised hands. An old judge used to say, are any of you all kin to any of us and we don't know it? We ask that in a little bit more sophisticated way. Okay?

Do any of you know or are you related to any other person on the jury panel? In other words, your prospective panel members. If so, please raise your hand. Yes, ma'am. If you would, go ahead and stand.

PROSPECTIVE JUROR RHYMES: My name is Mildred Rhymes. I'm Jury 55, and I'm Warren Shubert's cousin.

THE COURT: You're cousins with Mr. Shubert. Is that right? And is your relationship with him, your familial relationship with him, if you were on the jury together, would that affect your ability to serve impartially as a jury member?

PROSPECTIVE JUROR RHYMES: I don't think so.

THE COURT: Okay. If you all had a different opinion,

would you be willing to stand your ground in your opinion even if he disagreed with that opinion?

PROSPECTIVE JUROR RHYMES: Yes.

THE COURT: Okay. All right. We'll see if he thinks the same. If you would, please stand, sir.

PROSPECTIVE JUROR SHUBERT: Warren Shubert, Juror Number 57. Like she said, me and her cousins.

THE COURT: Okay. Would the fact that you all are cousins, would that influence your ability to serve as an impartial juror in this case?

PROSPECTIVE JUROR SHUBERT: No, it wouldn't affect it.

THE COURT: If she disagreed with you, would you give up your opinion simply because she's your cousin?

PROSPECTIVE JUROR SHUBERT: No.

THE COURT: All right. That makes for good interesting family reunions, I'm sure.

Do any of you have any bias, prejudice, anger, hostility or emotions, either for or against the defendant or the defendant's lawyer, Mr. Pate, or his attorney, Mr. Maines? There's no answers to that question.

Do any of you have any bias or prejudice either for or against the federal government? There's no answers to that question.

Do any of you have any bias or prejudice either for or against the Internal Revenue Service, the Federal Bureau of

Investigation or the United States Attorney's Office? There's no responses to that question.

Do any of the panel members, have any of you ever worked for or you now work for the United States Government? All right. We've got a number of answers to that, so what we'll do is we'll start here, kind of work our way left to right. Okay.

PROSPECTIVE JUROR WILSON: Billy Wilson, Juror 66. I'm in the United States Army Reserve.

THE COURT: And thank you for your service, sir. Is the fact that you're in the United States Army Reserve, would that influence your ability to be impartial in this case at all?

PROSPECTIVE JUROR WILSON: No, sir.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR LINGWAI: Juror Number 39, Tina Lingwai. I work for the Armed Services Blood Program at Kendrick Memorial Blood Donor Center, part of Eisenhower Army Medical Center.

THE COURT: Is your service to the government, would that influence your ability to be an impartial juror in this case?

PROSPECTIVE JUROR LINGWAI: No, it will not.

THE COURT: Thank you, ma'am.

THE CSO: Send it on down, ma'am.

THE COURT: We'll do that back row first, and then we'll come down to the second row. Yes, sir.

PROSPECTIVE JUROR MODRELL: Howard Modrell, Juror Number 49. I am a former government employee.

THE COURT: And which portion of the government did you work for?

PROSPECTIVE JUROR MODRELL: Department of Defense, in finance accounting.

THE COURT: I'm sorry?

PROSPECTIVE JUROR MODRELL: Department of Defense.

THE COURT: Okay. And your work with the Department of Defense, would that influence your ability to serve as an impartial juror in this case?

PROSPECTIVE JUROR MODRELL: No.

THE COURT: You may have a seat. Thank you, sir.

PROSPECTIVE JUROR MARTIN: Derek Martin, Juror Number 41. I served 22 years in the United States Army.

THE COURT: And thank you for your service, sir.

PROSPECTIVE JUROR MARTIN: Thank you.

THE COURT: Would your service to the government, would that influence your ability to serve fairly and impartially in this case?

PROSPECTIVE JUROR MARTIN: No, sir.

THE COURT: All right. Thank you. Yes, sir.

PROSPECTIVE JUROR SPELL: Mitchell Spell, Juror Number 60. Former employee for Georgia Department of Corrections.

THE COURT: And your service with the Georgia Department

of Corrections, would that influence your ability to serve impartially in this case?

PROSPECTIVE JUROR SPELL: No, sir.

THE COURT: All right. Thank you. If you would, pass the microphone back. I failed to follow up. What was your -- with the Department of Corrections. What was your position with the Department of Corrections?

PROSPECTIVE JUROR SPELL: Correctional officer.

THE COURT: Okay. Thank you, sir.

PROSPECTIVE JUROR ALBRECHT: John Albrecht, Juror 1. I'm a retired federal worker. When I was young, I worked for the postal service, but my career was as a psychologist with the VA and with the Department of Defense.

THE COURT: Okay. And those various positions that you've held in the government, would that affect your ability to serve impartially in this case?

PROSPECTIVE JUROR ALBRECHT: No.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR FOUNTAIN: Cynthia Fountain, Juror Number 24. I'm in the U. S. Army Reserves.

THE COURT: And thank you for your service. The fact that you're in the U. S. Army Reserves, would that -- and your employment there, would that affect your ability to serve fairly and impartially in this case?

PROSPECTIVE JUROR FOUNTAIN: No, sir.

THE COURT: Thank you, ma'am.

THE CSO: Anyone else?

PROSPECTIVE JUROR LAIRD: Michael Laird, Juror Number 36. I served in the Marine Corps.

THE COURT: And, again, thank you, sir.

PROSPECTIVE JUROR LAIRD: Thank you.

THE COURT: Your service in the Marine Corps, would that affect your ability to serve fairly and impartially as a juror in this case?

PROSPECTIVE JUROR LAIRD: No, sir.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR ANDERSON: Andrew Anderson, Juror Number 3. I retired out of the Air Force, and I am currently a Department of Defense employee.

THE COURT: And thank you, sir. Your service with the government, would that affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR ANDERSON: No, sir.

THE COURT: Thank you.

PROSPECTIVE JUROR KADLEWICZ: Laura Kadlewicz, Juror Number 34. I formerly worked for the Department of Veterans Affairs, and I served in the Army.

THE COURT: And thank you, ma'am. And your employment with the federal government, would that affect your ability to serve fairly and impartially in this case?

PROSPECTIVE JUROR KADLEWICZ: No.

THE COURT: Okay. Thank you, ma'am. Any additional answers? Okay. Any follow-up to that at all, Counsel?

MR. HOWARD: None from the government.

MR. MAINES: None from the defense.

THE COURT: All right. Thank you. Have any of you ever sued the United States Government or been sued by the United States Government? Any prospective juror members? Okay. No answers to that question.

Has any prospective juror member, any panel member had any personal dealings with the United States Attorney's Office or any federal law enforcement entity, including the Federal Bureau of Investigation? Yes, ma'am.

PROSPECTIVE JUROR LINGWAI: Juror Number 39, Tina Lingwai. I filed an Inspector General claim, whistle blower claim against the VA at -- when I worked at -- when I worked for the VA.

THE COURT: And was the United States Attorney's Office ever involved in that, do you know?

PROSPECTIVE JUROR LINGWAI: No, it was not.

THE COURT: Okay. Was the Federal Bureau of Investigations ever involved in that, do you know?

PROSPECTIVE JUROR LINGWAI: No, it was not.

THE COURT: Okay. That experience you had with that claim, would that influence your ability to serve as a fair and

impartial juror in this case?

PROSPECTIVE JUROR LINGWAI: No, it will not.

THE COURT: Okay. Thank you, ma'am. Any followup, Counsel?

MR. HOWARD: No, Your Honor.

MR. MAINES: None, Your Honor.

THE COURT: Okay. Thank you, ma'am. Any additional answers to that question? All right.

Have any of you or any of your close personal relatives had any dealings with the Internal Revenue Service that would affect your ability to be fair and open minded to testimony and witnesses from the Internal Revenue Service? I mean all of us have had interaction with the IRS by filing taxes. Have any of you had any dealings with the IRS that would affect your ability to be fair and open minded to testimony and witnesses from the IRS? There's no answers to that question.

Have any of you ever been audited by the Internal Revenue Service? All right. Front row here.

PROSPECTIVE JUROR ROONEY: Michelle Rooney, Juror Number 56. Just got audited last week because my husband made too much money in Puerto Rico last year.

THE COURT: Well, that's a good problem to have. Did you feel that you and your husband were treated fairly in that process?

PROSPECTIVE JUROR ROONEY: We were treated fairly. He

had his CPA recommend an amendment because the former CPA didn't claim something for 2017, and so we got audited.

THE COURT: Did that experience, would that affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR ROONEY: No.

THE COURT: Okay. Thank you, ma'am. Anyone else with an affirmative answer to that question?

All right. Have any of you or a family member or close personal friend ever been employed by a state or federal prosecutor, for example, the district attorney's office or the United States Attorney's Office? Yes, ma'am.

PROSPECTIVE JUROR KADLEWICZ: Laura Kadlewicz, Juror Number 34. My cousin up in Springfield, Massachusetts, is employed by the district attorney's office.

THE COURT: And I think you told me earlier that you hadn't had any --

PROSPECTIVE JUROR KADLEWICZ: We don't talk.

THE COURT: Okay. And that wouldn't have any influence on your ability in this case; is that right?

PROSPECTIVE JUROR KADLEWICZ: No.

THE COURT: Thank you, ma'am. Any further answers to that question? All right. No additional answers.

Do any of you have any bias or prejudice for or against law enforcement in general, be it federal, state or local law enforcement? I don't see any answers to that question. Okay.

Is there any member who would tend to believe the testimony of a government agent or law enforcement officer or governmental employee over a private citizen solely because of the agent, officer or employee's position with law enforcement or the government? There's no answers to that question.

Have any of you or any member of your family or close personal friend ever been employed by any law enforcement agency, federal, state or local? All right. We've got a number of answers to that question. So let's do -- again, let's start on the back row and then work to the second row.

PROSPECTIVE JUROR JENKINS: Timothy Jenkins, 33 Juror Number. Richmond County have something to do with it, law enforcement?

THE COURT: Just any local law enforcement agency, or state or federal. Have you been employed or -- you or a personal friend.

PROSPECTIVE JUROR JENKINS: I have a family member at Richmond County.

THE COURT: And who is that?

PROSPECTIVE JUROR JENKINS: Eric Jenkins.

THE COURT: Okay. And what was their position with Richmond County?

PROSPECTIVE JUROR JENKINS: He's been in since the 80s, but I think he work at the training center out there off Tobacco Road. He's been in the early 80s. That's all I can tell you.

THE COURT: Would that family member having been employed in law enforcement, would that affect your ability to serve fairly and impartially in this case?

PROSPECTIVE JUROR JENKINS: No, sir.

THE COURT: Okay. All right. Thank you, sir.

PROSPECTIVE JUROR WILKERSON: Scott Wilkerson, Juror Number 63. My stepdad is a bailiff for juvenile court for Richmond County. I worked for Columbia County Jail. And my cousin works in Savannah. I forget what police department.

THE COURT: And what is your position with the Columbia County Jail?

PROSPECTIVE JUROR WILKERSON: I was a former deputy jailer. I no longer work there.

THE COURT: Okay. So you're not currently employed in a law enforcement position?

PROSPECTIVE JUROR WILKERSON: No, sir.

THE COURT: Okay. Having been employed in law enforcement and having family that have been in law enforcement, would that affect your ability to serve fairly and impartially in this case?

PROSPECTIVE JUROR WILKERSON: No, sir.

THE COURT: Okay. Thank you, sir.

PROSPECTIVE JUROR ROONEY: Michelle Rooney, Juror Number 56. My husband used to be a police officer for Richmond County, Columbia County and prison guard for Hancock State Prison. And

I have a brother-in-law that works for Harlem -- I'm sorry. Lincolnton. He used to work for Harlem as a chief deputy, and I have an ex-brother-in-law that worked for GBI.

THE COURT: Those family members having worked in law enforcement, would that affect your ability to serve as a fair and impartial juror in this case?

PROSPECTIVE JUROR ROONEY: No.

THE COURT: Okay. Thank you, ma'am.

PROSPECTIVE JUROR MOBLEY: Talina Mobley, Juror 48. My husband's best friend is a Georgia State Patrol Officer. He served in Richmond County and Columbia County as an officer.

THE COURT: Okay. The fact that you have that close personal friend that's employed in law enforcement, would that influence your ability to be a fair and impartial juror in this case?

PROSPECTIVE JUROR MOBLEY: No, sir.

THE COURT: Thank you, ma'am. I think we have an answer on the front row, a couple answers on the front row here.

PROSPECTIVE JUROR McALISTER: Dennis McAlister, Juror Number 43. My mother worked for the Department of Natural Resources, and my uncle retired as a police officer in McDuffie County, and I can't remember the one in Atlanta.

THE COURT: Okay. That employment, would that affect your ability to be a fair and impartial juror in this case?

PROSPECTIVE JUROR McALISTER: No, sir.

THE COURT: All right. Thank you, sir.

PROSPECTIVE JUROR McCOOK: Melissa McCook, Juror 45. My mother-in-law worked in the Richmond County Jail. She's now retired.

THE COURT: Would that experience affect your ability to be a fair and impartial juror in this case?

PROSPECTIVE JUROR McCOOK: No, sir.

THE COURT: All right. Thank you, ma'am. Did we have some additional answers to that question at all? All right. I believe that's all the answers that we had to that question.

Have any of you or any close personal friend ever been employed by a clerk of court, in other words, a clerk of this court, the Southern District of Georgia, or a clerk of the superior court or state court or other clerk of court? Anyone ever been employed in those -- has anyone ever been employed by any of those entities or do you have any relatives or close personal friends that have been employed by any of those entities? Okay. No answers to that question.

Have any of you had any formal legal training, such as law school, college law courses, paralegal training or other legal training at all? No answers to that question either.

Has any -- have any of you or any member of your family or a close personal friend ever been accused of committing a felony criminal offense? Any answers to that question? There's no responses to that question.

Is any member of the panel currently serving a probated or suspended sentence of any sort, state or federal, or serving a sentence under the First Offender's Act? Okay. There's no answers to that question either.

All right. Panel members, I'll ask you, if you were selected to sit on this case, is there any member of the panel who will not be able to render a verdict solely on the evidence presented at the trial and in the context of the law as I will give it to you in my instructions, disregarding personal emotions, such as prejudice, sympathy, hostility or patience, and any other ideas, notions or beliefs about the law that you may have encountered in reaching your verdict? Any of you who will not be able to do that? All right. There's no prospective jurors who've answered to that question.

Now, in this case, this criminal case, the government has the burden to prove Mr. Pate's guilt beyond a reasonable doubt. There is a presumption of innocence in criminal trials. In other words, the defendant sits here now, he is presumed innocent, and that presumption follows him throughout the trial. That means that he does not have to prove his innocence. In fact, he doesn't have to prove anything at all in this case. It's the government's burden to prove his guilt beyond a reasonable doubt. Is there anyone who would find it difficult to follow that principle of law? There's no members who have answered in the affirmative to that question.

Is there anyone who believes the defendant is guilty right now? No one's answered in the affirmative to that question.

Is there anyone who would not require the government to comply with its burden of proof? No one's answered in the affirmative that question.

Now, our law provides the defendant does not have to testify in a criminal case. Again, it's the government's burden to prove the defendant's guilt beyond a reasonable doubt on all the charges alleged in the indictment, and the defendant doesn't have to prove anything. Is there anyone who will not follow that principle of law or who would hold it against the defendant if he chooses not to testify? No one's answered in the affirmative that question.

Is there any member of the jury who thinks the defendant must have done something wrong or else he would not have been indicted? No one's answered in the affirmative to that question.

Is there anyone on the panel who for a religious, moral, philosophical or similar belief cannot sit in judgment in this case and render a verdict based only on the evidence that is to be presented and the law which the Court will give to you? There's no member who's answered to that question.

Now, having heard the questions put to you by the Court and the summary of the indictment in this case, for all the

panel members, does any other reason suggest itself to you as to why you could not sit on this jury and render a fair verdict based on the evidence presented to you and in the context of the Court's instructions to you on the law? Anyone? Okay.

Is there anyone who feels there's some reason not already mentioned that he or she could not or should not serve on this jury that you'd like to discuss with me? All right. No one's answered in the affirmative to that question.

I'm going to speak with the attorneys for just a second. Okay. And then we may ask a couple of followup questions. But then after that, we're going to take a restroom break. Okay? All right.

Counsel, would you please approach.

(Sidebar discussion)

THE COURT: All right, Counsel. As discussed with you at the pretrial conference, that concludes my Part A questions, the specific questions about this case. Are there any followup questions or additional voir dire questions that you want me to ask of any of the panel members at this time at all?

MR. HOWARD: None from the government.

MR. MAINES: Your Honor, there was one juror that indicated she works for the tax commission. And -- 19. 19, yes.

THE COURT: Juror Number 19 indicated she works for the -- and that's Melanie Monique Davis; is that right?

MR. MAINES: That sounds right, Judge. And I just wanted to see in what capacity she was employed there, since this case directly involves --

THE COURT: Tax filings.

MR. MAINES: Tax filings. Correct.

MR. HOWARD: She isn't on the panel.

MR. MAINES: I don't think she's --

THE COURT: I don't think she's a panel member, is she?

MR. HOWARD: No, she's not.

MR. MAINES: But I had zoned out for a second and missed a couple numbers.

THE COURT: That's fine. If she's not a panel member, then we don't need to follow up with that. Does everybody agree? But if she becomes on the panel during the biographical point (sic), I'll certainly follow up on that. Does that satisfy, Mr. Maines?

MR. MAINES: Yes, Judge.

THE COURT: Are there -- at this point in time are there any panel members that anyone would like removed at this point in time for cause? These aren't your peremptory challenges obviously. This is a for-cause removal.

MR. HOWARD: None from the government.

THE COURT: Mr. Maines?

MR. MAINES: None from the defense.

THE COURT: What I'm going to do at this time is I'm

going to give everybody a restroom break and obviously tell them not to talk about this case or anything about their qualifications at all, and then we'll come back and they'll do those biographical questions. Okay? Everybody understand the procedure we'll follow?

MR. HOWARD: Yes.

MR. MAINES: Yes.

(Sidebar discussion concluded)

THE COURT: Okay. All right. Ladies and Gentlemen, as I promised, we're going to take a restroom recess at this time. Let me instruct you in this way, however. During this break do not talk with your panel members or other potential jurors about this case or about this process at all. Okay? Do not talk about this case or about this process at all.

Make sure that you remain here in the courthouse during this recess. You can talk to your prospective juror members about the weather, about sports, but don't talk to them anything about this case. Everybody understand? Don't talk to them about anything about your qualifications to serve as a juror or anything in that regard at all.

When we come back, those of you who are seated as panel members, make certain that you sit in the exact same seat that you're currently sitting in. That's very important for us. Okay. So we would request that you sit in the exact same seat that you're currently sitting in.

What we're going to do when you come back, just to give you a preview of that, is we'll have some biographical questions for each of you to answer. And I'll explain that process more in a moment. These questions are not going to delve deeply into anything at all as far as your personal affairs are concerned, but just general information that the attorneys in the courtroom want to know in selecting a jury in this case. Okay?

So we'll take -- we've got a number of prospective juror members, and we got a limited set of bathrooms. So we'll take 15 minutes. Okay? But please be prompt and please come right back to the seats where you are.

(Proceedings stood in recess from 11:29 a.m. until 11:45 a.m.)

(Jury present)

THE COURT: All right, everyone. I trust that you had a good break, and I appreciate you following the Court's instructions. Before we proceed with the biographical questions for you all to answer, I understand we had one juror, Ms. Vanessa Blyden, Juror Number 7, that wanted to address the Court on a followup. Is that right, Ms. Blyden?

PROSPECTIVE JUROR BLYDEN: Yes.

THE COURT: Yes, ma'am.

PROSPECTIVE JUROR BLYDEN: Yes. Back in March I went into cardiac arrest, and I'm currently waiting to see the cardiologist. That appointment is actually tomorrow afternoon.

THE COURT: I'm very sorry that you had that medical

issue come up. Is that an appointment that you've been waiting on for a while?

PROSPECTIVE JUROR BLYDEN: Yes, sir. I've been waiting for about maybe four months.

THE COURT: Okay. And is that an appointment that you think you can reschedule easily if you are selected to serve on the jury?

PROSPECTIVE JUROR BLYDEN: I'm not sure.

THE COURT: Okay.

PROSPECTIVE JUROR BLYDEN: Being that I have waited so long to see the cardiologist, I'm not sure if they'll let me reschedule or not.

THE COURT: And what time is your appointment tomorrow?

PROSPECTIVE JUROR BLYDEN: It's at 2:30.

THE COURT: Okay. Unless there's some objection, I'm going to excuse Ms. Blyden.

MR. HOWARD: No objection.

MR. MAINES: No objection.

THE COURT: You're excused. Thank you.

Ms. Hammock, if you would, please pull one of our prospective jurors that is not on the panel to be able to take Ms. Blyden's spot. Let's give Ms. Blyden an opportunity to make her way down the road there first, though. I wish you the best of luck, ma'am.

THE CLERK: Juror Number 32. Jemetrice Heard.

THE COURT: Ma'am, before you walk all the way down there, let me ask you this while the microphone is right there. And you can step down from there if you'd like to.

You've been listening, and I see you've got your notes there. You've been listening this entire time we've been asking these questions. Is that right?

PROSPECTIVE JUROR HEARD: Yes, sir.

THE COURT: Are there any of the questions that I've asked thus far that you would have answered yes to?

PROSPECTIVE JUROR HEARD: No, sir. Everything good.

THE COURT: I'm sorry. Go ahead. What did you say?

PROSPECTIVE JUROR HEARD: Oh, I was saying yes, sir.

THE COURT: There are some questions you'd answer yes to?

PROSPECTIVE JUROR HEARD: Oh, no, sir.

THE COURT: There's not questions that you would have answered yes to. All right. Just wanted to be certain. Thank you, ma'am. You may have a seat.

So, ma'am, let me ask you this one followup question on that. Is there any reason not already mentioned, or mentioned, that you feel that you could not serve on this jury that you'd like to discuss with the Court?

PROSPECTIVE JUROR HEARD: No, sir.

THE COURT: All right. Thank you, ma'am. What we're going to do at this time, as I previewed earlier, is ask

everyone to answer some general biographical questions. I believe that you all have the questions on the screen in front of you.

Ms. Hammock, do they have a list of the questions as well?

THE CLERK: Yes, sir.

THE COURT: And there's also -- for those of you who have amazing eyesight, there's also the questions listed on the TV screen across the courtroom here. But as it comes your turn, if you don't understand what questions you're supposed to answer, let us know and we'll be certain of that.

So what we're going to do is we're going to start at the top of the jury box, and we're going to go from the top row left to right, and then we'll pass this microphone down, and we'll go right to left and then left to right, and then we'll go to the first row behind the attorneys.

Now, when you give us this information, please be certain that you stand. Please be certain that you speak in a loud, clear voice so that the lawyers and I will be able to hear you. I'll ask the lawyers and allow them to ask any brief followup questions that they think they need to ask you while you're standing. And, again, begin your answer to the questions with a loud, clear voice, give us your name and your juror number first, okay. Every time, make sure when you stand you give us your name, your juror number and then answer the

questions.

Ms. Hammock, did I misspeak? Should we start back there?

THE CLERK: Yes, sir. We should start in the back far right.

THE COURT: Okay. If you would, please, Marshal, pass that microphone to the back far right there. And we'll start back there.

All right, sir. You are first up. If you will, please stand.

PROSPECTIVE JUROR LEWIS: My name is Carlos Lewis, Juror Number 38. I live in Waynesboro, Georgia. I've been living there 16 years. I've been living in Georgia for 40 years. My occupation, I work at Ingevity in Waynesboro where I'm currently a machine operator. My marital status, I'm married, and my wife is a nurse, and she work at Doctors Hospital. I have two children. My son is 12 and my daughter is 7. I have no military experience. I have no jury experience. And I'm a high school graduate of Burke County High School.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR MODRELL: Howard Modrell, Juror Number 49. I've lived in Augusta for 18 years. I'm retired government employee, widowed, no children. I served in the U. S. Army as an electronics technician, and I did serve on one jury panel. I don't remember exactly when it was. It was a D.U.I. case over

at the old jailhouse. That was a good number of years ago.

THE COURT: Okay.

PROSPECTIVE JUROR MODRELL: And I have a high school education.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR HARDEN: Trinetta Harden, Juror Number 29. I live in Augusta, been here for 13 years. I've lived in Georgia 42 years. I am a teacher; single, no children, no prior military service. I have served on a jury panel in Augusta back in, I think, 2010. It was a criminal case. We did reach a verdict. And I have a master's degree.

PROSPECTIVE JUROR WILKERSON: Scott Wilkerson, Juror Number 63. Live in Harlem, Georgia. Lived there for 30 years. Lived in Georgia for 30 years. I'm an asphalt plant foreman for Reeves Construction. I'm married. My wife is the youth director at Sweetwater Baptist Church. I have four kids; eight-year-old, a six-year-old, a three-year-old and a one-year-old. No prior military experience, no jury experience, and I have an associate's degree.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR JENKINS: Your Honor, my name is Timothy Jenkins, Juror Number 33. I've been in Augusta 61 years. I lived here 61 years. Sorry. I work for Orthopedic Associates Surgery Center. Not married. Have three kids. 28, 23 and 22. They're 13 months apart. No military experience.

We did do a criminal case and there was a verdict.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR JENKINS: Yes, sir.

PROSPECTIVE JUROR WYNN: I'm Sherid Wynn, Juror Number 68. I am a residence of Augusta. I've been here for 21 years. I am a U. S. Postal mail handler. I am married. My spouse is retired military. I have two children, 22 and 13. I am an ex vet. I was an administrative specialist in the Army. And high school grad, college courses.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR LINGWAI: Hi. My name is Tina Lingwai, Juror Number 39. I live in Augusta, Georgia, for 16 years. I've lived in Georgia for 35 years. I'm a medical technologist for Clinical Liberty Scientists. I'm an assistant QA loop-back coordinator and inventory manager. I'm married. My husband is an electrician. I have a 23-year-old son who is a security escort at one of the skiff buildings on Fort Gordon. He's working on his master's degree in cyber security. I have no prior military experience, no prior jury service. And I have a bachelor's degree.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR SMITH: Michael Smith, Juror Number 59. I've lived in Hepzibah like seven years, been in Georgia 31 years. I'm a system operator out at Plant Vogtle. Single. I have an 18-year-old daughter, full-time student; no military

experience, no jury experience and some college.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR WILSON: Billy Wilson, Juror 66. I'm a resident of Augusta, lived here for five years, or lived where I'm at for five years. I've been in Georgia for 10 years. I'm a dental lab technician by trade. Married, and my wife is self-employed. She does insurance liability. I have a 14-year-old and an 8-year-old, and I served 12 years' active duty and still currently serving in the reserves. No jury service, and I have a bachelor's degree.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR WHITE: My name is Reggie White, Juror Number 67. Residence is Hepzibah. Lived there 17 years, lived in Georgia total of 21 years. Supervisor logistics at Harbor Freight Tools. Single, no military experience and high school diploma at Hepzibah High School.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR HEARD: My name is Jemetrice Heard. I'm Juror Number 32. I live in the city of Hepzibah, been there eight years; been in Augusta for 34 years. Work with the Department of Defense. I'm single. I have no children, no military experience, no jury experience, and a high school diploma.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR LYON: My name is Mildred Lyon, Juror

Number 55. I'm from Waynesboro, Georgia. I served in the military. I'm a disabled vet. And I have three kids, two boys and one girl, five grandkids. That's it.

THE COURT: Thank you, ma'am. One followup. You may have said this. Have you ever served on a jury before?

PROSPECTIVE JUROR LYON: Yes.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR ROONEY: Michelle Rooney, Juror Number 56. Reside in Augusta, Georgia, 44 years; lived in Georgia 44 years. Homemaker, married; spouse, electrician. Three children, 21, 19, 12. Two are full-time students at Augusta University. The other one is a student at Davidson Fine Arts. No military service, no jury service, and high school diploma.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR MARTIN: Derrick Martin, Juror Number 41. I've been living in Hepzibah, Georgia, 17 years; been in Georgia for 17 years. I work at Bridgestone, Aiken County plant as a machine technician. I'm married. My wife is a dental assistant. I have three children, 9-year-old son, 18-year-old daughter in her first year of college, and a 26-year-old son in the Air Force. I served in the Army for 22 years as a signal systems support supervisor. I have no jury experience, and associate's degree.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR BROWN: My name is Lacoria Brown,

Juror Number 9. I'm from Harlem, Georgia. I've lived in Georgia for 35 years. I'm a concierge. I'm single, no children. Never married. Never served in the military. And never done jury duty. And I have some college degree.

THE COURT: Thank you.

PROSPECTIVE JUROR CALHOUN: Hi, I'm Nancy Calhoun. I'm Juror Number 11. I live in Stapleton, Georgia. I've been there 12 years. I've lived in Georgia 50 years. I'm self-employed. I'm married. My husband is also self-employed. We own a commercial and residential cleaning service. I have two children; one 30. She's a dog groomer. She does dog grooming. And a son that's an accountant that's 25. I have no military service and no jury experience, and I have a high school diploma.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR NEWTON: Whitney Newton, Juror Number 51. My residence, city of residence is Evans, and I've been there the last four years. I've lived in Georgia the past eight years. I'm a registered nurse. I'm married. My husband is a registered dental hygienist. I have two children, a seven-and-a-half-year-old daughter and almost four-year-old son; no military service, no jury service, and I have a college diploma, diploma.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR SPELL: Mitchell Spell, Juror Number

60. I live in Gibson, Georgia. I've lived there for 26 years, lived in Georgia for 26 years. I'm a lineman for Southeast Utilities, contractor for Comcast. I was previously employed with the Georgia Department of Corrections as a correctional officer. I am married. Wife stays at home with the kids. I have two kids; four and one, boy and girl. No previous military experience and never done jury duty before. And that's it.

THE COURT: Thank you.

PROSPECTIVE JUROR ALBRECHT: John Albrecht, Juror Number 1. I've lived in Evans for 26 years, lived in Georgia for 34 years. I'm a retired psychologist. I'm married. My wife is a psychologist as well. Two sons, 33 and 30. One's an IT consultant; the other is a pharmacist. No military service, no jury experience. Education Ph.D.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR MOBLEY: Talina Mobley, Juror Number 48. I live in Martinez, been there for three years. I've lived in Georgia for about 25 years. I'm a stay-at-home mom. I am married. I have three kids, five years, three years and nine months. My husband is the assistant manager at SunTrust Bank. I have no military experience, no jury experience, and some college.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR THOMPSON: I'm Howell Thompson, Juror Number 61. I've lived in Waynesboro for 42 years. I have lived

in Georgia for 48 years. I'm a retired educator. I am married. My husband is a retired bank president. I have a son -- we have a son, who's 32 years old, and he's in software development. He codes software. I have no military experience, nor have I ever served on a jury, and I have an L6 and F leadership.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR McCOOK: Melissa McCook, Juror 45. I've lived in Evans for the last two years, lived in Georgia for 41. I am a teacher. My husband is also a teacher. We have three girls, 20, 18 and 14, all which are full-time students. I have not had any military experience nor jury experience, and my level of degree is an EDS.

THE COURT: Thank you.

PROSPECTIVE JUROR McALISTER: Dennis McAlister, Juror Number 43. I live in Thompson, Georgia, lived there for 24 years. I've lived in Georgia for 24 years. I am a fleet manager at a car dealership. I am divorced. I have two daughters, 25 and 22. One is a secretary, and one is a server. I have prior military service. I was in the United States Army for four years as a combat field medic. I have never served on a jury, and I have an associate's degree and a bachelor's degree.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR FREE: Carolyn Free, Juror 25. I have lived in Augusta for the last 50 years, and I've lived in

Georgia for the last 50 years. I work for Golden Harvest Food Bank as a SNAP advocacy coordinator. I'm single. I have one child that is 22 years old. She's a dance instructor. I have no military service, no jury service, and I have an associate's degree.

THE COURT: Thank you.

PROSPECTIVE JUROR CLARK: I'm Tracy Clark, Juror Number 13. I've lived in Georgia the last 16 years; I lived in Grovetown the last two years. I'm a supply specialist out at Fort Gordon. I work for a contractor out there. I'm divorced. I have two children. One is deceased; one is a dental hygienist. I was in the U. S. Army. I have not had jury experience, and I have a high school degree, or excuse me, a high school -- I'm nervous.

THE COURT: No worries.

PROSPECTIVE JUROR CLARK: Anyway. I graduated high school, and I had two years of college.

THE COURT: Thank you.

PROSPECTIVE JUROR FOUNTAIN: I'm Cynthia Fountain, Juror Number 24. I live in Evans for the last four years, 15 years in Georgia. I am a nurse educator. I'm married. My husband is a college campus director. We have two children, 23 and 14. My 23-year-old, I'm not sure what she does. She says she's a struggling actress. She lives in Atlanta. Currently I'm in the U. S. Army Reserves as a nurse. I have served on a jury in

Sumter, South Carolina, about 30 years ago. It was a civil case, and we did reach a jury (sic). And currently I'm pursuing a doctorate in nursing.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR KADLEWICZ: Laura Kadlewicz, Juror Number 34. I live in Augusta. I've lived there for seven years. I've lived in Georgia for seven years. I'm a registered nurse. I'm single. I have one daughter who's 27, and she's a marketing manager. I served as a registered nurse in the Army. I have no jury experience, and I have a bachelor's degree.

THE COURT: Thank you, ma'am.

PROSPECTIVE JUROR LAVENGOOD: My name is Cindy Lavengood, Juror Number 37. I live in Martinez. I've been there seven years, been in Georgia eight years. I'm currently unemployed. I am married. My husband's a chiropractor with the D.O.D. We have five children, a 39-year-old in the military, a 35-year-old communications specialist, 33-year-old chiropractor, 31-year-old chiropractor and a 27-year-old who schedules floor installations. I have 10 grandchildren. And I have no military experience, no jury experience, and a high school education.

THE COURT: Thank you.

PROSPECTIVE JUROR ANDERSON: Andrew Anderson, Juror Number 3. I live in Grovetown. I've lived there for 12 years. I've lived in Georgia for 14 years this time and four years previous to that. I work for the Department of Defense at Fort

Gordon. I'm married. My wife is retired from both military and the Department of Defense. We have two children, 28-year-old who works in food service, a 27-year-old who works in retail sales. I was in the Air Force for 21 years. I was an analyst. I do not have previous jury service, and I have an associate's degree.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR BECKMAN: My name is Brett Beckman, Juror Number 6. I've lived in Augusta, Georgia, for the last 13 years; lived in Georgia for 13 years. Currently an ER physician here in Augusta. Married. Wife is also an ER physician. We have a four-year-old daughter. No military service. And I have had previous jury service here in Augusta, approximately 2013, criminal case, and we did return a verdict. Degree of medicine.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR LAIRD: I'm Michael Laird. I'm Juror 36. I live in Evans, Georgia. I've been there for just over four years. That's how long I've lived in Georgia as well. I'm a full-time student. I'm married. My wife is an office worker. We have two boys; six and four years old. I do have prior military. I was in the Marine Corps. I was a linguist and in intelligence. I do not have jury service, and I am finishing my second bachelor's degree this semester.

THE COURT: Thank you, sir.

PROSPECTIVE JUROR SHUBERT: My name is Warren Shubert,

Juror Number 57. I live in Millen, Georgia. I've been there 31 years. I've lived in Georgia for 64 years. I'm a machine operator at Textron. I'm single. I have two daughters, 44 and 37. I have no military experience. I have had previous jury experience, civil trial. And I have a high school diploma.

THE COURT: Thank you, sir. All right. Counsel, if you'll approach, please.

(Sidebar discussion)

THE COURT: All right. Are there any followup questions anybody needs me to ask at this time at all?

MR. HOWARD: None from the government.

MR. MAINES: None from the defense.

THE COURT: Any reason you see any motion to excuse any of these jurors for cause by anybody?

MR. HOWARD: None from the government.

MR. MAINES: None from the defense.

THE COURT: No motions to strike at this time; correct?

MR. HOWARD: Correct.

THE COURT: What I'm going to do is just follow up and be certain that they're all willing to serve with one more question, and then we'll begin the silent strike process. Everybody understand the process we'll follow?

MR. MAINES: Just so I'm clear, how many strikes on alternate jurors?

THE COURT: Each side will get one strike, so to be

clear, on the jury sheet there will be four alternates on there. Each side will get one strike and that will leave us with two alternates. Okay?

MR. HOWARD: Okay.

(Sidebar discussion concluded)

THE COURT: Thank you, Ladies and Gentlemen. Again, let me ask you, if you are selected -- as to all of you, if you are selected as a juror to try this case, will each of you render a fair and impartial verdict based only upon the evidence presented in the courtroom and the law as it pertains to this particular case as you will be instructed by the Court? If you will, please say I will.

PROSPECTIVE JURORS: I will.

THE COURT: And if you won't, please say I won't. (No response.)

Okay. All right. The parties are now going to begin the silent striking process. As I told you earlier, please don't be offended if you are struck for any reason, or for no reason. Don't be offended whatsoever.

That will take a little bit of time. They're going to pass the sheet back and forth to engage in the striking process. Again, as I said earlier, it's not an exact science. It's important that you remain seated in the chairs that you are currently in. And, please, again, don't talk to each other while this process goes on. Okay? All right.

(Silent strike from 12:10 p.m. until 12:22 p.m.)

THE COURT: All right, Ladies and Gentlemen. The attorneys have finished their silent striking process. I suppose what we need to do, Ms. Hammock, and, officers, to make this easiest, is to do as we did earlier, the folks on the top row come over here? Is that our plan of action? So for those of you on the top row, follow the direction of the court security officer, please.

THE CSO: Back row please stand, bring your belongings with you.

THE COURT: All right. The clerk will now begin to call the names of those of you who have been selected as a juror to try this case. When your name is called, please return to the jury box and have a seat as you will be instructed by the court security officer.

Mrs. Hammock.

THE CLERK: Yes, sir. Carlos Lewis, Juror Number 38. Trinetta Harden, Juror Number 29. Timothy Jenkins, Juror Number 33. Sherid Wynn, Juror Number 68. Michael Smith, Juror Number 59. Billy Wilson, Juror Number 66. Michelle Rooney, Juror Number 56.

THE CSO: After she comes out, I'll get all of you off the stand. When you exit, make sure you gather your belongings.

THE CLERK: Nancy Calhoun, Juror Number 11. Whitney Newton, Juror Number 51. Carolyn Free, Juror Number 25. Laura

Kadlewicz, Juror Number 34. And Cindy Lavengood, Juror Number 37. Brett Beckman, Juror Number 6. Michael Laird, Juror Number 36.

THE COURT: Ladies and Gentlemen, if you all will please go ahead and find a seat, or a standing spot in the back of the courtroom.

All right, Counsel. I'll ask you to look upon the jury and to tell me if you are satisfied that this is the jury that you have selected in this case. Mr. Howard?

MR. HOWARD: We are, Your Honor.

THE COURT: Mr. Maines?

MR. MAINES: Yes, Your Honor, I am.

THE COURT: Is there any reason, Counsel, to think that this jury was not fairly and impartially selected? Mr. Howard?

MR. HOWARD: There is not, Your Honor.

THE COURT: Mr. Maines?

MR. MAINES: No, Your Honor.

THE COURT: Okay. Ladies and Gentlemen who are members of the jury, if you will, please stand, and I'm going to have the clerk administer the oath to you at this time.

THE CLERK: If you will, please raise your right hand. Each of you shall well and truly try the issues joined upon the indictment between the United States and the defendant and give a true verdict according to the evidence, so help you God. Please say I do.

THE JURY: I do.

THE CLERK: Thank you.

THE COURT: Thank you. You may have a seat. Ladies and Gentlemen, you've been selected to serve as the jury in this case. In a few moments we are going to take a lunch recess after I address the jurors who were not so fortunate as to be selected as jurors in this case and after I give you some preliminary instructions.

When that is over, you'll come back and we'll begin with some preliminary jury instructions in the case, and then we'll have opening statements from the attorneys.

Now, let me turn to address those of you who were not selected as jurors. You are off the hook now, but I do hope that you have found this process enlightening and consequential. I can tell you, we could not have tried this case without you. It truly -- when I said earlier that the administration of justice and our system of law would literally grind to a halt if we didn't have jurors come in and serve, I mean it. It doesn't take much to think about how dependent our republic is on the service of jurors. So it is with a heartfelt thank you that I will excuse you in a moment. Please stay seated right now. But I will excuse you, and then I will dismiss those who were selected as a juror.

I hope, again, that you found the process enlightening and consequential. For those of you who are parents and

grandparents, I hope you have things that you can tell your children and grandchildren about this process and to tell your friends, your family, that it's not as onerous a process that everyone may make it out to be, but that it is a process that is directly consequential to the administration of justice and to the foundations of our country. So, again, we thank you so much.

Now, as for those of you who have been selected as jurors, please rest assured that I understand that you all have busy lives that you've put on hold, and that, again, we will make every effort not to waste your time. We will typically begin every day at 9:00, and we'll conclude every day, particularly today because I know that you all have issues to attend to, at 5:00 generally. Lunch breaks will typically be about an hour. We'll also take a morning break and an afternoon break.

Before I give you this break, let me give you these instructions. And this is the first time I'll give them to you, but by the end of this trial you'll be sick of hearing them from me. So please listen carefully.

During a recess don't discuss the case with anyone, including with each other, until you have heard all of the evidence, the closing arguments and my final instructions on the law. We don't want you to prejudge the case. Okay? Do not read, watch or listen to anything about this case that may

appear in any media accounts. To do so would be a violation of your oath.

Generally I will tell you just don't watch, read or listen to the news while you serve as a juror, because shutting all that out allows you to serve as a juror in this case based upon the information you receive in this courtroom and on nothing else.

If anyone tries to speak to you outside of the courtroom or if you hear anything about this case, even inadvertently outside of the courtroom, then I want you to report back to me and we can take it up at that time.

The seat that you have now is your assigned seat, if you will, for the duration of this trial. So when we return from our lunch recess and every recess thereafter, it's imperative that you sit in the same seat where you are now.

I know that many of you use computers, cellphones, tablets and the internet and other tools of technology. However, be cautious about that use during this case. Be cautious about what you look up, about whom you talk to and about what you post, for example, on social media. Do not talk to anyone about this case or use these tools to communicate electronically with anyone about this case.

So this includes your family and friends. You may not communicate with anyone about the case on your cellphone, through email, social media, iPhone, text messaging, Twitter,

Instagram and anything like that. Don't speak about or communicate about the case through any blog or website, through any internet chat room or by any other way of social networking websites, including Facebook and LinkedIn and YouTube.

Don't do any independent research about this case at all. Okay. You are to decide this case solely on the evidence you hear in this courtroom, and if you were to do any independent research, it would be a violation of your oath as a juror.

Please be punctual when you return. We don't want to waste your time, and you don't want to waste your colleagues' time, your fellow jurors' time. So please be punctual when you return.

Don't linger in the hall when you return. There may be times that we have things going on in the courtroom so that the court security officers or marshals may direct you to go somewhere else to wait, but typically come into the courtroom and go to the jury room which you'll become acquainted with when you come back from your recess. That is your room to use during this case. Don't hang out in the halls or elsewhere when you return. Okay?

Now, as for our time for our recess, it's 12:30 right now. We typically take an hour, but we have a couple things we need to take up, so I'll give you an hour and 15 minutes, recess for lunch. So an hour and 15 minutes now, you all please

return. The rest of you can go back to your busy lives with the sincere appreciation of the Court. Let's all rise for the jury.

THE CSO: All rise for the jury.

(Jury out)

THE COURT: All right, everyone. Please be seated. The record will reflect that the jury members have been excused and they're not in the courtroom.

Counsel, I wanted to take up with you a number of issues before I excuse you for your lunch recess. Of course, we'll try to be timely in doing so, because I know you all need a break and some time to prepare for your opening statement.

That's the first thing I want to bring up with you. I know you all gave us the estimate about how much time you need for an opening statement. But we'll have someone serving as a timekeeper for you during your opening statement, so let me be specific right now. How much time do you need from the government's perspective for an opening statement?

MR. HOWARD: Your Honor, a max of 20 minutes.

THE COURT: Okay.

MR. MAINES: 10 minutes.

THE COURT: Okay. We'll give you 20 minutes as well, Mr. Maines. And Ms. Hammock will give you a five-minute warning, Mr. Howard. Okay?

MR. HOWARD: Okay.

THE COURT: You can, of course, have somebody at your

counsel table keeping a closer watch on it, but --

MR. HOWARD: And I expect it to be right at 15 minutes, so is there any way that could just be a two-minute warning, because I don't expect to get that --

THE COURT: You need a ten-minute warning? Is that what you said?

MR. HOWARD: A two-minute warning.

THE COURT: A two-minute warning. Okay. Yep. Okay. The next thing to address is the fact that the defendant chose this morning, as we reflected -- as the record will reflect, we began the day, as you all recall, in the holding cell, the Marshal's holding cell where Mr. Pate refused to come out of his cell. He refused to put on any of the clothes that have been provided for him for court. I tried to address all of that with him. We did the best we could of making a record of that. But he continued to talk over me during that time period.

Nonetheless, we made it very clear to him that he has the right to be present here, and he made it very clear through his words and his actions that he had no interest in entering the courtroom. So obviously we have been proceeding this morning without him in the courtroom.

As I stated then, we are doing everything we can to provide him with a screen and -- in other words, a video and audio feed back to the holding cell area, where if he so chooses, he can see the proceedings that are going on in here

and hear the proceedings that are going on in here.

Mr. Maines, however, I will instruct you -- and I'm sure that you are going to do this anyway -- during the lunch recess to go check with Mr. Pate, to remind him that he has the right to be present here and to inquire as to whether he wants to be present in the courtroom or whether he continues to refuse to come to the courtroom. And then I'll ask you to report back to the Court on that interaction. Of course, we wouldn't want you to report to us anything that you would consider a privileged communication, but simply report back to us as to whether he chooses to be in the courtroom or whether he still refuses to come into the courtroom. Okay, Mr. Maines?

MR. MAINES: Yes, Your Honor.

THE COURT: All right. Now, his refusal to attend or his declining his right to attend his trial raises some issues that we raised earlier, and I want to get your take on them, Counsel. One, do you want the jury to be instructed on his absence? If so, when and what is it that you want the Court to say to the jury about the fact that he is not in the courtroom?

Mr. Howard, does the government have any proposal on that front?

MR. HOWARD: We do, Your Honor. We'd like, in terms of the substance of the instruction -- first of all, we want an instruction, and we would like the substance of the instruction to be very succinct and basically two parts. One, that the

defendant has a right to be present at trial. Defendant has elected not to be present at trial. Simply that.

In terms of the timing, I think that can be done before openings and when the jury is brought back after lunch.

THE COURT: Okay. Anything further you want to offer on that, Mr. Howard?

MR. HOWARD: No, Your Honor.

THE COURT: Mr. Maines, what's your response to that?

MR. MAINES: Your Honor, I would just like the Court to add that the jury is not to infer or to consider that absence during the course of this case.

THE COURT: Mr. Howard, any objection to that?

MR. HOWARD: We do, Your Honor. I'm not sure it would be an accurate statement of the law. I think that it isn't -- we do have an objection to adding that, because I'm not sure that would be an improper inference. I don't think the Court needs to instruct them one way or the other as to it. It isn't as if he's electing not to take the stand. He has a right to do that.

THE COURT: Do either of you have any case law for me that supports your position on any of these issues?

MR. HOWARD: Not on that with respect to --

MR. MAINES: I can get you from South Carolina specifically, I know that there is language for trials in absentia of defendants, that the jury cannot consider that

absence in the trial itself as evidence. I can find that, and I'll file that.

We can address that at a later point. I guess for the time being I don't object to just giving the U. S. Attorney's recommended charge to the jury, and if Mr. Pate continues to absent himself, which I fully expect, and I have authority on that point, we can take that up in the morning tomorrow morning.

THE COURT: Okay. Any objection, Mr. Maines, to me saying he has the right to be present, but he's chosen not to be present today?

MR. MAINES: No objection to that. No.

THE COURT: Okay. Mr. Howard, anything further on this issue at all at this time?

MR. HOWARD: No, Your Honor.

THE COURT: Okay. We'll take a look on it. If you all have that law that you want to give to us, please be sure to give that to Ms. Hammock or Mrs. Manly and I'll take a look at it during the recess.

There was a motion in limine filed, and you will recall that I took Part 4, I believe it was, under advisement, which was essentially a motion in limine by the government to prevent the defendant from expounding upon various views that he has about the law.

What I'm going to do is deny that without prejudice. I just can't tell right now as to whether that would be ripe. I

need to -- excuse me, one, whether it would be ripe; and two, whether there would be any probative value to this evidence. And, largely, that is based on what is the government going to prove and how is the government going to intend to prove its case. We need to see that and see what evidence comes in.

By what was previewed at the pretrial hearing and the arguments on the motion in limine, I can see how it could become relevant. I could also see how it could not be relevant. But I need to hear more of what the government intends to produce.

Furthermore, as Mr. Maines said at the hearing, if the defendant is not here and chooses not to testify, then the entire issue is moot. As of right now, he's indicated unequivocally that he does not intend to participate in this trial. So I don't want to give you an advisory ruling on an issue that doesn't come up.

So that's where I am on it. All right?

Now, Mr. Maines, if you feel the need to introduce any of that evidence that would be subject to the motion in limine, you shouldn't take this denial as free rein to introduce that evidence. Rather, address the Court first outside the presence of the jury that you want to introduce that evidence, and then we'll have a ruling for you after hearing from the government as to whether it should come in. Everybody understand where I am on that?

MR. HOWARD: Yes, Your Honor.

MR. MAINES: Yes, Your Honor.

THE COURT: Any need for followup on that or any disagreement with the course that we're following on that?

MR. HOWARD: Your Honor, there was part of that motion in limine dealt with ignorance of the law as an argument. That would be something that, you know, counsel would argue, you can't convict my client because he didn't know there were these specific laws that prohibit this sort of conduct. So I don't know if Your Honor is going to rule on that. I don't know if that intends to be an argument. But that would be another issue that was raised in that motion in limine.

THE COURT: Mr. Maines?

MR. MAINES: Your Honor, I do intend to pursue a defense that not that my client did not know that the statutory offenses that he's charged with were against the law, but rather, that these -- the legal documents that the exhibits that we stipulated as to coming into evidence, whether or not they meet the statutory definition of fictitious or fraudulent and whether he knew or had reason to know that based on his perceptions of what is lawful and what's not lawful.

So I'm not arguing that he doesn't -- that he's excused because he doesn't know what the criminal statute is for filing false retaliatory lien -- or involuntary -- you know, filing an action to push someone involuntarily into bankruptcy. This is simply dealing with the elements of the offense itself and his

knowledge about what those documents that he filed, what the legal significance of those things were. So I do think that that would be allowed because knowledge is an element of the offense.

THE COURT: But you're not intending on making an argument, a legal argument during open; correct?

MR. MAINES: I don't intend to make any kind of argument. I simply intend to illustrate what the evidence would show from the defense standpoint, that -- and not to get too much into my opening before we do it. Simply, that these documents come from someone, as some of the exhibits show, that is not schooled in law; that, in fact, one of the first things he says in some of these documents is that I'm not schooled in the law, and that that -- that is relevant to his knowledge as to the frivolousness or the falsity of the documents he's filing.

THE COURT: I'll hear from you, Mr. Howard.

MR. HOWARD: Your Honor, the issue of the validity of the documents isn't an issue. The issue is the falsity of the substance of the documents. We don't have to prove that it's a valid lien. There's case law that's clear on that. I noted it in our proposed jury instructions. So the legal sufficiency of the lien itself is irrelevant. It doesn't matter.

What does matter is the substance of the claims that he wrote in there, the amounts, the debtors. That's what matters.

That's not a legal determination. It's a factual determination regarding knowledge.

THE COURT: Mr. Howard, correct me if I'm wrong, and I was recalling the pretrial conference and your argument at the motion hearing. What may distinguish this from some of the cases we've seen, the government does intend to get into evidence about documents he had in his possession, about the redemptionist theory, for example, and the government intends to get into evidence about this whole theory of filing these documents. I think you mentioned a couple of manuals that he had and some IRS documents. Is that accurate?

MR. HOWARD: Your Honor, I don't think we're going to necessarily -- depending on how the case proceeds, we may. I'm not, you know, committed to bringing out the manuals. And we're certainly not going to dive deep into the redemptionist theory. We'll talk about the 1099-OID, only in the sense that the IRS told him it was frivolous and that's the basis of his claim for refunds.

But, again, going to the law of whether the lien is a valid lien, whether he knew the legal requirements for a lien or not are not at issue here. It's not something that the jury is going to have to decide. We're not even going to have evidence on the law as it pertains to particular liens. We'll have evidence on what a lien is. But, you know, the specific code citations regarding liens, it's not relevant here.

So, again, whether he -- his knowledge as to the law regarding the validity of liens isn't relevant. That's our position.

THE COURT: Okay. I'm going to deny it without prejudice at this time. If he -- again, if it comes up that he wants to offer a lot of testimony about his knowledge regarding the validity of liens, we'll have to see what the government's proof on that is. I just recall from the pretrial conference and from some of the argument on this motion that the government does have some documents, that it's listed exhibits and that it may intend to offer that go to this individual defendant's view of these liens. And so it's denied without prejudice at this time. Okay?

MR. HOWARD: Understood, Your Honor.

MR. MAINES: Understood, Your Honor.

THE COURT: Okay. All right. The next issue we had -- and this goes back to the question about his absence -- is how to prove his identity.

The government raised the issue, Mr. Howard raised the issue that they had witnesses that -- by they, the government, has witnesses that it intends to offer that would want to make an eyewitness I.D. of Mr. Pate in the courtroom. If he's not here, then the question was raised how do we go about that, how do we do that.

Mr. Howard, do you have anything further on that, since

we've last talked, about how to do that?

MR. HOWARD: Your Honor, after considering it further, in light of the risks I think that poses in bringing somebody out really against their will to do an identification, what I instead plan to do is just through photographs, to connect that to the defendant to avoid the kind of other issues that would raise by forcibly bringing him out here.

THE COURT: Any objection to that, Mr. Maines?

MR. MAINES: Absolutely not, Your Honor. That's what we would prefer, or I would prefer.

THE COURT: Okay. That's what we'll do. Okay. Well, when we get the jury back, what I'm going to do is give them their preliminary jury instructions and then delve right into your opening and then right into witnesses.

As I told you at the pretrial conference and I've just reiterated to the jury, I try to break as close to 5 as we can and err on the earlier side on the first day of trial, because we've got 14 people who thought this morning that they probably would be out of here by lunchtime and now they're jurors. I may go later moving forward in other days, but today we're going to be as close to 5 as we can.

Mr. Howard, that gives you some direction as to what we're looking for from you. And you can give your witnesses instructions in that regard. Does anybody need any additional information from the Court about what I'm looking at timing

wise?

MR. HOWARD: Not with respect to timing, just a matter of exhibits once we get there.

THE COURT: Okay.

MR. MAINES: I don't -- I don't have any issues.

THE COURT: Is there anything you want to talk about right now about exhibits?

MR. HOWARD: Just briefly. In light of the fact that there's already been some stipulations regarding the admissibility --

THE COURT: Right.

MR. HOWARD: -- if I could move to pre-admit Government's Exhibit 1-1 to 73.

THE COURT: I want to do that in front of the jury.

MR. HOWARD: Okay. And then I'll also ask for permission to freely publish those exhibits instead of asking for permission each time.

THE COURT: Any objection to that?

MR. MAINES: None, Your Honor. I think that would be helpful.

THE COURT: All right. Just bring that up in front of the jury. I try to do as many things as we can do -- obviously this discussion doesn't need to be in front of the jury, but when we're admitting exhibits, entering stipulations, things like that, to do that in front of the jury so they understand

what we've done.

MR. HOWARD: Understood.

THE COURT: Okay. Anything else that we need to discuss before you all go get a quick lunch and before we bring this jury back?

MR. HOWARD: I think there have been some agreements regarding the government's objections to proposed jury instructions, but we can take that up at the charging conference.

THE COURT: Okay.

MR. MAINES: We've got a consensus on everything except one part, and, again, we can take that up later.

THE COURT: Why don't we do that after we dismiss the jury at 5 today. We'll bring that up this evening, so then that will allow us to get you a draft. As I mentioned to you at the pretrial conference, I like to give you a draft so you can see it in paper form what I'm proposing to read to the jury. You all can look over that and you can flyspeck it then. Okay?

MR. HOWARD: And with respect to scheduling, our first witness we expect to take several hours, and I know Your Honor mentioned that you take an afternoon break. So it'll, in all likelihood, be in the middle of that first witness's -- we're going to get out some 50 some documents through. It'll be through her.

THE COURT: That's fine. And, again, if -- I always

allow jurors, if they're at a point and they look at that clock and it's close to 5:00 and they've still got a witness up there and you feel like you're in a break at the time where you've been questioning this witness and you think it's a natural break time, let me know and say, Your Honor, I see we're approaching 5:00, would now be an appropriate time to take our recess for the day?

MR. HOWARD: At what time in the afternoon does Your Honor like to take the afternoon recess?

THE COURT: Well, usually I would do it around 2:30 or so, but, of course, this jury is not coming back, so it'll probably be more in the 3:00 hour, somewhere in there. Okay?

MR. HOWARD: Understood.

THE COURT: I try to gauge if they are all engaged. Okay. All right. All right. Anything else?

MR. HOWARD: Nothing from the government, Your Honor.

MR. MAINES: Nothing from the defense.

THE COURT: All right. We'll be in recess.

(Proceedings stood in recess from 12:52 p.m. until 2:03 p.m.)

(Jury out)

THE COURT: Everybody have a seat. All right. We're back on the record in *United States of America vs. Timothy Jermaine Pate*, 1:18-CR-45. I trust everyone had a good lunch recess.

Mr. Maines, I take it that you unquestionably followed

the Court's instructions to see if you could coax Mr. Pate to join us this afternoon.

MR. MAINES: Your Honor, I went immediately after we adjourned to speak to Mr. Pate informing him that he has the right to be present, that he may wear the clothing that I provided him, and that if he refuses to enter into court, that the trial still will continue without him, but that he did have the right to be present.

THE COURT: And he chose not to participate; is that correct?

MR. MAINES: Your Honor, he did not engage me in any meaningful way. So I interpreted his actions as him declining his right to be present.

THE COURT: I understand. And, Ms. Hammock, I take it the marshals have tried to see if he would want to participate, and he has chosen not to participate. Is that accurate?

THE CLERK: Yes, sir. That's my understanding.

THE COURT: And, Ms. Hammock, I also take it that we have the ability to stream this hearing to him where he can see it and he can hear it, but, again, that technology may give out, but we're going to keep moving forward. Is that correct, ma'am?

THE CLERK: That's correct.

THE COURT: All right. Mr. Pate, I know you can hear us. At this point in time we've done everything we can to try to get you to be present, but you've chosen, sir, not to be

present, and that is your choice; you've made that choice abundantly clear with the Court. Okay?

Anything further we need to address regarding that from the government or from the defense?

MR. HOWARD: Nothing from the government.

MR. MAINES: No, Your Honor.

THE COURT: All right. Anything further we need to bring up before we bring the jury back in and we proceed with preliminary jury instructions and your openings?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor.

THE COURT: Let me make sure that I have my technology working well before you bring them in.

All right. Counsel, we're just making sure our screens are straight. You don't have anything on your screens; correct?

MR. HOWARD: Correct.

THE COURT: And I know the jury doesn't have anything on their screens. We're just making certain that the screens are working where Mr. Pate can see us. Okay?

All right. We want all the science working correctly, which, as you all know, is far beyond my capabilities. So it seems like we've got all that working. Is that correct, Mrs. Hammock?

THE CLERK: Yes, sir.

THE COURT: And they, of course -- the marshals -- we've

given the marshals directions to, again, avail him of the room where all of this is present and to try to move him into that room where these screens are located; and Mr. Pate has the opportunity -- and I know he can hear me right now; he has the opportunity to go into the room where he can see these screens. We've gone, frankly, over and above, and kudos are to be to the court staff in trying to get this to him. Okay. Is all of that correct, Mrs. Hammock?

THE CLERK: Yes, sir.

THE COURT: All right. Let's bring the jury in. All rise for the jury.

(Jury present)

THE COURT: Members of the Jury, good afternoon. I trust that you all had a good lunch break and that you followed the Court's instructions during that break.

Now that you have been sworn in and you've had your lunch break, I'm going to give you preliminary instructions to guide you in your participation in this trial.

First, during the jury selection process, I summarized for you the charges that are contained in the indictment. Let me briefly review those with you so you'll recall the charges. Again, you're not to presume anything regarding guilt or innocence in this case from the fact that an indictment has been filed, but I want to summarize for you the charges that are in the indictment.

Counts 1 and 2 charge filing false retaliatory lien against a federal official, in violation of 18 United States Code Section 1521. Counts 3 and 4 allege filing false retaliatory lien against a federal official, in violation of 18 United States Code Section 1521. Counts 6 through 10 also allege that same charge, but, of course, with different alleged actions, of filing false retaliatory lien against a federal official, in violation of 18 United States Code Section 1521.

Counts 11 through 15 charge false bankruptcy declaration, in violation of 18 United States Code Section 152(3). Counts 16 through 18 allege filing false retaliatory lien against federal official, in violation of 18 United States Code Section 1521.

Counts 19 through 21 allege filing false retaliatory lien against a federal official, in violation of 18 United States Code Section 1521.

Those are the charges that are alleged in this case by the grand jury in the superseding indictment.

Now, let me explain to you briefly the jobs that you and I have together during this trial, because we are co-equals during this trial. You have said that you will well and truly try this case based upon the evidence and the law to the best of your ability. That is your oath as a juror in this case. It will be your duty to decide what happened so that you can determine whether the defendant is guilty or not guilty of the

crimes charged in the indictment.

At the end of the trial I will explain the law that you must follow to reach your verdict. You must follow the law as I explain it to you even if you do not agree with the law. You must decide the case solely on the evidence presented here in the courtroom.

Now, evidence can come in many forms. It can be testimony about what someone saw or heard or smelled. It can be an exhibit admitted into evidence. It can be someone's opinion. Some evidence proves a fact indirectly, such as a witness who saw wet grass outside and people walking into the courthouse carrying wet umbrellas.

Indirect evidence, sometimes called circumstantial evidence, is simply a chain of circumstances that proves a fact.

As far as the law is concerned, it makes no difference whether evidence is direct or indirect. You may choose to believe or disbelieve either kind, and you should give every piece of evidence whatever weight you as a juror think it deserves.

Now, certain things are not evidence and must not be considered. Let me review those with you now. Statements and arguments of the lawyers. I want you to pay attention to their statements and their arguments, but in their opening statements and closing arguments, the lawyers will discuss their case, but their remarks are not evidence at all.

Questions and objections of the lawyers. The lawyers' questions are not evidence. Only the witnesses' answers are evidence. You should not think that something is true just because a lawyer's question suggests that it is. For instance, if an attorney were to ask a witness, you saw the defendant run the red light, didn't you? The question is no evidence whatsoever of what the witness saw or what the person did in regards to the red light. Rather, the witness's testimony is what you should pay attention to.

There are rules of evidence that control what can be received into evidence. When one side asks a question or offers an exhibit and the other side thinks that it is not permitted by the rules of evidence, that person may object. Now, if I overrule the objection, then the question may be answered and the exhibit may be received. If I sustain the objection, then the question cannot be answered and the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question itself and not try to guess what the answer would have been. Sometimes I may order that evidence be stricken and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider that evidence that I have ordered stricken and that I've asked you to disregard.

Some evidence is admitted only for a limited purpose.

When I instruct you that that item of evidence has been admitted for a limited purpose, you must not consider it for any other purpose. You must consider it only for that limited purpose and no other.

Now, in reaching your verdict, you may have to decide what testimony to believe and what testimony not to believe. You may believe everything that a witness says or part of it or none of it. In considering the testimony of any witness, you may take into account the opportunity and the ability of the witness to see or to hear or know the things testified to, the witness's memory, the witness's manner while testifying, the witness's interest in the outcome of the case and any bias or any prejudice, whether other evidence contradicted the witness's testimony, the reasonableness of the witness's testimony in light of all of the evidence, and any other factors that bear on believability. I will give you additional guidelines to determine credibility of witnesses at the end of our case.

Now, as you know, as I previewed with you earlier, this is a criminal case. There are three basic rules about a criminal case that I want you to keep in mind and that you must keep in mind. First, the defendant is presumed innocent until proven guilty.

The indictment against the defendant brought by the government is only an accusation, nothing more. It is not proof of guilt or anything else. The defendant, therefore, starts out

with a clean slate.

Second, the burden of proof is on the government until the very end of the case. The defendant has no burden to prove his innocence or to present any evidence or to testify. Since the defendant has the right to remain silent and may choose whether to testify, you cannot legally put any weight on a defendant's choice not to testify. It's not evidence.

Third, the government must prove the defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later, but bear in mind that the level of proof required in this case is quite high.

Now, our law requires jurors to follow certain instructions regarding their personal conduct in order to help assure a just and fair trial. Let me give you some of those instructions. They're similar to some of the instructions that I gave you before.

First, do not talk either among yourselves or with anyone else about anything related to the case. You may tell the people with whom you live and your employer that you are a juror. You may give them information about when you will be required to be in court, but you may not discuss with them or anyone else anything related to the case.

Second, do not at any time during the trial request, accept, agree to accept or discuss with any person any type of payment or benefit in return for supplying the information about

the trial.

Third, you must promptly tell me about any incident you know of involving an attempt by any person to improperly influence you or any other member of the jury.

Fourth, do not visit or view the premises or place where any of the alleged crimes were alleged to have been committed, or any other premises or place involved in the case. Don't use internet maps, such as Google Maps or Google Earth or any other program or device to search for a view of any location discussed in the testimony.

Do not read, watch or listen to any accounts or discussions related to the case which may be reported by newspapers, television, radio, the internet or any other media.

Do not attempt to research any fact, issue or law related to this case, whether by discussion with others, by library or internet research or by any other means or source.

Now, in this age of instant electronic communication and research, I want to emphasize that in addition to not talking face to face with anyone about the case, you must not communicate with anyone about the case by any other means, including by telephone, text messages, email, internet chat, chat rooms, blogs, social networking websites, such as Facebook, Instagram or Twitter.

You must not provide any information about the case to anyone by any means whatsoever. And, again, that includes

posting information about the case or what you are doing in the case or any evidence on any device or internet site, including blogs, chat rooms, social websites and other means.

Also, do not Google or otherwise search for any information about the case or the law that applies to the case or the people involved in the case, including the defendant, the witness, the lawyers and the judge.

It's important that you understand why these rules exist and why they are so important. Probably helps you to follow them if you understand that there is a basis for us having these rules. Our law does not permit you as jurors to talk with anyone about the case or to permit anyone to talk to you about the case, because only you as jurors are authorized to render a verdict. Only you through that very extensive voir dire process we just went through have been found to be fair, and only you have promised to be fair. No one else in this world is qualified the way that you are qualified to sit as a juror in this case.

In addition, our law does not permit jurors to talk among themselves about the case until the Court tells them to begin deliberations, because premature discussions, as innocent as they may be, can lead to a premature final decision.

Our law does not permit you to visit a place discussed in the testimony for numerous reasons. First, you can't be sure that the place is the same condition as it was on the date in

question. Second, even if it were in the same condition, once you go to a place discussed in the testimony to evaluate the evidence, in light of what you see, you become a witness, not a juror. As a witness, you may now have a mistaken view of the scene that neither party may have a chance to correct, and that wouldn't be fair to either side.

Finally, our law requires that you not read or listen to any news accounts of the case and that you not attempt to research any fact, issue or law related to the case, because your decision must be based solely on the testimony and other evidence presented in this courtroom. The law often uses words and phrases in special ways. So it's important that any definitions you hear come only from me and not from any other source. It wouldn't be fair to the parties for you to base your decision on some reporter's view or opinion, for example, or upon other information you acquire outside of the courtroom.

These rules are designed to help guarantee a fair trial, and our law accordingly sets forth serious consequences if the rules are not followed. I trust that you understand and appreciate the importance of following these rules, and in accordance with your oath and promise, I know that you will do so throughout this trial.

Now, if you wish, you may take notes to help you remember what a witness said. We have notepads for you, and I trust you all found those when you came back to your seat. If

you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case and I direct you to begin your deliberations.

Also, do not let note-taking distract you so that you do not hear other answers by witnesses. When you leave the courtroom, your notes should be left in the jury room. Even if you take notes, you should rely on your own memory of what was said. Notes are to assist your memory only. They are not entitled to any greater weight than your memory or impression about the testimony, and that includes fellow jurors' notes during your deliberations.

All right. The trial is going to begin. Now, let me give you one other instruction. You'll note that Mr. Pate, the defendant, is not currently present in the courtroom. You shouldn't take anything from that one way or the other. Okay?

Now, the trial is going to begin. First, the government will make an opening statement, which is simply an outline to help you understand the evidence as it comes in. Next, the defendant may, but does not have to, make an opening statement. Opening statements are neither evidence nor argument. The government will then present its witnesses, and the defendant may cross-examine them.

Following the government's case, the defendant may, if he wishes, present witnesses whom the government may cross-examine. After all of the evidence is in, the government

and the defendant will present their closing arguments to summarize and interpret the evidence for you, and I will instruct you on the law. After that, you will go to the jury room to decide your verdict.

Now, I am going to invoke the rule of sequestration as to prospective witnesses during this trial. Under Rule 615 of the Federal Rules of Evidence, the Court hereby orders that all witnesses, except parties or others who may be determined to be essential to the presentation of the case, both lay and expert, shall be excluded from the courtroom until such time as they are called to testify. Witnesses shall not discuss this case with any other witness nor attempt in any way to read or otherwise learn the testimony of another witness.

Counsel, I direct you to notify each of your witnesses and every of your witnesses that the rule of sequestration has been invoked. Tell them what the rule entails and relay the Court's insistence that they comply with that rule.

Now, Members of the Jury, I ask you to please give your careful attention to the lawyers while they present to you their opening statements in the case. Remember, their statements are not to be considered by you as either evidence in this case or as your instructions on the law, but I urge you to give them your careful attention, as I know that you will. Mr. Howard.

MR. HOWARD: Thank you, Your Honor. May I proceed?

THE COURT: You may.

MR. HOWARD: Timothy Pate wanted millions of dollars from the IRS. He filed tax returns claiming 2.7 million and 1.1 million in refunds. Timothy Pate didn't have a job, no salary, no wages. He lived in a motel. And when the IRS looked at those tax returns, they told him they were frivolous. So Timothy Pate, who also goes by Akenaten Ali, came to this courthouse and filed a civil complaint against the IRS Commissioner, John Koskinen. But when Timothy Pate didn't get that 2.7 million or that 1.1 million even after filing that complaint, he got mad. So he set his sights on threatening and then filing false liens against federal officials.

Timothy Pate turned a lien into a weapon of harassment and retaliation: Do what I say or else, do what I say or else I'm going to put a lien on you. And he followed through with those threats.

You'll see that he filed liens of 15 million dollars, 33 million dollars, 100-million-dollar lien against seven people, seven victims, seven people who were federal employees and officials, all in retaliation for them just doing their job.

They were all false liens. And he didn't stop there. For several of those victims he even went to bankruptcy court and tried to put them into bankruptcy against their will by filing involuntary bankruptcy petitions. Timothy Pate wanted millions of dollars, and he didn't care who he hurt to get it. His false liens had real consequences. As a result of his

greed, his anger, he's charged with 16 counts of filing false retaliatory liens and five counts of making a false bankruptcy declaration.

In the course of this case, you're going to hear about what a lien is, and I expect that you'll hear that it's the right that a creditor has on the debtor's property to secure payment of a debt. But there needs to be a debt. You get a car loan from a bank, you and the bank agree to use as collateral that car to secure payment of that loan. And the bank puts a lien on that car.

You'll hear that the effect of having a lien placed against a debtor is a very real effect. It's a document, but you'll hear that it has a very real consequence on the person named as a debtor.

And you'll also hear about those seven victims in this case, seven public servants, seven people who went into public service and as a result of their position were threatened and had false liens placed against them by Timothy Pate.

So let's talk about who those victims are. You're going to hear about John Koskinen. John Koskinen served as the Commissioner of the IRS. After Timothy Pate filed his complaint against Commissioner Koskinen, he demanded that the Court arrest the IRS Commissioner. That didn't happen. The judge denied that demand. And so then Timothy Pate threatened Commissioner Koskinen, threatened to file liens against him if he didn't get

his tax returns, if he didn't get his tax refunds. Do what I say or else. And then he carried it out. He filed two 33-million-dollar liens against IRS Commissioner John Koskinen.

Commissioner Koskinen doesn't know Timothy Pate, never spoken with him, never talked to him, doesn't know who he is. Commissioner Koskinen doesn't owe Timothy Pate anything.

Commissioner Koskinen is going to come down to Augusta, Georgia, and he's going to tell you that. You see, his liens, his choices, his actions had consequences even on the highest ranking government officials that he targeted, people like Jacob Lew.

Jacob Lew served as the Secretary of the United States Treasury Department. It's the department that oversees the IRS. Timothy Pate threatened to file liens against Secretary Lew if he didn't get his tax refunds. And then he filed those, two 15-million-dollar liens against Jacob Lew personally.

Jacob Lew is going to come down to Augusta, Georgia, and he's going to tell you he doesn't know Timothy Pate, never talked to him, doesn't have any agreement with him, doesn't have a debt that he owes Timothy Pate. He doesn't owe Timothy Pate one cent. But it didn't matter to Timothy Pate.

You're also going to hear about other federal officials that Timothy Pate targeted, people like Eric Thorson. Eric Thorson -- Eric Thorson served as the Inspector General for the Treasury Department. Never spoke with Timothy Pate, doesn't

know him, had no agreement with him. Timothy Pate threatened and then filed two 15-million-dollar liens against Inspector General Thorson. Inspector General Thorson is going to come to Augusta, Georgia, and he's going to testify, and he's going to tell you he doesn't owe Timothy Pate anything.

But you're also going to hear about other victims. You're going to hear from Denise Davis. She works for the IRS. Denise Davis wasn't nominated by the President for her job. She's one of thousands of employees of the IRS who show up and do their job. When the IRS told Timothy Pate that his liens were frivolous, you'll see that in one of the letters, her name appears at the bottom of that letter; her name's in the signature of that letter. That's how she came within the cross-hairs of Timothy Pate.

As a result of just her doing her job, her name being on the letter, he filed two 15-million-dollar liens against Denise Davis. She doesn't know him, hasn't spoken with him, doesn't owe him anything.

You're also going to hear from another victim in this case, Judge Brian Epps. Judge Epps is a federal judge in Augusta, here in this courthouse. He's from Augusta, Georgia, born and raised here, grew up here and continues to call this community his home.

After Timothy Pate filed that civil complaint against Commissioner Koskinen, that case got assigned to Judge Epps. In

fact, it was Judge Epps who issued that order denying Timothy Pate's demand to have Commissioner Koskinen arrested. You're going to see in filing after filing, motion after motion on the Court's docket, Timothy Pate made it very clear that Judge Epps had a choice. He could choose to rule in Timothy Pate's favor or have a lien filed against him, personally. He could choose to enter judgment for Timothy Pate or else.

I mentioned that Judge Epps is a federal judge, in federal court. He didn't back down to Timothy Pate's threats. And so as a result, Timothy Pate filed two 15-million-dollar liens against Judge Epps. And after he filed those liens, he took an ad out in the Augusta Chronicle to publicize those liens. You'll see that ad, just as Judge Epps's friends, just as his family who opened the newspaper would see that ad in this community. And he wasn't done with Judge Epps.

You see, after filing those 15-million-dollar liens, he filed a 100-million-dollar lien on Judge Epps. And after he filed that 100-million-dollar lien against Judge Epps personally, he offered to take it back, offered to withdraw the lien, but only if, only if Judge Epps ruled in his favor, or if Judge Epps paid him a couple million dollars. Do what I say, or else.

And Timothy Pate didn't just file false liens against federal employees and officials. He didn't stop there. Because on May 21st, 2018, he walked into the Bankruptcy Clerk of Court.

The bankruptcy court is right across the square from this courthouse. You'll see it when you leave the courthouse. And he walked into that clerk's office, and he filed five petitions to put those victims into bankruptcy against their will. He filed petitions that would have bankrupted them. Timothy Pate wanted millions of dollars, and he didn't care who he hurt to get it.

You'll see the false statements that he made in those bankruptcy petitions. And you'll hear about the effect that it can have on someone financially to be put into bankruptcy. You'll hear about the effect that it can have on someone personally to be put into bankruptcy. Timothy Pate didn't care.

And as he was at the clerk's office and when he filed those involuntary petitions, he demanded a case number. You're going to hear from the clerks that he was banging his fist on the counter demanding that he get a case number. And when he didn't get one fast enough, he threatened to file a lien. When he has a problem, the solution for him is to file liens against federal employees and officials.

And he didn't think that he got a case number fast enough. So you're going to hear from the sixth victim in this case. Her name is Lucinda Rauback. Ms. Rauback is the Clerk of Court of the United States Bankruptcy Court. She doesn't know Timothy Pate. She's never spoken with him, never talked to him, made no agreement, owes no debt to Timothy Pate. Members of the

Jury, he put two 15-million-dollar liens on Lucinda Rauback personally.

You're going to hear from her, and you're also going to hear from the seventh victim in this case, United States Bankruptcy Judge Susan Barrett. You see, after Timothy Pate filed those petitions, they went to Judge Barrett to rule on them, and Judge Barrett saw them for exactly what they were, false and retaliatory. She issued an order that prevented those victims from being put into bankruptcy, from -- saving them from being put into bankruptcy against their will. And then when Timothy Pate got that order, he didn't like that order so much. So you can imagine what he did next. He filed two 33-million-dollar liens against Judge Susan Barrett personally.

Timothy Pate turned a lien into a weapon, and he used that weapon time and time again, which is why at the end of this case we're going to ask you to find Timothy Pate guilty, based on the evidence, applying the law that the judge will give you and using your common sense.

Timothy Pate isn't above the law, and choices have consequences. Thank you.

THE COURT: Mr. Maines.

MR. MAINES: Thank you, Your Honor.

Ladies and Gentlemen of the Jury, my name is J. D. Maines. And in stark contrast to what Mr. Howard said, these were not weapons. These are legal instruments that

Mr. Pate, an uneducated man in his 40s, living in a hotel room for a long period of time, considered his right to use.

When you go through the exhibits in this case and you see the rambling statements of Mr. Pate, one thing will be very clear to you. This is someone that clearly has incorrect ideas about how our justice system works, how our civil courts work, how our legal instruments work; and much like a doctor would use instruments to treat his patients, he's using these legal instruments to his own self-destruction. He's inexperienced. He says, in the very first documents he files, I'm not a lawyer, I'm requesting your indulgence.

And the one thing that you will see is someone that's gotten some very bad information. And I expect that the government is going to introduce evidence that they recovered from a search warrant at his hotel room that had a manual on how to engage in this ridiculous, crazy, absurd idea that the IRS owes him and other individuals that he identifies with money. And what you will see in his filings and his statements is sincerity. This is not a lawyer.

I like that Mr. Howard brought up that our esteemed judicial officer, Judge Epps, who lives here in Augusta, is from Augusta, because on the other side of the tracks is Mr. Pate, who didn't go to law school, doesn't have a prestigious position as a judicial officer in this courthouse. He's a low-educated man, in his 40s, living in a motel room for

a long period of time, whose ideations are wrong; and you will not hear me defend him by saying that these were right or correct or he had any right to do them. But what I'm going to ask you to focus on is, is this someone that's filing liens that knows what they are, has reason to know what they do, or is what he's doing just a foolish, hair-brained scheme that someone told him about that he's just regurgitating out. And what you will hear, especially from his bankruptcy court hearing, is this is someone that wanted to be heard. He wanted his day in court, what he perceived to be his day in court. And he felt like he was denied that. 15 million, 30 million; it's all just absurd paperwork.

What I'm going to ask you to do during this trial is not to consider the stuff that the government is going to introduce into evidence as me in any way condoning what he has done. What I want you to focus on, especially as it relates to the stuff that Mr. Pate writes, is this is nonsensical; this is someone that doesn't know what he's doing.

Thank you very much.

THE COURT: Mr. Howard.

MR. HOWARD: Your Honor, the government calls Jamie Hodge.

THE COURT: Before we call that witness, Mr. Howard, are there any exhibits that you have reached a stipulation regarding introduction?

MR. HOWARD: We have, Your Honor. The government at this time would move to admit Government's Exhibits 1-1 through 73.

THE COURT: Is it 1-1 through 1-73? Is that right?

MR. HOWARD: No, Your Honor. And I'll clarify. It's 1-1 through 1-48.

THE COURT: Okay.

MR. HOWARD: And then it's 2-1 through 2-3.

THE COURT: Okay.

MR. HOWARD: 3-1 through 3-9. 4-1 through 4-5. And then from there it's straight to 73.

THE COURT: 5 through 73.

MR. HOWARD: Correct, Your Honor.

THE COURT: Is there any objection to those exhibits from the defense?

MR. MAINES: No, Your Honor.

THE COURT: Those exhibits are admitted without objection.

Mr. Howard, you can call your witness.

MR. HOWARD: Thank you, Your Honor. The government calls Jamie Hodge.

THE COURT: Jamie Hodge.

MR. HOWARD: Your Honor, while she's coming up, I wonder if I could take a witness binder up to the witness stand for the witness.

THE COURT: No problem. Mr. Maines, you've seen that binder in advance?

MR. MAINES: I have.

THE COURT: You may.

Go ahead, Ms. Hammock.

THE CLERK: Please raise your right hand.

JAMIE HODGE, being first duly sworn, testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. You can have a seat, please. If you will, please state your full name for the record.

THE WITNESS: Jamie Hodge.

THE CLERK: And spell your last name for us.

THE WITNESS: H-O-D-G-E.

THE CLERK: Thank you.

MR. HOWARD: Your Honor, may I proceed?

THE COURT: You may.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. Ms. Hodge, what do you do for a living?

A. I am a deputy clerk for the Southern District of Georgia.

Q. And how long have you worked as a deputy clerk?

A. Since September 2017.

Q. And you mentioned that you work in the Southern District of Georgia. Where, specifically, do you work at?

A. In the clerk's office.
Q. And where is the clerk's office?
A. Right down the hallway.
Q. Okay. It's within this courthouse; correct?
A. It is.
Q. What are some of your duties and responsibilities as a deputy clerk?
A. We intake pleadings that come through the window or through the mail, and we receive payments. We docket orders, and we mail orders to pro se clients.
Q. And when you say you do intake, does that mean that you physically receive filings from litigants?
A. Yes.
Q. What types of cases are handled in the district court?
A. Civil, criminal and miscellaneous cases.
Q. And are you familiar with the district court's process for court filings?
A. Yes.
Q. Let's talk about how documents are filed in the District Clerk's Office. When someone has a case here in the federal district court, how can they file documents in their case?
A. They can either come to the window and file it in person, or they can mail documents and we receive them and clock them in, and we put them on the docket.
Q. And do all filings go through the clerk's office?

A. Yes.

Q. When someone makes a filing in person as you mentioned, what happens with that filing?

A. We receive it from the pro se client. We clock it in, which means there is an electronic clock. We take the paper, and we put a stamp on it; sign our initials, and if it's a new case, we assign a case number, whatever the next case number may be.

Q. And you mentioned a legal term there, pro se. Can you tell the jurors what that means?

A. Yeah. Pro se just means that they represent themselves. They are acting as their own attorney.

Q. And after you received it, is it scanned and then put into the electronic docket?

A. It is.

Q. Can you tell the jury a little bit about what that electronic docket is?

A. So the electronic docket is, it took the place of a physical file. So everything that is filed from the beginning, from the complaint that we receive is put in an electronic file. So everything is maintained in -- on the electronic filing system and throughout the duration of that case.

Q. And can the general public access the filings on the Court's electronic docket?

A. Yes, they can, through PACER.

Q. Well, what is PACER?
A. PACER is the public -- the public avenue where anybody in the United States can look up a case. So it could be anybody from Washington, all the way to Virginia; it doesn't matter. So long as you have an account to PACER, anybody can look up the document.
Q. And they can search by the person or by the case; right?
A. Correct.
Q. So if you wanted to search for any case involving Jamie Hodge, anyone with an internet connection and a PACER account could do that; right?
A. They could.
Q. And does the clerk's office also have computers open to the public to access case filings?
A. We do. We do have a public terminal available for the public.
Q. And as a clerk, when you receive and docket a filing, are you deciding the merit of that filing?
A. No. We are not allowed to decide the merit.
Q. Who makes that decision?
A. That would be Chambers.
Q. And when you say Chambers, what do you mean?
A. Means that we intake anything that comes in our window, or the mail. We docket it as it is, as it appears, and then the chambers, or the judge, will review and set forth an order,

determine the legitimacy of that filing.

Q. Ms. Hodge, did you become aware of a federal civil case filed by Timothy Pate?

A. Yes.

Q. How did you become aware of that case?

A. He came to the window and filed a complaint.

Q. Were you the one that actually accepted that complaint --

A. Yes.

Q. -- from Mr. Pate? Now, I've handed -- or I've put up on that witness stand in front of you a binder of documents that contain Government's Exhibits 1-1 through 1-48, as well as the Exhibits 2 and 3 in those. Have you reviewed those before coming and testifying today?

A. Yes.

Q. Let's start with the Exhibits 1-1 through 1-48. Do you recognize those?

A. Yes.

Q. What are they?

A. This is the civil case filing filed by Timothy Jermaine Pate.

Q. Okay. And those are documents that were on the docket for Mr. Pate's civil case; correct?

A. Yes. Correct.

Q. And have you compared the documents in that binder to the digital copy that will be shown on the screens for the jurors?

A. Yes.
Q. And are the documents in the binder the same as the digital copy?
A. Yes.
Q. If we could pull up -- and, Your Honor, I'd ask permission to freely publish these exhibits?
THE COURT: Any objection?
MR. MAINES: No. No objection.
THE COURT: You have such permission.
MR. HOWARD: Thank you, Your Honor. If we could pull up Government's Exhibit 1-1.
BY MR. HOWARD:
Q. If we could look at the first page of that document. Ms. Hodge, do you recognize that?
A. Yes, I do.
Q. What is that?
A. That is the first page of the complaint filed by Timothy Jermaine Pate on October the 10th, 2017.
Q. And who is Mr. Pate suing in this complaint?
A. Commissioner of Internal Revenue.
Q. When was it filed?
A. October the 10th, 2017.
Q. And who at the clerk's office received this complaint?
A. I did.
Q. Looking at the stamp in the top right-hand corner, do you

see that?
A. Yes.
Q. What can you tell us about that particular stamp? What information is conveyed there?
A. The date that it was clocked in and the time and the initials of the clerk, which is myself.
Q. The J. Hodge is you; right?
A. It is.
Q. Was this filed in person?
A. Yes.
Q. Who filed the complaint?
A. Timothy Jermaine Pate.
Q. Did he also go by another name?
A. Yes.
Q. And what was that?
A. Akenaten Ali.
Q. All right. As I ask you questions, for ease of reference I'll refer to him as Mr. Pate. Okay?
A. Okay.
Q. If we can pull up Exhibit 19. Looking at the screen in front of you when we pull up Exhibit 19, the photograph, do you recognize that?
A. Yes.
Q. Who is that?
A. Timothy Jermaine Pate.

Q. And how do you recognize that individual?
A. Because he came to the clerk's office quite often to file his filings, in person.
Q. The person that's reflected in Exhibit 19 is the same person that came and filed that document; correct?
A. Yes, correct.
Q. Is it fair to say that you had a number of interactions with Mr. Pate?
A. I did.
Q. Up until his arrest, who came in person to make filings on his civil cases?
A. He did.
Q. If we could go back to Exhibit 1-1. After that complaint was filed, what judges was it assigned to?
A. Judge Hall and Judge Epps.
Q. And when you say Judge Hall and Judge Epps, what are their different roles?
A. Judge Hall would be the district judge, the Article III judge; and Judge Epps is the magistrate judge.
Q. If we could look at Page 2 of Exhibit 1-1. Looking at Page 2, does this contain information on the plaintiff and defendant?
A. Yes, it does.
Q. And, in general, when we're talking about this complaint, who's the person actually completing the information in the

complaint? Is it you?
A. No.
Q. Who is it?
A. It is always the plaintiff. We are not allowed to file anything or put down anything on the document.
Q. And staying on this page, it lists Timothy J. Pate, a/k/a Akenaten Ali, as the plaintiff; correct?
A. Correct.
Q. And the defendant's name is John A. Koskinen as the Commissioner of Internal Revenue; correct?
A. Correct.
Q. If we could look at Page 6 of Exhibit 1-1. And looking at the bottom of Page 6, is that complaint signed and dated?
A. It is, by Timothy J. Pate.
Q. And looking at Page 8 of Exhibit 1-1, what is that?
A. Affidavit of complaint.
Q. And was this filed by Mr. Pate at the same time he filed the complaint?
A. It was.
Q. All right. Staying on Page 8, if we could look at the second paragraph, the first sentence of that paragraph. Does he complain about credit hasn't been returned to him by the IRS for the 2015 and 2016 tax years?
A. He does.
Q. If we could go to Page 10 of Exhibit 1-1. I'll direct

your attention to the second full paragraph on that page. And in the middle of that paragraph begins a sentence that says, "Let the record show that I am not a U. S. Citizen." Can you see that?
A. I do.
Q. Can you read that sentence and then the two sentences that follow it?
A. Sure. "Let the record show that I am not a U. S. Citizen nor an employee of the United States. I will never play the role of the debtor as this case proceeds. The estate of Timothy Jermaine Pate has been reclaimed and the birth certificate of Timothy Jermaine Pate was returned via registered mail to Jacob J. Lew whom holds the Office of Secretary of the United States Treasury, also known as Secretary of the U. S. Bankruptcy Chapter 11 reorganization."
Q. Can you read the following sentence?
A. Yes. "I am an heir to the kingdom of Morocco."
Q. If we could move to Government's Exhibits 1-2. When you file a civil complaint in the federal district court, is there a fee?
A. There is.
Q. And do you need the Court's permission to proceed without paying that fee?
A. You do.
Q. As part of getting the Court's permission, do you disclose

your assets on a form?
A. You do.
Q. If we could look at Government's Exhibit 1-2, do you recognize that?
A. I do.
Q. What is that?
A. That is a motion to proceed without prepayment of the fees.
Q. And who completed this form?
A. Timothy Jermaine Pate.
Q. Was it filed by the defendant the same day he filed his complaint?
A. It was.
Q. Looking at Page 1 of that, does he list his wages?
A. Yes.
Q. And what does he list as his wages?
A. Nothing. Zero.
Q. And above that, is there a section for him to list his employer?
A. Yes.
Q. And what does he write regarding his employer?
A. He writes nothing.
Q. Scrolling down, with respect to his income, does he list any?
A. No.

Q. And Sections 4 and 5, if we go to Page 2 of that document, Sections 4 and 5 ask about his other assets, including bank accounts, stocks and bonds; correct?

A. Correct.

Q. And he listed zero there as his assets?

A. Yes.

Q. Looking at Sections 6, 7 and 8 regarding his expenses and his debts, he also said that he has no expenses and no debts. Correct?

A. Correct.

Q. And scrolling to the bottom of this page, that's signed under penalty of perjury, isn't it?

A. It is.

Q. Looking at Exhibit 1-3 now. Ms. Hodge, what is this?

A. Motion for court order of tax records.

Q. And who filed it?

A. Timothy Jermaine Pate.

Q. Looking at the first sentence of that motion, what does Mr. Pate demand?

A. A court order for compliance, tax records from the Internal Revenue Service for the account of Timothy Jermaine Pate for the 2015 and 2016 tax years.

Q. And this was filed just a few days after his complaint; correct?

A. Correct.

Q. And did he also file another motion that same day?
A. Yes.
Q. Turn to Exhibit 1-4. What is this?
A. Motion for court order of bank records.
Q. And did the Court rule on Mr. Pate's motions days later?
A. They did.
Q. If you'll look at Exhibit 1-5. What is this?
A. It's an order denying his motions.
Q. And who issued the order?
A. Judge Epps.
Q. And this order is from October of 2017; correct?
A. It is.
Q. Let's move ahead to December 21st, 2017, in Exhibit 1-6. Do you see that filing?
A. I do.
Q. What is that?
A. United States Motion to Dismiss and Memorandum of Law in Support Thereof.
Q. And the IRS Commissioner after he was sued by Mr. Pate was represented by the Department of Justice in Mr. Pate's civil case; correct?
A. Correct.
Q. And that Motion to Dismiss was filed by a D.O.J. attorney; is that right?
A. Correct.

Q. Let's look at the first page of this Motion to Dismiss. Do you see the paragraph under factual background?
A. I do.
Q. Can you read the first two sentences of that paragraph?
A. Yes. "As the tone and content of the plaintiff's complaint suggests, plaintiff is a tax defier who participated in an original issue discount, OID or 1099-OID scheme to defraud the government. The 1099-OID scheme is a frivolous tax argument that has been around in various forms for many years."
Q. If we will look at Page 2 of that exhibit, I'd ask if you'd look at the first paragraph, the last sentence which begins "the IRS has repeatedly notified the public." Do you see that?
A. I do.
Q. Can you read that sentence?
A. "The IRS has repeatedly notified the public that arguments involving the 1099-OID scheme are frivolous and can result in civil penalties."
Q. Looking at Page 6 of this exhibit, there's a Section B; correct?
A. Yes.
Q. And the second paragraph below that section begins with a sentence stating the plaintiff's complaint. Do you see that?
A. Yes.
Q. Would you read that sentence and the one that follows it.

A. "The plaintiff's complaint is a narrative letter that raises frivolous arguments as to why the IRS's failure to refund the plaintiff for tax years 2015 and 2016 is unlawful. Courts have found that such arguments related to false Forms 1099-OIDs are meritless and frivolous."

Q. If you would turn to Exhibit 1-7, and I'll ask whether Timothy Pate filed a response to the government's motion to dismiss that we just looked at.

A. He did.

Q. And what is Exhibit 1-7?

A. Response to motion to dismiss case.

Q. Who received this filing at the clerk's office?

A. I did.

Q. And looking at that stamp in the top right-hand corner, what can you tell the jury regarding that stamp?

A. This is an actual physical stamp, unlike our electronic stamp. And we were trying to bide time, and that is why we used this stamp instead of our electronic one.

Q. Why were you trying to bide time?

A. We were directed to prolong so that Deputy Brant could talk to Timothy Jermaine Pate.

Q. Who is Deputy Brant?

A. Deputy Brant is a U. S. Marshal here in the Southern District.

Q. So the United States Marshals were aware and involved with

Mr. Pate's filings by this time?
A. Yes.
Q. If you would turn to Page 3 of Government's Exhibit 1-7. And I'll ask you to look at the first full paragraph, the seventh line down. There's a sentence that begins "If Case Number CV 1:17-0126 is dismissed." Do you see that?
A. I do.
Q. Starting at that sentence, can you read the rest of the paragraph?
A. Yes. "If Case Number CV 1:17-0126 is dismissed before rightful credit is returned back to the principal account of Timothy Jermaine Pate from the tax returns concerning said case, then a registered nonjudicial claim/lien will be constructed and mailed via registered mail for conspiracy to commit fraud against any judge, tax agent that makes an order to dismiss the case before justice is served. If any judge/tax agent denies my motion for tax records or motion for bank records, then a registered nonjudicial claim/lien will be constructed and mailed via registered mail against any judge/tax agent that makes the denial. If the Internal Revenue Service does not honor the tax returns which was originally filed, then Jacob J. Lew, Eric Thorson and John Koskinen will have registered nonjudicial claims/liens made against them for breach of fiduciary and conspiracy to commit fraud. Let the record show that several other nonjudicial claims/liens will be made against others that

help support any fraud concerning this tax situation."

Q. Ma'am, if you would look at the next paragraph, the sixth line down with a sentence that begins "I will be filing claims/liens." Do you see that?

A. I do.

Q. Beginning with that sentence, can you read the remainder of the paragraph?

A. "I will be filing claims/liens against the personal commercial bond of everyone connected to any type of fraud concerning this tax situation. This includes any judge, any attorney, any government official or et cetera. I came to the de facto court for commercial justice, but I do not require the de facto courts for commercial justice. My word is my bond, and I will put it to use under penalty of perjury. Since I was given 14 days to respond, then I only find it fair to give the Internal Revenue Service 14 days from the day that this document is placed on U. S. District Court record to return credit, which is rightfully due, or registered nonjudiciary claims/liens will be filed against all parties whom have acted in dishonor. Attached with this document is an affidavit of notary presentment/certification of mailing which was filed on Elaine C. Johnson, superior court record, and shows that 19 government agencies were given notification of my status, fee schedule and et cetera. With all due respect, I am not playing any more got damn games with any of you. I know who I am."

Q. And this document was filed with the Court on January 2nd, 2018; correct?

A. Correct.

Q. Ma'am, if you would turn to Exhibit 1-8, and I'll ask if you recognize that.

A. Yes.

Q. What is that?

A. Motion for arrest warrant filed by Timothy Jermaine Pate.

Q. If you would look at the first sentence of that motion, who is Mr. Pate seeking to have arrested?

A. John A. Koskinen.

Q. Looking at Page 2 of that Exhibit 1-8, can you read the first seven lines under the heading notice of intent?

A. "On January 31st, 2018, a commercial maritime claim via affidavit shall be mailed to the defendant for the tax refund credit that the defendant is holding fraudulently from the principal account of Timothy Jermaine Pate. Any fraud from anyone concerning this matter will result in a claim/lien, and notice of the claim/lien shall be placed in the newspaper so others in commerce can be aware of the commercial fraud in the sea of commerce. Let all know that I have acted with commercial honor since the beginning of this matter."

Q. Can you continue reading?

A. Sure. "Everything I have done has been true and on the level. I will now exercise my right to lien upon those whom

have acted in dishonor."
Q. Thank you. If you would turn to Exhibit 1-9. What is that?
A. An order signed by Judge Epps.
Q. And in this order does Judge Epps deny Mr. Pate's motion to arrest the IRS Commissioner?
A. He does.
Q. And in response to that, if you would look at Exhibit 1-10. What is that?
A. Response to order of denial of arrest warrant.
Q. On Page 1, the second paragraph, the fifth line down, does Mr. Pate write that he doesn't give a damn about the Constitution?
A. He does.
Q. Looking at the second page, does Mr. Pate again move to arrest Commissioner Koskinen?
A. He does.
Q. If you'd look at the second paragraph on that page, the last sentence of that paragraph, what does Mr. Pate write?
A. "If Brian K. Epps does not honor this affidavit, then a commercial maritime claim will be filed against him."
Q. Brian K. Epps is the magistrate judge assigned to this case; correct?
A. It is. Correct. He is.
Q. Looking at Exhibit 1-11, what is that?

A. Affidavit of truth for claim.
Q. And, again, was this filed by Timothy Pate?
A. It was.
Q. If you'd look at Page 2, paragraph that's numbered 6. Would you please read the first sentence of that.
A. "On January 31st, 2018, I responded to the order to deny the motion to arrest made by the judge a/k/a referee a/k/a Jesuit Priest a/k/a tax collector a/k/a contract enforcer a/k/a Brian K. Epps." Continue?
Q. If you'd look at Page 3 of 1-11, there's a paragraph under the heading affidavit of claim. Does he write that he requires Jacob Lew, John Koskinen and Eric Thorson to answer several questions that he lists there?
A. He does.
Q. Looking at Page 4, in the middle of that page, there's a paragraph that begins failure to answer. Do you see that?
A. I do.
Q. What does Mr. Pate say will happen if he doesn't get a response?
A. That he will file a commercial lien.
Q. And looking at that, if you would just go ahead and read that paragraph.
A. Sure. "Failure to answer these questions point for point with proof will result in a commercial lien in the amount of 15 million against the estate/slash account of Jacob J. Lew, a lien

in the amount of 15 million against the estate/account of Eric Thorson; and a lien in the amount of 33 million will be filed against the estate/account of John Koskinen. I require a response within 7 days of receipt of this claim. Failure to respond via sworn affidavit under full commercial liability point for point and under perjury will deem this claim as valid and will result in a commercial lien as mentioned."

Q. And if we look at the next sentence right below that, does he require Brian K. Epps to answer several questions?

A. He does.

Q. On Page 5 of that exhibit, in the second paragraph, towards the bottom of that page that begins with the word "note." Do you see that?

A. Yes.

Q. What does Mr. Pate write in that sentence?

A. That after the time has expired to respond, that a commercial lien will be placed in the newspaper to alert all commerce, and the Department of Transportation will be notified.

Q. All right. So he mentions not only filing a lien, but also putting public notice of that lien in the newspaper. Correct?

A. Correct.

Q. If you'd look at Exhibit 1-12. What is that?

A. Motion for default judgment in order for payment.

Q. If you'd look at Page 2 of that exhibit, in the first

line, the first full sentence that begins "I do not." Do you see that?
A. I do.
Q. Could you read that sentence and the following sentence?
A. Yes. "I do not argue facts because none of them can be proven by anyone, and I am not licensed to argue. The defendant either accepts the charge with honor or I am going to lien on his property and trade his securities until the lien is satisfied."
Q. In the third paragraph on that same page, towards the middle of that paragraph, there is a sentence that begins "regardless of any unsworn nonsense that is put on court record." Do you see that?
A. I'm having a hard time finding that.
Q. Okay. If you'll look at the middle of that paragraph, towards the very right, the word "regardless" starts the sentence.
A. Okay. I got it.
Q. Okay. If you would please read that paragraph.
A. Sure. "Regardless of any unsworn nonsense that is put on court record, I am moving forward with the claim/lien process if this tax situation is not cured within the allotted time frame that I gave. I have given the government too many chances to right this wrong. Save the ridiculous word play a/k/a legalese for some U. S. Citizen that don't know any better, because I am

not the one to play any got damn games. If select people would do their got damn job, then this case would not be on the docket. Holding back credit that I created is nothing short of theft and I be damned if I let anyone steal from me. All would be wise to remember Matthew 5:25 because it is my pleasure and honor to lien against all dishonorable debtors whom think they can deceive me."

Q. And below that there is a reference to a Bible verse; correct?

A. Yes.

Q. And below that Bible verse, beginning with the word "no," he clarifies that his previous filing did not specify a lien amount against Judge Epps. Correct?

A. Correct.

Q. And did he rectify that in this paragraph?

A. He did. With 15 million.

Q. Looking at Government's Exhibit 1-13, what is that?

A. Affidavit of truth for claim.

Q. If you would look at Page 2, in the paragraph that is numbered 4, does Mr. Pate refer to Judge Epps there as a coward?

A. He does.

Q. And below that, does Mr. Pate write that Brian K. Epps has seven days from February 15, 2018, to answer the claim or a lien will be filed as stated in the claim that is already on record?

A. He does.

Q. And the next series of filings that we're going to see, does Mr. Pate lay out the specific amount of money that he's going to lien against Commissioner Koskinen and Judge Epps?

A. He does.

Q. If you would look at page -- or Exhibit 1-14. And at the end of that first paragraph, does he write that a 33-million-dollar lien will be filed against John Koskinen in seven days?

A. He does.

Q. And that same day, February 27th, 2018, did Mr. Pate make a similar filing threatening a 15-million-dollar lien against Judge Epps?

A. He did.

Q. If you'd look at Exhibit 1-15. And in that filing, again, that's where another threat of 15-million-dollar lien against Judge Epps is?

A. He did.

Q. Looking at Exhibit 1-16, is that a filing from Mr. Pate on March 2nd, 2018, styled affidavit of notice of presentment?

A. It is.

Q. If you would look at the first paragraph, the last three sentences of that paragraph, beginning with the sentence, "let the record show." Do you see that?

A. I do.

Q. And does Mr. Pate write that "let the record show that I

require the return of the six million dollars in credit and the return of credit which was claimed in the original complaint. If what I require is not met then I will lien to get what I require and more for the dishonor in the sea of commerce against the account of Timothy Jermaine Pate. I, Akenaten Ali, enter this affidavit under penalty of perjury with full commercial liability"? Did I read that correctly?
A. Yes, you did.
Q. All right. So to take a step back, Ms. Hodge, we've seen several filings now where Mr. Pate threatened to file a lien against several government officials; correct?
A. Correct.
Q. Commissioner Koskinen, Judge Epps, Secretary Lew. Mr. Thorson was mentioned as well; right?
A. Correct.
Q. And the filing we just read said that he wanted six million or he'd file a lien; correct?
A. Correct.
Q. On March 6th, 2018, did Mr. Pate carry through with that threat?
A. He did.
Q. If you would look at Government's Exhibit 1-17. What is that?
A. Affidavit of lien and notification of lien.
Q. If you would please read the first sentence of the first

paragraph.
A. "I, Akenaten Ali, secured party for the account of Timothy Jermaine Pate and creditor-in-fact to the United States of America, hereby place a lien in the amount of 33 million U. S. Dollars against the account of John Andrew Koskinen."
Q. If you would look at the second paragraph on that same page, if you would please read the first sentence.
A. "I, Akenaten Ali, secured party for the account of Timothy Jermaine Pate and creditor-in-fact to the United States of America, hereby place a lien in the amount of 15 million in U. S. Dollars against the account of Brian Keith Epps."
Q. Turning to the second page of Exhibit 1-17, what is that?
A. Notice of claim of maritime lien.
Q. And this document was filed on the Court's docket; correct?
A. Correct.
Q. Publicly available?
A. Correct.
Q. Let's go through this filing. What is the vessel listed in box one?
A. JOHN ANDREW KOSKINEN.
Q. And is it styled the U. S. M/V JOHN ANDREW KOSKINEN?
A. It is.
Q. And Box 6, what is the amount that is claimed there?
A. 33 million United States Dollars.

Q. And looking above that in Box 5, who is the listed claimant?
A. Akenaten Ali.
Q. And, again, Timothy Jermaine Pate went by Akenaten Ali; correct?
A. Correct.
Q. Looking at Box 7, does that list various property --
A. It does.
Q. -- in which being is liened on?
A. It does.
Q. It includes his 401(k)s; right?
A. Yes.
Q. It also includes everything from a coin collection to liquor, farm equipment, crops and farm supplies; right?
A. Correct.
Q. If you'd look at the third page of Exhibit 1-17. What is that?
A. Notice of claim of maritime lien.
Q. And, again, this was filed and placed on the Court's docket?
A. It was.
Q. Now, the last maritime lien we just looked at on the previous page named JOHN ANDREW KOSKINEN. Who's named in this lien?
A. U. S. M/V BRIAN KEITH EPPS.

Q. And in Box 6, what's the amount claimed?
A. 15 million United States Dollars.
Q. Looking at Exhibit 1-18, what is that?
A. Affidavit of notice of presentment.
Q. And looking at the last sentence of the first paragraph, does it make reference to the Coast Guard's National Vessel Documentation Center?
A. It does.
Q. If you would look at the second paragraph of Exhibit 1-18, can you please read that?
A. Yes. "I, Akenaten Ali, hereby give notice that a notice of claim of maritime lien was placed in the Augusta Chronicle against the commercial vessel of JOHN ANDREW KOSKINEN and the commercial vessel of BRIAN KEITH EPPS. The legal ad number is 3016831 and will display in the Augusta Chronicle on March 15th, 22nd and 29th, 2018. Additionally, it will display on April 5th, 2018, in the Augusta Chronicle. I, Akenaten Ali, hereby enter these affidavits under penalty of perjury with full commercial liability."
Q. Ms. Hodge, what is the Augusta Chronicle?
A. It is a newspaper in Augusta.
Q. Is it fair to say that newspaper is distributed widely in the Augusta, Georgia, region?
A. It is.
Q. One of the major newspapers of this area, if not the major

newspaper. Is that fair to say?
A. It is.
Q. The next day did Mr. Pate make another filing with the Court?
A. He did.
Q. If you would look at Exhibit 1-19 and tell me what that is.
A. Affidavit of demand for payment.
Q. In the second sentence does he demand 15 million dollars against Brian Keith Epps?
A. He does.
Q. In several of Mr. Pate's filings, does he also seek the arrest of Judge Epps?
A. He does.
Q. If you'd look at Exhibit 1-20. What is that?
A. Affidavit for arrest warrant.
Q. What does the first sentence say?
A. "I, Akenaten Ali, secured party for the account of Timothy Jermaine Pate and creditor-in-fact to the United States, hereby enter this affidavit for arrest for the Court to issue a warrant for arrest against the commercial vessel of JOHN ANDREW KOSKINEN and BRIAN KEITH EPPS."
Q. If you'd look at Government Exhibit 1-21, Ms. Hodge, and tell me what that is.
A. Affidavit of response.

Q. In the first two sentences does he reference a letter from the IRS notifying him that his tax returns are frivolous?
A. He does.
Q. In the last sentence of that filing, do you see a reference there to a woman named Denise D. Davis?
A. I do.
Q. In all the filings that we've discussed today, is that the first reference we've seen to Denise Davis?
A. It is.
Q. What does the last sentence of that filing warn?
A. "Failure to process both returns in the next eight days will result in claims against Denise D. Davis for conspiracy to commit fraud."
Q. Looking at Page 3 of Exhibit 1-21, did Mr. Pate attach a letter from the IRS?
A. He did.
Q. Toward the middle of that page, do you see where it says why we can't allow your claim?
A. I do.
Q. Can you read the first sentence underneath that?
A. Yes. "We disallowed your claim for credit for the period listed at the top of this letter. You based your claim on a frivolous position that isn't supported by law. Federal courts consistently rule against these arguments and may impose substantial fines for taking a frivolous position."

Q. If you would look at Page 4 of Exhibit 1-21. Whose name is listed as the signer of that letter?
A. Denise D. Davis.
Q. If you would look at Exhibit 1-22. Is that a filing from March 29th, 2018?
A. It is.
Q. What is the title of that filing?
A. Affidavit of truth and notice of intent.
Q. Turning to Page 2, looking at the second full paragraph, the sixth line down, there's a sentence that begins "let it be known that I will file a lien." Do you see that? And I'll give you a minute. That was a lot of instructions.
A. I do.
Q. Okay. Can you please read that sentence and the one that follows it?
A. "Let it be known that I will file a lien every time I have a commercial issue with anyone in the United States or under the United States. I do not stand under the authority of the United States or any corporation, man or woman."
Q. Thank you. Now, looking at Exhibit 1-23, is this a filing by Mr. Pate on April 3rd, 2018?
A. It is.
Q. Does he reference Eric Mines Thorson in that filing?
A. He does.
Q. If you'd look at the first paragraph, the second-to-last

sentence, does it warn that a 15-million-dollar lien will be filed against Eric Mines Thorson in seven days?
A. It does.
Q. If you would turn to Exhibit 1-24. What is Exhibit 1-24?
A. Affidavit warrant of arrest.
Q. In the first two sentences of this document, does Mr. Pate enter an arrest warrant against Judge Epps?
A. He does.
Q. Does he also write that the commercial vessel of Judge Epps be taken into custody until the lien is satisfied?
A. It does.
Q. And Exhibit 1-25, does he also try to enter an arrest warrant against John Koskinen?
A. He does.
Q. And that was filed on April 3rd, 2018; correct?
A. Correct.
Q. We move ahead two days after those motions for the arrest warrants. Look at Exhibit 1-26. What is that?
A. Affidavit of notification.
Q. What do you notice about the stamp on the first page of that exhibit?
A. Again, that is one of our physical stamps versus our electronic stamps. Again, we were trying to postpone the filing so that Deputy Brant could talk to Mr. Pate at this time.
Q. Was there a security concern concerning Mr. Pate?

A. It was.

Q. If you would look at the first paragraph, and if you could read that first paragraph.

A. Sure. "I, Akenaten Ali, secured party for the account of Timothy Jermaine Pate and creditor-in-fact to the United States, hereby enter this affidavit for the record to show that public notification was given in concerns to the maritime liens that was filed against the commercial vessel of JOHN ANDREW KOSKINEN and BRIAN KEITH EPPS. Attached with this affidavit is an additional affidavit from those connected to the Augusta Chronicle as proof that public notification was placed in the newspaper. Additionally, legal ad 3016831 can be viewed on the World Wide Web at www.legalnotice.org."

Q. If you would turn to Page 3 of Exhibit 1-26. What is that?

A. An affidavit of publication from the Augusta Chronicle.

Q. And that affidavit is the Augusta Chronicle saying they're going to publish that advertisement?

A. They did.

Q. And if you'd look at the middle of that page, there's several dates listed that that advertisement was published. Do you see that?

A. I do.

Q. April and March of 2018; right?

A. Correct.

Q. Looking at the bottom right of that page, is there an image of the actual advertisement that was published?

A. There is.

Q. Ms. Hodge, I don't know if you can, but if you are able, would you read that to the jury.

A. Sure. "Notice Of Claim of Maritime Lien. I, Akenaten Ali, hereby give public notice of a lien in the amount of 15 million U. S. Dollars against the commercial vessel of BRIAN KEITH EPPS. I also give public notice of a lien in the amount of 33 million U. S. Dollars against the account of JOHN ANDREW KOSKINEN. Default judgment against both commercial vessels was entered on February the 27th, 2018, in the United States District Court for the Southern District of Georgia, Case Number CV 1:17-0126. Both commercial vessels were found guilty of commercial dishonor, and liens were issued on March 6th, 2018."

Q. Ms. Hodge, being familiar with the docket, there's a reference there to the fact that default judgment was entered on February 27th, 2018. Did the Court enter a default judgment at all in this case?

A. The Court did not.

Q. Did the Court enter a default judgment in Timothy Pate's favor on February 27th, 2018?

A. No, it did not.

Q. Was anybody found guilty by the Court of anything in relation to this case as reflected in that last sentence?

A. No, they were not.
Q. If you'd look at Exhibit 1-27. Does that mention Denise D. Davis in that filing?
A. It does.
Q. And looking at that filing, does it threaten towards the bottom to file a 15-million-dollar lien against her?
A. It does.
Q. If you'd turn to Exhibit 1-28. Is that an order from Judge Epps?
A. It is.
Q. And did that order instruct Mr. Pate that he needed to file a certificate of service with his filings?
A. It did.
Q. If you'd move ahead to Exhibit 1-31. And did Mr. Pate respond to Judge Epps's order?
A. He did.
Q. On the first page, the last sentence on that page, which begins on the second-to-last line that says, "let the record show." Do you see that?
A. I do.
Q. I'm going to ask you to read that sentence, and it goes into the next page. So just give us a minute to allow us to publish that next page for the jury.
A. Sure. "Let the record show that if federal Magistrate Judge Brian Keith Epps denies any of my motions, then a case

will be filed against him in the United States Supreme Court and a commercial presentment in the amount of 500 million U. S. Dollars will be filed with the case for the liability of Brian Keith Epps."

Q. If you would look at Exhibit 1-35. What is that?

A. Affidavit of lien and notification of lien.

Q. The date of this filing is May 1st, 2018; correct?

A. Correct.

Q. What does the first sentence say?

A. "I, Akenaten Ali, secured party for the account of Timothy Jermaine Pate and creditor-in-fact to the United States, hereby place a lien in the amount of 15 million dollars against the account of Eric Mines Thorson."

Q. And we're looking at -- are you looking at Exhibit 1-35?

A. I was not. I apologize.

Q. You had me until you said Eric Mines Thorson.

A. I'm so sorry. I will read that again. "I, Akenaten Ali, secured party for the account of Timothy Jermaine Pate and creditor-in-fact to the United States, hereby place a lien in the amount of 15 million U. S. Dollars against the account of Denise D. Davis."

Q. And looking at Page 2, what is that?

A. Notice of claim of maritime lien.

Q. What's the name of the vessel in Box 1?

A. U. S. M/V DENISE D. DAVIS.

Q. Who is the claimant in Box 5?
A. Akenaten Ali.
Q. And what is the amount in Box 6?
A. 15 million dollars.
Q. This was filed with the Court and placed on the publicly available docket; correct?
A. Correct.
Q. Let's go to what I think you were just looking at, which is Exhibit 1-36. On that same day there was an additional lien filed against Eric Mines Thorson; correct?
A. Correct.
Q. If you'd take a look at Exhibit 1-36, what is that?
A. Affidavit of lien and notification of lien.
Q. Okay. And I think you read it last time, but that says that a 15-million-dollar lien is being placed against Eric Mines Thorson; right?
A. Correct.
Q. Looking at Page 2, what is that?
A. Notice of claim of maritime lien.
Q. I think you may be able to anticipate what I'm going to ask, but what's the name of the vessel?
A. U. S. M/V ERIC MINES THORSON.
Q. What is the amount of the claim?
A. 15 million dollars.
Q. And who is the claimant?

A. Akenaten Ali.
Q. Looking at Exhibit 1-37. That day was there also a filing for a 15-million-dollar lien against Jacob Lew?
A. There was.
Q. What is Exhibit 1-37?
A. Affidavit of lien and notification of lien.
Q. That first sentence which we've zoomed in on on the screen, does that describe a 15-million-dollar lien against Secretary Lew?
A. It does.
Q. And looking at Page 2 of Exhibit 1-37, does that give notice of a lien against the U. S. M/V JACOB JOSEPH LEW for 15 million dollars?
A. It does.
Q. And lists the claimant as Akenaten Ali?
A. It does.
Q. If you'll look at Exhibit 1-39. What is that?
A. Affidavit, proof of claim and proof of lien.
Q. If you'd look at Page 2, the first paragraph, the second sentence, and I'm going to ask if you would please read that.
A. "Let the record show that public notice of the liens against JOHN ANDREW KOSKINEN and BRIAN KEITH EPPS have been placed in the Augusta Chronicle, legal ad number 3016831."
Q. Could you read the next sentence?
A. "Let the record show that public notice of the liens

against DENISE D. DAVIS, JACOB JOSEPH LEW and ERIC MINES THORSON will display in the Augusta Chronicle, legal ad number 3041808, on May 9th, May 16th, May 23rd and May 30th of 2018.

Q. If you would look at the paragraph below that on Page 2 of Exhibit 1-39, does that reference a number of UCC Financing Statements as well?

A. It does.

Q. If we could go to Page 3 of Exhibit 1-39, what is that?

A. A UCC Financing Statement.

Q. And who is the debtor named in -- it's going to be section one of that document?

A. John Andrew Koskinen; and, two, the second debtor is Brian Keith Epps.

Q. Okay. Just give us a minute to get there. So there's two debtors that are listed in this financing statement; correct?

A. Correct.

Q. The first is John Andrew Koskinen. The second is Judge Epps. In Section 4 of that document, there's a section on collateral. Do you see that?

A. I do.

Q. And does that list as collateral 33 million dollars against the commercial vessel commercial account of JOHN ANDREW KOSKINEN for a maritime lien?

A. It does.

Q. And that references a case number. Do you see that?

A. I do.
Q. Is that case number the same federal civil case number that concerns Mr. Pate's civil filings that we've been going through?
A. It does.
Q. If you'd look at Page 4 of Exhibit 1-39. What is that?
A. UCC Financing Statement.
Q. And who are the debtors named in Boxes 1 and 2?
A. Jacob Joseph Lew and Eric Mines Thorson.
Q. Looking at Section 4, the section regarding collateral, that lists the collateral as 15 million dollars. Correct?
A. Correct.
Q. If you'd go to Page 5 of Exhibit 1-39. What is that?
A. UCC Financing Statement.
Q. And who is listed as the debtor?
A. Denise D. Davis.
Q. And so this has attached, we've seen three UCC Financing Statements; correct?
A. Correct.
Q. The first one had two debtors; the second one had two debtors, and the third one had Ms. Davis?
A. Correct.
Q. A total of five?
A. Correct.
Q. If you'd look at Exhibit 1-40, what is that?

A. Affidavit of claim.
Q. Page 2 lists a number of questions. Do you see those?
A. I do.
Q. In the second paragraph after those numbered questions, in the second paragraph on Page 2 of Exhibit 1-40, does Mr. Pate warn what would happen if Judge Epps fails to respond?
A. He does.
Q. On the fourth line down in that paragraph, do you see the sentence that begins with, "Additionally, Brian Keith Epps agrees to"?
A. I do.
Q. Can you read that sentence and the one that follows it?
A. "Additionally, Brian Keith Epps agrees to a 100 billion United States Dollars commercial maritime lien to be placed against his commercial estate. Brian Keith Epps also agrees to forfeit his entire commercial bond to the possession of Timothy Jermaine Pate if he does not respond."
Q. In the third paragraph on Page 2, does it discuss that Judge Epps has an additional option to extinguish the claim?
A. It does.
Q. And what is that option that Mr. Pate gives to Judge Epps? You can just read it.
A. Okay. So "Let the record show that Brian Keith Epps has an additional option. One, entering judgment against the defendant for failure to accept the commercial presentment which

is on court record or by sending a check in the amount of six million dollars within seven days of the receipt of this claim/contract. Let the record show that this is a duty that should have already been done by Brian Keith Epps."

Q. So the option is to enter judgment against Commissioner Koskinen or pay Timothy Pate six million dollars?

A. Correct.

Q. If we'd look at -- turning the page in that exhibit to Page 3, at the top there does he give another option to Judge Epps to extinguish that lien?

A. He does.

Q. And reading that sentence, what is that other option that he gives to Judge Epps?

A. "Entering judgment on behalf of the plaintiff for the 2015 and 2016 tax returns or if a check in the amount of 2,753,248 U. S. Dollars for the 2015 tax year and a check in the amount of 1,153,008 U. S. Dollars for the 2016 tax year is mailed within seven days of the receipt of this claim slash contract."

Q. So he's offering Judge Epps the option of extinguishing the claim if Judge Epps rules in his favor or pays him a couple million dollars; correct?

A. Correct.

Q. Exhibit 1-41.

THE COURT: Would this be a good point, Mr. Howard, for us to take a break?

MR. HOWARD: Yes, Your Honor.

THE COURT: Let's take a 15-minute recess and then we'll delve back in. Let's all rise for the jury.

(Jury out)

THE COURT: We'll be in recess.

(Proceedings stood in recess from 3:45 p.m. until 4:05 p.m.)

(Jury present)

THE COURT: All right, everyone. Court is back in session.

Mr. Howard, you may proceed. Ma'am, I'll remind you that you are under oath still.

BY MR. HOWARD:

Q. Ms. Hodge, when we left off, we were getting ready to turn to Exhibit 1-41. If we could pull that up. And looking at 1-41, can you tell the jury what this is?

A. Affidavit of settlement of case.

Q. And if you would read the first sentence.

A. "I, Akenaten Ali, secured party for the account of Timothy Jermaine Pate and creditor-in fact to the United States, hereby offer the following for the settlement of case CV 1:17-0126.

Q. And in those following numbered paragraphs, does he offer to sell the liens at a discount?

A. He does.

Q. For instance, he offers to sell the lien against Denise Davis for seven million; correct?

A. Correct. Incorrect. It's 7 billion.

Q. Thank you for that correction. If you'd look at Page 2 of Exhibit 1-41. The first full paragraph begins, "Let the record show." Do you see that?

A. I do.

Q. And will you read the first sentence of that paragraph.

A. "Let the record show that I really do not want to lien on the estate of Brian Keith Epps again, but I will if commercial justice does not take place in the next seven days."

Q. And looking at the last paragraph on Page 2 that begins, "Let it be known," can you read that paragraph?

A. "Let it be known that I really have no desire to lien upon the complete commercial estate of Brian Keith Epps, but I will do so if this offer is not accepted within the next seven days. Let the record show that the Most High created the heavens and the earth in seven days, so persons should be able to respond to an offer or claim within seven days. This offer is more than fair given all that has happened. I am willing to shake hands and bring this case to a close on these terms. Hopefully all concerned can accept this proposal so this case can be closed. If I do not hear anything from the Court within the next seven days, then this offer is null and void. If this offer is not accepted, then involuntary bankruptcy proceedings will ensue for the payments of the liens from my administrative process in rem."

Q. Thank you. And if we would look at and turn to Exhibit 1-42. What is this?
A. Affidavit of claim.
Q. In the first numbered paragraph, does Mr. Pate state that he filed involuntary bankruptcy cases against Jacob Joseph Lew, John Andrew Koskinen and Denise D. Davis, Eric Mines Thorson and Brian Keith Epps?
A. It does.
Q. And does this filing also mention Susan D. Barrett?
A. It does.
Q. Who is Susan D. Barrett?
A. She is the bankruptcy judge for the Southern District.
Q. And on Page 2 of exhibit dash one -- on Page 2 of Exhibit 1-42, after Question 19, the first full paragraph begins, "if Susan D. Barrett fails to respond." Do you see that?
A. I do.
Q. Will you read that sentence and the following sentence.
A. "If Susan D. Barrett fails to respond to this affidavit point for point under penalty of perjury, with full commercial liability via a sworn affidavit of her own, then her acquiesce equates to Susan D. Barrett agreeing that she is guilty of conspiracy to commit theft and conspiracy to commit fraud. Additionally, Susan D. Barrett agrees to a maritime lien in the amount of 33 million U. S. Dollars to be placed against her commercial estate."

Q. Thank you. Looking at Exhibit 1-43, what is this?
A. Affidavit of claim.
Q. And in this filing does Mr. Pate mention Lucinda Rauback?
A. He does.
Q. And is Ms. Rauback the Clerk of Court of the Bankruptcy Court?
A. She is.
Q. Looking at Page 2 of this exhibit, does he warn that a 33-million-dollar lien will be placed against Ms. Rauback and published in the Augusta Chronicle?
A. It does.
Q. Looking at Exhibit 1-44. And, Ms. Hodge, up to this point had Mr. Pate filed a lien against Ms. Rauback or Judge Barrett on the docket?
A. He did.
Q. And looking at 1-44, what is this?
A. Affidavit of default judgment and notice of lien.
Q. And in the first sentence does he enter a default judgment of guilty against the commercial vessel estate account of Lucinda B. Rauback?
A. He does.
Q. Looking at Page 2, what is that?
A. Notice of claim of maritime lien.
Q. And does this list the vessel the U. S. M/V LUCINDA B. RAUBACK?

A. It does.
Q. Box 5 lists the claimant as Akenaten Ali?
A. It does.
Q. And the amount listed is 15 million; correct?
A. Correct.
Q. And this was filed on June 15th; right?
A. Correct.
Q. Staying on that same date, was there an additional maritime lien document filed against Judge Epps?
A. There was.
Q. Look at Exhibit 1-45. What is that?
A. Affidavit of default judgment and notice of lien.
Q. And in the first sentence of that, does Mr. Pate enter a default judgment of guilty against the commercial account of Brian Epps?
A. It does.
Q. Looking at Page 2, is that a notice of claim of maritime lien?
A. It is.
Q. And that lists the vessel as the BRIAN KEITH EPPS; correct?
A. Correct.
Q. Looking at Box 6, the amount listed is the full value of the commercial estate. Debtor has agreed to forfeit the entire commercial bond; right?

A. Correct.
Q. So the full value of Judge Epps?
A. Correct.
Q. Looking at Page 3 of Exhibit 1-45, what is that?
A. Notice of claim of maritime lien.
Q. And is that a 100-million-dollar lien he places against Brian Keith Epps?
A. It is.
Q. Staying on that same date, was there a maritime lien document filed against Judge Barrett?
A. Yes.
Q. If you'd look at Exhibit 1-48 and turn to Page 2 of that exhibit, what is that?
A. Notice of claim of maritime lien.
Q. And the vessel is the U. S. M/V SUSAN D. BARRETT; correct?
A. Correct.
Q. And the amount is 33 million?
A. Correct.
Q. Turning to Exhibit 1-46, what is that?
A. An order.
Q. And in this order does Judge Hall grant the government's motion to dismiss Mr. Pate's case?
A. It does.
Q. On July 6th, 2018, did Mr. Pate respond to that order dismissing his case?

A. He did.
Q. If you'd look at Exhibit 1-47, what is that?
A. Affidavit of response to court order.
Q. If you'll look at Exhibit 1-47, Page 1, the second paragraph. What does the first sentence of that second paragraph say?
A. "I do not agree with or accept the order made by J. Randal Hall."
Q. And is that Judge Hall?
A. It is.
Q. Staying on that same paragraph, the fourth line down, do you see the sentence that says "the private record of the parties"?
A. I do.
Q. As we pull up that sentence, beginning "the private record of the parties," can you read that sentence?
A. Yes. "The private record of the parties shows that Brian Keith Epps is my property slash slave slash boy and I have the law a/k/a contract to prove it."
Q. Staying on that same page on Exhibit 1-47, can you read the first line in the third paragraph?
A. "I do not have to kiss the ass of anyone at the United States District Court for the Southern District of Georgia, the United States Bankruptcy Court for the Southern District of Georgia nor anyone else."

Q. All right. Ms. Hodge, let's move away from the civil filings on that civil docket that we've talked about. In June of last year, did the government file a case to expunge the liens that Mr. Pate had filed?
A. They did.
Q. Was that docketed as a miscellaneous proceeding?
A. It was entitled miscellaneous proceeding. It was docketed as a civil case.
Q. And can you tell the jury what a miscellaneous proceeding is?
A. Miscellaneous, by the term miscellaneous, falls in something that is not categorized as a criminal or civil proceeding, such as when someone wants to file a power of attorney or someone wants to file an affidavit of a name change, et cetera.
Q. And if you would go to Exhibit 3-1, is this the United States' motion to expunge the liens?
A. It is.
Q. And what's the date that this was filed?
A. June 7th, 2018.
Q. And did Mr. Pate respond to this filing?
A. He did.
Q. If you would look at Exhibit 3-2, what is that?
A. Affidavit of response.
Q. And then the second page in the second paragraph, can you

read the first sentence?

A. "Let the record show that I don't give a damn about any United States Code, any statute or any other corporate rules and regulations."

Q. Thank you. Looking at Page 3 of Exhibit 3-2, can you read the first paragraph?

A. With "let the record show"?

Q. Yes.

A. "Let the record show that I will file a lien on anyone that tries to enter a judgment stating that the liens I filed are null and void or bogus, because they are not. Additionally, if a settlement agreement is not reached by June 15th, 2018, then I am going to enter judgment for the contract that was presented to Edward J. Coleman, III; Lucinda B. Rauback; and Susan D. Barrett. I am also going to file a lien against the entire commercial bond of Brian Keith Epps. This is not a threat. This is a promise. I have tried to be fair, but it seems select people still want to play the legalese games."

Q. And there's a mention there to Edward J. Coleman, III. Is that a federal bankruptcy judge in the Southern District of Georgia?

A. It is.

Q. And there's also mention there about a threat to place a lien against the entire commercial bond of Brian Keith Epps. Do you see that?

A. Correct. Yes, I do.
Q. We saw from those previous filings that he went through and filed that lien; correct?
A. Correct.
Q. Turning to Exhibit 3-3, what is that?
A. It is a complaint under seal.
Q. And was that filed by the United States Government in connection with its efforts to expunge those liens that Mr. Pate filed?
A. It is.
Q. And does this complaint ask the Court to declare the liens null and void?
A. It does.
Q. Did Mr. Pate respond to this complaint?
A. He did.
Q. If you would look at Exhibit 3-4. Is that his response?
A. It is.
Q. Turning to 3-5, did the Court issue an order declaring that defendant's liens are null and void?
A. It does.
Q. And is that order in Exhibit 3-5?
A. It is.
Q. Turning to 3-6. Did the clerk's office receive a response from Mr. Pate to that order we just saw declaring his liens null and void?

A. It did.

Q. On Page 3, the first full paragraph, the first sentence, which begins "let the record show," can you read that?

A. "Let the record show that T.J.P. claimed one billion one hundred twenty-six million dollars in gross income for the 2018 tax year."

Q. Do you recognize the initials T.J.P.?

A. I do.

Q. And whose initials are those?

A. Timothy Jermaine Pate.

Q. Looking at Exhibit 3-7, is that the Court's civil judgment expunging the liens from the public record?

A. It is.

Q. And that was filed in May of this year; correct?

A. Correct.

Q. Looking at Exhibit 3-9, what is that?

A. Affidavit of presentment of settlement.

Q. On the first page of this filing, does Mr. Pate offer to settle the case and void the debt instruments he filed?

A. He does.

Q. Looking at the second page, does he lay out what he requires in exchange for doing that?

A. He does.

Q. And looking at Page 2, beginning with "In return, T.J.P. requires the following." Do you see that?

A. I do.
Q. What are the four things that he lists there to void those liens?
A. "Number 1, T.J.P. requires the return of credit for the 2015, 2016 and 2017 tax years. All charges in Case 1:18-CR-45 are dismissed.
"Number 2, The government honors the presentment made to John Andrew Koskinen that was made in December 2017.
"Number 3, I am released from jail on or before July the 1st, 2019.
"Number 4, T.J.P. require to not have any problems in commerce when creating instruments for return to principal. T.J.P. require to not have any future problems with the IRS when balancing the account of T.J.P."
Q. Staying on that sentence that's numbered one, the Case Number 1:18-CR-45, do you recognize that case number?
A. I do.
Q. And what case number is that?
A. That is the criminal case number in which this proceeding is happening.
Q. Against Timothy Pate; correct?
A. Correct.
Q. By this time and by the filing of this particular document, Timothy Pate had been charged in the Southern District of Georgia; correct?

A. Correct.
Q. And in exchange for releasing those liens, he's demanding that his criminal charges be dismissed; correct?
A. Correct.
Q. In the course of your duties as a deputy clerk in this courthouse, did you learn that Timothy Pate had been arrested in August 2018?
A. I did.
Q. After his arrest did the clerk's office receive handwritten letters from jail in the name of Akenaten Ali and Timothy Pate?
A. We did.
Q. Did the clerk's office docket a number of those filings in Mr. Pate's criminal case?
A. We did.
Q. Have you reviewed a number of those filings?
A. Yes.
Q. Looking at the binder in front of you and the documents identified as Exhibit 2-1, 2-2 and 2-3, can you look at those and let me know if you recognize them?
A. I do.
Q. What do you recognize those as?
A. Filings from Timothy Jermaine Pate.
Q. Now, are those handwritten letters received by the clerk's office and docketed in Mr. Pate's criminal case?

A. It was, yes.
Q. Let's start with Exhibit 2-1. If we could pull that up. What is the date of this filing?
A. September 28th, 2018.
Q. And after Mr. Pate was charged in this case; correct?
A. Correct.
Q. If we could look at the title of that document. And what is the -- a little bit lower, the actual title, beginning with "Affidavit to accept all charges for value and honor in exchange for value and honor." Do you see that?
A. I do.
Q. If you would, read the first sentence of this filing.
A. "I, Akenaten Ali, secured party for the account of Timothy Jermaine Pate and creditor-in-fact to the United States, hereby respond to Case Number 1:18-CR-45."
Q. And if you'd continue reading the next two sentences.
A. "I accept the two counts of filing false retaliator (sic) liens for value and honor in exchange for value and honor. I accept one count of filing false bankruptcy declaration for value and honor in exchange for value and honor."
Q. If we could look at Exhibit 2-2 and let me know if you recognize that document.
A. I do.
Q. What is the title of that document?
A. Affidavit of default judgment.

Q. Who is listed as the defendant in this filing?
A. Judge Baker. Raymond Stanley Baker, Jr.
Q. And you mentioned Judge Baker. Who is Raymond Stanley Baker, Jr.?
A. He is one of the judges for the Southern District of Georgia.
Q. Indeed, is he the judge in this case?
A. Yes. He is.
Q. And at this point was Judge Baker assigned to Mr. Pate's criminal case?
A. Yes.
Q. And in this filing he lists Judge Baker as the defendant; correct?
A. Correct.
Q. If you would, can you read the first paragraph on the first page of Government Exhibit 2-2?
A. "I, Akenaten Ali, secured party for the account of Timothy Jermaine Pate as shown on UCC-1 Financing Statement 121-001158-2014, hereby enter a default judgment of guilty against Raymond Stanley Baker, Jr. The defend (sic) was mailed an notarized affidavit of claim via certified mail with tracking number of 7017-2620-0001-1403-2196. The defendant was given seven days, seven days to respond to the claim but has failed to respond. Silence to a claim equates to tacit agreement by default. Acquiesce to a claim is commercial dishonor by

default. The lack of a response from the defendant shows that he is in agreement to all within the claim that was sent to him."

Q. Now, turning back to the civil filings that we looked at, it was Judge Epps that was assigned to his civil case; correct?

A. Correct.

Q. And then liens put against Judge Epps.

A. Correct.

Q. And in this -- and the criminal case assigned to Judge Baker; correct?

A. Correct.

Q. And in this letter, and if you would read the first sentence of the second paragraph of that letter.

A. "Within the next seven days, seven days, a UCC lien will be filed against the defendant as shown in the original claim."

Q. And that defendant as styled in this document is Judge Baker; correct?

A. Correct.

Q. Turning to Page 2 of Exhibit 2-2, who is that letter signed by?

A. Akenaten Ali.

Q. And this was from October of last year?

A. Correct.

Q. Now, Judge Baker wasn't the only judge assigned to Mr. Pate's criminal case; correct?

A. Correct.
Q. There was also a magistrate judge assigned?
A. Correct.
Q. And who was that magistrate judge?
A. Judge Cheesbro.
Q. If you'd look at Exhibit 2-3, do you see the defendant listed there?
A. Yes.
Q. Who's listed as the defendant in this filing?
A. He writes Benjamin Cheesdor, but it is Judge Cheesbro.
Q. What's Judge Cheesbro's first name?
A. Benjamin.

MR. HOWARD: I have no further questions for this witness, Your Honor.

THE COURT: Cross-examination, Mr. Maines?

MR. MAINES: Thank you, Judge.

CROSS-EXAMINATION

BY MR. MAINES:
Q. Now, Ms. Hodge, have you and I ever spoken over the phone about a bankruptcy case prior to today?
A. No, not about a bankruptcy.
Q. There are a number of attorneys that practice in the Southern District of Georgia that practice in the civil division; correct?
A. Correct.

Q. And then bankruptcy has its own particular procedures that are unique to bankruptcy; correct?
A. Correct.
Q. Okay. And you work primarily in the civil division; is that correct?
A. Correct.
Q. All right. Now, while you don't judge the merits of a particular filing, the contents of that, you do have criteria for rejecting certain pleadings; correct?
A. Incorrect. We cannot reject any pleadings filed by a pro se litigant. We have to accept everything that they give us over the counter.
Q. Okay.
A. And, sorry. To correct what I said before, I don't just do civil filings. We do both civil and criminal filings.
Q. All right. And there are rules for the Southern District of Georgia for filing that have to be met before you will accept the filing, though; correct?
A. The only requirement is that they need to sign the pleading and that they need to date and have the current address and phone number.
Q. For attorneys, the -- you make a delineation, though, in that they have to comply with other rules that a pro se litigant would not; is that correct?
A. Yes. Attorneys are different. Yes.

Q. And, clearly, from the ramble -- the ravings of Mr. Pate, he's not an attorney; correct?
A. Correct.
Q. You've never seen an attorney file anything like these documents, have you, in your career?
A. Nothing like this.
Q. All right. You stated that you have to accept the filings. However, the government intervened and requested an injunction against future filings against Mr. Pate; correct?
A. Correct.
Q. In fact, the government asked for two parts of relief; correct, as far as injunctions against Mr. Pate go?
A. I'm going to assume correct, without the order in front of me.
Q. I'm just referring to their motion --
A. Okay.
Q. -- not their -- and I think it was Exhibit 4. I'm sorry. 3-3. Do you have access to that?
A. I do.
Q. And Count 4 of the government's complaint against Mr. Pate -- and this was filed on February 8th of 2019; correct?
A. Correct.
Q. -- was for a request for injunction prohibiting defendant from filing future civil actions; correct?

A. Yes.
Q. Okay. And Part 4 was for the future civil actions; correct?
A. Yes.
Q. And Part 3 was requests prohibiting defendant from filing future liens.
A. Correct.
Q. So the Court has procedures to prevent other individuals like Mr. Pate from filing some of this nonsense; correct?
A. Yes.
Q. And, in fact, the Court did promptly issue an order prohibiting him from filing such actions; correct?
A. Correct.
Q. And that would have been Exhibit Number 3-5. Is that correct?
A. Yes. There was an order entered.
Q. And the Court -- and that was Chief Judge Randal Hall -- stated in that order that he would conduct a hearing on May 7th, at 10 a.m., regarding the government's request for further relief. There the judge is referring to the injunctions against Mr. Pate; correct?
A. Correct.
Q. And you did, in fact -- so when you say -- when we talk about expunge, all of these liens that -- these ridiculous absurd liens were all expunged from the docket report; correct?

A. They were sealed.
Q. Right.
A. Correct.
Q. So members of the public would not be able to access them; correct?
A. If they have a sealed lock on it, then, no, members of the public cannot access those liens. I do not know of any -- the case right now with 1:18 -- with 1:17-CV-126 that where -- as docketing clerks we went back and locked down those liens. I believe that as of to date they are still accessible to the public.
Q. Now, and correct me if I'm wrong here. It appears Mr. Pate is filing what are called affidavits, but they don't relate to any other document in the case; correct?
A. Can you clarify the question?
Q. When Mr. Pate in the civil case, the civil case that he initially filed against the IRS, that little piece of lunacy, those affidavits don't refer to any other docket events. Correct? When he files the affidavits, there's no reference to a prior document in that case; correct?
A. Correct.
Q. When an attorney or a pro se litigant is trying to properly file things with the clerk, it either has to be a motion or it has to be some document that relates to a case event; correct?

A. Well, again, we can't determine whether or not what they file is a correct document. Most of the time things that are given to us are very confusing. But we can't just turn it away and say, no, you didn't say "motion" in this, or you didn't say "request for an attorney" in this, for example. So we can't just turn it away because it's not labeled correctly. Does that make sense?

Q. Okay. And while you don't have any -- or let me rephrase that question. You don't participate in the discovery process between litigants, do you?

A. Correct. We do not.

Q. That's between the parties; correct?

A. Correct.

Q. Sometimes parties file disclosure notifications so that there is a record that discovery requests were complied with; right?

A. We do not accept any forms of discovery. So we would not know anything about that until there was a dispositive motion -- dispositive meaning that it would turn the case. So as far as everything that you're describing, we as clerks would not have any knowledge of that.

Q. Okay. But you are familiar with what are called requests for admissions; correct?

A. I am.

Q. And you have seen other attorneys reference those requests

for admissions in pleadings that they have filed in court; correct?
A. I have seen it in documents, yes.
Q. All right. Without getting into the specifics of it, generally speaking, requests for admissions are a legitimate tool of discovery between civil litigants; correct?
A. Correct.
Q. And the idea is to narrow the scope of the controversy between the parties. Would you agree with that?
A. I think that would be out of the realm of my --
Q. All right. Fair enough.
A. -- duties as a civil clerk and not as an attorney.
Q. The references that Mr. Pate is making that the party has 7, 14 days -- do you recall several times Mr. Pate said that in those crazy affidavits that he filed; correct?
A. Yes.
Q. He would say respond point by point in fact; correct?
A. Yes.
Q. And if you don't respond point by point, then judgment or default or some other adverse consequence, for instance, a lien, would be asserted by Mr. Pate; correct?
A. Correct.
Q. But it wasn't styled like a request for admission, was it?
A. No.
Q. He didn't cite or have in the heading on those filings

"requests for admission"; correct?
A. Correct.
Q. But requests for admissions in a civil case are a perfectly legitimate exercise of the parties to conduct discovery; correct?
MR. HOWARD: Your Honor, I'm going to object to relevancy with respect to that question and also asking the clerk, who's already identified she doesn't have that basis of knowledge.
THE COURT: I overrule the first objection. As to the second, she's capable of telling us whether that's within her knowledge or not.
THE WITNESS: Can you repeat the second part of that question, then, please?
THE COURT: Just repeat the entire question. It was the objection that I overruled.
BY MR. MAINES:
Q. It is a perfectly legitimate exercise of the parties in civil litigation to request admissions from their opponent, from the opposing party; correct?
A. Correct.
Q. And the assertions made by Mr. Pate, he's requesting that they address those points or he will consider them admitted. Would that be a fair characterization of some of the documents you went over in this case?

A. That would be a fair assumption, yes.
Q. But, again, they're not styled -- when I say styled, there's no caption that says "request for admission"; correct?
A. Correct.
Q. All right. And, in fact, every time those deadlines are not met, it appears Mr. Pate does respond with these absurd, crazy liens; correct?
A. Correct.
Q. So it appears that there is a pattern that Mr. Pate's following, if he says respond point by point and then after -- and he'll put a time deadline on that, and then after that time he will then engage in that conduct that he threatened; correct?
A. Correct.
Q. And was there any prohibition or condition that would have prevented the United States Government from intervening at an earlier date to request an injunction?
A. No.
Q. So the United States Government could have come into the court and filed a civil action to enjoin Mr. Pate from engaging in this conduct immediately after filing those liens, could they not have?
A. I -- I get -- assuming, yes. But I think that's reaching, again, with my scope of my duties as a clerk.
Q. There was no prohibition from the clerks from letting the government file that; correct?

A. Correct.

Q. In fact, you were personally concerned. You notified one of the United States Marshals who work in the courthouse about what's going on with Mr. Pate; correct?

A. Incorrect. It's not that I was personally concerned. We received notification from the U. S. Marshals that they were concerned and that that is why, during the first part, if you remember, we tried to delay the filings so that Deputy Brant could talk to Timothy Jermaine Pate.

Q. Subsequent to -- and you're familiar when the criminal charges were filed against Mr. Pate; correct?

A. Correct.

Q. Subsequent to the filing of the criminal charges Mr. Pate's not filed any liens or recorded any liens with the Clerk of Court; correct?

A. Since his criminal filings? Is that what you're asking?

Q. Yes.

A. Correct.

Q. There's been no more publications in the newspaper about liens as far as you're aware?

A. Correct.

Q. Do you recall how Mr. Pate was dressed and his demeanor when he came by the clerk's office to file some of these affidavits?

A. I do.

Q. Can you describe to the jury how he was dressed?
A. It was usually in a tattered T-shirt and jeans.
Q. He didn't have very good hygiene, did he?
A. No, he did not.
MR. MAINES: Okay. Judge, I don't have any other questions. Thank you.
THE COURT: Any redirect?
MR. HOWARD: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. HOWARD:
Q. Those liens that we looked at and talked about, those were filed by Timothy Jermaine Pate; correct?
A. Correct.
Q. They were filed on the Court's docket; correct?
A. Correct.
Q. The Court's docket is a public record and is also publicly and generally available to the public; correct?
A. It is, correct.
Q. And those named several federal employees and officials; correct?
A. Yes, correct.
MR. HOWARD: I have no further questions, Your Honor.
THE COURT: Any followup on that, Mr. Maines?
MR. MAINES: No, Your Honor.
THE COURT: Ma'am, you may step down. Can she be

excused?

MR. HOWARD: She can, Your Honor.

MR. MAINES: No objection.

THE COURT: You're excused. Thank you, ma'am.

THE WITNESS: Thank you, Judge.

THE COURT: Mr. Howard, we're at 4:40 in the afternoon, and these jurors have been with us all day, but I want to be sure that we move efficiently through this case. Do you have a witness that would make sense for us to call at this time?

MR. HOWARD: Your Honor, the next witness will, I expect, be brief; however, I don't want to certainly leave the jury or cut midway. So I'm happy to break now or call the next witness, whichever Your Honor would prefer.

THE COURT: I think it would be appropriate -- we've got a little bit of business that the Court needs to do this afternoon, and I'm sure each of these jury members have a little bit of business that they may need to do this afternoon. So while I typically keep everybody here at least until 5, I think today it would be appropriate for us to break early.

Members of the Jury, I'm going to ask you to give me that time back in the morning. In the morning I want to start court at 9:00. So if I tell you to be here at 9:00, that's not very fair to you, because then we'll be cranking up court just as you're walking in the door, and that wouldn't give you enough time. So everyone be here by 8:45.

You know your own schedule. It may be that you need to get here a little bit earlier to get yourself settled into the jury room and then be ready for me to call you in. But make no mistake, at 9 my intention is for us to start court at 9:00.

We will have -- am I right, Mrs. Hammock, we'll have some morning refreshments available in the morning for the jurors? We'll have some things in there for you for the morning. We'll certainly have some coffee, some caffeine for you.

I had an old football coach that used to tell me that if you're not 15 minutes early, then you're late. And that always has stuck with me; and, you know, court is a lot more important than football practice. So I certainly would expect all of you to be punctual in the morning, and I appreciate that from you.

Now, let me give you those instructions that I told you I would give you and I told you that you'll probably get sick of, but it having been a long day, I want to remind you of these important instructions that we have for you.

First, remember, do not discuss the case with anyone, including with each other, until you've heard all the evidence, closing arguments and final instructions. So don't talk about the case with anybody. Don't read or listen to any media this evening and try to see if you could discern anything about this case from the media at all. Don't do that. That would be a violation of your oath. Report to me if anybody tries to talk

with you about this case or if you hear anything about this case from any source outside of this courtroom.

Again, when you do return and you're called back into the courtroom, sit where you sit now. You'll report to the jury room in the morning.

Again, don't do any electronic research about this case at all. Don't communicate in any way electronically about this case. You know, innocently, some people think that they need to update their Facebook page with every detail in their life or their Instagram page with every detail in their life. Right? Well, as a juror, let me relieve you of that duty. Okay. And let me tell you, in fact, that it would be an obligation (sic) of your oath if you did that. So don't post anything about this case to anybody. Don't text message anything about this case to anybody. Don't call anybody and talk with them about this case. Okay?

Again, don't do any independent research about this case at all, because we want you to decide the case solely on the evidence that you receive here. And, again, we would all appreciate you being punctual here, as a matter of respect to not just the Court, but to your fellow jurors as well. And we'll be certain that we do the same. All right?

I imagine some of you may have items in the jury room that you need to retrieve. So what we're going to do is we're going to rise for you and you're going to exit to the jury room.

And then, Counsel, we'll take a recess, and if there's any matters that the lawyers need to bring up with the Court, we'll do that after we take our recess. All right.

But you all are excused for the day. We'll see you at 8:45 in the morning, but understanding that it may be that you need to be here earlier than that if we're going to open at 9. Okay.

All right. Please rise for the jury.

(Jury out)

THE COURT: All right, Counsel. We'll take a ten-minute recess so that the jury can gather their things and head out.

(Proceedings stood in recess from 4:46 p.m. until 4:57 p.m.)

(Jury out)

THE COURT: All right, Counsel. We made good progress today. I always smile a bit when some of my colleagues in other districts talk about spending a whole day picking a jury. We don't typically do that here, and there's no real need to do that. We got a fair and impartial jury today, and we got through some evidence today.

What I'd like to discuss with you now is any other -- again, I always try to give you the opportunity to raise any other legal issues that you have that you feel we need to cut off at the pass. But, specifically, your jury instructions. You all indicated at the beginning of the day that you've had some movement on your proposals and perhaps some agreement

regarding those proposals. So let's talk about that now. Okay? Give me a moment to pull up your proposals, your prior proposals at least.

Okay. You all can proceed -- for this portion of the case, you can proceed from counsel table since I know you've got a lot of paper in front of you. Tell me what it is that we can discuss that's different from what you proposed previously.

MR. HOWARD: Your Honor -- and I think Mr. Maines will correct me if I'm wrong, but with respect to the offense instructions and other instructions, I think we've agreed to go with the government's proposed jury instructions, specifically, with respect to the offense instructions. And he can correct me if there's any other instructions in the government's that he does not want in.

I think the one disputed item is regarding the propriety of giving a good-faith instruction.

THE COURT: Okay.

MR. HOWARD: I had objected to it, and just to clarify that objection, I would just request that if one -- if a good-faith instruction is given, that it be made clear that it only applies to those bankruptcy charges that requires an intent to defraud; whereas, it does not apply, as courts have held, to 1521, the false retaliatory lien charges.

THE COURT: Okay.

MR. HOWARD: There are some instructions that I objected

to that I think counsel and I agree that are just -- can't be decided now because some regarding if defendant testifies or not. We just don't know that until we get there.

But with respect to the substantive instructions, I think we're in agreement, certainly as to the offense instructions, as to the other instructions, with the one dispute being the applicability of that good-faith instruction.

THE COURT: Okay. Thank you, Mr. Howard.

Mr. Maines, is that an accurate statement of where we are?

MR. MAINES: That's exactly where we are, Judge.

THE COURT: Okay. So to be clear, the government's -- the United States' proposed jury instruction on the offense was, in Doc. 64, it was G1 and G2. Let me be clear about where that is.

MR. HOWARD: It's on Page 24 of that document, Your Honor.

THE COURT: Thank you. So Page 24 and all the way through Page 28. You have no objection to giving that; correct, Mr. Maines?

MR. MAINES: No, Your Honor.

THE COURT: Is that correct?

MR. MAINES: I'm sorry?

THE COURT: 24 through 28. You have no objections --

MR. MAINES: No.

THE COURT: -- to giving that; correct?

MR. MAINES: No objection.

THE COURT: Okay. Good. But you're still requesting your good-faith instruction, and the government objects to that; correct?

MR. MAINES: Only as it relates to the false lien, the 1521 charge.

THE COURT: You're requesting it only as to the 1521 --

MR. MAINES: No. I'm requesting it for both, but I think the controversy is only as it relates to 1521.

THE COURT: Understood. Okay. I have a good picture of where everybody is. Anything else you need to tell me about your jury instructions at this time?

MR. HOWARD: Nothing from the government.

MR. MAINES: No, Your Honor.

THE COURT: All right. Again, we'll get those compiled for you, a draft together. Wait one second.

I know I should always check with certain folks before I think we're wrapped up on an issue. But the defendant requested in B9.1A and B9.1B in Doc. 70 a charge on willfully. Is that still being requested by the defense?

MR. MAINES: No, Judge. I agree with the government's position on that.

THE COURT: So you're withdrawing --

MR. MAINES: Yes, I am withdrawing that. It is a

knowing standard, not a willful. So I believe the government's correct on that issue. So that's not a point of contention.

THE COURT: Okay. All right. Anything further we need to address on those, Ms. Manly?

MS. MANLY: No.

THE COURT: Okay. Anything else that you all need to bring to my attention at this time at all?

MR. HOWARD: No, Your Honor. Can't think of anything.

MR. MAINES: Just what time you would like the attorneys to report tomorrow morning.

THE COURT: Be here at 8:30 tomorrow morning. What we will do, you know, Mr. Maines, you'll be given an opportunity, today obviously, to speak with Mr. Pate, if he chooses to speak with you. You can go back to the holding area, and if he does indeed want to talk with you about the case in any way, you let the marshals know that and we'll give you all the time you need and the space you need to speak with him in private.

Then in the morning if he continues to choose not to be present in the courtroom, my intention is to do just as we did this morning, to go and make certain that that is his intention. Of course, Mr. Maines, we trust exactly what you're telling us, which is that he's making that certain to you, but I want to make the record abundantly clear and make him well aware -- you know, this is his trial -- that he's got the right to be here, and be certain that he doesn't have any questions for the Court

about his right to be here.

I think we're all going through great lengths to make certain the record is clear of that, but more importantly, to make sure that Mr. Pate is clear of that, that he has the right to be here and to be certain that he's executing -- that he's deciding that he doesn't want to be here. Okay? All right. So that's why I want you here at 8:30. Okay.

All right. Anything else -- if you all have other things you want to address in the morning, you know, we can be here earlier, but I don't want you here for no purpose.

All right. Well, we'll be adjourned until the morning.

(Proceedings concluded at 5:05 p.m.)

- - -

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly A. McKee, Registered Diplomate Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 28th day of April, 2020.

Kelly A. McKee

KELLY A. McKEE, CCR, RMR, CCP, RDR

#2731