IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) CASE NO. 1:18-CR-45
) Day 2
TIMOTHY JERMAINE PATE, )
)
Defendant. )

----------------------------

TRANSCRIPT OF JURY TRIAL, VOL. II
**BEFORE THE HONORABLE R. STAN BAKER**
United States Courthouse
600 James Brown Boulevard
Augusta, GA
October 16, 2019

COURT REPORTER: Kelly A. McKee, CCR, RMR, CCP, RDR
United States Court Reporter
P. O. Box 8552
Savannah, GA 31412
912-650-4065

(Proceedings reported by mechanical stenography, transcript produced by computer-aided transcription.)

APPEARANCES OF COUNSEL

FOR THE UNITED STATES OF AMERICA:

CHRISTOPHER HOWARD, Esq.
JOSEPH McCOOL, Esq.
U. S. ATTORNEY'S OFFICE - SAVANNAH
22 Barnard Street, Suite 300
P. O. Box 8970
Savannah, GA 31401
912-652-4422
Email: christopher.howard@usdoj.gov

FOR THE DEFENDANT:

JUSTIN D. MAINES, Esq.
THE NYE LAW GROUP
2008 Whitaker Street
Savannah, GA 31401
912-358-8485
Email: Jd@thenyelawgroup.com

# I N D E X


| | PAGE |
|---|---|
| GOVERNMENT'S WITNESSES | |
| CHRISTINA TOOLE | |
| Direct Examination by Mr. Howard | 16 |
| Cross-Examination by Mr. Maines | 28 |
| Redirect Examination by Mr. Howard | 33 |
| CHARLENE BURKE | |
| Direct Examination by Mr. Howard | 34 |
| Cross-Examination by Mr. Maines | 38 |
| JOHN KOSKINEN | |
| Direct Examination by Mr. McCool | 41 |
| Cross-Examination by Mr. Maines | 51 |
| Redirect Examination by Mr. McCool | 54 |
| Recross-Examination by Mr. Maines | 55 |
| ERIC MINES THORSON | |
| Direct Examination by Mr. McCool | 56 |
| Cross-Examination by Mr. Maines | 65 |
| CHARLES BRANT | |
| Direct Examination by Mr. Howard | 69 |
| Cross-Examination by Mr. Maines | 87 |
| BRIAN KEITH EPPS | |
| Direct Examination by Mr. Howard | 94 |
| Cross-Examination by Mr. Maines | 112 |
| Redirect Examination by Mr. Howard | 120 |
| SUSAN D. BARRETT | |
| Direct Examination by Mr. Howard | 122 |
| Cross-Examination by Mr. Maines | 147 |
| LUCINDA RAUBACK | |
| Direct Examination by Mr. McCool | 155 |
| Cross-Examination by Mr. Maines | 162 |
| MICHAEL SMITH | |
| Direct Examination by Mr. Howard | 166 |
| Cross-Examination by Mr. Maines | 186 |
| TIM CODA SHOEMAKER | |
| Direct Examination by Mr. Howard | 193 |
| Cross-Examination by Mr. Maines | 203 |
| TARA DURRANT | |
| Direct Examination by Mr. Howard | 205 |
| Cross-Examination by Mr. Maines | 235 |
| DENISE D. DAVIS | |
| Direct Examination by Mr. McCool | 239 |
| Cross-Examination by Mr. Maines | 249 |
| Redirect Examination by Mr. McCool | 251 |

# I N D E X


| GOVERNMENT'S WITNESSES | PAGE |
|---|---|
| BRIANNA TAYLOR | |
| Direct Examination by Mr. Howard | 253 |
| Cross-Examination by Mr. Maines | 261 |
| Redirect Examination by Mr. Howard | 264 |
| Recross-Examination by Mr. Maines | 267 |
| Certificate of Reporter | 277 |


## E X H I B I T S


| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 1-10 | Response by T.J.P. to BKE Order of denial of arrest warrant | 103 | Vol. I 136 |
| No. 1-11 | Affidavit of Truth for Claim by T.J.P. | 104 | 136 |
| No. 1-17 | Affidavit of Lien and Notice of Lien | 199 | 136 |
| No. 1-2 | Application to proceed *in forma pauperis* | 98 | 136 |
| No. 1-21 | 105C Letter dated 2/14/18 to T.J.P. from the IRS | 244 | 136 |
| No. 1-3 | Motion for Production filed by T.J.P. for tax records | 100 | 136 |
| No. 1-39 | Affidavit Proof of Claim and Proof of Lien filed by T.J.P. against Commissioner of IRS John A. Koskinen | 47 | 136 |
| No. 1-39, Page 5 | UCC Financing Statement against Eric Mines Thorson | 60 | 136 |
| No. 1-4 | Motion filed by T.J.P. for bank records | 100 | 136 |

# E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 1-47 | Affidavit of Response to Court Order | 111 | 136 |
| No. 1-5 | Order signed by Judge Epps | 100 | 136 |
| No. 1-7 | Response by T.J.P. to Government's Motion to Dismiss | 101 | 136 |
| No. 1-8 | Motion for Arrest Warrant filed by T.J.P. | 103 | 136 |
| No. 1-9 | Judge Epps' Order denying T.J.P.'s motion for arrest warrant | 103 | 136 |
| No. 4-3 | Involuntary Bankruptcy Petition, J.J.L. | 25 | 136 |
| No. 4-4 | Involuntary Bankruptcy Petition D.D.D. | 25 | 136 |
| No. 5 | Order dated 5/25/2018 signed by Judge Barrett | 26 | 136 |
| No. 7 | Affidavit of Claim filed by T.J.P. | 27 | 136 |
| No. 8 | Affidavit of Claim filed by T.J.P. | 27 | 136 |
| No. 9 | Affidavit of Presentment of Taxable Income for Case Filing filed by T.J.P. | 27 | 136 |
| No. 10 | Affidavit of Response filed by T.J.P. | 28 | 136 |
| No. 11 | Affidavit of Presentment for Liability filed by T.J.P. | 28 | 136 |
| No. 12 | Certificate of Service filed by T.J.P. | 28 | 136 |

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 13 | Still photo from surveillance video | 36 | 136 |
| No. 14 | Ad of lien published in Augusta Chronicle | 108 | 136 |
| No. 15 | Ad in the Augusta Chronicle | 76 | 136 |
| No. 16 | Affidavit Warrant of Arrest of John Koskinen dated 4/2/2018 | 78 | 136 |
| No. 17 | Letter dated April 6th from T.J.P. to Judge Epps | 80 | 136 |
| No. 18 | Letter from T.J.P. to Judge Epps | 82 | 136 |
| No. 20 | Letter from T.J.P. to Judge Epps | 84 | 136 |
| No. 21 | Letter from T.J.P. to Deputy Brant | 85 | 136 |
| No. 23 | A letter from T.J.P. to Deputy Brant | 85 | 136 |
| No. 29 | Certificate of Official Record Tax Transcript from the IRS for tax year 2011 | 209 | 136 |
| No. 30 | Certificate of Official Record Tax Transcript from the IRS for tax year 2012 | 209 | 136 |
| No. 31 | Certificate of Official Record Tax Transcript from the IRS for tax year 2013 | 209 | 136 |
| No. 32 | Certificate of Official Record Tax Transcript from the IRS for tax year 2014 | 210 | 136 |

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 33 | Certificate of Official Record Tax Return from the IRS for tax year 2015 | 210 | 136 |
| No. 34 | Certificate of Official Record Tax Return from the IRS for tax year 2015 | 212 | 136 |
| No. 35 | Notice of Frivolous Positions | 215 | 136 |
| No. 36 | A document entitled The Truth About Frivolous Tax Arguments | 216 | 136 |
| No. 37 | Letter dated July 7, 2016 to T.J.P. from the IRS | 217 | 136 |
| No. 38 | Certificate of Official Record, IRS CCP15 notice dated 9/19/16 to T.J.P. | 220 | 136 |
| No. 39 | Certificate of Official Record IRS Form CP504 for tax year 2015 to T.J.P. dated 11/14/16 | 221 | 136 |
| No. 43 | Certificate of Official Record Tax Return for T.J.P. for tax year 2016 | 222 | 136 |
| No. 44 | Letter dated 3/30/17 to T.J.P. from the IRS | 224 | 136 |
| No. 45 | Form 8278, Assessment and Abatement of Miscellaneous Civil Penlites | 224 | 136 |
| No. 46 | Claim Disallowance Letter dated 2/14/18 to T.J.P. from the IRS | 224 | 136 |
| No. 48 | Individual Tax Return for tax year 2017 for T.J.P. | 225 | 136 |

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 51 | Letter dated March 2015 to the IRS from T.J.P. | 227 | 136 |
| No. 51-5 | Augusta Utilities bill | 230 | 136 |
| No. 51-7 | Enhanced Recovery Company, LLC, bill | 231 | 136 |
| No. 51-9 | A Collection letter to T.J.P. from Windham Professionals, Inc. | 231 | 136 |
| No. 52 | Cover Letter of Correspondence dated June 11, 2019 from T.J.P. to the IRS | 232 | 136 |
| No. 52-29 | A 1099-OID for 2015 | 232 | 136 |
| No. 52-44 | A 1099-OID for 2015 | 232 | 136 |
| No. 52-64 | A 1099-OID for 2015 | 233 | 136 |
| No. 52-74 | Receipt from Richmond County Jail | 233 | 136 |
| No. 52-76 | Receipt from Richmond County Jail | 233 | 136 |
| No. 53-18 | 2017 1099-OID | 234 | 136 |
| No. 53-21 | Letter dated 11/3/17 to T.J.P. from Division of Child Support Enforcement | 234 | 136 |
| No. 55 | Petition dated 8/15/17 filed by T.J.P. with the U. S. Tax Court | 256 | 136 |
| No. 56 | Motion to Dismiss for Lack of Jurisdiction | 260 | 136 |

**P R O C E E D I N G S**

**(8:41 a.m.)**

(**In USMS Holding Cell**)

(No jury)

THE COURT: All right. We are on the record in 1:18-CR-45, *United States of America vs. Timothy Jermaine Pate*. We have Chris Howard here for the government, Justin Maines here for Mr. Pate.

THE DEFENDANT: I have no business with the Court.

THE COURT: Mr. Pate, we are in --

THE DEFENDANT: I have no business with the Court.

THE COURT: Mr. Pate, please be quiet, sir.

THE DEFENDANT: I have no business with the Court.

THE COURT: We are in the Marshal's --

THE DEFENDANT: I will accept all charges for value in exchange for value.

THE COURT: -- holding cell --

THE DEFENDANT: I have no business with the Court.

THE COURT: -- at the United States Federal Courthouse --

THE DEFENDANT: I have no business with the Court.

THE COURT: -- here in Augusta.

THE DEFENDANT: I'm not a U. S. Citizen. I made no agreements with the Court.

THE COURT: Mr. Pate has --

THE DEFENDANT: I made no agreements with the Court.

THE COURT: -- indicated --

THE DEFENDANT: I made no agreements with the Court.

THE COURT: -- that he does not wish to attend his trial today.

THE DEFENDANT: I made no agreements with the Court. I made no agreements with the Court.

THE COURT: Mr. Pate, please stop speaking over me --

THE DEFENDANT: I made no agreements with the Court. Dude, you forged my signature.

THE COURT: Mr. Pate --

THE DEFENDANT: I have no business with the Court. You lied about me being a citizen.

THE COURT: -- you have the right to attend your trial today --

THE DEFENDANT: I have no business with the Court. I have no business with the Court. I have no business with the Court. I do not consent to a trial.

THE COURT: If you want to attend your trial today, you need to let me know right now.

THE DEFENDANT: I do not consent to a trial.

THE COURT: Mr. Pate, if you want to attend your trial today --

THE DEFENDANT: I do not consent to a trial.

THE COURT: -- you need to let me know right now.

THE DEFENDANT: I do not consent to a trial. I do not consent to a trial.

THE COURT: It appears that Mr. Pate does not want to attend his trial today.

THE DEFENDANT: I do not consent to a trial.

THE COURT: Mr. Pate, if you change your mind --

THE DEFENDANT: I do not consent to a trial.

THE COURT: -- and you want to attend your trial today, you need to let your attorney --

THE DEFENDANT: I will never -- I don't have an attorney.

THE COURT: -- or the United States Marshal Service know.

THE DEFENDANT: Mr. Maines is not my attorney.

THE COURT: All right. We'll go off the record.

(Proceedings stood in recess from 8:41 a.m. until 9:06 a.m.)

(Jury out)

THE COURT: Good morning, everyone. We're back on the record in Mr. Pate's case. A couple of things to put on the record and to discuss before we bring the jury in.

One, as the record will reflect, I attempted to have a conversation with Mr. Pate back in the holding cell to remind him of his right to attend this trial, as I know Mr. Maines has attempted to communicate with him as well. He made it very evident that he does not want to attend the trial. So we're

going to continue to proceed without him. I asked him if he wanted to attend, then he needed to let me know, and I believe his response is he doesn't consent to a trial. But I have, of course, directed the Marshals to make every accommodation they can to provide audio and video back in the holding cell, so that if he so chooses, he has the ability to hear and to see the proceedings via audio and video feed back into that area.

Additionally, I've instructed the Marshals, as they have done throughout -- as they did throughout yesterday and will do throughout the day today, to continue to check with him to see if he does want to attend; and if so, to let us know. And I know during recesses Mr. Maines is communicating with him as well. But Mr. Pate continues to indicate that he doesn't want to attend; and of course, we're not going to force him into the courtroom for the reasons that everyone has discussed.

Anything else we need to put on the record about that issue, Counsel?

MR. HOWARD: Nothing from the government.

MR. MAINES: Your Honor, prior to going on the record in the holding cell with Mr. Pate, I also attempted to, again, communicate with Mr. Pate. And I informed him that the trial would proceed regardless of his expressed desire for consent and that he had -- I informed him he had the right to be present. And he continued to respond in a way that did not make sense to me, but I do believe he understands that this trial is happening

right now and that he's voluntarily decided to stay in the holding cell.

THE COURT: Thank you, Counsel. The other thing I wanted to bring up with you is the requested instruction T3 regarding transcript and audio. I didn't know if counsel anticipated introducing the audio and transcript today. If so, I want to discuss with you when this instruction should be given.

And, secondly, there are some blanks and some brackets in the requested instruction. So we need to think about when -- not only when this trial instruction should be given, but how those blanks and bracketed information and proposed instructions should be handled.

Mr. Howard, is that something you're going to get to today?

MR. HOWARD: No, Your Honor. I expect that we'll get to it tomorrow. We can talk about it. Mr. Maines and I have already talked about the instruction. We're happy to address it at a break, but I think we can work out language that's agreeable for everyone.

THE COURT: Okay. The last thing that I had to discuss -- thank you. We'll discuss -- make sure that I bring that up at the end of the day --

MR. HOWARD: I will.

THE COURT: -- that we don't forget about that, because

I want to be certain we give that trial instruction at the appropriate time.

The last thing I had on my list to bring up with you is, unfortunately, at 10:30 I have a bit of court business that I have to tend to. It will likely take at most 20 to 30 minutes. So I'm going to wait to take that morning break until about 10:25. But where, ordinarily, as you could see yesterday, I kind of wait until it would be a natural point in the witness's testimony to do so, today we're going to need to be pretty steadfast that at 10:25 I'm going to take that break.

That said, we're not going to take a lunch break until 12:30, because I want to get through a good bit of information this morning; and I'll likely keep the jury later than 5:00 today since we ended before 5 yesterday and since I'm taking up some time with a bit of court business in the middle of trial today. I want us to get through as much as we can. Okay?

MR. HOWARD: Understood.

MR. MAINES: Yes, Judge.

THE COURT: Anything that you all need to bring up with me before we bring the jury in and before we get to our next witness?

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

THE COURT: All right. Again, I trust that you all had a good evening and we're ready to go forward with a productive

day today. Let's bring in the jury.

THE CSO: Before we do, Your Honor, I just mention these screens right here are showing an image.

THE CLERK: Yes, thank you.

THE COURT: Thank you very much. Everybody's on their toes this morning, and I appreciate that.

THE CSO: They're off.

THE COURT: They're off? Are we good, Mrs. Hammock?

THE CLERK: Yes, sir.

(Jury present)

THE COURT: Good morning, everyone.

THE JURY: Good morning, sir.

THE COURT: Members of the Jury, thank you for being so punctual this morning and for being ready to proceed with another day in the trial in this case.

I trust that everyone followed the Court's instructions last night, and I haven't received any word that anybody needs to report anything to me, so we're going to delve right into the government's case again this morning.

Before doing so, let me state again, as I instructed you yesterday, that Mr. Pate is not in the courtroom. He's chosen not to be in the courtroom, but you should not infer anything from that one way or the other. Okay?

All right. Mr. Howard.

MR. HOWARD: Thank you, Your Honor. The government

calls Christina Toole.

THE CLERK: Please raise your right hand.

CHRISTINA TOOLE, being first duly sworn, testified as follows:

THE WITNESS: Yes.

THE CLERK: Thank you. You can go ahead and have a seat, please. If you will, ma'am, please state your full name for the record.

THE WITNESS: Christina Toole.

THE CLERK: Spell your last name for us.

THE WITNESS: T-O-O-L-E.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. Ms. Toole, what do you do for a living?

A. I'm a case administrator at the U. S. Bankruptcy Clerk's Office.

Q. And where is the U. S. Bankruptcy Clerk's Office?

A. It is right across the courtyard.

Q. And how long have you worked with the United States Bankruptcy Court in Augusta?

A. I have been there for 18 years.

Q. What are some of your duties as a case administrator?

A. I process incoming bankruptcy cases and process them through the end.

Q. Do you also work at the counter?
A. I do.
Q. Now, if someone has a bankruptcy action and they don't have an attorney, where do they file documents in their bankruptcy case?
A. If someone is not represented by an attorney, they will come into our clerk's office and file them in person with one of our bankruptcy clerks.
Q. And is that filed right there at the counter in the bankruptcy clerk's office?
A. It is.
Q. Now, when you receive a document for filing when you're working at that counter, do you decide if that filing has merit or not?
A. Most of the time we go ahead and just enter them and then we will determine that after.
Q. Okay. Is that determined by the judge deciding whether a particular filing is meritorious or not?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. Are you even allowed to turn away or deny filings at the clerk's office?
A. No, we are not.
Q. Last May were you working in the clerk's office at the

bankruptcy court?
A. I was.
Q. Did an individual come in to get paperwork for an involuntary bankruptcy petition?
A. Yes. He came in and got five involuntary petitions.
Q. If we could pull up Exhibit 19. And, ma'am, once that gets pulled up, I'm going to ask you to look at that screen in front of you and tell me if you recognize the individual that's going to be depicted there.
A. Okay.
THE CLERK: Are we publishing this to the jury?
MR. HOWARD: Yes. It's been admitted.
BY MR. HOWARD:
Q. All right. I don't know if it's possible to zoom out at all, but looking at that screen in front of you, ma'am, do you recognize the individual depicted there?
A. Yes.
Q. Okay. And how do you recognize that individual?
A. He was the gentleman that came in and asked for the involuntary petitions.
Q. And did you later learn his name?
A. Yes.
Q. And what was that?
A. Timothy Pate.
Q. In your 18 years at the clerk's office, are involuntary

bankruptcy petitions rare?
A. They are.
Q. How many involuntary bankruptcy petitions have you seen during your 18 years working at the bankruptcy clerk's office?
A. Two.
Q. So when the defendant, Mr. Pate, asked for those petitions, what did you do?
A. When he came in and asked, I printed them out; and in the back of my head, I thought that that was just a little strange, because those are just very rare, and to ask for five was even rarer.
Q. Did you give him those petitions?
A. I did.
Q. And a few days later did you see Mr. Pate again?
A. Yes. He came back in.
Q. And was that on May 21st of 2018?
A. It was.
Q. Let's talk about what happened on May 21st, 2018. Were you working that day?
A. I was.
Q. Where were you working?
A. At the front counter.
Q. You were working at the counter that day?
A. I was.
Q. And at the counter in the bankruptcy clerk's office?

A. Yes.
Q. And you mentioned earlier that when you work at that counter you intake filings; correct?
A. That's correct.
Q. Who came into the bankruptcy clerk's office that day?
A. Mr. Pate.
Q. What happened when he came in?
A. The day that he came in, he brought in -- when he came back, he brought in the five bankruptcy petitions, or involuntary petitions that were filled out, and he asked to file them and get case numbers on all of them.
Q. Okay. And when you received those petitions, did you look at them?
A. I glanced through them, yes.
Q. What, if anything, did you notice?
A. I noticed that one of the petitions lists one of our judges here at district court.
Q. And which judge was that?
A. Judge Epps.
Q. So after you saw that it listed Judge Epps, what did you do with those filings?
A. I had file stamped them in, and I took them to my supervisor at the time and asked her for instructions as to what we needed to do before I actually entered them in our system.
Q. Okay. And what did your supervisor tell you to do?

A. She suggested that we forward those back to Judge Barrett, our bankruptcy judge, for review.
Q. Okay. And did you also tell Mr. Pate that it would take several days to get a case number?
A. I did.
Q. Did those filings ultimately go to the bankruptcy judge?
A. They did. They were forwarded on to her.
Q. And who is the bankruptcy judge in Augusta?
A. Susan Barrett.
Q. After those petitions were filed, were they put on the Court's docket?
A. After they were filed, they were opened up as a miscellaneous proceeding.
Q. Does the bankruptcy court have an electronic docket that's publicly available?
A. We do.
Q. And were those petitions put on that electronic docket that's publicly available?
A. Not at first.
Q. Why not?
A. Because they were looking over them to make sure that they were not fraudulent because it listed one of our judges here.
Q. There was some concern about the public disclosure of that?
A. There was. And the other names that were listed on there

as well.
Q. And because when those documents go on the electronic docket, it becomes a matter of public record; right?
A. It does.
Q. Could affect somebody's credit, just the mere filing of those petitions; is that right?
A. It can.

MR. MAINES: Your Honor, I'm going to object. I don't think there's been a foundation laid for this witness to comment on whether or not this could affect someone's credit history if this was reported.

THE COURT: Sustained.

BY MR. HOWARD:
Q. Ma'am, in the course of your 18 years at the bankruptcy court, are you aware of some of the effects that result when someone gets put into bankruptcy?
A. I know as soon as we have -- as soon as we give out a case number, that it -- credit agencies can pick that record of filing up.
Q. Thank you.
A. And it can be used.
Q. Now, days later did the defendant return to the bankruptcy clerk's office?
A. He did.
Q. What, if anything, did he ask for?

A. He came in and he asked for his case numbers.
Q. And were you working the counter?
A. I was.
Q. What was your response when he asked for those case numbers?
A. I told him that I had not been given any case numbers on those and that they had been forwarded to our judge for review.
Q. And you were waiting on instruction from Judge Barrett; correct?
A. Yes. Correct.
Q. How did Mr. Pate take that response when you told him that?
A. He got angry, and he leaned up against the front counter and started hitting his fist on the counter, saying that he needed those case numbers by the next day and that if he did not get them, that he would start to file liens against our clerk.
Q. Ma'am, has anything like that ever happened in your 18 years as a bankruptcy clerk?
A. Never.
Q. Was that frightening?
A. Yes.
Q. You mentioned the threat, a lien against the bankruptcy clerk. Who is the bankruptcy clerk of court?
A. Lucinda Rauback.
Q. Did Mr. Pate eventually leave that day?

A. He did.
Q. Was court security notified?
A. They were.
Q. If we could pull up Government's Exhibit 4-1. Ma'am, taking a look at that document, do you recognize it?
A. Yes.
Q. What is that?
A. That's our involuntary petition.
Q. And is this -- do you recognize the "filed" stamp there in the top middle?
A. Yes. That is our file stamp.
Q. Okay. And is this the document that was filed by Mr. Pate?
A. It was.
Q. And did you stamp it on May 21st, 2018?
A. Yes.
Q. And listed there in the name, if we zoom out to the whole document, this is a petition against -- naming Brian Keith Epps; correct?
A. That's correct.
Q. And if we look at Exhibit 4-2. What is this?
A. It's another bankruptcy involuntary petition that was filed by Mr. Pate.
Q. And was that also filed on May 21st?
A. It was.

Q. And who is named as the debtor?
A. John Koskinen.
Q. If we could pull up Exhibit 4-3. Do you recognize that document?
A. Yes.
Q. What is that?
A. It's our involuntary bankruptcy petition.
Q. And, again, who filed this?
A. Mr. Pate.
Q. Okay. And when you say it's our involuntary bankruptcy petition, are you referring to the form itself?
A. Yes.
Q. But the substance of the form, who's actually filling that out? Is the clerk's office actually filling that out?
A. No. It was filled out before -- he brought them in filled out.
Q. Looking at 4-3, this names Jacob Lew as the debtor; correct?
A. That's correct.
Q. If you'll look at Exhibit 4-4. Do you recognize that?
A. Yes.
Q. Was this another involuntary petition filed on May 21st, by Mr. Pate?
A. It was.
Q. And this one naming Denise Davis; correct?

A. That's correct.
Q. If you'll look at Exhibit 4-5. Was this the fifth involuntary bankruptcy petition brought in and filed by Mr. Pate?
A. It was.
Q. This one naming Eric Mines Thorson; correct?
A. That's correct.
Q. Each of these filed in the bankruptcy court on May 21st by Timothy Pate; right?
A. That's correct.
Q. And attached to these filings, was there a maritime lien and a UCC Financing Statement to each of these petitions?
A. Yes, sir.
Q. Did the Bankruptcy Judge Barrett issue an order on those five involuntary bankruptcy petitions?
A. She did.
Q. If we could pull up Exhibit 5, and I'll ask if you recognize that document.
A. Yes.
Q. What is that?
A. That is the order that Judge Barrett issued in response to the five involuntary petitions, and this order started the miscellaneous proceeding within the bankruptcy court.
Q. And the date of this order is what?
A. May 25 of 2018.

Q. Okay. So Mr. Pate files the involuntary petitions on May 21st; four days later this order comes out; correct?
A. That is correct.
Q. And was that order sent to Timothy Pate?
A. It was.
Q. If we could pull up Exhibit 6. Do you recognize that document?
A. Yes.
Q. What is that?
A. That is a certificate of mailing. Anytime we hand-serve a notice to any party, this is what we would use.
Q. Okay. So this certifies that that order was mailed out; correct?
A. That's correct.
Q. And looking through this, do you see the name of Timothy Jermaine Pate and an address there?
A. Yes.
Q. And does that reflect that it was mailed to Timothy Pate after that May 25th order?
A. That's correct.
Q. And did Mr. Pate respond to the Court's order?
A. He did.
Q. Have you reviewed his filings made after the court order?
A. Yes.
Q. And are those filings Exhibits 7 through 12?

A. They are.
Q. And were each of those filings made after Judge Barrett's order in the bankruptcy case *In Re: Timothy Jermaine Pate a/k/a Akenaten Ali*?
A. Yes, they were.
MR. HOWARD: No further questions, Your Honor.
THE COURT: Cross-examination.
MR. MAINES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MAINES:
Q. Ms. O'Toole (sic), only pro se litigants can file at the -- file hard copies of pleadings and petitions -- when I say pleadings, I just mean paperwork, paperwork with the bankruptcy court; correct?
A. That's correct.
Q. Attorneys have to go through what's called ECF training, Electronic Case Filing training; correct?
A. That's correct.
Q. And, in fact, there are a lot of rules regulating attorneys as they try to navigate through that Electronic Case Filing system; correct?
A. Yes.
Q. And, in fact, it's not uncommon for attorneys to have their pleadings rejected for noncompliance with the bankruptcy court rules; correct?

A. Um...
Q. You've rejected my filings in bankruptcy court, haven't you?
A. Attorneys are allowed to file electronically, and if a pleading is filed and it's deficient in any way, then we issue deficiency notices on them.
Q. Deficiency notice.
A. But we don't actually reject them.
Q. I used a poor word choice there; correct?
A. Yes.
Q. It's not uncommon for attorneys to file deficient paperwork with the bankruptcy court?
A. That's correct.
Q. And so it's reasonable to assume that a pro se person would file even more -- would be more likely to file defective paperwork with the bankruptcy court.
A. Yes.
Q. When Mr. Pate came to the counter, he was dressed -- how would you describe his manner of dress?
A. I mean, he was usually in like T-shirts and either --
Q. Ratty old T-shirts and jeans for the most part; right?
A. I mean, I don't know specifically what he was wearing, so --
Q. Okay. In your dealings with Mr. Pate, did he seem to have any knowledge about how bankruptcy proceedings worked or any

proficiency with bankruptcy court?
A. The first day he came in he specifically asked for the involuntary petition. And he was adamant that he wanted involuntary.
Q. Did he provide any further explanation about the petition or did he just simply say I want to file this, this paperwork?
A. He walked -- and when he came back, he walked in and said that's what he wanted to file.
Q. Okay. Did you ever discuss with him the contents of the paperwork that he was filing?
A. I did not.
Q. And as the clerk your -- part of your responsibility is to not review the contents of the pleadings, the paperwork that litigants file; correct, other than to make sure that it complies with the local rules?
A. When some -- when a pro se debtor comes in, we go through the paperwork and we make sure that they have at least the basic information for their bankruptcy, to actually get a case number.
Q. And in Mr. Pate's case that information was in those filings; correct?
A. He did have what he needed for an involuntary petition.
Q. And the fact that an employee within the district court was named as the debtor, for any other debtor you would not -- that would not have caused the same suspicion or alarm by yourself or any other clerk; correct?

A. Well, just the fact that he brought in five involuntary petitions set off an alarm for me. And I took them back to my supervisor. And -- because we've only had two of them before.

Q. There's nothing wrong with it being rare or an unusual event; correct?

A. No, but if it is, then it's usually something that we involve our supervisor in.

Q. There's no prohibition or local rule or law that prohibits a creditor from filing an involuntary bankruptcy proceeding against a judicial official; correct?

MR. HOWARD: Your Honor, I'm going to object as it calls for a legal conclusion regarding the laws and regulations.

THE COURT: Overruled. I think she's probably aware of those authorities based on her position, but if she's not, she can say she's not.

THE WITNESS: I -- I don't really know that part of it.

BY MR. MAINES:

Q. So as far as you're aware, there's no prohibition on filing involuntary bankruptcy proceeding against a judicial officer?

MR. HOWARD: Your Honor, again, I'm going to object --

THE WITNESS: I don't know.

MR. HOWARD: -- since she said she doesn't know, and he's asking about legal conclusions to draw.

THE COURT: Overruled. I think he's just trying to get

a clarification.

MR. MAINES: And it was only because of the objection I want to make sure there's a continuity in the answer to the question, Judge, for the jury.

BY MR. MAINES:

Q. So there's no prohibition that you're aware of?

A. Not that I know of.

Q. Okay. So despite that no prohibition, this still caused an alarm for you because of the infrequency of the event; correct?

A. That's correct.

Q. And because of Mr. Pate's strange demeanor, wanting these case numbers and demanding case numbers; correct?

A. Um, the first two times that I dealt with him at the counter he was fine. It was when he did not receive his case numbers the third time he came in is when he got irate.

Q. And have you -- it's unusual for people to demand something as silly as a case number, isn't it? I mean, have you had the occasion to have other pro se litigants come into bankruptcy court and file paperwork for the bankruptcy court; a debtor, for instance?

A. Have we -- can you repeat it?

Q. You've had a lot of experience with pro se debtors.

A. Yes.

Q. All right. It's not unusual for debtors to not have an

attorney.
A. That's correct.
Q. And most of them don't get hung up on case numbers, do they?
A. No. They don't.
MR. MAINES: Judge, that's all the questions I have.
THE COURT: Any redirect?
MR. HOWARD: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. HOWARD:
Q. In your interactions with Mr. Pate, did he seem confused?
A. No.
Q. He knew what he -- he appeared to know exactly what he wanted; correct?
A. That's correct.
Q. And counsel made a reference to strange demeanor, but you never said anything about a strange demeanor, did you?
A. No.
Q. And you also said that when he -- in your first interactions with him, he wasn't angry, was he?
A. He was not, no.
Q. Was he relatively calm?
A. Yes.
Q. And, but when did he get, in your words, irate?
A. When I told him that I did not have those case numbers.

Q. When he didn't get what he wanted; correct?
A. That's correct.
MR. HOWARD: No further questions, Your Honor.
MR. MAINES: No recross.
THE COURT: You may step down. Thank you, ma'am. May she be excused?
MR. HOWARD: She may, Judge.
THE COURT: You're excused. Thank you, ma'am.
MR. HOWARD: The government calls Charlene Burke.
CHARLENE BURKE, being first duly sworn, testified as follows:
THE WITNESS: I do.
THE CLERK: Thank you. You can have a seat, please. If you will, ma'am, please state your full name for the record.
THE WITNESS: Charlene Burke.
THE CLERK: Spell your last name for us.
THE WITNESS: B-U-R-K-E.
THE CLERK: Thank you.

DIRECT EXAMINATION

BY MR. HOWARD:
Q. Ms. Burke, what do you do for a living?
A. I am a case administrator at the bankruptcy court.
Q. And is that the bankruptcy court right across the plaza here in Augusta?
A. Yes.

Q. How long have you worked in the bankruptcy clerk's office?
A. 10 years.
Q. Can you tell the jury a little bit about what you do with that, please?
A. We are -- at the counter we intake any documents that come in from debtors, creditors. We intake all those documents; and we process all the bankruptcy cases, get them ready for hearings, send them to the judge, that sort of thing.
Q. Were you working in May of last year with Christina Toole?
A. Yes.
Q. Did you see an incident involving Ms. Toole and a gentleman at the bankruptcy clerk's office?
A. Yes.
Q. Can you tell the jury what you saw that day?
A. I was passing by, and there was a gentleman at the window, and I noticed him banging on the counter. So I stopped and just stood there while he was banging on the counter. And she took in his paperwork. And, I mean, I didn't hear anything. I just saw him banging on the counter, and that was it.
Q. In your ten years working at the bankruptcy clerk's office, had you seen anything like that?
A. No.
Q. If we could pull up Exhibit 19. Ma'am, I'm going to ask you to look at that screen in front of you. Do you recognize the individual depicted there?

A. Yes.
Q. And how do you recognize that person?
A. That's the gentleman that was at the window, and that's the gentleman that -- the day that I waited on him, that's him.
Q. Let's talk about the day that you waited on him. Weeks later, on June 12th, 2018, can you tell us what happened that day?
A. That day he was -- he was escorted in by one of the SOs. He came in. He was calm that day, I guess because the SO was with him. He gave me his document. I clocked it in, and they left. No interruption. The SO escorted him back out. I took that document, and I gave it to my supervisor at that particular time, and they processed everything after that.
Q. And when you say SO, what do you mean?
A. The security officer.
Q. Does the courthouse have video surveillance in the clerk's office?
A. Yes.
Q. And have you reviewed an image from the video surveillance from June 12, 2018?
A. Yes.
Q. If we could pull up Exhibit 13. Do you recognize the image depicted in Exhibit 13?
A. Yes.
Q. What is that?

A. That is Mr. Tate (sic), and that is the security officer that's at the window.
Q. Okay. Is this an image from the surveillance video?
A. Yes.
Q. And as you kind of explained you said that's Mr. Pate and that's the security officer. Can you describe which is which?
A. Mr. Pate is in the red shirt with the documents in his hand, and the security officer is standing at the other window.
Q. Right.
THE COURT: Ms. Burke. Sorry for interrupting. When you first answered, responded to his question, I'm not sure if I heard you correctly. Did you say Mr. Tate or Mr. Pate?
THE WITNESS: Mr. Pate.
THE COURT: Thank you. I apologize. Go ahead, Mr. Howard.
BY MR. HOWARD:
Q. And the clothes Mr. Pate's wearing depicted in that photograph, he's not in tattered rags, is he?
A. No.
Q. The individual that you mentioned in the blue blazer is the court security; correct?
A. That's correct.
Q. And by this time court security had been alerted as to when Mr. Pate came in?
A. Yes.

Q. And in your interaction with him, how would you describe his demeanor?
A. He was calm. Only thing, he didn't say anything. He just said he wanted to file the pleading. He gave it to me, and that was the end of the conversation.
MR. HOWARD: I have no further questions for this witness, Your Honor.
THE COURT: Cross-examination.
MR. MAINES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MAINES:
Q. Prior to the June 12, 2019, incident, did you actually observe Mr. Pate during the earlier outburst?
A. When he was banging his hands on the counter, yes, sir, I did.
Q. Yes. Okay. So you saw him through -- there's a glass enclosure at the counter; correct?
A. It is.
Q. So the counter comes up to about maybe about four feet? Would that be fair?
A. Good estimate, yes.
Q. And then the rest of the -- the top half portion would be like a Plexiglass or some kind of protective glass; correct?
A. Correct.
Q. And that's a security issue; correct?

A. Yes.
Q. And you also have bailiffs, you call them SO, security officers?
A. Yes, sir.
Q. And those are present in the bankruptcy court in addition to the district court; right?
A. On a normal day, the only time that a security officer will come in, if there is a problem or they suspect something. Normally they would send them in to the clerk's office, no one's with them.
Q. In the clerk's office itself, but in the building there's always --
A. Yes, always. And when they first come in the building, there's always a security officer.
Q. The counter for the clerk's office is actually its own room --
A. Yes.
Q. -- within the bankruptcy court -- courthouse; correct?
A. Yes, sir.
Q. All right. And Mr. Pate's wearing a T-shirt, jeans and tennis shoes. Is that an accurate description of what you observed him wearing?
A. T-shirt, jeans, yes.
Q. All right. Did you actually get close enough to Mr. Pate to observe any smells or anything like that coming from him?

A. No. The partition is there, so I'm here and he's right here.
Q. So you would not be able to tell if he'd even been bathing recently, could you, because of that protective partition?
A. I mean, it depends. You can -- it's not where it's -- I mean, you have an opening there. I mean, if it was an odor, maybe; maybe not, but...
Q. Maybe, maybe not?
MR. MAINES: Judge, that's all the questions I have. Thank you.
THE COURT: Redirect?
MR. HOWARD: Nothing from the government, Your Honor.
THE COURT: May this witness be excused?
MR. HOWARD: She may, Your Honor.
MR. MAINES: No objection.
THE COURT: Ma'am, you may step down.
MR. McCOOL: Your Honor, the government would call John Koskinen.
THE CLERK: Please raise your right hand.
JOHN KOSKINEN, being first duly sworn, testified as follows:
THE WITNESS: I do.
THE CLERK: Thank you. You can have a seat, please. If you will, sir, please state your full name for the record.
THE WITNESS: John Andrew Koskinen.

THE CLERK: And spell your last name for us.
THE WITNESS: K-O-S-K-I-N-E-N.
THE CLERK: Thank you.
THE COURT: Go ahead, Mr. McCool.
MR. McCOOL: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. McCOOL:
Q. Good morning, Mr. Koskinen.
A. Good morning.
Q. Sir, can you tell the members of the jury, where do you currently live?
A. I live in Washington, D.C.
Q. And what do you currently do for a living?
A. I'm retired.
Q. And how long have you been retired?
A. Just about two years.
Q. And prior to retirement were you employed?
A. Yes.
Q. And where were you employed?
A. I was the Commissioner of the Internal Revenue Service operating out of the headquarters in Washington.
Q. And how long were you the Commissioner for the Internal Revenue Service?
A. Four years.
Q. And during what time period?

A. I was confirmed by the senate in December of 2013, and my term by statute ran out in November of 2017.

Q. To be appointed as the Commissioner for the Internal Revenue Service, how does one obtain that appointment?

A. I was nominated, or was asked by The White House if I would take the job and was nominated by the President, in that case, President Obama, and then confirmed by the Finance Committee and the full Senate.

Q. Prior to serving as Commissioner for the Internal Revenue Service, did you have other positions in public service?

A. Yes.

Q. Can you tell the members of the jury a little bit about that?

A. I originally came to Washington in 1965. I clerked for David Bazelon, who was then the chief judge of the Federal Court of Appeals. I came back to Washington after a year of practicing law and worked on the National Advisory Commission on Civil Disorders, otherwise known as the Kerner Commission, in 1967 and '68. John Lindsay was the vice chairman of that commission and asked me to represent New York City and the mayor in Washington in an office with another gentleman. And I did that for a little over a year. And then for four years I was the Chief of Staff to Senator Abraham Ribicoff of Connecticut.

I then spent 21 years in the private sector managing large failed private sector enterprises. Returned to government in

1994 when I was nominated and confirmed by the Senate as the Deputy Director for Management at the Office of Management and Budget in The White House. I served there for three years. I left and was called back about six months later to be assistant to the President, President Clinton at that time, and Chairman of the President's Council on Year 2000 Conversion, coordinating the transition of the government and the country and ultimately countries around the world into the year 2000. I was known as the Y2K czar.

Thereafter, when we managed to get through the year 2000, I became the deputy mayor and city administrator of the city of Washington. I did that for three years. Then in a nongovernment position, I was president on the U. S. Soccer Foundation, the charitable arm of soccer in the United States. And when I retired from that position, shortly thereafter was asked by the Bush Administration at the start of the financial meltdown in 2008 to become the nonexecutive chairman of Freddie Mac, which I served for about four years, retiring in 2012. And then in 2013 I was asked by the President to become the Commissioner of the Internal Revenue Service.

Q. What were some of your responsibilities, job responsibilities as the Commissioner of the Internal Revenue Service?

A. The Commissioner is responsible for the day-to-day operations of the agency, and also working and relating to the

Congress with regard to the budget and the operations of -- the IRS is a division of the Treasury Department, so the Commissioner works closely with the Secretary as well.

Q. How many employees made up the Internal Revenue Service?

A. When I started, there were 100 -- give or take a little, 100,000 employees across the country and the world; and when I left, there were about 80,000.

Q. And how many offices does the Internal Revenue Service have?

A. Between 450 and 500 offices.

Q. Can you tell the members of the jury about some of the various divisions and organizations under your supervision at the IRS?

A. There are basically four operating divisions at the IRS. The wage and investment division is the division that processes the vast majority of 150 million tax returns every year for individuals.

Small businesses work with the small business division.

There's a division called the large business and international, which handles all corporations, large corporations, as well as wealthy individuals.

And the fourth operating division is tax exempt and government enterprises. So all of the tax exempt organizations and governments work with that division. Then there is an enforcement division, the criminal investigation division works

with the Commissioner and an appeals -- independent appeals division where taxpayers, if they disagree with an IRS decision, can appeal that within the agency before they go to the tax court, if that's what they desire.

Then there are a set of support operations, information technology, human resources, operations like that. So they all ultimately are the responsibility of the Commissioner.

Q. So for a person that would have a particular dispute, taxpayer dispute, who would handle that within the Internal Revenue Service?

A. Generally, for the average taxpayer, that would be handled by a revenue agent operating out of -- for compliance purposes, out of the small business division at the IRS.

Q. Would you ever get involved with an individual's taxpayer disputes?

A. No. The Commissioner never gets involved in any individual taxpayer. In fact, the Commissioner has no authority to look at anybody -- any taxpayer's information.

Q. And the system that is in place within the Internal Revenue Service, is it designed to protect the individual taxpayer when there's a dispute?

A. Yes. A key part of the ethos of the IRS is to ensure that every taxpayer's information is protected. There's a criminal statute if you reveal taxpayer information, but even within the IRS, no IRS employee is allowed to look at any taxpayer's

information, unless they're involved in an audit with that taxpayer. So if a taxpayer is under audit, they would be dealing with a revenue agent, and perhaps might be two if it's a complicated case, and a manager, but no one else in the IRS were to be authorized to follow that matter or to engage in it. And no one would be authorized ever for any reason to just look at a taxpayer's information.

Q. And as the Commissioner for the Internal Revenue Service, would you ever correspond with an individual taxpayer over a dispute?

A. No. Those issues would never rise to the Commissioner. Those disputes would be handled directly by the agent, revenue agents involved or their managers.

Q. Commissioner Koskinen, I want to ask you some questions about some liens that were filed against you in relation to this case. Were you aware that an individual by the name of Timothy Pate, also known as Akenaten Ali, filed some liens against you?

A. I was.

Q. How did you become aware of that?

A. I was advised -- shortly after my term expired as IRS Commissioner, I had a security detail operating out of the Criminal Investigations Division, and I was advised by them that a maritime lien had been filed against me.

Q. Directing your attention to March 6, 2018, were you aware that Mr. Pate, known as Akenaten Ali, had filed a maritime lien

against you in the amount of 33 million dollars?
A. I was.
Q. And at any time did you owe Mr. Pate 33 million dollars?
A. I did not.
Q. Directing your attention to May 7, 2018, were you aware that Timothy Pate, also known as Akenaten Ali, had filed a 33-million-dollar lien against you in a UCC Financing Statement?
A. I was.
Q. I want to ask you to take a look at Exhibit 1-39, if we can pull that up. And if we could go to the second page. I'm sorry. The third page.
Sir, you have in front of you page -- the third page of exhibit -- Government's Exhibit 1-39. Can you see that?
A. Yes.
Q. And do you recognize it?
A. Yes. I was -- I haven't spent a lot of time looking at it, but I was shown this by the criminal investigation group.
Q. Do you see your name there, John Andrew Koskinen?
A. Yes.
Q. And that is your name; correct?
A. Pardon?
Q. That is your name; correct?
A. That is my name, yes.
Q. Do you recognize the address that is listed for your mailing address below your name?

A. The address is the headquarters of the IRS in Washington.
Q. And which is where you worked during your time at the IRS --
A. Yes.
Q. -- as the IRS Commissioner?
A. Yes.
Q. The name listed at the top of this UCC Financing Statement, do you see the name Akenaten Ali as well as Box C, send acknowledgment to Timothy Jermaine Pate, and there's an address?
A. Yes.
Q. Do you recognize that person?
A. I do not.
Q. All right. Have you ever corresponded with that person?
A. No.
Q. Is there any reason that you're aware of that Mr. Pate, known as Akenaten Ali, would have filed a UCC Financing Statement against you?
A. No.
Q. Has anyone filed liens against you as Commissioner of the Internal Revenue Service?
A. That has happened on occasion.
Q. And when it has, how has it been handled?
A. I would be advised by the Criminal Investigation Division that they had discovered generally UCC filings, and they would

work with the Department of Justice to get those released.
Q. And "released," otherwise expunged?
A. Expunged, yes.
Q. So that they would not affect you?
A. Correct.
Q. I want to direct your attention also to May 21st, 2018. Were you aware that Timothy Pate, also known as Akenaten Ali, had tried to put you into involuntary bankruptcy?
A. No.
Q. As the Commissioner of the Internal Revenue Service, has that ever happened to you before?
A. No.
Q. What -- in terms of this particular case with Mr. Pate filing these maritime liens and financing statements and involuntary bankruptcy petitions, is that unusual?
A. Yes.
Q. How so?
A. As I noted, there were a handful or number of cases where taxpayers for one reason or another would file a UCC filing that would be uncovered. But there was never anything like a maritime lien. Most of the filings were not for anything like 33 million dollars, and there was never an attempt to put me in involuntary bankruptcy.
Q. I had asked you a little bit before about Mr. Pate, or known as Akenaten Ali. As far as you're aware, had you ever met

him?
A. No.
Q. Spoke to him?
A. No.
Q. Ever corresponded with him?
A. No.
Q. Have you ever entered into a contract with him?
A. No.
Q. Had you ever loaned him any money?
A. No.
Q. Is there any reason for you that you would have done anything that you're aware of to suggest to him that you owed him 33 million dollars?
A. No.
Q. As the Commissioner of the Internal Revenue Service, how would these type of liens or involuntary bankruptcy petitions affect you as a public official?
A. Well, first, you obviously were concerned -- or I was concerned that they would be expunged, obviously as your credit rating is important to you. I was also concerned because they could not guarantee to me that they would find all of them. They, as a regular matter, kept an eye out for that. And one of the worries you have is that, particularly at the IRS, I was brought in because the IRS was under a lot of questions and attack about whether they'd treated some applicants for tax

exempt organization status fairly. So the IRS was very visible, and so my concern was that adverse publicity for the Commissioner, me, or the agency would not be helpful as we were trying to straighten out all the stuff that had happened before I got there.

MR. McCOOL: Sir, thank you very much. Those are all the questions I have for you.

THE COURT: Cross-examination, Mr. Maines.

MR. MAINES: Thank you.

CROSS-EXAMINATION

BY MR. MAINES:

Q. Director Koskinen, my name is Justin Maines. I represent Mr. Pate, also known as Mr. Ali. I'll refer to him just as Mr. Pate for expediency. Thank you for being here today.

You indicated in your testimony that the Criminal Investigation Division notified you about the liens and the involuntary bankruptcy proceeding; is that correct?

A. Not the involuntary bankruptcy proceeding. They advised me about the UCC filing and the maritime lien. I did not know about the involuntary bankruptcy --

Q. Okay.

A. -- until now.

Q. So you did not even know until you walked into this courtroom that there had been an involuntary bankruptcy petition --

A. No. I was advised earlier by the U. S. Attorney's Office, but I did not realize that last year when I was advised about the UCC filing and the maritime lien.

Q. All right. With respect to the UCC and the maritime liens, when did the Criminal Investigation Divisions, or criminal investigation unit notify you about those liens?

A. That would have been in the spring of 2018, shortly after the liens were filed.

Q. So the first lien would have been March 6th, 2018; correct?

A. That's my understanding, yes.

Q. All right. And so how long after that before the criminal investigation unit notified you about these liens?

A. It would have been sometime in that period in the spring, but I don't know the exact date.

Q. Okay. Would it have been before or after May 7th, 2018, UCC lien?

A. I'm -- my recollection is that I was advised about the maritime filing in person and given a copy of the lien filing and then advised by phone about the UCC filing.

Q. It's fair to say you have extensive experience and familiarity with financial institutions; correct?

A. Yes.

Q. And you're familiar with the three major credit bureaus --

A. Yes.

Q. -- that keep track of individuals' credit scores; correct?
A. Yes.
Q. And to your knowledge, none of these events have been recorded by any of the three major credit bureaus; correct?
A. Not that I know of.
Q. Okay. You've never been denied credit as a result of any of these events; correct?
A. No.
Q. And these were -- I understand you said that you've never had an involuntary bankruptcy petition filed against yourself; correct, sir?
A. Not that I'm aware of, yes.
Q. But it's not an unusual event -- might not be frequent, but it's not an unusual event for people that identify themselves as sovereign citizens to file liens against yourself in such a high-profile position with the IRS; correct?
A. I never knew who the people were filing the UCC filings, whether they were part of an organization. As I say, the IRS is not anybody's favorite agency. So, but I was never advised as to who was behind the filings or the individuals or whether they were related.
Q. And even though you don't have anything to do personally with individual returns because of the privacy rules, any layman in the community that's not educated or sophisticated would immediately see your name when looking for the director of the

IRS, for instance?
A. Yes. I was easy to see and find.
Q. Right. Because you were actually confirmed by the United States Senate --
A. Right.
Q. -- as the director of that?
A. Yes. And there were a series of hearings. So I was visible.

MR. MAINES: Thank you. I don't have any other questions, Judge.

THE COURT: Any redirect?

MR. McCOOL: Just very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. McCOOL:

Q. Sir, to be clear, you never consented to any of these liens ever being filed against you?
A. No.
Q. And in your time as the Commissioner of the Internal Revenue Service, how many times had somebody filed a maritime lien against you?
A. None that I'm aware of other than this case.
Q. All right. And how many times -- you had indicated that some individuals had filed UCC Financing Statements against you, liens against you. How many times in your four years did that happen?

A. It would have been somewhere in the 6 or 8, 10 times; a small number, but a number.
Q. And the only reason in this particular case that the liens did not affect your credit was because they were expunged?
A. That's correct.
MR. McCOOL: Thank you very much. I don't have any additional questions.
THE COURT: Any followup on that, Mr. Maines?

RECROSS-EXAMINATION

BY MR. MAINES:
Q. You indicated that the only reason this did not affect your credit is because they were expunged; correct?
A. Yes. That's my understanding.
Q. Do you know when they were expunged?
A. No.
Q. Okay. Did you ever review your credit history prior to that expungement?
A. No, I don't regularly review my credit.
Q. Okay. So you have no knowledge whether these events had ever been recorded on your credit history at any time?
A. That's correct.
MR. MAINES: Thank you.
THE COURT: Any further questions of this witness?
MR. McCOOL: No, Your Honor. Thank you.
THE COURT: Sir, thank you. You may step down. May he

please be excused?

MR. McCOOL: Yes, Your Honor.

THE COURT: Mr. Maines, any --

MR. MAINES: No objection.

THE COURT: All right. You're excused, sir. Thank you.

MR. McCOOL: Your Honor, the government would call Eric Thorson.

THE CLERK: If you will please raise your right hand.

ERIC MINES THORSON, being first duly sworn, testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. You can have a seat, please. If you will, sir, please state your full name for the record.

THE WITNESS: My name is Eric Mines, M-I-N-E-S, Thorson, T-H-O-R-S-O-N.

THE CLERK: Okay. Thank you.

THE COURT: Go ahead, Mr. McCool.

MR. McCOOL: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. McCOOL:

Q. Good morning, Mr. Thorson. Sir, where do you currently live? What state do you currently live in?

A. I live in Virginia.

Q. And are you currently employed?

A. I am recently retired as of June of this year.

Q. And where did you retire from?
A. I was the Inspector General of the Department of the Treasury.
Q. How long were you Inspector General of the Department of the Treasury?
A. Just shy of 11 years.
Q. And can you tell the members of the jury how does one become -- obtain that position?
A. I imagine every Inspector General has a different story. I came up through -- well, I'll go all the way back. I'm a graduate of the U. S. Air Force Academy. I was an Air Force pilot for about six years, two of those years in Southeast Asia. I left the government; I left the Air Force at that point, but came back in after starting my own company for about 13 years.
I was named -- appointed to the position of Deputy Assistant Secretary of the Air Force, and I was in the Pentagon for four years, finishing there, from '85 to '89, as acting Assistant Secretary of the Air Force. And then I went over to the Congress, and I guess that's what leads to how did I get to be an I.G. I was a congressional investigator for what was then called the House Government Operations Committee. Today it's the government -- Government operations -- Oversight and Reform Committee.
Then I went two years as the Chief Investigator of the Senate, Permanent Subcommittee on Investigations; and then

eventually after that two years, I was the Chief Investigator of the Senate Finance Committee.

From there I went to OPM, the Office of Personnel Management, as a senior advisor; and somewhere in there I was also a -- an assistant to the Senate Minority Leader on investigative matters.

After OPM, I was appointed by the President, confirmed by the Senate to be the Inspector General of the Small Business Administration, where I was for two years; and then appointed by the President, again, confirmed by the Senate, as the I.G. of the Department of the Treasury.

Q. And which President appointed you as the I.G. of the Treasury Department?

A. George W. Bush.

Q. Do you recall when you were appointed for that position?

A. In August of '08.

Q. And confirmed that appointment required confirmation by the Senate?

A. Yes.

Q. As the Inspector General for the Treasury, what were some of your duties and responsibilities?

A. The responsibilities of an Inspector General office are sort of unique, and they're unique in the basis that you have not only the authority, but the responsibility to oversee all of the operations of the department, meaning that you can question

what they do. You can ask -- interview senior officials right up and to include the secretary of that department.

You can ask for any document, and you write -- the audit section will write reports making recommendations on how to improve the efficiency, make the department run better. Not everybody likes being told how to make their department run better, so it's a unique and interesting job.

We also have, in addition to the audit section, we have the law enforcement side; and I had a number of the most outstanding special agents who have law enforcement authority, and we had every responsibility for whether it was an employee doing something improper or getting involved in international money laundering cases. These are very special people trained to do that kind of work, and we were called upon by a number of other law enforcement agencies as well to assist them.

So to be able to oversee that kind of an office is a really very special thing and something I'm very grateful for.

Q. During your time as the Inspector General for the Treasury, did you become aware that an individual had filed liens against you?

A. I was not aware of any lien filed against me until your office notified my counsel.

Q. And when was that, sir, do you recall?

A. I believe that was August of 2018.

Q. And during that time, you were still the Inspector General

for the Treasury; is that correct?
A. Yes.
Q. And did you learn that this individual's name was Timothy Pate, also known as Akenaten Ali?
A. I don't believe I've ever heard that name until I was asked to come to -- for this trial.
Q. All right. Were you aware that Mr. Pate, also known as Akenaten Ali, had filed a maritime lien against you in the amount of 15 million dollars?
A. The first I learned of that was, again, when your office notified my counsel in 2018.
Q. All right. Directing your attention back to March of -- I'm sorry, May 1st of 2018, were you aware and became aware that Mr. Pate, also known as Akenaten Ali, filed a maritime lien against you in the amount of 15 million dollars?
A. No.
Q. And did you -- did you have any reason to think that Mr. Ali, that you owed him 15 million dollars?
A. No.
Q. All right. And on May the 7th of 2018, directing your attention to that date, were you aware that Mr. Pate, also known as Akenaten Ali, had filed a UCC financing lien against you?
A. No.
Q. All right. I want to pull up Government's Exhibit 1-39 and direct your attention to Page 4. Sir, you have in front of

you what has been published Page 4 of Government's Exhibit 1-39. Can you see that?
A. Yes.
Q. Directing your attention to Paragraph 2, or the 2 there on the page, debtor's name. Do you see that?
A. Yes.
Q. And do you recognize the name there?
A. Yes, I do.
Q. Eric Mines Thorson. Is that you?
A. Yes, it is.
Q. And the mailing address on Box 2C, do you see that?
A. Yes.
Q. Do you recognize that address?
A. Yes, I do.
Q. And can you tell the members of the jury what's located there at that address?
A. That is the address of the main Treasury building in Washington, D.C., where I worked.
Q. All right. At the top of this, on Page 4 of this exhibit, of this UCC Financing Statement, do you see the name Akenaten Ali in Box A as well as an email contact in Box B and then send acknowledgment to a name and address in Box C?
A. Yes.
Q. Do you recognize the name Akenaten Ali?
A. No.

Q. Do you recognize that email address?
A. No.
Q. And do you recognize the name Timothy Jermaine Pate as well as an address here in Augusta, Georgia?
A. No.
Q. Have you as far as you're aware ever spoken to Mr. Pate, or known as Akenaten Ali?
A. I know I have never spoken to him.
Q. Have you ever corresponded with him through email or mail?
A. No.
Q. Spoken to him on the telephone?
A. No.
Q. Met him in person?
A. No.
Q. Ever enter into any contracts with him?
A. No.
Q. Ever loaned him -- did he ever loan you any money?
A. No.
Q. Sir, did you give Mr. Pate any reason to -- at all to suggest that you owed him 15 million dollars?
A. No.
Q. In your position as the Inspector General for the Treasury, had liens ever been filed against you before?
A. Not that I'm aware of.
Q. I'm going to direct your attention to May 21st, 2018.

Were you aware that Timothy Pate, also known as Akenaten Ali, had filed an involuntary bankruptcy petition against you?
A. No.
Q. Has anyone ever tried to do that to you as Inspector General for the Treasury?
A. No.
Q. And were you aware that the government -- in terms of the maritime lien and the UCC financing lien, that the government had those expunged? Were you aware of that?
A. No.
Q. Sir, as -- you know now that these liens were filed against you?
A. Yes.
Q. And can you tell the members of the jury a little bit about as a public official, what kind of effect does these liens have on you as the Inspector General?
A. Let me go back to my statement of why I considered the job of Inspector General so important. When you've been given the authority to oversee, literally interview, pull documents of any employee in the Department of the Treasury, in my case except for the IRS, which has its own I.G., you may not have -- you try and build an office that is as good as can possibly be.
Now, you may not have all of the financial expertise as all of the employees at the Department of the Treasury, but they better have the highest degree of integrity and fairness, if

we're going to exercise our authority over these people.

As head of that office, which is -- just was one of the greatest privileges of my life, if I had had -- if any of these documents that have been discussed were legitimate, I could not have in any way held that position. So it would have gotten right down to the fact that I could not be in that position; whether I would have been removed, another matter, but I certainly would have personally resigned as a result of the effect of these documents.

Q. And how about on you personally in terms of your own personal finances? How would a maritime lien or a UCC financing lien affect you?

A. Well, again, this comes back to the same thing. Assuming that certainly UCC-1, especially, which as I understand it, you can't ever make those go away, and they would have been entered into some database had this office not intervened, which I am very grateful.

The first thing it affects, at least in my opinion, would be your credit rating. And that's going to affect everything, not only my ability to do the job that I'm in where my employees look at me as the example that I intend to hold them to, but everything -- every financial dealing I had that would have shown up. So from a personal point of view, it would have been devastating; and certainly from a professional point of view, it would have been my biggest nightmare.

Q. All right. Did you ever consent to any of these liens being filed against you?
A. No.
Q. And these liens, these two liens, they were, in fact, false; correct?
A. Yes.
MR. McCOOL: Thank you very much. I don't have any additional questions for you.
THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. MAINES:
Q. Good morning, my name is Justin Maines. I'm going to refer to Mr. Timothy Pate, also known as Mr. -- I don't think I can pronounce it -- Akenaten Ali, as Mr. Pate for expediency. Is that all right?
A. Yes, sir.
Q. I don't want to keep using two different names. I'm just going to refer to Mr. Pate.
A. That's fine.
Q. Okay. The Department of the Treasury encompasses the IRS; correct?
A. Yes.
Q. Even though the IRS has their own Inspector General.
A. Correct.
Q. Okay. Now, when did you leave office as the Inspector

General?

A. I left office on June 8th of this year.

Q. Okay. And when did you discover -- now, you indicated that the United States Attorney's Office notified you about the liens and the bankruptcy proceeding that was filed against yourself. But when did that occur?

A. I believe it was August of 2018 the U. S. Attorney's Office called the counsel to the I.G. -- I have kind of my own small law firm -- and my counsel called me and said, guess what.

Q. I see. All right. So you never discovered this reviewing your credit history; correct?

A. No.

Q. Okay. And you've never been denied any credit as a result of these events?

A. No.

Q. And as far as you're aware, none of these events have ever been recorded on your credit history?

A. No.

Q. And you're familiar with the three major credit bureaus that most people refer to as the entities that maintain individuals' credit scores; correct?

A. Yes.

Q. And to your knowledge, no one has ever reported any of these events on either -- any of those three credit agencies; correct?

A. I'm not aware of it, no.

Q. Okay. No -- other than discovering these events from the United States Attorneys informing you and having to come to court today, none of these liens or this bankruptcy petition have affected you in your professional capacity in any significant way, have they?

A. Fortunately, they were intercepted before they did, yes.

Q. And do you know when they were intercepted?

A. No, I don't.

Q. So you don't -- you can't say for sure whether or not this -- that the interception actually affected in any meaningful way your professional career?

A. I'm not sure that's a correct statement. Had they not been intercepted, I would assume that some of these documents by simple way of their design would have been entered into a database and would have affected me. So I'm not sure I'm --

Q. You -- okay. You assume that, but you do not know that for sure?

A. I assume that would be the case, so, therefore, they did not get into the database, therefore, they did not affect me.

Q. All right. And do you know when they were intercepted?

A. No.

Q. And do you know when they were filed?

A. No.

MR. MAINES: Thank you.

THE COURT: Any followup, Mr. McCool?

MR. McCOOL: No, Your Honor. Thank you.

THE COURT: May this witness be excused?

MR. McCOOL: Yes, Your Honor.

THE COURT: Thank you, sir. You may step down. Any objection to that, Mr. Maines?

MR. MAINES: No, Your Honor.

THE COURT: Members of the Jury, it's about time for our morning break. This morning I've got another matter that I've gotta tend to for a few minutes, so it may be a little bit longer than our typical break. I would imagine that within 20 minutes I'll be able to be back and we'll be getting right back into it, but it may extend to 25, 30 minutes. But I just wanted you to know that.

I also wanted you to go ahead and know that I anticipate taking a lunch break, depending on how our witnesses break out -- I don't want to interrupt a witness midstream -- but probably around 12:30 is when we'll take our lunch break. So just to let you know that during this break that if you're already hungry, you might want to go ahead and grab a bite because it will be 12:30 or after before we take a lunch break, because I believe we do have some snacks in the jury room for you. Okay. We'll take a break, and then we'll keep plowing on when we get back from our recess. All right. We'll be in recess.

(Proceedings stood in recess from 10:20 a.m. until 11:03 a.m.)

(Jury present)

THE COURT: Members of the Jury, thank you for your patience during our somewhat extended morning break. Again, I trust that you all followed my instructions not to discuss the case with anyone, including with each other.

With that said, we'll move forward with the remainder of the government's case. Mr. Howard.

MR. HOWARD: Thank you, Your Honor. The government calls Charles Brant.

THE CLERK: If you will, sir, please raise your right hand.

CHARLES BRANT, being first duly sworn, testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. You can have a seat, please. If you will, please state your full name for the record.

THE WITNESS: Charles Michael Brant.

THE CLERK: Spell your last name for us.

THE WITNESS: B-R-A-N-T.

THE CLERK: Thank you.

THE COURT: Go ahead, Mr. Howard.

MR. HOWARD: Thank you.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. Deputy Brant, what do you do for a living?
A. I'm with the United States Marshal Service, Deputy United States Marshal.
Q. And can you explain to the jury what a Deputy United States Marshal does?
A. Yeah, we have the primary responsibility of protecting the federal judiciary, the court family. We execute federal court orders, civil and criminal. We do criminal investigations. We do threat investigations; transport and house in-custody defendants for federal cases.
Q. Pretty diverse range of responsibilities; right?
A. Correct.
Q. How long have you been a Deputy U. S. Marshal?
A. For a little over 12 years.
Q. And are you the deputy in charge of the Augusta Division?
A. I am.
Q. You mentioned a little bit about the individuals that you're tasked to protect. And you said that includes federal judges; correct?
A. Correct.
Q. Are those considered protected persons?
A. They are.
Q. Now, early last year in the course of your work as a deputy marshal, did you come to learn of Timothy Pate?
A. I did.

Q. Deputy, how did you come to learn of that individual?

A. I have interactions with the clerk's office and such about people that are like prolific filers or filing certain type of documents and stuff. So in the course of me talking about other individuals, his name was brought up. And I asked a few questions about it. And then the next time I heard about it was when he produced that ad against one of our judges.

Q. Now, when the clerks alerted you about Mr. Pate, what, if anything, did you ask the clerk to do when Mr. Pate came into the courthouse?

A. To notify me about what he was filing so I could just kind of keep track of it, make sure that there was nothing any hostile or physical threat coming out of any of the filings.

Q. And to be clear when you talk about physical threats, in all of the communications that we'll go through today, at any time did Timothy Brant (sic) threaten to physically harm any of those protected persons?

THE COURT: I think you meant -- you mixed up last names there. Just to be clear for the record, you said Timothy Brant, but I think you meant Timothy Pate; is that correct?

MR. HOWARD: That is, Your Honor. I appreciate that.

THE WITNESS: Correct. We actually identify things in a couple of different categories. We identify things as a threat or either an inappropriate communication. An inappropriate communication could be anything that would cause someone to feel

uncomfortable about proceeding in the normal course of business. So those type of things we monitor as well, and we felt it was kind of like more of an inappropriate communication.

BY MR. HOWARD:

Q. So, Deputy Brant, Mr. Pate did not file physically threatening documents against federal judges; correct?

A. Correct.

Q. In March of last year -- you mentioned an ad in the newspaper -- did you become aware of an ad that had been placed in the Augusta Chronicle?

A. I did.

Q. How did you come to learn of that ad?

A. Actually, it was Judge Epps, he brought a copy of the ad to me that was found in the paper. And it referenced maritime liens and stuff and addressed him as a vessel in the ad.

Q. And did you photograph that ad?

A. I did.

MR. HOWARD: If we could pull up Government's Exhibit 14.

BY MR. HOWARD:

Q. Deputy, once that gets pulled up, I'm going to ask if you'd review that and then let me know if you recognize it.

A. That's the ad I saw.

Q. And you're looking at Exhibit 14? And in this ad does it list Judge Epps and John Koskinen?

A. It does.
Q. As well as millions of dollars they purportedly owe; correct?
A. Correct.
Q. Now, after seeing this ad in the paper, did you meet with Mr. Pate when he came to court?
A. I did. After the ad, I requested the clerk's office notify me if he showed up to file anything again. I waited for him to conduct his business with the clerk's office, and then I introduced myself and spoke to him at that time.
Q. Can you tell the jury why you wanted to meet Mr. Pate and why you directed the clerk's office to alert you when he came in?
A. So in these type of -- in these type of situations, anytime we can actually physically monitor someone that's trying to have interactions with the Court, we try to engage with them so they'll keep wanting to interact with us, so that way we can make sure that, you know, they don't try to hunt down one of our protectees or something at their home or out at dinner. So I tried to give him basically an advantageous avenue to approach me to get information to the judge.
Q. So he's approaching you and not the Judge; right?
A. Correct.
Q. You want to be his point of contact. Is it fair to say?
A. Exactly.

Q. Fair to say you were the mediator between him and Judge Epps?
A. And that's how I explained it, that I had access to mediate if he needed anything from us.
Q. And when you're speaking with Mr. Pate, do you also take comfort in knowing where he is?
A. Correct.
Q. Can you talk a little bit about that?
A. So anytime I would meet with him, I would -- the first thing was what was his overall goal. And he, matter of fact, just told me he was just trying to get his money. So I told him if he -- you know, if he needed to, you know, have any further contact or anything like that, that he could just ask for me, and I would always make myself available to meet with him.
Q. If we could pull up Exhibit 19. Do you recognize the individual depicted in that photograph?
A. Correct.
Q. And who is that?
A. That's Timothy Pain -- or Timothy Jermaine Pate, or Akenaten Ali. I might be mispronouncing the name, but...
Q. Is that the same individual that you met with several times in this courthouse?
A. Correct. That's him.
Q. This particular photograph we're looking at, Exhibit 19, did you actually obtain this photograph?

A. I did.
Q. And from what source did you obtain that photograph?
A. From his driver's license photograph.
Q. And as a Deputy U. S. Marshal, that is a system that's publicly available to you?
A. Correct.
Q. When you met with Mr. Pate, did he tell you what his phone and his address was?
A. He did. I actually asked for that, so if I was receiving a phone call or something, I could identify where the number was coming from. And I did get his address and put it in my file.
Q. Okay. And when he came into court, were you -- did you make yourself available to meet with him when you could?
A. I did. I believe I only was not available one time. But he left -- he left mail for me at that time, and I got back with him later.
Q. And do you normally meet with litigants in this courthouse?
A. Not normally meet with litigants, but people that have a special interest of like the inappropriate communication or something like that, I do try to make myself available.
Q. Now, going back to that ad that was placed in the Augusta Chronicle, did law enforcement obtain records concerning that ad?
A. Correct.

Q. And do the records show who placed that ad in the paper?
A. They do.
Q. If we could pull up Exhibit 15. Looking at the top half of this document, do you recognize what's depicted there?
A. I do. That's the same ad number that was taken out in the paper.
Q. And let's start at the top left of this document. Do you see where it says ad order number?
A. I do.
Q. And is that the same ad order number listed in the ad that you saw in the Augusta Chronicle?
A. It is.
Q. The customer's name is listed as Akenaten Ali; correct?
A. Correct.
Q. And you already mentioned that in the course of this case was that a -- another name that Timothy Pate went by?
A. Correct.
Q. And the customer and payor address. Do you see that address there?
A. I do.
Q. Now, is that the same address that Timothy Pate provided as his address to you?
A. It is. It's the same address.
Q. And the phone number listed there, is that the same phone number that he provided to you?

A. I believe it is.
Q. If you'd look at the second page of that exhibit, is the ad posted on that page?
A. It is.
Q. And is that the same ad that you saw in the paper?
A. It is.
Q. Now, below that are there a number of dates listed there as the run dates?
A. It is.
Q. What do you understand that to be?
A. The times that it was actually being released to the public via the news publication.
Q. The dates that that ad ran in the newspaper; correct?
A. Correct.
Q. And it shows that it not only ran in the Augusta Chronicle, but the Augusta Chronicle online as well. Is that fair to say?
A. Yes, sir.
Q. And looking at this, do you see eight different instances in which that ad ran across four different days?
A. Correct.
Q. Now, when you first met with Mr. Pate, did he mention a letter he had sent to the Marshals requesting arrest warrants?
A. He did.
Q. And did you obtain that letter from the Marshal's office?

A. I did. Mr. Pate actually identified to me that he had sent arrest warrants for people to Savannah where our -- our headquarters is located in Savannah, Georgia. And he said that he had actually requested the U. S. Marshal for the Southern District of Georgia to execute a couple of arrest warrants, and he knew that we had received them because they had certified mail numbers, and he quoted the numbers to me. So I contacted Savannah to see if they had received them and got copies of exactly what he sent with the certified mail numbers and all.
Q. Appeared to be fairly organized it sounds like?
A. Correct.
Q. If we could pull up Exhibit 16. If you'd review that document titled affidavit warrant of arrest. Do you recognize that?
A. Yes, sir. That's one of the two.
Q. All right. And the date of this is dated April 2nd, 2018; correct?
A. Correct.
Q. And is that around the same time when you first met with Timothy Pate?
A. It is. I believe I met with him on the 5th of April of 2018.
Q. Are you familiar as deputy marshal with the process to obtain arrest warrants?
A. I am.

Q. Can you tell the jury a little bit from where you get an arrest warrant?

A. So, generally, I mean, you -- as an investigative agency, you'll meet with the AUSA prosecutor; you'll present them the case, and if you have enough evidence, they'll generally take it to the grand jury, you'll get a true bill and then get an arrest warrant from there. You can also do it off of a criminal complaint by meeting with the judge, giving him the facts of the case at the time; and if he believes there's probable cause, you can get an arrest warrant generally that way, too.

Q. So the arrest warrant comes from a judge; correct?

A. Correct.

Q. An individual who isn't the Court, can they just enter an arrest warrant?

A. Not if they want the U. S. Marshals to execute it.

Q. This particular affidavit that we were looking at in Exhibit 16, if we could pull that up again. Whose arrest is that seeking?

A. John Koskinen, Koshkinen (ph).

Q. What did the Marshals do with this affidavit warrant of arrest?

A. We -- I actually scan all the documents into our computer system, so if anybody wants to access the investigation we're running, they'll have access to the documents. So I took the documents, scanned it in, and then I believe I notified the FBI

about these documents as well.
Q. Mr. Koskinen wasn't arrested as a result of this; correct?
A. He was not.
Q. Now, from April to June of 2018, did you meet with Mr. Pate at the courthouse several times?
A. I did.
Q. And on several occasions did he bring you letters?
A. He did.
Q. Who were the letters directed towards?
A. He brought a couple letters addressed to Brian Epps; and I believe one time he had a letter addressed to Scott Poff, the Clerk of Court.
Q. And do you know why Mr. Pate was bringing you those letters?
A. So he would -- in addition to him filing stuff, he wanted to make -- I guess to kind of like circumvent the timeline for the judge to actually read his request, he could get me, because as soon as I would notify the judge for a meeting, I would present him with the letter.
Q. Well, let's start on April 6th. Did Timothy Pate give you a letter that day for Judge Epps?
A. I believe he did.
Q. If we could pull up Exhibit 17. I'm looking at the first page of this exhibit. Do you recognize that?
A. That is one of the letters he presented me.

Q. And is this the April 6th letter from Mr. Pate?
A. I believe it is.
Q. And to whom is this letter addressed?
A. To Mr. Epps.
Q. And did you understand that to be Judge Epps?
A. I do.
Q. Without reading the entire document for the jury, can you summarize the content of this?
A. He's basically explaining to the judge that he requires that he will sell the liens against various parties and that he won't send any more paperwork to members of the press. He will not file a case against the U. S. Supreme Court and things like that.
Q. Okay. And he's offering to sell those liens for 25 million; correct?
A. That is correct.
Q. In exchange, he wants certain things, though; right?
A. Correct.
Q. And what are those things that he wants?
A. So do you want me to read what he's --
Q. Is it fair to say that he's requesting judgment against the defendant for six million dollars?
A. Correct, that is.
Q. Okay. And various other requests that are listed there; right?

A. Correct. He's wanting his tax returns for various years, 2015, 2016.
Q. And you mentioned in exchange for this he's laying out what he's willing to do for that; right?
A. Correct.
Q. And one of those is he agrees not to send paperwork to any members of the press; right?
A. Correct.
Q. What did you do with the letter after he gave it to you?
A. Again, I -- I notified the FBI. I scanned it in for our file. And then I contacted Judge Epps for a meeting and explained to him I had a letter and presented him with the letter.
Q. Ten days later -- let's go to April 16th -- did you meet with Timothy Pate again at the courthouse?
A. I believe I did.
Q. Did he give you another letter addressed to Judge Epps?
A. I know he did, at another time.
Q. If we could pull up Exhibit 18. Do you recognize that?
A. I do.
Q. What is that?
A. It's a letter he gave me addressed to Judge Epps.
Q. So this one, if you would, just go ahead and read that first paragraph.
A. Okay. "I have given you and the counsel for the defense

an opportunity to settle and close this matter, but nothing has transpired from it. If I do not receive payment in the mail by Wednesday, April 18th, 2018, then I am going to continue filing paperwork to perfect all liens on April 18th, 2018. I am going to file a claim against Steve Smith on Wednesday, April 18, 2018. I am going to make the offer that I placed on court record null/void, and I am going to seek the full sum of all liens. I am going to state on record that it was you that got the U. S. Marshal deputy to contact me as a middleman. On April 18, 2018, all court paperwork will be sent to the press and the case paperwork that I have constructed will be notarized and sent to the U. S. Supreme Court via overnight mail. I will no longer talk to the deputy, you nor anyone else concerning settlement. If I do not receive payment, then I will use the service of a broker to sale/sail the liens."

Q. There's a reference in there to Steve Smith. Who is that?

A. That was the U. S. Marshal at the time for the Southern District of Georgia.

Q. Now, when you were interacting with Mr. Pate, can you describe his demeanor?

A. He was very pleasant, well spoken, articulate.

Q. Was he acting out? Was he boisterous? Was he physically threatening you?

A. No, sir.

Q. How would you describe his physical demeanor?

A. He was calm and matter of fact.
Q. On June 5th, did you receive a letter from defendant for you to deliver to Judge Epps?
A. I did.
Q. If we could pull up Exhibit 20. Do you recognize this?
A. I do.
Q. What is that?
A. It's another letter to Judge Epps explaining to him when he was going to come, trying to have a meeting.
Q. And he's talking about coming to meet and to discuss a settlement proposal?
A. Correct.
Q. After receiving these letters, what did you do with them?
A. After scanning them in and uploading them to our file, I notified Judge Epps about the letters.
Q. And to your knowledge did Judge Epps ever meet with defendant?
A. He did not.
Q. And other than in a court proceeding, is a judge just going to meet with a private party about a case?
A. They will not.
Q. Given the language in these letters, is that something that you would have advised Judge Epps to do?
A. I would advise him not to meet.
Q. Why?

A. Because it -- I mean, it puts him in contact with somebody we don't want them to have contact with, and we'd rather control the situation and keep the judge away from him so he can focus on his other matters at hand.
Q. On June 25th, 2018, did the defendant leave a letter for you at the courthouse?
A. He did.
Q. Did you review that letter?
A. I did.
Q. If we could pull up Exhibit 21. What is this?
A. It's his offer to, I guess, everyone involved.
Q. Now, is he asking for six million dollars in exchange for removing the liens?
A. Yes.
Q. The next day, and actually, turning to June 28th, did the defendant come to the courthouse and meet with you?
A. He did.
Q. Did he give you a letter?
A. He did.
Q. If we could pull up Exhibit 23. Do you recognize that?
A. I do.
Q. Is this the letter you received from Mr. Pate on June 28th, 2018?
A. It is.
Q. If you'd look at the first sentence, does he mention that

he came to the court to settle?
A. It does.
Q. And in the second sentence does he say that he's taking his case to an international court of justice?
A. He does.
Q. Looking at that third paragraph, a little bit of a long paragraph, but, Deputy, if you would, would you please read that paragraph.
A. The "I find it extremely laughable"?
Q. Yes.
A. "I find it extremely laughable that you all would stoop to deliberate fraud to keep credit away from me which is rightfully due. I was going to dismiss all the liens, but you all would rather stick out your chest as if I am fearful or dumb. If you all think that I would stop just because a chief judge, a/k/a chief tax agent, made a ridiculous order based on fraud/lies, then you all are fools. I will never stop until I get what is rightfully due. It's going to be my pleasure to file international criminal charges against select people. Law is contract and contract is law. I have the law a/k/a contract a/k/a private record of the parties, and they will hold firm in the international venue. A maritime lien is the highest lien one can file, and no Bar member has any authority over it. The same process I used is the same process all courts use. You all have to use this process because you all really have no

authority. This district court may be pathetic, but I am 100 percent positive that the international court of justice will honor the liens. When the dust settles, remember that I tried to be fair in concerns to this situation. Do know that I am aware that one cannot operate in commerce without a bond."

Q. Deputy, in each of your interactions with Mr. Pate, was he with someone?

A. He was not.

Q. Was he alone?

A. He was always by himself.

Q. Was there somebody whispering in his ear?

A. No.

Q. After meeting with the defendant on June 28th, did you have any other interaction with him until his arrest in August of last year?

A. I believe I only met with him about five or six times between April and August. I don't think I spoke with him again after this letter.

MR. HOWARD: I have no further questions for this witness, Your Honor.

THE COURT: Cross-examination.

MR. MAINES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MAINES:

Q. Deputy Brant, the way you described Mr. Pate -- I'm just

going to call him Mr. Pate -- is that he was -- when you met with him in person, that he was calm, reasonable and articulate. Those were the words that you used to describe him; correct?
A. Correct.
Q. But that's not how you would characterize his writings, would you?
A. I believe he's very articulate in his writings.
Q. You believe that that is --
A. I wouldn't say the last letter was calm, but he was articulate.
Q. When you -- when you -- when you spoke to him and acted as an intermediary, you knew that you were dealing with someone who was not a trained attorney; correct?
A. I'm sorry. What --
Q. You knew you were not dealing with a trained attorney. Correct?
A. Correct.
Q. And you knew that he -- your purpose was to make sure that there was no physical threat to the judicial officers; correct?
A. Correct.
Q. And that's your -- that's one of the primary roles of the Marshal?
A. Correct.
Q. And so you, acting as intermediary on behalf of the judicial officer, created an impression that the Court was

engaging with him; correct?
A. I'm not sure what it created. I explained to him very clearly that I would meet with him to find out what he wanted, and if it was like to deliver a letter, then I would in fact deliver the letter, but promised him no outcome of the letter.
Q. And, in fact, he wanted to meet personally with Judge Epps, didn't he?
A. I believe he wanted to resolve the matter any way he could.
Q. And you testified that you discouraged him from trying -- or told him that he could not meet personally with Judge Epps?
A. Correct.
Q. Well, if he's not a physical threat and he's calm and articulate and reasonable as you described him, why would that be a problem?
A. Because there's rules and procedures in place of how to get before a judge, and he was not at that point yet, I would say.
Q. And do you have any expertise on defining when that point was when a person would be allowed to meet a judicial officer that's presiding over their case?
A. I believe it would be when they scheduled a hearing.
Q. And so there's no -- are you aware of any law or prohibition from litigants meeting or discussing directly with a judicial officer their case?

A. No.
Q. But you, in fact, acted as an intervening agent from him contacting Judge Epps?
A. Correct.
Q. Despite the fact that you've described him as calm, reasonable and articulate.
A. Correct.
Q. He -- his address, this Glenn Hills Drive address that I think was on Exhibit 16 and Exhibit 17. Can we pull up 16? I'm sorry. 17, third page. Or 16, third page. Of Exhibit 16, third page.
You see here there's a return address, care of 2980 Glenn Hills Drive. As part of your investigation to make sure that these individuals that seemed alarmed or disturbed that are interacting with the court system, these frequent fliers, so to speak, you would have investigated where this person was residing?
A. I made note of the address. I did not investigate the address.
Q. All right. So do you have any personal knowledge that Mr. Pate even lives at this address?
A. I do not, other than documentation, and the address that he -- when I asked him if he wanted to give me his address and his number, that's the address he gave me.
Q. Okay. Are you aware of where Mr. Pate was residing at the

time that you interacted with him in 2018?
A. I do not. My interactions were all here, so I didn't.
Q. Okay. When Mr. Pate came to the courthouse, he was -- he was not dressed professionally or even office casually. That would be a fair description of how -- what his attire was?
A. I believe he was in casual attire. It was not coat and tie.
Q. And, in fact, it was just a T-shirt, jeans and tennis shoes; correct?
A. It could have been. I mean, he was dressed differently each time. I mean --
Q. Do you remember how he was dressed any particular time?
A. I believe he was wearing a polo one time and it was like slacks. I mean nothing -- more like just casual attire in my opinion.
Q. And I want to be clear for the jury so they can understand your role in this case. You as the Marshal perceived, based on his writings and filings, to be a potential threat to judicial officers; correct?
A. I perceived it to be an inappropriate communication.
Q. And it was inappropriate because the writings were disturbing; correct?
A. Not -- not disturbing. Just -- I mean, it was uncommon.
Q. So the mere fact that someone would file something uncommon would cause a United States Marshal to become involved

in the case?
A. I make it a practice to interact with the clerk's office and just follow up with anything that's like out of the realm or, you know, inappropriate. So if -- there's several people at any time that I may be monitoring.
Q. So this was not a case where because of these rantings and ravings and these frequent filings, that you got involved because you were concerned that this might be a disturbed individual? That's not the case?
A. I did not get involved until the ad directing -- identifying one of my judges. So --
Q. Prior to the ad had you spoken to the clerks about Mr. Pate?
A. I didn't know who he was, but he was mentioned as somebody that was filing similar documents to a different individual. But the difference being was the other individual had become hostile, and Mr. Pate was always described -- before I knew it was Mr. Pate, he was always described as very pleasant, very articulate, calm.
Q. And is that how you would characterize his writings?
A. Very articulate. I mean, like very in depth.
Q. You were concerned because the writings and the contents involving -- and the fact a judicial officer are involved concern you because these writings were clearly disturbing and written by someone that might be unwell and potentially cause

harm to judicial officers?
A. I wouldn't say that. We have training that allows us to identify like pro se litigants, prolific filers and things like that as a reason to take note, but not necessarily to intervene. So --
Q. And that's what he fit the description of in this case; correct?
A. Once he took out the ad, yes. Prior to that, like I say, I couldn't even tell you I could have told you his name prior to the ad.
Q. But other clerks have reported his filings to you before the advertisement was put in the Augusta Chronicle.
A. Just -- I mean, just that there were other type of filings similar to a case I was investigating at the time.
MR. MAINES: Thank you.
THE COURT: Any redirect?
MR. HOWARD: No, Your Honor.
THE COURT: All right. You may step down. Is this witness excused?
MR. HOWARD: Yes, Your Honor.
MR. MAINES: No objection.
THE COURT: You're excused. Thank you.
MR. HOWARD: Your Honor, the government calls Judge Brian Epps.
THE CLERK: If you will, please raise your right hand.

BRIAN KEITH EPPS, being first duly sworn, testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. You can have a seat, please. If you will, please state your full name for the record.

THE WITNESS: Brian Keith Epps.

THE CLERK: Spell your last name for us.

THE WITNESS: E-P-P-S.

THE CLERK: Thank you.

THE COURT: Go ahead, Counsel.

MR. HOWARD: Thank you.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. What do you do for a living, sir?

A. I am a magistrate judge here in the Southern District of Georgia.

Q. And how long have you been a United States Magistrate Judge?

A. Six years in June of this year.

Q. Where do you primarily work as a judge?

A. In Augusta primarily. I'm also responsible for the Dublin Division.

Q. And when you talk about Augusta, is it this very courthouse?

A. Right.

Q. What did you do before becoming a judge?
A. I was an attorney in private practice.
Q. For how long?
A. I graduated from law school in '98. I clerked for a federal judge in Atlanta for two years, so from 2000 until 2013.
Q. And are you from the Augusta area?
A. Yes.
Q. Born and raised here?
A. Yes.
Q. Do you continue to call it home?
A. I do.
Q. Can you explain to the jury the process to become a United States Magistrate Judge?
A. We are selected from the pool of applicants. When a magistrate judge retires or isn't renewed for a new term, they field applicants from anyone who's interested, and then a panel of people appointed from this area, lawyers and business leaders, look at the applicant pool and interview either all the candidates or a shorter list of the candidates and then make recommendations to the district judges in the Southern District of Georgia in terms of who all to be interviewed by the district judges.
The district judges then select from that list the applicants that they want to interview, and then they make a decision by majority vote of the district judges in the Southern

District of Georgia who they want to select.

And once you are selected, you serve a term of eight years. And if you do your job well enough, you hope that you'll be reappointed for another eight-year term after the first one ends.

Q. And as a magistrate judge, what types of cases do you handle?

A. I am involved in every case that's filed in the Augusta and Dublin Divisions in some capacity or another, whether it's criminal or civil.

Q. And are you the only magistrate judge here in Augusta?

A. Correct.

Q. Once a civil case is filed here in the Augusta courthouse, will it be assigned to you?

A. Yes.

Q. What are some of your duties and responsibilities for civil cases?

A. It depends on the type of case. If it's a pro se case by a prisoner alleging some violation of the Constitution in terms of their confinement, then I handle those from the beginning all the way until trial begins. If it's a case like this one by a pro se civil person, the case out of which this criminal case originates, in those cases I do all of the pretrial workup of the case.

Q. And when you mention "a case like this one," are you

referring to the case of Timothy Pate vs. The IRS Commissioner, John Koskinen?
A. Correct.
Q. Can you tell the jury a little bit about your responsibilities for criminal matters?
A. In criminal matters it depends on the type of case. If it's a misdemeanor or petty offense case, I handle those all the way through trial. If it's a felony case, I'm responsible for all the pretrial matters, primarily making sure that there's a full exchange of information in a felony criminal case between both sides, the prosecution and the defense, and ruling on any motions that are filed in advance of trial.
Q. And how do the responsibilities of you as a United States Magistrate Judge differ from those of a United States District Judge?
A. The core responsibility and distinction between the two offices would be in felony criminal trials. I think the core function of a district judge is to preside over jury trials in felony criminal cases and sentence those who either plead guilty to a felony offense or are found guilty after trial.
Q. And, generally, is there both a magistrate judge and a district court assigned to each civil and criminal case?
A. Yes.
Q. And are you familiar with a federal civil case filed by Timothy Jermaine Pate in 2017 against the IRS Commissioner?

A. Yes.
Q. Was that filed here in the Southern District of Georgia?
A. Yes.
Q. And, Judge, how are you familiar with that case?
A. I was assigned as the magistrate judge on that civil case.
Q. Did you issue several rulings in that case?
A. I did.
Q. Both from your work presiding over that case and in preparation for your testimony today, have you reviewed filings in that case?
A. I have.
Q. If we could pull up Exhibit 1-1. Judge, as we're pulling this up, I'll ask you to review it and let me know if you recognize it.
A. Yes. That's the complaint that Mr. Pate filed in the civil action.
Q. And looking at the very top header, do you recognize your initials up there?
A. Yes.
Q. Is that the BKE?
A. Correct.
Q. And whose initials are the JRH?
A. That's Chief Judge J. Randal Hall.
Q. If we could turn to Exhibit 1-2. Looking at the first page of that exhibit, do you recognize that?

A. Yes.
Q. What is that?
A. That's his application to proceed *informa pauperis* without having to pay the court filing costs.
Q. And this form -- and I guess, why does this form have someone list their wages, their income, their assets?
A. Because if we're going to grant them special status and not having to pay the filing fee, then we have to make sure that financially they cannot afford to pay it.
Q. And is it signed under penalty of perjury?
A. I'd have to look at this one to make sure, but typically they are, yes.
Q. And if we could, looking at staying on this exhibit, go to the next page.
A. Yes. This one is.
Q. Turning to Page 3 of this exhibit, and I'll direct your attention to the first sentence of Page 3, do you see where the filer writes that "I require the Court to waive all court fees"?
A. Yes.
Q. And if we could look at the third paragraph, the first line, do you see where it says, "it would be wise to waive the costs"?
A. Yes.
Q. Judge, does that sort of language raise your antenna?
A. Yes. I mean, this is not typical. This is -- normally

parties come to the Court for resolution of disputes, and they do so in a respectful manner, understanding that the Court is in control of the outcome and will decide it based on the merits. And already you're seeing here this attitude that he's going to control the outcome and dictate how it's going to occur and the terms are really his to decide and not the Court's.

Q. If we could pull up Exhibit 1-3. Do you recognize that?

A. Yes.

Q. What is that?

A. That's a motion he filed pretty early on in the case asking for production of tax records, his tax records.

Q. And looking at Exhibit 1-4, is this a similar motion that was also filed early in the case by Mr. Pate?

A. Yes, a request for production of his bank records.

Q. Are these types of discovery motions ones that fall within your duties as a United States Magistrate Judge to decide?

A. Yes.

Q. And did you issue an order in response to these motions?

A. I did.

Q. If we could look at Exhibit 1-5. What is that?

A. That's my order basically explaining to him that it's too early in the case for us to talk about what information needs to be exchanged by the parties because the defendants are not even -- the defendant has not even been served with process and entered the case officially yet. So it's really premature to

ask for any type of discovery such as this.
Q. And did the government in this case file a motion to dismiss Mr. Pate's complaint?
A. Yes.
Q. And after that government's motion to dismiss, how would you characterize the language in Mr. Pate's filings?
A. Threatening.
Q. If we could pull up Exhibit 1-7. What is that, Judge?
A. That's the response he filed to the government's motion to dismiss the case.
Q. If we could turn to the third page of that exhibit. And I'm going to ask you to look at the first paragraph starting on the seventh line down where it begins "if Case Number C.V. 1:17-0126 is dismissed." Do you see that?
A. I do.
Q. Judge, I'll give you a minute to read that paragraph, and I have a couple questions for you.
A. Do you want me to read it?
Q. Silently is okay.
A. Oh. Oh, good. Okay. (Reading.) Okay.
Q. Judge, can you explain to the jury what it's like to read something like that that's directed towards you?
A. It's certainly out of the ordinary; and when you see a litigant taking this type of tact with the Court, you're concerned about, I think, their mental state, whether they're

the kind of person that might act out against you and your family. I mean, it's always a concern when you're a judge ruling in cases, that we may be dealing with litigants that have a temper and they become a threat to you and your family. And filings like this certainly trigger that thought in the back of your mind.
Q. Now, in the description there about what will happen to any judge who denies his motions, did you understand that to be a threat?
A. Yes.
Q. In all your years as a federal judge, has anyone ever filed something like that in a case in which you've presided?
A. Well, like I say, I've been on the bench six years; and I've seen a lot of pro se filings through the years, and this one stands out as the most concerning, I felt.
Q. In the course --
A. And when I say "this," I don't mean this particular statement that we've read. I mean his course of conduct throughout the litigation as a whole.
Q. In the course of your work as a federal judge, do you issue arrest warrants?
A. I do.
Q. And how is an arrest warrant issued?
A. On application by an investigating officer in conjunction with the United States Attorney's Office.

Q. If we could pull up Exhibit 1-8. Looking at the first page of Exhibit 1-8, do you recognize that?
A. I do.
Q. Before this filing, have you ever seen a private litigant seek someone's arrest?
A. No.
Q. Did you deny Mr. Pate's motion seeking an arrest warrant?
A. I did.
Q. And Exhibit 1-9. What is that?
A. That's my order denying his motion for the issuance of a warrant for the arrest of the defendant.
Q. Now, in the course of this case -- and you already touched upon the tenor and the language used and your concern about that, but in the course of this case, did Mr. Pate make other motions and other filings and other threats against you personally?
A. Certainly.
Q. If we could pull up Exhibit 1-10. If we could go to the second page, I'll direct your attention to the second paragraph and the last sentence of that paragraph. Looking at that sentence, sir, what do you understand Mr. Pate to be demanding there?
A. I mean, I read that as basically being a threat that if I don't act in the manner that he has dictated, that I'll suffer consequences as a result, some type of claim of lien would be

made against me.
Q. If we could pull up Exhibit 1-11. Do you recognize this document?
A. I do.
Q. What is this?
A. This is his affidavit where he attempts to establish the veracity and merits of his claim.
Q. If we could go to Page 4. And in the middle of that page, do you see your name in bold letters and capitalized?
A. I do.
Q. And in that filing does Mr. Pate list out various questions he's requiring you to answer?
A. Yes.
Q. And to take one of those as an example, if we look at Question Number 11, is that asking, "Is it true that you carry a title of nobility?"
A. Yes.
Q. Did you respond to those questions, Judge?
A. No.
Q. Why not?
A. In litigation with pro se litigants, you receive sometimes filings that, like this, that I consider to be noise. There are things that are filed on the record that really, truly aren't proper and don't ask for official judicial rulings; instead, just a various and sundry improper information and questions

that in our judicial capacities we're not supposed to address. It doesn't go to the merits of the case. There's nothing for me to do. The thought of answering those questions is laughable to anyone who's familiar with the legal process.

Q. And is part of the reason also the volume of work that you have to handle?

A. Right. Yeah. I mean, there's no way I could give every litigant time to ask me questions that don't pertain to the merits of the case.

Q. And if you respond to these point by point, does that encourage further filing?

A. Yes.

Q. If we go to the next page of that exhibit, which is 1-11, if we could go to Page 5 of that. And in the middle lower part where the text is written in bold and starts with the word "note, after the time has expired." Do you see that?

A. I do.

Q. What does Mr. Pate warn will happen if you didn't answer his questions?

A. He's going to put something in the newspaper basically saying that he has a valid lien against me.

Q. In light of the filings in this case, including the one we just read, did you alert the U. S. Marshals?

A. I did.

Q. Why?

A. This is just beyond the pale. It's beyond anything I'd seen as a judge; and, you know, I felt some concern about the safety of me and my family.
Q. And this occurred in a civil case; correct?
A. Correct.
Q. Before Mr. Pate's civil case, had you ever alerted the marshals about a particular litigant in a civil case before?
A. No.
Q. This was the first; right?
A. Correct.
Q. Did you get a series of letters from Mr. Pate that were given to you by Deputy Brant?
A. I did.
Q. What was your response to those letters?
A. Basically to ask Marshal Brant whether he thought that this litigant was a threat to me and my family.
Q. And did you respond to each one of those letters?
A. No.
Q. Did you respond to any of them?
A. No.
Q. Can you explain why you're not responding to private letters from a private litigant?
A. Same reason. You know, we try to be in the court system very efficient in our handling of cases and the administration of justice. So we're very much laser focused on ruling on the

merits of every case that's presented. And so we don't have the capacity and the time to deal with these -- with correspondence or anything else that pro se litigants or anyone for that matter asks us to do that doesn't really go to that core function of deciding cases on the merits.

Q. And when someone comes in and files documents, that's put on the publicly available docket; correct?

A. Correct.

Q. When Mr. Pate goes around that procedure and files these letters and gives these letters to Deputy Brant, does that also cause concern about circumventing that filing process?

A. Yes. You're not allowed ethically to have what we call ex parte conversations with parties. If I'm going to have a discussion about a case with a litigant, then I have to be in the courtroom and have that discussion on the record with the other party present. Or if it's going to be a situation where there's a written request filed with the Court, that written request needs to be provided, a copy of it, to the opposing party and the -- my response to it has to be in the official court record and provided to everyone involved in the case.

Q. Judge, did Mr. Pate proceed to file several multi-million-dollar liens against you personally?

A. Yes.

Q. Has anyone ever filed a lien against you before?

A. No. In any capacity, whether that's a legitimate lien.

You know, certainly I pay all my debts and have good credit, and certainly no one's ever -- that I've done business with in life -- threatened me with a lien or filed one against me, and I certainly have never had any litigant in court attempt to file one against me.
Q. And you mentioned that you pay your debts. Do you take pride in that, in your kind of financial solvency?
A. Absolutely.
Q. How did you become aware that those liens had been filed against you?
A. I think through the filings that he made in the case, notifying me first of his intent to file the lien, and then notifying me that he had filed the lien.
Q. So he threatened to do it and then he did it; right?
A. Right.
Q. Did you also become aware that there were ads taken out in the Augusta Chronicle publicizing the liens?
A. Yes.
Q. If we could pull up Exhibit 14. Do you recognize that, Judge?
A. I do.
Q. What is that?
A. That's the lien that he published in the newspaper, the legal section of our local Augusta Chronicle.
Q. And how did you first become aware of that advertisement

that was put in the Augusta Chronicle?
A. I think through the docket filings that he made.
Q. And do you see your name there?
A. I do.
Q. And what was your reaction to seeing that published in the community where you were raised and the community where you continue to live?

MR. MAINES: Your Honor, I'm going to object to that question. I'm not sure that that's relevant under 401 to what we're here to decide today, which is the false liens.

MR. HOWARD: Your Honor, it goes to intent. The intent of this advertising was punitive. There was a threat, and this was retaliatory. The effect that it had on the victim is relevant to that intent.

THE COURT: Overruled, but only for the limited purpose of -- only response would be for the limited purpose of going to the issue of intent.

BY MR. HOWARD:
Q. Judge, would you like me to repeat the question?
A. Sure.
Q. What was your reaction to seeing that published in the community where you were raised and continue to live?
A. Well, I have a sense of humor, and so at first I kind of laughed, but the laughter turned very quickly to concern, number one, about his intentions and my family's safety; and number

two, that someone in the community not understanding the background of this could see this in the newspaper and legitimately believe that I owe someone millions of dollars and failed to pay it.

Q. Judge, at any time did you ever consider just ruling in Timothy Pate's favor in the hopes that these threats would go away?

A. Absolutely not.

Q. Why not?

A. I think a foundational principle of our country is the fiercely independent judiciary. And I'm very proud to be a small part of a system where rulings can be made on the merits of every single case without fear that you're going to lose your job or that your family is going to be affected. I think our country's judicial system is one of the best in the world, in part because we are independent, and we are trained from day one to rule on every case based on the merits, solely based on the merits. And thank God we live in a country where we are -- we can do that without fear of retribution. And in the few instances when you may feel a threat, you understand your duty is to do your job first, no matter the consequences.

Q. Judge, the ad that we looked at mentioned a default judgment that had been entered. At any time in this case was there a default judgment entered in favor of Timothy Pate?

A. No.

Q. In this case, though, District Judge Hall did enter a judgment. Correct?
A. Correct.
Q. And he entered an order dismissing Mr. Pate's civil action in June 2018; correct?
A. Correct.
Q. If we could pull up Exhibit 1-47. Looking at the document, which is labeled affidavit of response to court order, do you recognize this document filed July 6, 2018?
A. I do.
Q. And was this filed after Judge Hall dismissed Mr. Pate's civil case?
A. Yes.
Q. If you would look at the second paragraph, fourth line down, do you see the sentence that begins "The private record of the parties"?
A. Yes.
Q. And can you read that sentence out loud, sir?
A. "The private record of the parties shows that Brian Keith Epps is my property slave boy and I have the law a/k/a contract to prove it."
Q. Judge, at any time have you entered into an agreement with Timothy Jermaine Pate a/k/a Akenaten Ali?
A. Absolutely not.
Q. Did you correspond with him?

A. No. I did not, and he tried -- he attempted to correspond with me.
Q. Did you ever speak with him?
A. No.
Q. To your knowledge did you ever even see Timothy Pate?
A. No.
Q. Did you make him any promises?
A. No.
Q. Do you owe Timothy Pate any money at all, let alone the millions that he liened against you?
A. No.
Q. Have you done anything to suggest that you owe Timothy Pate any money?
A. No.

MR. HOWARD: I have no further questions for this witness, Your Honor.

THE COURT: Cross-examination, Mr. Maines.

MR. MAINES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MAINES:
Q. Good morning, Judge Epps. I don't think we've had the pleasure. My name is J. D. Maines. I'm a CJA lawyer in the Southern District. It's nice to meet you.
A. Nice to meet you as well.
Q. Judge Epps, I want to direct your attention to

Government's Exhibit Number 7, I believe the third page. Can you pull that up? I'm sorry. It might have been the second page. Is this the series of questions that you were referring to as being ludicrous to answer from Mr. Pate that he filed in response to, I believe, an order that you issued dismissing his request for IRS returns?

A. The page that's called up on my screen is the -- a similar set of questions that he addressed to Lucinda Rauback. I can't tell you without comparing it with mine whether it is the same or not.

Q. Okay. Well, just for illustration purposes, you got a similar list of questions that were patently absurd for a United States Magistrate to answer.

A. Right. Yes.

Q. We can all agree that those questions were improper to submit to the Court.

A. Right.

Q. And the attorneys that practice before you all know that. Correct?

A. Correct.

Q. In fact, filing something like that would probably get you disbarred in the Southern District. Would you agree to that?

A. I don't know what the repercussions would be.

Q. Okay. But Mr. Pate, he was clearly a pro se litigant without a membership in the Southern District of Georgia as a

practicing attorney; correct?
A. Correct.
Q. At any point did you take -- did you ever explain to Mr. Pate your role as a judicial officer as you've just explained to the jury?
A. No.
Q. Okay. And, in fact, Mr. Pate's motions don't comply with even the local rules that govern filings in the Southern District of Georgia; correct?
A. I'd be hard pressed to recall specifically a filing of his that did satisfy the local rules. I can't just make a blanket comment that none of them did.
Q. It would be hard -- just from generally considering everything that you can recall he filed, it would be difficult to think of one docket entry that he created that complied with the local rules governing the Southern District of Georgia; correct?
A. Correct.
Q. Now, you also indicated that -- and attorneys all know this -- that it's improper to have ex parte communications where one side in litigation is present but not the other.
A. Right.
Q. As far as you're aware -- as far as you are aware, did Mr. Pate understand that? Did you ever communicate that to Mr. Pate, that you could not communicate with him ex parte?

A. I think I did. I think there's a court order in the record of the case where I referenced maybe ten filings he had made in the case, maybe seven or eight, and explained to him that those filings did not satisfy the local rules, in part because they did not certify that he had served a copy upon the defense counsel and defendant in the case.

Q. Okay. So that deals with submitting documents and motions to the Court.

A. Right.

Q. When a party submits a motion, opposing counsel receives a copy of that motion so they have opportunity to respond.

A. Right.

Q. That's an accurate characterization of how that process is supposed to take place?

A. Correct.

Q. With respect to ex parte communications where someone is writing you a letter, that would be a separate type of event where someone is attempting to meet with you or talk to you in private in your chambers, for instance; correct?

A. Right.

Q. You never communicated that to Mr. Pate that he would not be allowed to do that?

A. I mean, I think I issued maybe three orders in the case. I'd have to go back and look at them all, in particular the one where I reference the certificate of service issue, to see

whether I reminded him that motions are the only proper way of addressing the Court and that letters are not accepted and not proper. I can't recall whether I told him that or not.

Q. Okay. You referenced what you felt were improper threats by Mr. Pate that relate to you personally. At no point in any of those rambling, nonsensical filings that Mr. Pate filed in your court did he ever threaten your physical safety or welfare; correct?

A. Not that I recall.

Q. Okay. As far as you're aware, he's never written a letter to you threatening your physical safety or your family's?

A. Not that I recall.

Q. Okay. You indicated that you have good credit. And as far as you're aware, did any of the liens that Mr. Pate filed ever result in an entry on your credit report?

A. I don't believe so. I've not conducted any research to determine that, but between the filing of multiple liens and the attempt to put me in involuntary bankruptcy, there's a possibility it could have at some point. I just -- I don't know the answer.

Q. Okay. And so between the time that all these things occurred, all of the liens and involuntary bankruptcy petition, you've never been denied credit?

A. I haven't, but I'm not even sure I've applied for credit in that short time frame.

Q. Okay.
A. No. I recall one occasion, a store credit card with a promotional zero-point discount -- I mean zero percent introductory APR. I was not denied credit for that.
Q. So that was a solicitation to yourself for credit?
A. Right. Lowe's credit card. And certainly I was given that credit card, and nothing was mentioned that I had a problem with my credit. And that did occur during the time span in question.
Q. The order that you issued in response -- I think it was the very first affidavit or motion that Mr. Pate filed requesting the IRS returns, the discovery motion that he made, or it was characterized as a discovery motion that you summarily dismissed as being untimely because no answer had been filed; as it relates to that order and discovery, there has to be an answer and action joined in what's called a Rule 26 order issued governing discovery; correct?
A. Correct.
Q. In a civil case. And so his motion for anything regarding discovery was far too premature.
A. Correct.
Q. And one of those tools for discovery are requests for admissions.
A. Correct.
Q. Or interrogatories, which are questions posed to each

party.
A. Yes.
Q. Okay. And so the questions that were submitted in response to your order by Mr. Pate to you appeared to be more in the line of discovery-type questions that were directed to yourself as a judicial officer; correct?
A. I mean, you're asking me to really give you the intent. Are you asking me why I believed he gave me those questions to answer?
Q. I'm asking if those questions appeared to be similar to discovery-type questions that do occur in civil litigation.
A. I'd have to go back and look at those questions.
Q. Asking for questions about taxes or --
A. Can you call up the questions and we can go through them?
Q. I think it's exhibit --
A. I'm not trying to be difficult. I'd just have to --
Q. Sure, sure.
A. I'd have to look at those again and tell you. Some probably qualify, some probably don't.
Q. Okay. You would say that some of those questions may appear to be similar to discovery questions --
THE COURT: Let's pull up the questions, if you would.
MR. MAINES: Can we go ahead and do that? I think it's Exhibit 24.
THE COURT: Members of the Jury, while we search for

that, let's all just stand up right in place. Don't talk about anything. Just stand up and take a stretch for a second.

All right. Let's have a seat. Would you identify for us, Mr. Maines, what exhibit you've got pulled up.

MR. MAINES: Yes, Your Honor. This is, for the record, Government's Exhibit Number 1-11, Page 3. There's a paragraph heading Affidavit of Claim filed by Mr. Pate, and it has a series of questions posed. I'm sorry. Page 4. Page 4. These are directed at Judge Epps to answer the questions that he submitted.

THE COURT: All right. Go ahead, Counsel.

BY MR. MAINES:

Q. Judge, these are the questions that we were talking about a moment ago that would be absurd for a United States Magistrate to answer to any litigant that were submitted to you in this -- in Mr. Pate's filing.

A. I'm sorry. Could you repeat the question?

Q. These questions, these types of questions would be more properly submitted as an interrogatory to the opposing party; correct, as opposed to you as the judge? Now, they might -- I'm not asking you if they're proper, but I'm saying asking questions in a case involving civil litigation would be properly submitted to the opposing party in the form of an interrogatory rather than submitted to the judge. Would you agree with that?

A. Well, that's correct. In civil litigation you don't ask

the judge questions about facts involved in the case. Those are the questions you pose to the party that you're fighting in the litigation.

Q. And as far as you're aware, did Mr. Pate understand that? Did you ever as the presiding judge explain that to Mr. Pate, that your role was not to answer these types of questions?

A. No.

Q. Okay.

MR. MAINES: Your Honor, that's all the questions I have. Thank you, Judge.

THE COURT: Redirect, Mr. Howard.

REDIRECT EXAMINATION

BY MR. HOWARD:

Q. In the course of this case, you understood that Mr. Pate attempted to put you into bankruptcy; correct?

A. Correct.

Q. Has anybody ever attempted to put you into bankruptcy before?

A. No.

Q. And the standard discovery motions or discovery requests that defense counsel was talking about, is a motion to have someone arrested, is that a standard discovery motion that you see?

A. No.

Q. And in terms of these filings, these filings were put --

the filings we've reviewed regarding that UCC filing and the maritime lien, those were on the Court's docket; correct?
A. Correct.
Q. And that docket is publicly available; correct?
A. Correct.
Q. And the liens in there, both the debt that Mr. Pate claimed to be owed by you and the amounts, are those false?
A. They are false.
MR. HOWARD: I have no further questions, Your Honor.
THE COURT: Any followup on that, Mr. Maines?
MR. MAINES: No, Your Honor.
THE COURT: All right. May this witness be excused?
MR. HOWARD: Yes, Your Honor.
MR. MAINES: No objection.
THE COURT: Thank you, sir. You may step down. Your next witness.
MR. HOWARD: Your Honor, the government calls Judge Susan Barrett.
THE CLERK: Ma'am, if you'll raise your right hand.
SUSAN D. BARRETT, being first duly sworn, testified as follows:
THE WITNESS: I do.
THE CLERK: Thank you. You can have a seat, please.
THE WITNESS: Thank you.
THE CLERK: If you will, please state your full name for

the record.

THE WITNESS: Susan Dupre Barrett.

THE CLERK: Spell your last name for us.

THE WITNESS: B-A-R-R-E-T-T.

THE CLERK: Thank you.

THE WITNESS: Thank you.

MR. HOWARD: Your Honor, may I proceed?

THE COURT: You may, Mr. Howard.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. Your Honor, what do you do for a living?

A. I'm a bankruptcy judge in Augusta.

Q. And where is that bankruptcy court that you serve?

A. Right across the street.

Q. How long have you been a United States Bankruptcy Judge?

A. 14 years.

Q. And before that were you in private practice for several years?

A. I was.

Q. Are you the only bankruptcy judge here in Augusta?

A. I am.

Q. Now, the jury has seen some documents referencing Edward Coleman. Who is that?

A. He is the chief judge, and he sits in Savannah, Georgia.

Q. Can you tell the jury a little bit how you became a United

States Bankruptcy Judge?

A. So the Eleventh Circuit, the Court of Appeals, hires the bankruptcy judges, and you go through an application process. They cull the applications down to probably five people. You go through an interview process with the district judges, chief district judges throughout the -- from Alabama, Florida and Georgia, and then they send a group to Atlanta to be interviewed by the Eleventh Circuit Court of Appeals judges. You get interviewed by them. You go through an extensive background check with the IRS and any kind of criminal issues or other things, as well as your work history and personal history.

Q. Now, as a bankruptcy judge, are you familiar with Title 11 of the United States Code?

A. I am. That's where all bankruptcies are filed, under Title 11.

Q. And do all bankruptcy cases go to federal bankruptcy court?

A. They do.

Q. As a bankruptcy judge, can you talk a little bit about what your work entails?

A. So we handle cases from anyone from an individual to a corporation. Any bankruptcies that get filed in Augusta or Dublin come before me. So I handle anybody from a farmer one day to a mother and father of six children or no children, or individuals. So we handle -- the codes are 7s, 11s, 12s and

13s. A 7 is a liquidation. An 11 is a reorganization, as is a 13; and a 12 is a farmer. So we handle whatever falls underneath the bankruptcy code.

Q. Pretty wide spectrum; fair to say?

A. It is.

Q. Within that spectrum is there something called an involuntary bankruptcy?

A. There is.

Q. Can you explain to the jury what is an involuntary bankruptcy?

A. An involuntary bankruptcy is when you place somebody in bankruptcy without their consent. So they haven't agreed to it, and you force them into bankruptcy, or attempt to force them into bankruptcy.

Q. How does an involuntary bankruptcy differ from a typical bankruptcy?

A. Usually -- a voluntary bankruptcy, obviously the people or the business are struggling, and they decide to file a bankruptcy. They voluntarily decide that that's in their best interest. An involuntary is the target doesn't consent to anything. Somebody forces them into bankruptcy or a group of their creditors force them into bankruptcy.

Q. Now, are involuntary bankruptcy cases rare?

A. In my experience they're very rare.

Q. In your over one decade of experience as a U. S.

Bankruptcy Judge, how many involuntary bankruptcy cases have you presided over?

A. So I basically have had four distinct involuntaries that are filed, including the one we're here today on, but they're four distinct cases. One of those cases involved a group of businesses that were real related. So I'm counting that as one, but I've had four.

Q. So four involuntary bankruptcy cases. Compare that to the number of, you know, voluntary bankruptcy cases that you've presided over.

A. Right now I have about 5,000 cases. They can run from 5 to 7,000 cases in any given month. And so that's a very, very minute percentage of the cases I've ever had.

Q. And you have 5 to 7,000 just right now; correct?

A. Yes.

Q. Do involuntary bankruptcy cases fall within Title 11 of the United States Code?

A. They do. That's the only way to file an involuntary is through Title 11.

Q. And how is an involuntary bankruptcy case started?

A. It's usually started by a group of creditors that get together and file an involuntary petition. Petition is on an official form that you file, under penalties of perjury, that you file to try to put the person in bankruptcy, or the company in bankruptcy. So it gets filed with the Court. You have to

pay a filing fee. And then, unlike other cases, you have to have a hearing and an adjudication to determine that it's a proper filing.

Q. What effect does it have on the debtor who is named in an involuntary bankruptcy petition?

A. I don't know of a more powerful provision in the bankruptcy code than filing an involuntary petition. It's as though -- you have an involuntary filed against you, it affects your credit. It affects your ability to get credit. It affects your standing in the community, and it affects you personally. You know, it's an important decision that people make and companies make to decide whether to file bankruptcy or not. So it's a big issue. They get to automatic stay, so it affects their ability to work with creditors and their creditors working with them. The automatic stay automatically goes into place if it's successful. It stops your creditors from contacting you. So it can be very important.

Q. Do you even lose control over your finances?

A. You can. In an 11 you keep some of your control of your finances, but there's oversight. And so in an 11 you do have more control than in some instances where you automatically have a trustee appointed to handle things. But you do lose some control over that. You get -- somebody is looking into your finances, and you lose some control on it. You run the risk of having a trustee appointed.

Q. And if that petition is filed and if it's granted and you go try to buy a car, what are the effects of having that bankruptcy?

A. If you're trying to get financing, it's going to show up on your credit. And so your ability to get credit -- one, do you have the ability to get the credit; and two, the expense you're going to pay for the credit. So if you've got a good credit rating, you can get a -- I don't know what a car loan is now, but 2 or 4 percent credit, you know, paying interest on that. If you go and you file bankruptcy and you're not being able to pay your creditors as they're due or that shows up on your credit report, I've seen cars as much as 20 percent interest rates. And so it's a significant increase in the cost of being able to borrow money and your ability to be able to borrow money.

Q. And if there's a trustee assigned to your case, do you even need to get trustee approval before you go buy that car?

A. Yes, you would.

Q. And you talked a little bit about it, but given the thousands of cases that you've handled, have you seen the personal effect that a bankruptcy has on people?

A. Yeah. It affects people every day.

Q. It simply isn't just financial, is it?

A. No. No. It's not financial at all. It's not only financial.

Q. And even the filing of an involuntary bankruptcy petition, if that is filed and publicly available, does that have the potential of showing up on someone's credit?
A. It does. It's an open record that's available to show up in somebody's record, and you're -- we all fill out applications that ask have you ever filed for bankruptcy. Some of those questions are written so broad that I think you would probably have to answer on some of them that you've had an involuntary filed against you. And trying to explain in the real world what an involuntary petition is when they see the bankruptcy, it happens in a lot of issues.
Q. It comes up when you apply for a job?
A. Jobs. If you were a stockbroker or trying to get something handling money. Any kind of job. A lot of jobs. Handling -- some of the cashier's jobs ask whether you've ever filed bankruptcy. Any kind of management job, any kind of control over personal money or secrets or anything else. It comes up a good bit.
Q. And you mentioned it, but when it shows up on your credit report, there really isn't a paragraph there with an asterisk giving a full explanation of involuntary and without consent, is there?
A. I've never seen that, no. It just talks about bankruptcy in general and groups them all together.
Q. Did you become aware of five involuntary petitions that

were filed in the Augusta Bankruptcy Court last May?
A. I did.
Q. Judge, how did you become aware of those involuntary petitions?
A. So involuntary was filed, or all five of them were filed with the clerk's office. As I said, I have about 5,000 cases. It's unusual to get an involuntary, and when -- the clerk's office brought it to me because it's unusual, and it's one of those things that requires almost immediate response to, because it is so serious. And so every involuntary I've ever had filed I get within 24 hours of it being filed. And that's not unusual for -- if an unusual pleading gets filed, it gets brought to my attention.
Q. And once you received the involuntary petitions, did you review them?
A. I did, because it requires such immediate reaction, I reviewed them, I would assume, within 30 minutes of getting them.
Q. And that immediate reaction is necessary given the powerful impact this can have on someone's life; correct?
A. That's correct.
Q. If we could pull up Exhibit 4-5. And we're going to go through a couple of these exhibits, Judge, rather quickly, and I'm just going to ask if you recognize them. Starting at 4-5, do you recognize that?

A. I do.
Q. What is that?
A. That is Official Form 105, which is the official form that this district uses for an involuntary petition to be filed against an individual.
Q. And that was filed May 21st, 2018; correct?
A. That's correct.
Q. Looking at Exhibit 4-4. Do you recognize that?
A. I do.
Q. What is that?
A. It's the same, Official Form 105. It's the same Official Form 105 against a different individual.
Q. And Exhibit 4-3, what is this?
A. The same Official Form 105 against a third individual.
Q. 4-2. What is that?
A. Same Official Form 105 against a fourth individual.
Q. And, lastly, 4-1. Fair to say that this is the same official form, just against a different official?
A. Yes.
Q. Did you review all of these after they were filed on May 21st?
A. I did.
Q. All right. Let's go through 4-1. If we could pull that back up. So looking at Part 1, can you explain what's contained in that section of this involuntary petition?

A. So this is an involuntary petition attempting to place this individual in a Chapter 11.
Q. And what advantage is there in checking that Chapter 11 box, Judge?
A. So as I said earlier, under Title 11 there are various chapters, and Chapter 11 is a reorganization usually if somebody -- of a business, so of the businesses you hear reorganizing, they're under 11, and it's usually for a wealthier individual, as opposed to a 7, which is a liquidation. But a Chapter 11 would be a reorganization.
Q. And under a Chapter 11 does that give the creditor more control?
A. It does give the creditor more control in the fact that you -- a plan gets filed and the creditors have creditors' committees. They'll be grouped together and would have ability to participate in the bankruptcy.
Q. Looking at Part 2 of this document, do you recognize the name of the debtor there?
A. I do.
Q. And when reviewing that petition, did that name catch your attention?
A. It did.
Q. Why?
A. That's Judge Epps, and he's a magistrate judge here in Augusta, and I also worked with him at the first law firm I

worked at. He was the runner in our law firm.
Q. Skipping ahead to Page 3 of Exhibit 4-1, do you see Section 11, allegations?
A. I do.
Q. Let's go through this --
A. All right.
Q. -- Judge. First, can you explain what's contained here in the allegations?
A. Yes. So the allegation -- to file a successful involuntary you have to meet certain thresholds. Because it is such a powerful tool, there are certain fundamental thresholds you have to meet before you can actually be successful. And one of the thresholds is the debtor can't -- the target must -- can't be -- must not have been paying their debts as they come due. So that's the first allegation.
And, secondly, to be able to put somebody in bankruptcy, your debt that is owed to you can't be subject to a bona fide dispute as to, one, the liability, or two, the amount. So if I have a legitimate dispute against how much I owe you, that can't qualify. Or if I have a legitimate dispute as to whether I even owe you anything, that doesn't qualify. The code did not want individual disputes to be able to force somebody in bankruptcy. It's so powerful they -- they didn't want the threat of being able to force somebody in bankruptcy to be a leverage.
If you have a dispute against somebody about their debt,

you need to sue on the debt in state court or in federal court and succeed or lose on that, not put somebody in bankruptcy. And so they have these thresholds, and these are the thresholds that are set forth there.
Q. And staying on that same section of allegations, and, again, this is in that involuntary bankruptcy petition, but it says there on that form that at least one box must be checked; correct?
A. That's correct.
Q. And what happens if neither of those boxes are checked?
A. They haven't met the threshold pleading and requirements of being able to do that. So I think you would take the same result. They have to make a fundamental threshold requirement of setting that forth.
Q. So it could be subject to summary dismissal without checking one of these mandatory boxes; correct?
A. I think so, yes.
Q. You gotta check one of them; right?
A. Yes. Yes.
Q. So going to this first one that's checked, and you broke it down, but there's two parts to this sentence; right?
A. Two or three, I would say, yes.
Q. Okay. Let's take the -- let's take the first one. The debtor is generally not paying the debts as they become due.
A. Yes.

Q. What does that mean?
A. So like all of us, the debtor, whether you're a business or individual, you get monthly bills and weekly bills, and it means you're not paying them. It doesn't mean you're -- it means you're habitually not being able to pay them or paying them on time. That's what it means, as they come due.
Q. And this is the allegations of the creditor; right?
A. Correct.
Q. So the creditor is saying the debtor is not paying my money?
A. Correct.
Q. Now, the next part, unless they are the subject of a bona fide dispute. What is bona fide dispute?
A. Bona fide dispute would be I don't owe you that money. You can not owe somebody money for a lot of reasons. I've either already paid you back, that's a fake lien. You haven't -- I have a setoff against you, meaning you actually owe me money, and so it's a legitimate dispute as to whether you owe somebody money or not.
Q. So the debtor isn't paying the debts and it's not in dispute.
A. Not in dispute as to liability or amount as to whether I even owe it to you or how much I owe you.
Q. And that's the third part of this; right?
A. Correct, yes.

Q. So the debtor owes me money; it is undisputed, and it's undisputed about the liability or the amount; correct?
A. Correct.
Q. And when we talk about it being undisputed, is that undisputed between the creditor and the debtor?
A. Correct.
Q. So there's no dispute -- everyone's in agreement, the person owes me money, and we're all in agreement about the liability and amount; right?
A. Yes.
Q. And that's the box that's checked here?
A. Correct.
Q. And one of those boxes have to be checked?
A. Correct.
Q. If you'd stay on that same page and look at Section 13 on that page. Can you talk briefly, Judge, about what, if anything, caught your attention in the information contained there?
A. Several things caught my attention. One is it's unusual to have a maritime lien. We're pretty inland in Augusta. But a maritime lien as the nature of your claim is unusual. The other thing that's unusual about it is, as I said earlier, when they drafted the involuntary petition, they did not want just disputes of any debt to come over -- to be able to cause an involuntary. So if you had a maritime lien, in theory, your

boat, the maritime, the collateral that the lien is subject to is worth something. So if he has a lien on a ship, the ship would be worth something; and if you go over to that third column, the amount of the claim of value above the value of the lien, and so this would mean that the ship was worth either a lot -- this is saying that the debtor owes 15 million dollars more than what the ship is worth, and that's unusual, if you had a ship that you could collect on that Congress wanted you to go collect on the ship, get paid your money that way and not file an involuntary bankruptcy on it. And so that, the amount of the claim over the value of whatever his lien was struck me as unusual.

Q. And there are three lines listed there; correct?

A. Yes.

Q. And there's a reference below that to if more than three petitioners, then certain qualifications come up. You mentioned earlier, Judge, that it's usually a group of creditors bringing these. Right?

A. Yes.

Q. Can you explain why it's typically a group of creditors bringing these?

A. It's usually a group because the threshold requirements of trying to meet the requirements to be able to file a petition, it usually takes at least three -- or most of the cases involve at least three, because, again, it's drafted not to have a

two-party dispute between you owe me money, no, I don't. The involuntary is not drafted to allow those kinds of disputes to end up over here. They can in certain circumstances, but it requires -- it's not a two-party dispute situation. It's more of a larger picture on it because of how powerful it is, again.

Q. If we'd turn to Page 4 of this exhibit, do you see a section there for request for relief?

A. Yes.

Q. Now, in the second paragraph, does it say that the petitioner is declaring under penalty of perjury that the information in the petition is true and correct?

A. It does.

Q. Does it also advise them about the implications of making a false statement?

A. It does.

Q. Does it advise them that it carries criminal penalties?

A. It does.

Q. And scrolling down, was this petition and the other petitions that we looked at, were all of those signed?

A. Yes. This petition is signed; and from my review of the petitions as they were filed, each of the petitions was signed.

Q. And signed and dated by the same individual; correct?

A. I don't know if they were dated, but, yes, they were signed and filed on the date stamp, but I -- certainly they were all signed.

Q. Now, attached to the petitions that were filed was there a document styled as a maritime lien and a UCC Financing Statement?
A. Yes.
Q. And were the other four involuntary petitions filed at the same time similar to what we've been looking at with respect to the petition against Judge Epps?
A. Contemporaneously, yes.
Q. Just different debtors and some different amounts; correct?
A. Different, yes. Yes.
Q. But each of those -- going back to the allegations, each of those claimed multi-million-dollar amounts of debt; correct?
A. Yes.
Q. And each of those have that box checked saying that the debt is not disputed and the debtor is not paying the debts; correct?
A. Right.
Q. Now, Judge, these petitions have been filed; they've made their way to you; you've reviewed those petitions. What did you do in response?
A. So I looked at them and I reviewed them. I looked at the -- I read the provisions of the bankruptcy code of Title 11 dealing with the involuntary, and I found the petitions to just be incoherent as involuntary petitions. And so I decided to

place them under seal. They were filed and they continued to be filed. So they were still there, but it would take a court order to be able to get them out of seal. And so I treated them -- I put them under seal, and then I started preparing an order to address it, doing the legal research necessary to prepare an order to address it.

Q. Why was it important to seal these petitions?

A. Because if you unsealed -- if you file it unsealed, the harm has occurred, because the court record is a public record open to the public to be able to come and get. So if you were the target of this, everyone would know that an involuntary had been filed.

It would -- how our system works, it's electronic. So your credit agencies come in there and they frequently sweep information from our electronic filing system. So it got filed. I just didn't put it on the electronic system, nor did I put it where it was available without getting a court order, because the harm would already have occurred, and you can't put that back in the box after it's happened. And so I thought it was appropriate to do that.

Q. Judge, did you issue an order in response to these petitions?

A. I did.

Q. If we could pull up Government's Exhibit 5. Looking at the first page of that, do you recognize that?

A. I do.
Q. What is that?
A. That is the order that I issued in response to the involuntary petitions.
Q. And this is dated May 25th, 2018; correct?
A. That's correct.
Q. And just four days after those May 21st filings that we reviewed; correct?
A. That's correct.
Q. What can you tell us about the speed at which you approached this given the gravity of those petitions?
A. I think part of my oath of office is to handle stuff promptly. Again, this is something that any involuntary that gets filed gets moved almost to the top of anything else. It's that important, and it got the immediate attention I thought it deserved.
Q. So with 5 to 7,000 bankruptcy cases pending before you, this jumped the line given the importance of it; correct?
A. That's correct.
Q. And the case name, looking at that, *In Re: Timothy Jermaine Pate a/k/a Akenaten Ali*; correct?
A. Yes.
Q. And is it typical with bankruptcy cases to have that In Re?
A. Yes.

Q. Was this an action related to a bankruptcy case under Title 11 of the United States Code?

A. It was.

Q. Now, looking at the first page of Exhibit 5, the first paragraph, the last sentence of that paragraph where you wrote that each of these filings is largely incoherent as an involuntary bankruptcy petition. Judge, what did you mean by that?

A. They didn't meet the threshold requirements to even file one, and so I thought they were incoherent to be able to be an involuntary petition. They didn't meet the threshold pleading requirements to do that, to even qualify to file one.

Q. And looking at Page 4 of Exhibit 5, at the bottom sentence, the bottom line, you write there that what is clear from the mere nature of petitioner's -- and moving to the next page -- pleadings, is that his claims are contingent and subject to a bona fide dispute. Judge, what did you mean by that?

A. So I couldn't tell from the pleadings as to whether there was anything else that already had happened before the money was owed, the purported money was owed. So usually in a contingency situation that's a guarantee; somebody doesn't pay the guarantee, the guarantor is responsible for it.

I couldn't tell on this whether the contingency, whether he'd filed the liens, whether the money was owed. I couldn't tell anything, whether anything had occurred. But, clearly, it

was subject to a bona fide dispute because he indicated -- there was no indication that those are actually recorded, it was a proper perfection, and when you look at the actual documents that he says secured his loan, they didn't make sense to me. And so I thought it was subject to a bona fide dispute and that they were inadequate.

Q. You mentioned that they didn't make sense, and you mentioned incoherent. Does that in any way affect the impact that those petitions have when they're filed?

A. No, because nobody's going to look at that. Involuntary -- the involuntary, the effort to put somebody in involuntary happens as soon as the paper gets filed. Somebody's gotta make a ruling and look at that and consider the legal implications, and so the damage has occurred.

Q. Judge, if you'd look at Page 6 of Exhibit 5. In the first full paragraph, the first sentence, you describe Mr. Pate's pleadings, and among other ways, as odious, frivolous, abusive and intended to intimidate, harass, injure and damage the individuals and destroy or harm their financial and personal reputation. Do you see that?

A. I do.

Q. Kind of speaks for itself, doesn't it, Judge?

A. Yeah. I was hoping you weren't going to ask me to explain that, because that's what I thought about it and continue to think about it.

Q. When you say you continue to think about these, can you tell the jury a little bit about that?
A. So I continue to think exactly what's in that sentence, that the purpose of this was to harass, intimidate and injure these individuals. And it's -- it continues on there. I think, as I said, this is one of the most powerful things, and I don't know of anything more powerful in what I do in a day-to-day than to try to put somebody in bankruptcy like this.
Q. And, Judge, in issuing this order, that was part of your duties and responsibilities as a U. S. Bankruptcy Judge; right?
A. It was.
Q. And after that order was issued, did Mr. Pate file a number of responses to it?
A. He did.
Q. In some of those responses, did he name you personally?
A. He did.
Q. If we could pull up Exhibit 8. Do you recognize that?
A. I do.
Q. What is that?
A. That is an affidavit where he is claiming a lien against me, and he wants me to respond to numerous questions; and if I -- I'm not sure if it's in this one or not, but if I didn't respond within seven days, that I was consenting to his claim.
Q. And if we look at the bottom of Page 1 of Exhibit 8, that's that series of questions after he names you; correct?

A. Yes. I think that's the start of them. I think they go on to the -- yes. That's the start of them.
Q. And did you respond to those questions?
A. I did not.
Q. Why not?
A. I didn't think it was appropriate for me to be able to respond. I continue to think this affidavit of claim is largely incoherent. I did end up -- because of my position, I ended up notifying the U. S. Government that I was potentially being sued at some point along this matter, or having a claim filed against me.
Q. And in the second page of Exhibit 8, in the paragraph below all those questions, do you see where your name is mentioned in capital letters?
A. I do.
Q. And in that paragraph does he threaten to file against you a lien for 33 million dollars?
A. He does.
Q. Judge, have you ever had anyone threaten to file a lien against you?
A. No.
Q. And that -- going back to the first page of that exhibit, the date is May 30th, 2018; correct?
A. Yes.
Q. A few days after you had issued your order and after you

had done your job in doing that; correct?
A. Yes.
Q. Did you learn that there were ultimately liens filed against you?
A. I did.
Q. If we could pull up Exhibit 1-48. And turn to Page 2 of that document reflecting it was filed on June 15th, 2018. Do you recognize that?
A. Yes.
Q. Do you recognize your name?
A. I do.
Q. Do you have a vessel?
A. I do not.
Q. If we could zoom in on Box 7, which is in the middle right-hand side. Exactly. Do you see a list of property listed there that's being liened upon in addition to that 33 million dollars?
A. Yes.
Q. And that lists things like your 401(k); correct?
A. Yes.
Q. Your retirement?
A. Yes.
Q. Pretty much everything that someone could own; correct?
A. Yes.
Q. What is it like to look at that, Judge?

A. It's obviously upsetting, for anybody. You have immediate concerns that it's been filed and it affects my credit rating. And I was thankful that I wasn't trying to obtain credit at that point, buying a car or trying to send somebody off to school or anything else. It's -- it's upsetting.
Q. Did you ever speak with Timothy Jermaine Pate a/k/a Akenaten Ali, Your Honor?
A. Not as far as I've ever known.
Q. Did you ever see him?
A. Not as far as I've ever known.
Q. Did you ever meet with him?
A. Not as far as I've ever known.
Q. Did you ever enter any agreement with him?
A. No.
Q. Did he loan you money?
A. No.
Q. Do you owe him any money?
A. No.
Q. Did you do anything, Your Honor, to suggest that you owe Timothy Jermaine Pate anything?
A. No.
MR. HOWARD: I have no further questions for this witness, Your Honor.

THE COURT: Cross-examination. Let's do this. Let's stand up for just another stretch of the legs, if you would.

CROSS-EXAMINATION

BY MR. MAINES:

Q. Good morning, Judge Barrett. My name is J. D. Maines. It's nice to meet you.

A. Nice to meet you.

Q. First thing I want to talk about is this -- the notice, the maritime lien was listed as the nature of the claim in his involuntary bankruptcy petition. Correct?

A. Yes.

Q. Now, just to explain a little bit for the jury, a lien is not really a claim. It's actually more of a tool used by creditors to secure a debt.

A. Right.

Q. Would that be an accurate characterization of how a lien operates?

A. Perfection. Yes. Perfection.

Q. In fact, a lien would help a creditor avoid having to go to bankruptcy court to collect on a debt by allowing them to take possession of property, and, therefore, not have to get a court order through bankruptcy to secure a creditor's debt.

A. Yes.

Q. Okay. So that in and of itself is bizarre when you see something like that on a bankruptcy petition filed.

A. To not have the promissory note, that's part of the issue on there. So you have no -- promissory note would be how you create the debt. A lien is how you secure the debt. And so there was no debt-creating instrument. That was part of the issue.

Q. Like a horse before the -- or the cart before the horse, so to speak?

A. To have -- to have a debt. He had no debt instrument.

Q. Just had a lien, but no debt?

A. Correct.

Q. And so you actually in your order, which was very promptly filed four days after the petition, actually enjoined him from -- or I guess prevented him from filing anything, another involuntary petition without your opportunity to review that, in camera, that petition?

A. He could file. He had to file it in camera. I did not want a mistake -- I'd have to look at the exact language, but he had to put a legend on the top of it so that it would alert that he couldn't just put something out there that would accidentally get on the docket.

With 5,000 cases we have a lot of stuff that gets filed, and I was trying to make sure -- he could file something. The clerk's office will always accept anything getting filed. It's whether it got on the public docket or not.

Q. I see. Thank you. Can we pull up Exhibit 5, Page 10?

And, Judge Barrett, if you could, could you review Paragraph 4 regarding any subsequent pro se involuntary petitions?
A. Yes.
Q. And so this, in a sense -- and I'll let you review it.
A. Yeah. I've reviewed it.
Q. This would -- this would prevent Mr. Pate from any future petitions getting through to the public docket before you were made aware, because you are the only bankruptcy court judge for the Augusta Division; isn't that correct?
A. Well, he could go to Savannah. So, I mean, it would prevent it from, in theory, yes. But whether he went somewhere else. But the attempt was to, yes. He could file anything he needed to file and wanted to file. It just got an in camera review, meaning that before it got available to the public, it would be looked at by a judge, whether it was me or someone else.
Q. And so this order would apply to anywhere in the Southern District presumably? Because this court would be --
A. Correct. Correct.
Q. So he wouldn't be able to do that in Savannah?
A. Yes.
Q. He'd subject to this order.
A. He would be subject to this order.
Q. Thank you. And you -- I'm not trying to suggest you shouldn't feel this way, but the -- it would be fair to

characterize his actions as disgusting to you, repugnant?
A. I don't know -- I think they were frivolous. They were frivolous. And I thought they were an abuse. Disgusting is a different thing. It was an intent to, in my opinion, to improperly use the involuntary petition to harass. I think it's harassment, intimidation. Disgusting is -- wouldn't be one of the first ones I would use.
Q. Maybe I chose a poor word, inarticulate word.
A. Improper, yeah. Improper, I think, yeah.
Q. And yet, in your order you never sanctioned him?
A. Correct.
Q. Okay. And part of that's because he's pro se.
A. No. I didn't sanction him -- that's one -- under 303, under the Bankruptcy Code you can be liable for all of that. But what I thought -- I sanctioned him by reporting him to the U. S. Attorney and to other people to investigate him for a potential abuse. But I considered the, first of all, his ability to pay, would he be able to pay. But, secondly, did it give him a public forum to continue this harassing conduct, and so if I said we'll have a hearing on whether I should sanction you or not, whether I close the hearing or other matters, I didn't think it would be successful. It's one of the things I could have done.
Do I think I could have gotten -- do I think he owes money? Yes. He owes money. To the extent -- because how it

got treated, I didn't think the expenses were that much, and I didn't really think it would be fruitful to sanction him. He wasn't a lawyer. I couldn't get his license. I couldn't do other things. I just thought it gave him another forum to continue his conduct.

Q. And let's talk about the forum a little bit. You were explaining that you never actually met Mr. Pate.

A. As far as I know, I've never met him.

Q. Okay. And so from a pro se litigant's perspective, you're more or less just a -- a name on a piece of paper that he received; correct?

A. I am just a name on a piece of paper?

Q. From his perspective.

A. He filed -- yes, I think I'm the adjudicator of what he tried to file, yes.

Q. Right.

A. Yes.

Q. And so the explanation about your role, your important role in our judicial system as a bankruptcy judge, that was never laid out to him in layman's terms by yourself or any other member of the bankruptcy court; correct?

A. No.

Q. And so you can't say whether or not he was aware of how bankruptcy court proceedings operate or work, can you?

A. I can't say what he was aware of. I know what's in that

104 -- 105 petition, and I know what the bankruptcy code says. I'm not aware -- I cannot speak to what he was aware of.

Q. Did you or any member of the bankruptcy court attempt to communicate the deficiencies or the problems that you saw immediately on that petition, or make him aware that what he was doing was frivolous before issuing the order?

A. No, and it would be improper for that conduct to go on. The clerk's office cannot give legal advice. Involuntary petition requires legal fundamentals, and so the clerk's office cannot do that. And I as a judge can't give legal advice to any litigant who comes before me. So, no, I did not do that, nor do I think it's appropriate to do that.

MR. MAINES: Thank you.

THE WITNESS: Thank you.

THE COURT: Any redirect?

MR. HOWARD: No, Your Honor.

THE COURT: Can this witness be excused?

MR. HOWARD: Yes, Your Honor.

THE COURT: Mr. Maines, any objection?

MR. MAINES: No objection.

THE COURT: Ma'am, you can step down. Thank you.

All right. Members of the Jury, better late than never. I told you 1:30 for our lunch break. Excuse me, 12:30, and it's 12:50. But I wanted to be sure that we didn't stop mid witness. So we're going to take a recess at this time for an hour for a

lunch break. Okay? In other words, we will crank back up at 2. We'll open court at 2, but you have to be back here at 1:50 in order for us to open court at 2.

Again, let me give you your general instructions on the break. Again, don't discuss the case with anyone. Even though the case is farther along now, it's even more imperative that you don't discuss the case with anyone, including amongst yourselves, until you've heard all the evidence, closing arguments and final instructions.

Don't read, watch, listen, research anything about this case at all. Don't pay attention to any media accounts about this case. Report to me if anybody tries to speak with you about this case or if you hear anything about this case from outside the courtroom.

When you return, again, sit where you're sitting now, and follow the court security officer's instructions about your notepads. I know that many of you have those computers that we for some reason call cellphones; and you'll have those, I imagine, during your break. Don't use those to communicate about the case, to research anything about the case. Don't post anything about this case. Don't Google anything about this case, anything like that. Okay?

And, again, please be punctual when you return; and when you return, you can return to the jury room. Okay? All right. Let's rise for the jury.

(Jury out)

THE COURT: Everybody have a seat. Is there anything anybody needs to discuss? Obviously the jury is removed from the courtroom at this time. There's a couple in the jury room, but no jurors are in the courtroom at this time. Anything, Counsel, that you need to discuss before we break for lunch?

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

THE COURT: All right. We'll be in lunch recess.

(Proceedings stood in recess from 12:54 p.m. until 2:06 p.m.)

(Jury out)

THE COURT: I trust everyone had a good lunch break.

Mr. Maines, during the lunch break, did you attempt to communicate with Mr. Pate regarding his right to be present?

MR. MAINES: I did, Your Honor.

THE COURT: And does it appear that he does not want to be present during this portion of the trial?

MR. MAINES: It does so appear.

THE COURT: Okay. Anything else we need to address before we bring the jury in?

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

THE COURT: All right.

THE CSO: All rise for the jury.

(Jury present)

THE COURT: Good afternoon, everyone. I hope that everybody and trust that everyone had a good lunch break, and I know that everyone followed the Court's instructions regarding the recess.

We're going to get right back to it, so, Mr. Howard, call your next witness -- or, Mr. McCool, your next witness.

MR. McCOOL: Thank you, Your Honor. The government would call Lucinda Rauback.

THE CLERK: Thank you.

LUCINDA RAUBACK, being first duly sworn, testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. You can have a seat, please.

THE WITNESS: Thank you.

THE CLERK: If you will, please state your full name for the record.

THE WITNESS: Lucinda Rauback.

THE CLERK: Spell your last name.

THE WITNESS: R-A-U-B-A-C-K.

THE CLERK: Thank you.

MR. McCOOL: May I proceed, Your Honor?

THE COURT: You may proceed.

MR. McCOOL: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. McCOOL:

Q. Good morning -- good afternoon, Ms. Rauback.
A. Good afternoon.
Q. Ma'am, where do you currently work?
A. I work for the U. S. Bankruptcy Court, and my duty station is Savannah, Georgia.
Q. And what is your title with the Bankruptcy Court?
A. Clerk of Court.
Q. How long have you been the Clerk of Court?
A. I've been the Clerk of Court since 2012.
Q. And prior to being Clerk of Court, did you hold any other positions in the Southern District of Georgia?
A. I did. From September 2002 to May 2012, I was the Chief Deputy for the Bankruptcy Court.
Q. All right. And prior to holding that position, where did you work?
A. I worked for the United States District Court, the Middle District of Florida; and I held several positions there for over a 13-year period.
Q. How long have you served in the Federal Judiciary?
A. It will be 30 years in January.
Q. Ma'am, as the Clerk of Court for Bankruptcy Court, can you tell the members of the jury a little bit about your duties and responsibilities?
A. Of course. As the Clerk of Court, I kind of serve as the Court's chief administrative officer. I am responsible for

managing or overseeing all of the nonjudicial duties and responsibilities for the Court, things such as managing the files and the records, sending out notices and orders, collecting fees or depositing to the Treasury, and then overseeing things like finance and budget, facilities, statistics, all of those kind of programs for the Court to operate.

Q. How many employees do you supervise?

A. 28.

Q. And your office, where do you currently work out of?

A. I work out of Savannah.

Q. And do you travel anywhere else within the Southern District of Georgia?

A. I do. We have three staffed offices actually; Savannah, Augusta and Brunswick. And we have staff there. So I travel to those offices. I try to at least monthly. And then we have three unstaffed divisional offices in Dublin, Waycross and Statesboro.

Q. And, ma'am, the staffed offices in Brunswick, Augusta and Savannah, is your name located anywhere in the clerk's office?

A. It is. It is located on the storefront or the entrance to the clerk's office.

Q. I want to ask you some questions leading to some involuntary bankruptcy petitions that were filed on May 21st, 2018. Were you aware that a Timothy Pate, also known as

Akenaten Ali, filed some involuntary bankruptcy petitions on May 21st, 2018?
A. I am.
Q. How did you become aware of that?
A. I was notified by the Augusta divisional manager.
Q. Were you present when Mr. Pate filed those involuntary bankruptcy petitions?
A. No. He filed them over the counter in Augusta, and as I said, my duty station is in Savannah.
Q. When you were informed that Mr. Pate had filed those involuntary bankruptcy petitions, did you ever reach out to Mr. Pate?
A. No. I've never spoken with or interacted with Mr. Pate at all.
Q. And did you later learn, on May 30th, 2018, that Mr. Pate had filed an affidavit of claim in the bankruptcy court?
A. Yes. I'm aware of that.
Q. How did you become aware of that?
A. I was notified by the Augusta divisional manager.
Q. And as part of that affidavit of claim, were you -- did Mr. Pate demand that you answer some questions?
A. He did.
Q. And you became aware of those questions?
A. I'm sorry?
Q. Did you become aware of the questions that he demanded?

A. I did. I reviewed the document that he filed.
Q. And did you respond to any of those questions?
A. I did not. Judiciary policy suggests that we do not respond directly to those sorts of pleadings and questions.
Q. As part of this affidavit of claim filed by Mr. Pate on May 30th, 2018, did he make a threat that he was going to file a lien against you?
A. He did.
Q. And did you become aware of that threat?
A. Yes.
Q. How did you respond to it?
A. Not directly. Once that actually occurred, I reached out to the Administrative Office of the U. S. Courts for guidance.
Q. And did you receive any guidance?
A. I did. I was told that I should request representation in the event that the matter progresses.
Q. On June 15th, 2018, did you become aware that Mr. Pate had filed a maritime lien against you in the amount of 15 million dollars?
A. Yes, I did.
Q. And did you, in fact, owe Mr. Pate 15 million dollars?
A. No. I -- I don't know Mr. Pate. I've never spoken or had any interaction with him.
Q. And on June 18th, 2018, three days after the first -- the maritime lien, did you become aware that Mr. Pate had filed a

15-million-dollar lien against you through a UCC Financing Statement?
A. Yes. I became aware of that.
Q. And, again, did you ever give Mr. Pate any indication that you owed him 15 million dollars?
A. No. Not at all.
Q. Had you ever spoken with him?
A. Never.
Q. Met him?
A. Never.
Q. Made any contract with him?
A. Never.
Q. Corresponded with him through email or telephone?
A. Never.
Q. Loaned him any money?
A. Never.
Q. Ma'am, in your 30 -- almost 30 years of service in the Federal Judiciary, has anyone ever filed a lien against you?
A. No, not to my knowledge. This is the first time.
Q. And did you become aware that the liens that Mr. Pate filed against you had been expunged?
A. I am aware that Chief Judge Hall entered an order doing that, yes.
Q. Can you tell the members of the jury a little bit about how these liens disrupted your office that you serve as the

Clerk of Court for?
A. Well, Chapter 11 involuntary cases are extremely rare, in our district at least. And I looked at the records; and going back to like 1990, we've had only seven involuntary cases, so they are unusual. And then a pro se filing such as this, it took an inordinate amount of time, more man-hours, more review to make sure we were handling it appropriately and processing it correctly.
Q. And how about the liens that were filed against you by Mr. Pate? How did that -- did that disrupt you as serving as Clerk of Court?
A. It did. I had to, of course, request representation twice through the Administrative Office of the Courts. And it just took a lot of attention away from my other core duties and mission to support the Court.
Q. How did it affect you personally?
A. Well, initially I was very surprised, a little shocked. And then beyond that it was unsettling. I was concerned about my financial standing, my credit history, my credit report. And then, in addition, my personal and professional reputation.
Q. Ma'am, do you owe Mr. Pate, also known as Akenaten Ali, 15 million dollars?
A. No, I don't.
MR. McCOOL: All right. Thank you very much. I have no further questions for you.

THE COURT: Cross-examination.

MR. MAINES: Thank you, Judge.

CROSS-EXAMINATION

BY MR. MAINES:

Q. I'm J. D. Maines. It's nice to meet you, Ms. Rauback.

A. You, too.

Q. Ms. Rauback, you indicated that you were made aware or you reviewed the filing that Mr. Pate filed in response to the order sealing and basically vacating the Chapter 11 involuntary bankruptcy petition; correct?

A. I became aware that he filed the pleadings, yes.

Q. And one of those documents he filed directed you to answer several questions; correct?

A. It did.

Q. And your -- your position as the Clerk of Court prohibit -- the judiciary rules prohibit you from answering questions like that.

A. Yes. That was the guidance I was given by the Administrative Office.

Q. Okay. Did you or did anyone on your behalf relay that to Mr. Pate, that you were not allowed to respond to those questions?

A. No. As I said, I've had no contact, direct contact with Mr. Pate myself.

Q. Okay. So you never sent a letter or indicated that you as

the clerk could not answer those questions?
A. I did not.
Q. Okay. And as it relates to the impact on your credit history, none of the liens -- or the lien or the UCC Financing Statement, that was never recorded on your credit history; correct?
A. I don't know.
Q. Okay.
A. I am not aware.
Q. You indicated that it was very unsettling for you; correct?
A. It was, yes.
Q. And you had -- you actually had an attorney appointed or provided to you by the Justice Department; is that correct?
A. Well, referred to the Justice Department for guidance, yes.
Q. Okay.
A. In my official capacity as clerk.
Q. Okay. But you've never inquired with your -- with the credit bureaus about whether any of this has ever been recorded on your credit?
A. No, because shortly thereafter Chief Judge Hall's order was entered expunging the documents.
Q. Okay. So you feel confident that it's not on your credit history?

A. I don't feel confident. I hope that it is not.
Q. Okay. Have you checked?
A. Not yet.
Q. Okay. There are a number of absurd filings that prisoners file. You're familiar with that as Clerk of Court. You've been doing this for a long time?
A. I have.
Q. Okay. And you're familiar with a lot of the absurd motions that defendants will file, a lot of times in prison; right?
A. Well, in the bankruptcy court we don't have a lot of prisoner filings. We have pro se filings, but not a lot of prisoner filings.
Q. Prior to that you worked in the clerk's office --
A. In the district court I did.
Q. -- for district court; correct?
A. Yes.
Q. And there you would have dealt with criminal filings?
A. Sure, yes.
Q. And so you're familiar with those filings?
A. They're unusual, yes.
Q. They're usually pro se; correct?
A. Some are, yes.
Q. Okay. And it was obvious to everyone that this was a pro se filing in this case by Mr. Pate?

A. I believe it was obvious to the folks who accepted the pleadings over the counter.

Q. Okay. But you as the clerk have direct access to the electronic case filings; correct?

A. To the electronic case filings, yes.

Q. So you could have easily pulled up these documents and seen that it was a pro se filing; correct?

A. Correct.

Q. Okay. And to your knowledge you've never been denied credit on -- or any access to credit; correct, as a result of this?

A. I haven't applied for any credit since this began, so I don't know if it's had any impact.

Q. Okay. Well, it's been at least a year and a half, would you agree with that, since this happened?

A. Yes. Last year. May, June, yes, sir.

MR. MAINES: Okay. Thank you. I have no further questions.

THE COURT: Any redirect?

MR. McCOOL: No, Your Honor. Thank you.

THE COURT: May this witness be excused?

MR. McCOOL: Yes, Your Honor.

MR. MAINES: No objection.

THE COURT: All right, ma'am. You may step down. You're excused. Thank you.

THE WITNESS: Thank you, Judge.

MR. HOWARD: Your Honor, the government calls Michael Smith.

MICHAEL SMITH, being first duly sworn, testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. You can have a seat, please. If you will, please state your name for the record.

THE WITNESS: Michael Smith.

THE CLERK: Spell your last name.

THE WITNESS: S-M-I-T-H.

THE CLERK: Thank you.

THE COURT: You may go ahead, Counsel.

MR. HOWARD: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. Mr. Smith, where do you work?

A. I work for the Georgia Superior Court Clerks' Cooperative Authority.

Q. How long have you worked there?

A. 21 years.

Q. What is the Georgia Superior Court Clerks' Cooperative Authority?

A. We were created in 1993 to establish a State-Wide Index of Uniform Commercial Code filings, UCCs, that's searchable by

anyone that wishes to do so.
Q. Do you also provide support to superior courts?
A. Yes, we do.
Q. Where in the state of Georgia do you work?
A. Atlanta.
Q. What's your job title?
A. I'm communications director and compliance officer.
Q. And as the communications director and compliance officer, what are some of your duties and responsibilities?
A. I conduct training around the state for clerks of superior court and their staffs, in the area of Uniform Commercial Code and notary public. I also do some training for lending institutions when they request it and other interested groups.
Q. You conduct training on UCC filings?
A. Yes, sir.
Q. Are you an attorney?
A. No.
Q. The training that you do, is that to other -- only to other attorneys?
A. No. It's typically not to attorneys. It's lending institutions and clerks and other stakeholders that may be interested.
Q. Are you familiar with liens and the process of filing liens in Georgia?
A. Yes.

Q. Let's start with the basics, Mr. Smith. What is a lien?
A. A lien is -- lien notice filing is simply an indication to anyone interested that there is a security agreement or financial arrangement between parties, in the simplest form.
Q. And then the actual lien itself, what is that lien?
A. The lien attaches to whatever the collateral is involved, so that, for instance, a lender that might lend money would require some type of collateral in exchange for that until that agreement is satisfied. So -- and that collateral could be -- could be anything. In the case of a business, a business might put up the inventory. It might put up their equipment and things like that.
Q. Okay. So you have a creditor and a debtor; right?
A. Right.
Q. And they have an agreement?
A. Right.
Q. And then as part of that agreement, the creditor gets an interest in the property of the debtor. Is that fair?
A. Right. Correct. Correct.
Q. There needs to be a debt; right?
A. Correct.
Q. And an agreement?
A. Yes.
Q. And, now, you gave an example of a business and a loan, but can you give the jury an example of a lien that you may

commonly see?
A. Many times we'll see a lending institution take collateral from an individual business that might put up inventory. You'll see that, all the way to a finance company will take personal items. I've seen lawnmowers, sound systems, anything they might put up that's worth that could cover that interest that the lenders take.
Q. Okay. And then you mentioned the lawnmowers that they put a lien on.
A. Uh-huh.
Q. How does that lien affect that lawnmower?
A. Well, the -- so, now, the lawnmower is promised to the lender so that if -- and so the lender has an interest in that until the agreement is satisfied. And then at that point the lien is released or terminated.
Q. So it impacts the ability to sell or transfer that property subject to the lien. Is that fair to say?
A. Correct, uh-huh.
Q. As a creditor, how do you give notice to others that you have a lien on certain property?
A. Typically, a Uniform Commercial Code statement will be filed, the UCC. It's a public record. And it notifies anyone that's interested that there is this agreement between these parties, and it's searchable by anyone.
Q. And is that referred to as a UCC Financing Statement?

A. Correct.

Q. And why do you need to give notice by filing? What's the advantage for the creditor?

A. The advantage to the creditor is because of the economic system that we have, so that anyone interested can see. So if creditor two comes along and is considering lending to that same debtor, they would search the records and find out that collateral is already promised to creditor one, is a good example.

Q. It's kind of putting a public stamp on that property.

A. Yes. Yeah. Exactly.

Q. Saying I as the creditor have an interest in this.

A. Right.

Q. And the UCC Financing Statement, that's the notice of the lien?

A. Yes.

Q. It's not the lien itself; right?

A. Right. Right.

Q. The lien itself is the agreement between the parties?

A. Correct. Uh-huh. Uh-huh.

Q. Now, that UCC Financing Statement, is that a standardized document across states?

A. It is.

Q. Can you talk a little bit about how it's standardized?

A. Well, the forms themselves were adopted by all states. It

was a national effort to standardize the forms themselves, and so that anyone filing -- and there are a lot of folks that file these in many states; companies, so that there's an effort to standardize that across state lines.
Q. Effort to make them easy to use?
A. Sure.
Q. Do just attorneys use these?
A. No. Businesses, individuals can file these. There's no limitation to who can file.
Q. And is that UCC Financing Statement, is it also referred to as a UCC-1?
A. Correct.
Q. What does UCC stand for, Mr. Smith?
A. Uniform Commercial Code.
Q. And where can you file a UCC Financing Statement to give notice to others of your lien?
A. In Georgia they're filed at the local county level with the Clerk of Superior Court.
Q. Only at the Superior Court Clerk's Office?
A. Correct. And, of course, Georgia has 159 of those.
Q. How do you file that notice of lien at the Superior Court Clerk's Office?
A. There's several methods. Some people -- you can walk it in and file across the counter. You can mail it, typical mail. And then most counties now also accept electronically filed.

Q. And these are filings that can be made by the general public. It's not restricted just to certain people or just to attorneys; correct?
A. Correct.
Q. And when it's filed at the Superior Court Clerk's Offices throughout the State of Georgia, what are those superior clerks' staff looking at with respect to that UCC Financing Statement?
A. There are some minimum filing requirements that they review, and there's a fee that they calculate, or if it's electronically filed, the system calculates for them. And then once they do that, they process it.
Q. So you mentioned some of the minimum requirements. You gotta pay a fee?
A. Correct.
Q. You have to list the debtor?
A. You do.
Q. Correct?
A. Uh-huh.
Q. And then the name and address of the secured party, the creditor?
A. Correct.
Q. Beyond that, are there a whole bunch of other requirements to file them?
A. No. No.
Q. Fairly easy to file; correct?

A. Yes.
Q. Now, when those Superior Court Clerk staff is reviewing that, are they verifying that there is in fact a lien?
A. No. That's not their role.
Q. Do the Superior Court Clerk's Office have UCC police to go out there and investigate to see if those are valid liens?
A. No.
Q. Now, once that UCC Financing Statement is received by the clerk's office, what does the clerk's office do with that document?
A. Once they accept it, they will imprint the recording information, which is the county in which it was filed, the name of the Clerk of Superior Court, the date and time it was filed and also a unique document number.
Q. And is that done via stamp?
A. It varies. Some, it's an actual physical stamp. Some have electronic stamps. And then in the case of electronic filing, those are affixed electronically.
Q. Okay.
A. By the system.
Q. So once at least the paper copy is filed, it's stamped?
A. Uh-huh.
Q. Then what happens to it?
A. Then it will be scanned to our office, and then it goes into a work cue where we have staff that indexes certain data

fields off that, and that's how the information gets into the database.
Q. And your office is in Atlanta; is that right?
A. Atlanta, correct. Uh-huh.
Q. So all of the liens that are filed throughout the state, those notices, those go to a centralized office; correct?
A. That's right.
Q. And once they're at that clerks' cooperative authority --
A. Uh-huh.
Q. -- a standardized or centralized office, what does your office do then?
A. Again, we have a staff that indexes the certain data elements off there. We're required by law to have those on the database within 24 hours of receipt.
Q. Okay. And what's that database?
A. It is the State-Wide UCC Index.
Q. And is that State-Wide UCC -- well, let me back up for a second. Before it goes up on that index, once it gets to your office, are there people in your office that are the UCC police investigating to determine if there is a valid lien between these individuals?
A. No, hunh-uh.
Q. And you said it's required that it has to be up within 24 hours; right?
A. Correct.

Q. And once it is up on that State-Wide Index, is that open and available to the public?
A. It is. Anyone that has an internet connection. We do require that someone register to use the site. But, yes, it's open to anyone who wishes.
Q. And that's open not only in the State of Georgia, but to anyone with an internet connection; correct?
A. Correct.
Q. And does that public database have liens filed across the State of Georgia?
A. Yes.
Q. Is it searchable?
A. Yes.
Q. How is it searchable?
A. Multiple ways. A search by last name of the debtor. You can also search by the name of the filer or the secured party. Also can search by the file number. Those are three major ways you can search those.
Q. And who are some of the organizations or entities that are searching this State-Wide Database Index to see who the debtors are?
A. Sure. Lending institutions, attorneys' offices. We cooperate with investigative agencies. They're searching those as well. Some larger companies that consume this data. Those are the typical customers. And there's also individuals that

can do that as well.

Q. And those large companies that consume the data, they're just scooping it up for a database elsewhere; right?

A. Yes. They're more than likely collecting data from all states.

Q. And once it's scooped up by a different entity, you don't have any control of where that data is going; correct?

A. No. No.

Q. Or when it's removed or if it's ever removed?

A. Right.

Q. Mr. Smith, what effect does it have on a debtor whose name appears on a UCC Financing Statement in that searchable index?

A. The effect would be the notice that the debtor now has this agreement with the secured party or the lender that they have promised certain collateral and entered into a financial agreement with that; and that information can show up in multiple places, a simple search. It can show up on a credit report, if the credit reporting agency chooses to search the database, that kind of thing.

Q. And once that financing statement is uploaded and put on that online database, does it just come down in a couple days?

A. No. The uniform -- a UCC is effective for five years, but it can be continued indefinitely. And then once -- so it's either going to lapse or become ineffective, or there's an action taken to terminate it. But that doesn't mean that the

original or the UCC-1 automatically just disappears.
Q. In the State of Georgia, in your state-wide database, once that goes up and is available on the database, does it ever come down?
A. No.
Q. It's up there forever; correct?
A. To date, yes. We opened the doors in 1995, and so original filings from 1995 are still there.
Q. What's the only way to remove it?
A. Through court order.
Q. So you have to go get approval from the Court, get a court order --
A. Uh-huh.
Q. -- to actually have it removed, but otherwise it's up there forever; correct?
A. Right.
Q. Fair to say that these are easy to file, but hard to remove?
A. Fair to say.
Q. As part of your work with the Superior Court Clerks' Cooperative Authority, did you review several UCC Financing Statements in this case?
A. I did.
Q. I'd like to show you five exhibits and then ask some questions about them. If we could start by pulling up

Government's Exhibit 24. Once that gets pulled up, Mr. Smith, I'm going to ask you to review that.
A. Okay.
Q. Let me know if you recognize it.
A. Yes.
Q. What is that?
A. That is a UCC-1 Financing Statement.
Q. And listed there the debtor is John Andrew Koskinen and Brian Keith Epps; correct?
A. Correct.
Q. If we could pull up Exhibit 25. Do you recognize that?
A. I do.
Q. What is that?
A. The UCC-1 Financing Statement.
Q. Has the debtors Jacob Joseph Lew and Eric Mines Thorson?
A. Right.
Q. Looking at Exhibit 26. What is that?
A. A UCC-1 Financing Statement.
Q. Looking at Exhibit 27, what is that?
A. The same, UCC-1 Financing Statement.
Q. The one we just looked at previously in 26 was for Denise Davis. This one lists Brian Keith Epps twice; correct?
A. Correct.
Q. And listing both a 100-million-dollar lien as well as a lien against the full value of his commercial account; correct?

A. Correct.
Q. If we go to Exhibit 28. What is that?
A. UCC-1 Financing Statement.
Q. And that lists as the debtor Susan D. Barrett and Lucinda Rauback; correct?
A. Correct.
Q. Do you recognize the five documents you just reviewed?
A. I do.
Q. And those are each, as you mentioned, UCC Financing Statements that you were asked to review in connection with this case?
A. Correct.
Q. Were each of these UCC Financing Statements on the Georgia State-Wide UCC Index?
A. They were.
Q. And if we could pull up Exhibit 28 again. And these were each publicly available; correct?
A. They were.
Q. How can you tell that?
A. Because up in the upper left-hand corner, or at the top of the page I can see that it's got our organization, the GSCCA.org image index. That means someone printed that off of our website. And also the address at the bottom.
Q. Were you also asked to look in your actual database to see if these were in there?

A. Yes.
Q. And these are in the database; correct?
A. Yes.
Q. If we would look back at Exhibit 24. Can you tell when this was filed?
A. I can. Upper right-hand corner, that was filed May 7th of 2018 at 10:50 a.m.
Q. And where was it filed?
A. It was filed in Richmond County.
Q. How can you tell that?
A. It has the clerk name and also Richmond County county name just below that.
Q. And below the stamp there are some numbers that read 121-2018. Do you see that?
A. Yes, I do.
Q. What do those numbers represent?
A. That's the unique file number. So if you'd like me to break it down, the 121 indicates it's Richmond County. The counties are numbered simply 1 through 159 alphabetically, and Richmond is County 121. The 2018 is the year. And then the 000891 is a sequential number assigned part of -- that goes together with that, that is -- that rotates every year. So every calendar year it starts back over at 1.
Q. And below that do you see the numbers 891?
A. I do.

Q. What do those numbers represent?
A. That's the sequential numbers that is part of the entire financing statement number.
Q. Okay. So this was the 891st UCC Financing Statement filed at the Richmond County Superior Court; correct?
A. In 2018.
Q. In 2018.
A. Right.
Q. That was in May.
A. Yes.
Q. They had already had just about 900; correct?
A. Correct.
Q. In your UCC State-Wide Database Index, how many filings do you get per year?
A. On average -- well, last year we had just over 250,000 statewide added to the database.
Q. Now, staying on Exhibit 24, I'd like us to kind of walk through a couple of parts of this document for you to be able to explain to the jury. Okay?
A. Okay.
Q. So let's start with the box in the top left form which lists Sections A, B and C.
A. Uh-huh.
Q. We'll get that zoomed in for you. And can you tell the jury what those sections are?

A. Those are there for contact information of the filing -- or the filing party.
Q. Okay. And this lists Akenaten Ali and also provides the name of Timothy Jermaine Pate, an address and an email address. Correct?
A. Correct. Uh-huh.
Q. So we have the individual who's filing it, and then below that in Section 1 it says debtor's name. Do you see that?
A. I do.
Q. And, again, this form is designed to be user friendly to a layperson; correct?
A. Correct.
Q. So the debtor -- who is the debtor listed?
A. John Andrew Koskinen.
Q. And if you look, that's Section 1a. under organization's name; correct?
A. It is.
Q. Would you expect to see a business or an entity there?
A. Typically, no. I mean --
Q. Under --
A. Oh, yes. Typically in 1a. that would be an organization's name. Correct. I'm sorry.
Q. Okay. So if the debtor was a person --
A. Uh-huh.
Q. -- that would be in the individual's surname; correct?

A. Right.
Q. In Box 1b.?
A. Uh-huh. Correct.
Q. Looking at Section 2 of the debtor, again, we have an individual's name in the organization's name section; correct?
A. We do.
Q. Section 3, what is that section?
A. The secured party. So that is the -- if you want to think of it as the creditor or the lender, typically that's where their information would go.
Q. Okay. And there's not an organization listed there, but there's an individual; correct?
A. That's right.
Q. And so this is the creditor who's saying he's owed by those debtors; right?
A. Right.
Q. If we look at Section 4.
A. Uh-huh.
Q. Mr. Smith, you may anticipate what I'm going to ask, but what is this section?
A. This is the collateral description.
Q. Well, what is collateral?
A. Collateral is what's given -- or what is promised or put up in consideration by the borrower to the lender, as I mentioned earlier.

Q. Okay. And here it's talking about -- and with respect to the collateral, do you see any mention of a, I guess, the security agreement there?
A. No.
Q. And, specifically, directing your attention to the, I guess the fourth line down, it says, debtor is a transmitting utility and debtor is a trust. The claim/lien is a security agreement contract?
A. Uh-huh. I do see it.
Q. So this is representing that there is some security agreement out there; correct?
A. Right.
Q. And do you see that term transmitting utility?
A. I do.
Q. What does a transmitting utility mean?
A. Typically it's an entity that is involved either in transportation or utilities. Example would be like Georgia Power or a gas provider, that kind of thing.
Q. Okay. And this is saying that that debtor is someone involved in a utility?
A. Yes.
Q. If you scroll down, in Section 6.
A. Uh-huh.
Q. There is going to be a box checked for debtor is a transmitting utility. Do you see that?

A. I do.
Q. And, you know, in some states what is the effect of checking that box and saying you're a transmitting utility?
A. In some states if that box is checked, then the financing statement is given a longer period of life, meaning in Georgia, as I mentioned before, they lapse at five years; they become ineffective at five years, unless they are terminated prior to that. Some states recognize that box and give it a longer, more-than-five-year effective period, and that can vary.
Q. Okay. And so this is saying that the debtor, John Andrew Koskinen and Brian Keith Epps, are utility -- are engaged in business of utilities; correct?
A. Yes.
Q. And the effect of this could potentially lengthen the term of this lien?
A. In some states, correct.
Q. Now, Mr. Smith, this UCC Financing Statement is notice of the lien; right?
A. Uh-huh.
Q. And we talked about it goes on a database and is publicly available; right?
A. Yes.
Q. Is there any obligation on a creditor to publish advertisements in a newspaper about a lien?
A. I'm not aware of a requirement for that, no.

Q. Are the five UCC Financing Statements that we've discussed today and that we've gone through and walked through, are those still publicly available on the State-Wide Index?

A. They are not.

Q. Why not?

A. A court order was executed directing the Clerk of Superior Court in Richmond County and also us to make those unavailable to the public.

Q. And if it wasn't for that judge entering that order expunging those liens, would they still be available for everyone and anyone with an internet connection to see?

A. They would.

MR. HOWARD: I have no further questions for this witness, Your Honor.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. MAINES:

Q. Mr. Smith, my name is J. D. Maines. Nice to meet you.

A. Nice to meet you.

Q. Mr. Smith, the -- and I just want to target -- I'm going to ask you questions to help me understand better. For creditors that want to extend credit and have a secured -- have a secured interest in whatever property the debtor is going to acquire using those proceeds, there's two parts. There's a financing statement --

A. Uh-huh.
Q. -- between the debtor and the creditor.
A. Correct.
Q. And then there's a UCC statement, or a financing, statement basically, --
A. There's a --
Q. -- that's recorded?
A. That security agreement is underlying and then UCC. Correct.
Q. Okay. So there are two parts?
A. Typically, yes.
Q. All right. So the financial statement is not made public with the Georgia Superior Court in that UCC book; is that correct?
A. Sometimes it can be. Some filers choose to attach the security agreement with the UCC, and no one's limited as to what they can attach or how many pages, so --
Q. Okay. So some people might attach that?
A. Yeah. Yeah.
Q. There's no prohibition on that for creditors, in other words?
A. No.
Q. Okay. And that UCC statement operates the same -- is basically a lien as people understand?
A. Lien notice.

Q. A lien notice.
A. A notice of a lien, a security agreement.
Q. So a lien is not collateral. That's not property that can be borrowed against; correct? The lien itself.
A. The collateral would be part of an agreement and a lien.
Q. But to list a lien itself as the collateral would be nonsensical. You would agree with that?
A. To list a lien itself as collateral?
Q. Right. I want to direct your attention to Exhibit Number --
A. Okay.
Q. -- 26.
A. Uh-huh.
Q. I'm sorry. 25. 24. 24. And if I could get the -- Ms. Ryherd to highlight on the Paragraph 4, collateral.
A. Uh-huh.
Q. As you can see from the Government's Exhibit Number 24, that's where the actual collateral, the property that the debtor is pledging --
A. Correct.
Q. -- to satisfy that debt --
A. That's right.
Q. -- in the event of a default; correct?
A. Right, uh-huh.
Q. That actually lists the collateral as a claim slash

lien --
A. Uh-huh.
Q. -- is a security agreement slash contract.
A. Right.
Q. That's nonsensical; correct? That doesn't make any sense to list a lien itself as the collateral in a financing statement?
A. There -- there are no parameters around what can be listed there. So I can't say that it's nonsensical in that sense.
Q. You have extensive experience with UCC statements?
A. Yes.
Q. Have you ever seen a financial institution list a maritime lien as collateral in a financing statement?
A. I can't recall that I have.
Q. It would be absurd, wouldn't it?
A. I'm not sure I would use that term. But it would be unusual.
Q. Financing statement operates as a type of lien. It's maintained by the Georgia Superior Courts; correct?
A. Correct. Again, it's --
Q. Notice of lien.
A. -- notice of lien.
Q. Right. And the purpose of the lien is to notify other people that the creditor has a secured interest; right?
A. Yes. Correct.

Q. So this statement, this financing statement would indicate to creditors --
A. Uh-huh.
Q. -- that there is a -- that the collateral that's being pledged is a claim slash lien.
A. Uh-huh.
Q. Correct?
A. Whatever is -- yes. I don't have it in front of me, but whatever is stated there.
Q. It's Number 24. Can we pull it back up?
A. Right.
Q. So the creditor would see this financing statement and see that the collateral pledged is a claim slash lien.
A. Uh-huh.
Q. Wouldn't they?
A. Taking it at face value, yes, they would look at that and also look at the entire description and the dollar amount and that kind of thing, yes.
Q. Right. And have you -- it's not typical to have United States currency listed as the collateral.
A. Um, I don't review UCCs unless I'm asked to. Are you asking me as -- I just don't know what your question is.
Q. Cash is not usually used as collateral, is it?
A. I would guess not.
Q. That wouldn't really make sense, would it?

A. It's unusual to see that.
Q. Can you think of ever seeing that before?
A. A dollar amount listed?
Q. No. Cash currency being listed as collateral.
A. I cannot cite you a specific case. Have I seen it before? Probably, but I can't -- I can't specify.
Q. It would be kind of nonsensical for a creditor to take a security interest in cash, wouldn't it?
A. That would be their decision. It would be unusual. Right.
Q. All right. You stated that five years before these UCC Financing Statements lapse; correct, in Georgia?
A. Correct. That's the effective period.
Q. Right. But you have no idea if a transmitting utility, if that's the debtor, whether or not that would extend it past the five years or not?
A. Well, it wouldn't extend it in Georgia, but some states it does.
Q. It would not extend it in the State of Georgia?
A. Correct.
Q. So the fact that he -- that the supposed creditor, Mr. Ali, listed this as a transmitting utility would have no impact on how long this financing statement would last on file with the Georgia Superior Court, Clerk of Court?
A. Correct.

MR. MAINES: Thank you. No other questions.

THE COURT: Any followup?

MR. HOWARD: No, Your Honor.

THE COURT: Can this witness be excused?

MR. HOWARD: Yes, Your Honor.

MR. MAINES: No objection.

THE COURT: All right. You may be excused. Thank you, sir.

MR. HOWARD: Government calls Tim Shoemaker.

THE COURT: Members of the Jury, if you so wish, you can stand while Mr. Shoemaker comes to the stand.

THE CLERK: Will you please raise your right hand.

TIM CODA SHOEMAKER, being first duly sworn, testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. You can have a seat, please. If you will, please state your full name for the record.

THE WITNESS: Tim Coda Shoemaker.

THE CLERK: Spell your last name.

THE WITNESS: S-H-O-E-M-A-K-E-R.

THE STENOGRAPHER: And your middle?

THE WITNESS: Coda, C-O-D-A.

THE COURT: Go ahead, Counsel.

MR. HOWARD: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. Mr. Shoemaker, where do you work?
A. U. S. Coast Guard Vessel Documentation Center.
Q. Where is the U. S. Coast Guard Vessel Documentation Center?
A. Falling Waters, West Virginia.
Q. Did you come all the way down to Augusta, Georgia?
A. Yes, sir, I did.
Q. Did you drive?
A. Yes.
Q. Okay. Do you live in West Virginia as well?
A. Yes.
Q. What is the National Vessel Documentation Center?
A. It's a form of vessel registry. A lot of people like to relate it to the DMV, but we're much more than that. We support commerce and ensure U. S. Citizenship for vessels.
Q. Specifically for vessels; right?
A. Yes.
Q. And you maintain this registry of vessel documentation; right?
A. Correct.
Q. And that's within the United States Coast Guard?
A. Yes. We're the only office that does this for the United States.

Q. The only office that does vessel documentation?
A. Correct.
Q. What is your job title with the United States Coast Guard?
A. I'm the chief of the recreational vessel division.
Q. How long have you worked in vessel documentation?
A. 24 years.
Q. What are some of your duties and responsibilities?
A. I oversee the documentation of vessels, recording of mortgages, deletion of vessels, just day-to-day operations of the documentation center.
Q. How many employees work at that documentation center in West Virginia?
A. Approximately 85 right now.
Q. Mr. Shoemaker, we've talked already a little bit about vessel, but can you explain to the jury when you use the term vessel, what is a vessel?
A. Yes. To be a documented vessel it has to be at least five net tons. That's usually about 25 or 26 feet. Tonnage and documentation is potential carrying capacity. Documentation was set up for commercial vessels. Then with the -- back in the 80s they brought in -- to support commerce they decided to bring in recreational vessels. They could file preferred mortgages against a vessel. It helps secure their interest in it.

Commercial vessels of that size, over five net tons, are required by law to be documented. When I say commercial

vessels, vessels that transport goods or cargo or people or commercial fishing vessels.
Q. And are they required to be documented with the U. S. Coast Guard?
A. Yes.
Q. In the course of your 24 years in vessel documentation, have you become familiar with a maritime lien?
A. Yes.
Q. What is a maritime lien, Mr. Shoemaker?
A. It's a -- we do notice of claim of lien. It's a lien against a vessel for goods or services performed to that vessel. It has to be for a documented vessel.
Q. Okay. So the lien is a claim against a vessel; right?
A. Correct.
Q. It isn't a claim against a person, is it?
A. No. It has to be against a vessel.
Q. And you mentioned for the payment of goods and services?
A. Performed for that vessel, yes.
Q. Can you give the jury an example of a common maritime lien that may come up?
A. For fueling, someone is charged for fueling and they don't pay it. That -- whoever did the fueling may put a lien against the vessel. If engine work is done, goods are purchased for the vessel. Anything pertaining to the vessel you can make a claim against it.

Q. Okay. And does that include, for instance, repair work?
A. Yes.
Q. So if I have an agreement to repair a vessel and the owner of that vessel doesn't pay me for the repairs I performed, I can put a lien against that vessel?
A. Correct.
Q. It's not a lien against the owner, is it?
A. No. It is against the vessel.
Q. Against the vessel itself?
A. Yes. Ownership can change, and that claim will still follow that vessel.
Q. So once payment is due, then the lien arises; right?
A. Yes.
Q. The -- and you're not an attorney, are you, Mr. Shoemaker?
A. No, I am not.
Q. Most of the people that make these filings, are they attorneys?
A. No one at the documentation center is an attorney.
Q. And you don't have to be an attorney to file a maritime lien; correct?
A. No.
Q. The examples we talked about are individuals who were providing these vessels with fuel; right?
A. Yes.
Q. Or doing repairs on these vessels?

A. (Nodded head.) Our purpose is not to determine the validity of the claim of lien. We're ensuring that it complies with 46 C.F.R.
Q. And that's the provision dealing with the requirements for a maritime lien?
A. Yes, it is.
Q. Now, if someone wants to put a maritime lien on a vessel and they have some questions, can they call your office?
A. Yes.
Q. Do you have people there who answer questions regarding documentation of maritime liens?
A. We have a staff answering the phone every day, yes.
Q. And if someone calls and says, I want to put a lien, a maritime lien against a person, what would your staff say?
A. We would guide them to the website, if they have access to that; and we do have instructions for filing a claim of lien. We also would refer them to 46 C.F.R.
Q. Okay. And if they say specifically that they want to file a maritime lien against a person, not a vessel, what would your office say?
A. It's not eligible. It has to be against a documented vessel.
Q. What effect does a maritime lien have on that vessel?
A. It kind of dirties -- it muddies the title. If somebody wants to purchase that vessel or hire that vessel, put a

contract for that vessel to be used to do something commercially, it could affect that. It could affect both.
Q. And is that put on the abstract of the title?
A. Yes, it is.
Q. And can you explain to the jury what an abstract of the title is?
A. Abstract --
THE COURT: Mr. Howard, I think we've gotten a little bit far afield here from what we're dealing with in this specific case. Let's move through some of this background, if we could.
MR. HOWARD: Understood, Your Honor.
BY MR. HOWARD:
Q. Can you explain what a notice of a maritime lien is?
A. A notice is an instrument that's recorded on the abstract of title showing that there is a notice or a claim of lien against that vessel.
Q. Okay. And where is a maritime lien filed?
A. The notice of claim of lien is filed at the Vessel Documentation Center.
Q. At your office; correct?
A. Yes, sir.
Q. And how is a maritime -- that notice of maritime lien filed with your office?
A. It could be mailed, faxed or emailed.

Q. In preparation for trial, were you asked to review certain documents styled as notice of claim of maritime lien?
A. Yes, I was.
Q. If we could pull up Government's Exhibit 1-17. Looking at Page 2, if you would review that page, Mr. Shoemaker. And then also look at Page 3, and reviewing that page as well. And let's start on Page 2 of this exhibit. Have you seen this document before?
A. I believe I have, yes.
Q. And was this document provided to you by the U. S. Attorney's Office in preparation for trial?
A. Yes.
Q. In the top left of this document, if we could zoom in on that box, it says U. S. Department of Homeland Security, U. S. Coast Guard. Do you see that?
A. Yes.
Q. Mr. Shoemaker, is this document a Coast Guard document?
A. No, it is not. We do not provide a document for filing notice of claim of lien.
Q. Okay. And if we could zoom out. Looking at Box 1, it says name of vessel. Do you see that?
A. Yes.
Q. And is there a vessel documented with the U. S. Coast Guard named U. S. M/V JOHN ANDREW KOSKINEN?
A. No.

Q. How do you know that?
A. I did a search for JOHN ANDREW KOSKINEN. I also used wild cards to get anything similar to that name, and I had no return.
Q. And you checked the registry that's maintained by the Vessel Documentation Center; correct?
A. Yes, sir, our database.
Q. The abbreviation U. S. M/V, are you familiar with that abbreviation?
A. Yes. A lot of customers will use that. That's United States Motor Vessel. We use U. S. FV sometimes for fishing vessel. That's normally not part of the vessel name.
Q. And did you review similar notice of maritime lien provided by the U. S. Attorney's Office?
A. Yes, I did.
Q. And were you asked to search for vessels named U. S. M/V DENISE D. DAVIS or ERIC MINES THORSON or JACOB JOSEPH LEW or LUCINDA RAUBACK or BRIAN KEITH EPPS or SUSAN D. BARRETT?
A. As I recall, I was.
Q. And what did your search reveal?
A. I found nothing similar to those names.
Q. There's no vessels in the database with those names?
A. No.
Q. Looking at Box 2 in the top middle of this page, it says unique identifier. Mr. Shoemaker, what is a unique identifier?
A. That's an official number or hull identification number.

That's a requirement in 46 C.F.R. that uniquely identifies that vessel.
Q. And so every vessel documented with the Coast Guard will have a unique identifier; correct?
A. Yes, it will.
Q. This box is blank, however; correct?
A. Correct.
Q. And what does that indicate?
A. They didn't have that number, a unique identifier for that.
Q. Looking at Box 6, and the amount listed there is 33 million dollars. Do you see that?
A. Yes.
Q. Have you ever seen a maritime lien amount that high in all of your time at the Vessel Documentation Center?
A. Never.
Q. What are the amounts you typically see?
A. Usually within the hundreds or low thousands.
Q. Hundreds of dollars?
A. Yes. Hundreds of dollars.
Q. Have you ever seen a lien even approaching a million dollars?
A. No. I don't believe I've ever seen one that high.
Q. Looking at Box 7, the property listed in this maritime lien, is there anything that stands out to you?

A. Yeah. There's a lot of things on there that, credit cards, lines of credit, stuff that wouldn't pertain to a vessel.
Q. Right, because, again, the lien is against the vessel, not a person; correct?
A. That's right.
Q. And was this notice of claim of maritime lien recorded by the Vessel Documentation Center?
A. No, it would not have been.
Q. Why not?
A. Because it doesn't meet the regulatory requirements for filing an instrument.
Q. It doesn't have that unique identifying number?
A. And it's not against a vessel, correct.
Q. What does the Vessel Documentation Center do when it receives a notice of claim of maritime lien like the one we're looking at?
A. We simply return these to the sender with a very brief letter explaining that it doesn't meet the eligibility requirements, and no action is taken.
Q. Now, the other -- were you also asked to look at several other notice of claim of maritime liens by our office?
A. I believe I was, yes.
Q. And if we could pull up Exhibit 1-35 and go to Page 2 of that. And looking at 1-36, Page 2 of that. And 1-37, Page 2 of that. And 1-44, Page 2. 1-45, Page 2 and Page 3. And, lastly,

1-48, Page 2. Do you recognize those?
A. Yes, I do.
Q. Are those the documents you previously reviewed?
A. Yes. I searched for them and I couldn't find anything.
Q. And did the Vessel Documentation Center record any of the documents we just looked at?
A. No.
Q. Why not?
A. They don't meet the requirements of 46 C.F.R.
MR. HOWARD: I have no further questions for this witness, Your Honor.
THE COURT: Cross-examination, Mr. Maines.
MR. MAINES: Thank you.

CROSS-EXAMINATION

BY MR. MAINES:
Q. Good afternoon. My name is J. D. Maines. The maritime liens that you were just shown, none of those were recorded with your office; is that correct?
A. No, they were not.
Q. So that means that a creditor would not have been able to access those liens by inquiring with your office; correct?
A. Correct. They would not be on the abstract of title.
Q. Right. Those liens would have -- a lien -- or a document that's called notice of lien that's filed with, for instance, the district court would not appear as a result with your office

just having had filed that with district court; correct?
A. No.
Q. The person, the creditor or the individual that wanted to file that lien would actually have to file that directly with your office?
A. That's correct.
Q. And that filing was deficient and would not have been entered into the system because it did not have the vehicle identification number; correct? Or, I'm sorry, the vessel identification number.
A. Vessel identification number.
MR. MAINES: Thank you.
THE COURT: Any redirect?
MR. HOWARD: No, Your Honor.
THE COURT: May this witness be excused?
MR. HOWARD: Yes.
THE COURT: Thank you, Mr. Shoemaker. You may step down.
MR. HOWARD: Your Honor, the government calls Tara Durrant.
THE CLERK: Please raise your right hand.
TARA DURRANT, being first duly sworn, testified as follows:
THE WITNESS: I do.
THE CLERK: Thank you. You can have a seat, please. If

you will, ma'am, please state your full name for the record.

THE WITNESS: Tara Camille Durrant.

THE CLERK: Spell your last name.

THE WITNESS: Durrant: D, as in Delta, U-R-R-A-N-T, as in Tango.

THE CLERK: Thank you.

THE COURT: You may proceed, Counsel.

MR. HOWARD: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. Ms. Durrant, how are you employed?

A. I am employed with the Internal Revenue Service in Ogden, Utah.

Q. And what is your job title there?

A. My job title is an analyst for the fraud referral and evaluation program.

Q. And how long have you worked at IRS?

A. 20 years.

Q. Have you had a variety of different jobs with IRS?

A. I have.

Q. Can you talk a little bit about your progression through the agency?

A. I started off in submission processing -- it's where we intake tax returns -- and moved on to become a tax examiner. I did a little stint in tax exempt government entities, became an

examiner for the frivolous return program and then became an analyst for the frivolous return program, and now I'm an analyst for the fraud referral and evaluation.

Q. And you mentioned that you're an analyst with fraud referral and evaluation. Can you talk a little bit more about your current duties and responsibilities?

A. Some of the current duties with fraud referral and evaluation, we help support a number of different areas, one of them being the frivolous return program, which is centralized in Ogden, Utah. We do a lot of their filtering, workload selection. We set policy, help with assisting setting policy and oversee a database of administration.

Q. Do you also do training and outreach with IRS to identify frivolous returns?

A. I do. I go out to each of the campuses every year and train.

Q. And you mentioned the FRP database. What is the frivolous return program?

A. The frivolous return program is tasked with housing and keeping track of all frivolous returns filed and identified by the Service.

Q. And how long have you worked with the frivolous return program?

A. I'd say I have been working with the frivolous return program for about 15 years.

Q. And as a result of your work and two decades of experience with IRS, are you familiar with how tax returns are processed?
A. Yes.
Q. It starts with the taxpayer making a tax return; correct?
A. Correct.
Q. With that filing. So once that return is filed, what group at IRS receives it?
A. It depends on how it is filed, but if it's a paper return, our submission processing gets that return.
Q. Okay. And what happens at the submission processing first?
A. They review that return and get it sent -- look for any identifiers which would cause it to go to another area, and if not, it continues down the pipeline.
Q. Okay. And that initial review -- you're talking about the identifiers. Can you talk a little bit about what's involved in that initial review of that tax return?
A. To keep it simple, it's -- you're just kind of looking at it to make sure that the information that is needed to process that return is there.
Q. And then you mentioned the different pipelines it can go through. Is one of those to the frivolous return program?
A. It is.
Q. And how does it make its way to that pipeline?
A. So anywhere within the Service, including the submission

processing, they can look at a tax return; and they're trained, much like the training we mentioned, to identify something that looks suspicious or funny. And if it meets that criteria, then it is sent to the frivolous return program.

Q. And if it's identified as potentially frivolous, where is that program at?

A. Ogden, Utah.

Q. Were tax returns of Timothy Jermaine Pate sent to the frivolous return program?

A. They were.

Q. Have you reviewed returns and IRS records concerning Timothy Jermaine Pate a/k/a Akenaten Ali?

A. I have.

Q. And are those records maintained by his Social Security Number?

A. They are.

Q. Let's go back to the years 2011 through 2014. Can you tell us what is an IRS account transcript?

A. An IRS account transcript basically is the chronology of what has taken place for that year; if a return is filed, when it's been filed and the progression of that return and anything that's been done with it.

Q. Does that account transcript show whether someone has filed a tax return for a particular tax year?

A. It does.

Q. Have you reviewed the IRS account transcripts for tax years 2011 through 2014 for Timothy Jermaine Pate?

A. Yes.

Q. What does it show?

A. It showed that nothing had been filed. There was no account transcript. It was essentially blank.

Q. Okay. So he did not file tax returns for 2011, 2012, 2013 and 2014; correct?

A. Correct.

Q. Let's start with Exhibit 29, Page 2. Is this his 2011 account transcript?

A. It is.

Q. And, again, showing no filing; correct?

A. Correct.

Q. Looking at Exhibit 30, Page 2. Is this his 2012 account transcript, again, showing no filing?

A. It is.

Q. Looking at Exhibit 31, Page 2. What is that?

A. An account transcript for tax period ending December 31st, 2013, showing no data found.

Q. Okay. And you'll notice there's been some redactions for his Social Security Number; correct?

A. Yes.

Q. But have you reviewed both the redacted and unredacted exhibits we're going to look at today?

A. I have.
Q. And do those match, other than the redactions?
A. They do.
Q. Looking at Exhibit 32, Page 2, do you recognize that?
A. Yes.
Q. Does that reflect that no tax return filed by Timothy Jermaine Pate for tax year 2014?
A. It does.
Q. Then we get to tax year 2015. If we could pull up Exhibit 33. And, Ms. Durrant, if we could go to Page 2 of that document. Did Timothy Pate file a 2015 tax return?
A. He did.
Q. And looking at Exhibit 33, Page 2, what is this?
A. It is the first page of the Form 1040 individual return of tax, income tax.
Q. An individual's tax return; correct?
A. Yes.
Q. If we could take a look at Line 7, which is towards the middle of this page, and as well as Lines 8. So looking at Line 7, what does that reflect?
A. There's no figure reported.
Q. No figure reported, so no wages, no salaries for the tax year; correct?
A. Correct.
Q. 2015 he made no wages, no salaries; correct?

A. Correct.
Q. And then Line 8a lists taxable interest of over four -- just about four-and-a-half million; correct?
A. Correct.
Q. What is taxable interest?
A. Taxable interest is just exactly what it is. It is interest that you receive from like an original issue discount or just interest on Schedule B.
Q. And turning to the next page, does this show the amount that Mr. Pate requests for a refund in his 2015 tax return?
A. It does.
Q. And is that amount on Line 76a?
A. It is.
Q. How much did Mr. Pate request for his 2015 tax return?
A. $2,753,248.
Q. And this comes after several years of filing no tax returns; correct?
A. Correct.
Q. And it's reflected here he had no wages, no salaries? As we looked at in Line 7?
A. Correct.
Q. Staying on that page, towards the bottom of that page, does it list his occupation there?
A. It does.
Q. And what is listed as Mr. Pate's occupation?

A. Creditor.
Q. Days after filing this return did Mr. Pate also fax to the IRS another tax return? And if we could look at exhibit -- is that a yes, ma'am?
A. Yes.
Q. Okay. If we could look at Exhibit 34, Page 2. Do you recognize this?
A. Yes.
Q. What is this?
A. It is a return of tax or individual income tax return for 2015.
Q. And it lists the filer there as Timothy J. Pate?
A. It does.
Q. Now, do taxpayers need to file multiple tax returns for the same year?
A. Generally, no.
Q. And looking at Page 3 of this exhibit, did Mr. Pate request the same amount of refund as the other return in Exhibit 33?
A. So $2,753,248.
Q. And this was -- this tax return was faxed in to the IRS; correct?
A. Correct.
Q. Were there some additional documents attached to this tax return that was faxed in?

A. Yes.
Q. And let's look at Page 6 of this exhibit. And I'll ask if you recognize the forms on that page.
A. I do.
Q. What are they?
A. They are Forms 1099, which stand for original issue discount.
Q. Okay. Is that a 1099-OID?
A. Correct.
Q. What is a 1099-OID?
A. Generally what they're used for in the simplest terms is if you were to go to a financial institution and you were to purchase a bond, and let's say its value -- or you purchased it for $200, and it matures within five years, and its face value of that maturity value would be $500. So the difference between what you purchased it at at $200 and then what it's valued at, that $300 difference would be issued on an original issue discount from the financial institution.
Q. Okay. And then is a 1099-OID issued as a result of that?
A. Yes.
Q. And who would be -- in the example of you purchase a bond from a financial company, who would be the payor of that 1099-OID?
A. The one who is paying the original issue discount, so a financial institution.

Q. Okay. And the recipient would be the owner of that bond?
A. Correct.
Q. And then how is that 1099-OID filed?
A. 1099 -- this 1099-OID acts much like an informational doc, like your W-2s, and it would be sent directly to the Internal Revenue Service for reporting.
Q. Okay. And is it sent by the, the example you gave, the financial institution to the IRS?
A. It is.
Q. So there would be a record of that 1099-OID coming from the financial institution; correct?
A. Correct.
Q. Now, looking at the two 1099-OID forms on this page in front of you which we're looking at as Exhibit 34-6, what catches your attention?
A. A number of different things, but first and foremost is that it's handwritten.
Q. And why does that catch your attention?
A. It's handwritten just because it's coming from the taxpayer, and usually we don't see those come from the filer or the taxpayer because it comes strictly or directly from the financial institution.
Q. And financial institutions aren't typically in the practice of filling out their tax forms by hand?
A. No, because we do impose penalties for paper-filed

returns, or informational docs. So...
Q. And the entities listed, you mentioned -- the example you give a financial institution, and Fifth Third Bank is listed in that top one. But how about Georgia Power? Is that an institution you would expect to see on a 1099-OID?
A. No, not generally.
Q. And you mentioned earlier that the IRS receives copies of 1099-OIDs that are sent by the financial institution to the IRS; correct?
A. Correct.
Q. Did the IRS receive any 1099-OID from Fifth Third or Georgia Power concerning Timothy J. Pate?
A. No.
Q. Now, 1099-OID filings, is that something that you see in the frivolous return program?
A. Yes.
Q. Has the IRS issued public notices regarding frivolous 1099-OID filings?
A. They have.
Q. If we could look at Exhibit 35. Do you recognize this document?
A. I do.
Q. What is this?
A. It's our Notice of Frivolous Positions, so Notice 2010-33.
Q. And does 2010 represent the year that it was issued?

A. Yes.
Q. And is this publicly available?
A. It is.
Q. Does this warn that taking certain frivolous positions in a tax return could result in a $5,000 penalty?
A. It does.
Q. And does this list various tax positions that if taken by a filer could be penalized by the IRS?
A. It does.
Q. As identified as frivolous; right?
A. Correct.
Q. Looking at Page 9 of Exhibit 35, and looking specifically towards the bottom at Paragraph 21, do you see that?
A. I do.
Q. And does that warn that taxpayers can't use a Form 1099-OID as a financial instrument to obtain money for a tax refund?
A. Yes, it does.
Q. If we could pull up Exhibit 36. Do you recognize this document?
A. I do.
Q. What is this?
A. It's the Truth About Frivolous Tax Arguments.
Q. Is this published by the IRS?
A. It is.

Q. Is it publicly available?
A. It is.
Q. This as well as the previous document, is this meant to inform the public about frivolous positions?
A. Yes.
Q. To instruct them not to take these positions or they could be penalized; correct?
A. Correct. To educate.
Q. If we could look at Page 4 of this exhibit, Paragraph Number 8. Would you please review that paragraph. And looking specifically at the bold language, is that describing a frivolous position there?
A. Yes.
Q. And is that, again, warning taxpayers that do not take this position or you will be penalized?
A. Yes.
Q. Turning back to Mr. Pate's 2015 tax return, after that was filed with the IRS, did that go to the frivolous return program?
A. It did.
Q. Was it identified as frivolous?
A. It was.
Q. If we could pull up Exhibit 37. Please review that document. Do you recognize that?
A. I do.
Q. What is that?

A. It is our prenotification letter that we send to filers of frivolous returns of tax.
Q. And who was this sent to?
A. Timothy J. Pate.
Q. And you said it's your prenotification letter. What do you mean by that?
A. Prenotification means that we're kind of putting them on notice affording them an opportunity to remove or redact their position so they can forego the $5,000 penalty. So they have 30 days to do that.
Q. And does this warn Mr. Pate that his return was frivolous?
A. It does.
Q. Does it also warn him that a $5,000 penalty is going to be assessed per tax return if he doesn't correct his return?
A. It does.
Q. And this is dated July 7, 2016; correct?
A. Correct.
Q. Is there also a phone number for him to contact?
A. There is.
Q. And where does that phone number ring to?
A. It actually rings to the desk of an employee trained in the frivolous return program in Ogden, Utah.
Q. So if he has specific questions about that, the effort here is to provide him with a phone number for him to get answers; right?

A. Correct.
Q. Why is that phone number there?
A. To educate the taxpayer and to afford them the opportunity to have the frivolous filing explained and what they can do to, again, forego that $5,000 penalty.
Q. All right. So there's publications that are in place as well as you're providing them a phone number to contact to avoid filing these frivolous returns; correct?
A. Correct.
Q. Did Mr. Pate correct the two tax returns he submitted for the 2015 tax year?
A. Not to my knowledge.
Q. As a result, what happened?
A. He was penalized.
Q. And was that a $10,000 fine representing a $5,000 penalty for each frivolous tax return?
A. It is.
Q. Was he informed of that $10,000 fine?
A. He was.
Q. How was he informed?
A. We have a System CP15 that goes out, and anytime that they're penalized, that systematically kicks out showing that we've imposed penalties.
Q. And did Mr. Pate pay that $10,000 fine?
A. Not to my knowledge.

Q. What did he actually do with that letter that he received from the IRS notifying him of the penalty?
A. He sent it back in.
Q. If we could pull up Exhibit 38, Page 2. Do you recognize this?
A. I do.
Q. What is this?
A. It's the CP15 systemic letter that I previously discussed.
Q. Before we get into the handwriting that's over it, the letter itself is a form advising him that you've been charged a penalty; correct?
A. Correct.
Q. A penalty for filing frivolous tax returns?
A. Indeed.
Q. And this is addressed to Timothy J. Pate?
A. It is.
Q. And then there's also handwriting on it; correct?
A. There is.
Q. Now, when the IRS sends out that form letter, does it contain that handwriting when it goes out?
A. It does not.
Q. When the IRS got it back, did it have that handwriting?
A. It did.
Q. If you'll look in the middle, the lower half of that document, do you see where it says "pay to U. S. Treasury" and

"money order"?
A. I do.
Q. Does this reflect an effort to convert that bill into a money order to pay to the IRS?
A. Yes.
Q. Did the Treasury Department accept this as payment?
A. No.
Q. If we could look at Exhibit 39, Page 2. So we just looked at a document that was dated September 2016, and this is dated November 14, 2016. What we're looking at is Exhibit 39; correct?
A. Yes.
Q. And what is Exhibit 39, Page 2?
A. It looks -- it is a Notice CP504.
Q. And what is that?
A. A Notice of Intent to Levy.
Q. And what does that mean?
A. That they need to pay the bill or their balance due or we will intend to levy any accounts.
Q. And when that notice of intent to levy goes out, does it have handwriting on it?
A. It does not.
Q. When the IRS received it back from Mr. Pate, did it have that handwriting?
A. It did.

Q. And, again, towards the middle bottom of that you have the same attempt at converting it to a money order and trying to pay that to the U. S. Treasury?
A. Yes.
Q. Now, of the 2.7 million dollars that Mr. Pate requested in his 2015 tax return, have you looked to see how much he was paid for that?
A. Yes.
Q. How much money did Mr. Pate receive as a result of that tax return for 2015 that was identified as frivolous?
A. Nothing.
Q. Did Mr. Pate file a 2016 tax return?
A. He did.
Q. Did he claim a refund of over a million dollars?
A. Yes.
Q. What did the IRS do in response to that tax return?
A. The same thing we did with the 2015. It was identified as frivolous.
Q. And did they warn him that he was going to be fined $5,000?
A. Correct.
Q. If we would pull up Exhibit 43, Page 2. Do you recognize this?
A. I do.
Q. What is this?

A. An individual income tax return.
Q. And is this Timothy J. Pate's tax return for the year 2016?
A. It is.
Q. In Line 7, what does he list as his wages and salary he earned for that year?
A. Nothing.
Q. Looking at Page 3, what is the refund amount requested on Line 75?
A. $1,153,008.
Q. And below that does it list his occupation?
A. It does.
Q. As what?
A. Creditor.
Q. And did Mr. Pate attach a letter to this 2016 tax return?
A. He did.
Q. If you could pull up Page 5 of this exhibit.
And, Ms. Durrant, if you could look at the second full paragraph, do you see that?
A. I do.
Q. And in that paragraph does it mention 1099-OIDs being sent to support his tax return?
A. It does.
Q. If we could look at Exhibit 44. Do you recognize that?
A. I do.

Q. What is that?
A. It's our prenotification letter putting him on notice.
Q. And this is dated March of 2017; right?
A. Correct.
Q. Addressed to Timothy J. Pate?
A. Yes.
Q. So in 2015 for tax year 2015, filed that return, got warned and then got penalized; right?
A. Indeed.
Q. 2016, files the return. Now he's getting warned again; correct?
A. Yes.
Q. If we could pull up Exhibit 45. What is this?
A. This is our assessment document Form 8278 to impose penalties.
Q. And does that reflect that he was actually imposed a $5,000 penalty for, again, filing a frivolous tax return for the year 2016?
A. Yes.
Q. Looking at Exhibit 46. What is that?
A. That is our claim disallowance, letter Number 105C.
Q. Looking at Page 2 of this letter, who signed that?
A. Our director, Denise Davis.
Q. And did Mr. Pate pay that $5,000 penalty?
A. No.

Q. Did he file a 2017 tax return?
A. He did.
Q. Looking at Exhibit 48, Page 2, do you recognize that?
A. I do.
Q. What is this?
A. It is an individual income tax return for the tax year 2017.
Q. And looking at Line 7, what is listed for his wages and salaries?
A. Nothing.
Q. What about Line 8?
A. It looks like reported taxable interest of $6,094,969.
Q. And this comes after he's been penalized for his 2015 tax return as frivolous; correct?
A. Correct.
Q. After he's been penalized for his 2016 tax return as frivolous; correct?
A. That is correct.
Q. Now he's filing this for his 2017 tax return. Did he file documents attached to this tax return?
A. He did.
Q. Looking at Page 5, does he break down -- I'll wait until you get there. Getting a little ahead of myself, Ms. Durrant. I apologize.
A. No problem.

Q. Does he break down there how he arrived at that six-million-dollar figure in taxable interest?

A. Yes.

Q. And looking at those seven numbered statements there, what are some of the items he lists there to support that figure?

A. Court filing fees. Looks like Windham Professionals, and Division of Child Support Enforcement, State of Virginia.

Q. Looking at Page 3 of this exhibit, going to Line 76a, after claiming that six million dollars in taxable interest that included the child support and the court fees, how much refund does Mr. Pate request?

A. $3,721,157.

Q. So the amount is greater than what he previously requested that resulted in him being penalized as frivolous; correct?

A. Correct.

Q. Did this 2017 tax return go to the frivolous return program as well?

A. It did.

Q. Did Mr. Pate receive a refund for his 2017 return?

A. No, he did not.

Q. Let's turn to correspondence that the IRS received from Mr. Pate. Did the IRS receive various correspondence from Mr. Pate?

A. Yes.

Q. Is the IRS going to respond to every piece of

correspondence that it receives from individuals, particularly those who are routed to the frivolous return program?
A. No.
Q. Why not?
A. We don't address frivolous issues on a point-by-point basis because they have no basis in tax law.
Q. And you do make available a phone number for them to contact as well; correct?
A. Correct.
Q. And have you reviewed the correspondence?
A. I have.
Q. If we could pull up Exhibit 51, Page 2. I'll ask if you recognize that. Do you recognize that?
A. I do.
Q. What is this?
A. Just a letter.
Q. And is this a letter from Mr. Pate sent in to the IRS?
A. It is.
Q. And this is dated March 2015; correct?
A. Correct.
Q. And he's requiring that certain presentments be discharged; right?
A. Yes.
Q. If we could go to Page 3. What is this?
A. A Comcast bill.

Q. Okay. And is that bill to Akenaten Ali?
A. It is.
Q. And in the amount of $116?
A. Yes.
Q. And he sent this to the IRS; correct?
A. He did.
Q. And tried to convert it to a money order?
A. Yes.
Q. Did the IRS pay Mr. Pate's Comcast bill?
A. No.
Q. If we go to Page 4. Turning to page -- are we able to go to Page 4 of Exhibit 51?

THE CLERK: I'm sorry. The system just timed out on us. Give me just two seconds.

MR. HOWARD: Your Honor, would now be a good time for a break?

THE COURT: Makes sense to me.

MR. HOWARD: Okay.

THE COURT: We'll take a 20-minute recess, 15-minute recess.

THE CSO: All rise for the jury.

(Jury out)

THE COURT: We'll be in recess.

(Proceedings stood in recess from 3:35 until 4:09 p.m.)

(Jury out)

THE COURT: Mr. Howard, looking at timing wise, just wanted to give you an idea of what the Court is thinking. I'm thinking we can proceed -- we can keep going tonight until 6, if we need to, however much time you have witnesses prepared. I know I told you that I typically break in the 5:00 hour, so it may be that you only have a couple more witnesses ready for today, and I understand that. How many more witnesses do you have lined up for this afternoon and evening?

MR. HOWARD: Your Honor, following Ms. Durrant's testimony, there will be three additional witnesses, one of whom the third one is en route.

THE COURT: Okay.

MR. HOWARD: Those will be relatively short. We do have a witness who is flying in tonight.

THE COURT: That will be ready to testify in the morning?

MR. HOWARD: Secretary Lew will be ready tomorrow morning.

THE COURT: I would think those three will take us to our full time. If you're at a point, just like you just did, where if you're at a point after two and you think, you know, we're already close to 6:00, for example, and you want to say, Your Honor, is this a good point for us to recess for the evening, happy to do that. But if we can get through your three, that would be the Court's preference.

MR. HOWARD: Understood, Your Honor.

THE COURT: All right. Okay. Let's rise for the jury.

THE CSO: All rise for the jury.

(Jury present)

THE COURT: Members of the Jury, I trust that everyone had a good recess break there. Again, I also trust that you followed the Court's instructions that I gave you at the beginning and throughout the case that during recess, obviously, don't conduct any research and don't discuss the case with anyone at all. And obviously if you yourself feel that you've breached those instructions or you've witnessed a breach of those instructions, you just let me know about that, okay, through the court security officer. But I trust that everybody has followed our instructions.

Mr. Howard, you can proceed. Ma'am, I'll remind you that you're under oath.

MR. HOWARD: Thank you, Your Honor.

THE WITNESS: Thank you, Your Honor.

THE COURT: Go ahead, Mr. Howard.

BY MR. HOWARD:

Q. Ma'am, when we left off, we were looking at a Comcast bill that had been sent in by Mr. Pate; correct?

A. Yes.

Q. I direct your attention to Government's Exhibit 51-5. Do you recognize that?

A. Yes.
Q. Was this an Augusta Utilities bill?
A. It is.
Q. And had this been sent in to the IRS by Mr. Pate?
A. Yes.
Q. And looking at the bottom of this document, is it, again, reflecting an attempt to convert that bill into a money order?
A. It is.
Q. Did the IRS pay Mr. Pate's Augusta Utility bill?
A. No.
Q. Looking at Government's Exhibit 51-7, what is this?
A. It looks like a Enhanced Recovery Company.
Q. Okay. And is this entitled Collection Notice --
A. Yes.
Q. -- and the creditor is AT&T, and it's directed towards Timothy Pate alerting him of an unpaid bill with AT&T?
A. Yes.
Q. And did Mr. Pate send this in to the IRS for payment?
A. He did.
Q. Did the IRS pay Mr. Pate's AT&T bill?
A. No.
Q. Looking at Page 9 of Government's Exhibit 51, what is this?
A. Looks like a collection agency letter.
Q. And the creditor there, NSLP, is that commonly used to

refer to the National Student Loan Program?
A. It is.
Q. And, again, is this directed to Timothy Pate?
A. Yes.
Q. And was this sent in by Timothy Pate to the IRS?
A. Yes.
Q. Did the IRS pay Mr. Pate's student loan bills?
A. No.
Q. Looking at Government's Exhibit 52, Page 1, do you recognize that certificate?
A. Yes.
Q. And is that a cover letter to correspondence received by the IRS regarding Timothy Pate?
A. It is.
Q. Are there a number of 1099-OIDs that Mr. Pate sent to the IRS?
A. There are.
Q. If we could look at Page 29 of this exhibit. Is this a 1099-OID that Mr. Pate sent in to the IRS?
A. It is.
Q. And who is the recipient?
A. The recipient is Richmond County Jail.
Q. Looking at Page 44 of Government's Exhibit 52. Is that also a 1099-OID listing the Richmond County Jail?
A. It is.

Q. And Page 64. Another 1099-OID filed by Timothy Pate concerning the Richmond County Jail; correct?
A. Yes.
Q. Did he file a number of receipts with these 1099-OIDs?
A. He did.
Q. Looking at Page 74, Government's Exhibit 52. What is this?
A. It is a receipt from the Richmond County Jail.
Q. And does this list a number of food items?
A. It does.
Q. And did Mr. Pate send in this receipt for payment by the IRS?
A. He did.
Q. Looking at Page 76. And what is this?
A. It is also a receipt for food items.
Q. From the Richmond County Jail?
A. Yes.
Q. Including crackers, glazed honey buns and barbecue Fritos; correct?
A. Yes.
Q. And this is, again, an attempt to convert it to a money order for payment by the IRS; correct?
A. Yes.
Q. Did the IRS pay for Mr. Pate's snacks at the Richmond County Jail?

A. No.
Q. Did he continue to send in 1099-OIDs and his bills to the IRS?
A. He did.
Q. If you'd look at Government's Exhibit 53, Page 18, what is this?
A. It is a 1099-OID for 2017.
Q. And that concerns the Division of Child Support; correct?
A. Correct.
Q. Looking at Page 21 of Exhibit 53. What is that?
A. It is a letter of the -- from the Child Support Enforcement office.
Q. Addressed to Timothy Pate?
A. Yes.
Q. Advising him of a little over $16,000 in past-due child support?
A. Yes.
Q. And he's -- Mr. Pate sent this in to the IRS for the IRS to pay this?
A. Yes.
Q. Did the IRS send Mr. Pate payment for his child support?
A. No.
MR. HOWARD: No further questions for this witness, Your Honor.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. MAINES:

Q. Good morning. My name is J. D. Maines. Nice to meet you.

A. Nice to meet you.

MR. MAINES: Ms. Ryherd, can we pull up Document Number 34, Page 3?

BY MR. MAINES:

Q. Ms. Durrant, I believe this is the 2015 returns that Mr. Pate filed; correct?

A. Yes.

Q. And in that he's requesting 2.7 million dollars as a refund?

A. Yes.

Q. Is that correct? The IRS never paid that refund; correct?

A. No.

Q. Okay. And then going to Document Number 42 -- or, I'm sorry, Exhibit Number 42. The same page, the 2016 return. It's Exhibit Number 42. That return was for 1.15 million; correct?

A. Yes.

Q. The IRS never paid that?

A. No.

Q. Okay. And he filed these in the years following that calendar year; correct? So 2015 he filed in 2016?

A. Correct.

Q. And then for this 2016 he filed in 2017; correct?
A. Yes. In 2017.
Q. And then the 2017 year he filed that that following calendar year; correct?
A. Yes.
Q. And I believe -- correct me if I'm wrong -- does 3.72 million sound about right as the amount he requested as a refund for the 2017 return?
A. Yes, if my recollection holds.
Q. So we're talking about a series of three to four years; correct?
A. Yes.
Q. In which the IRS has paid him nothing. Is that correct?
A. That is correct.
Q. In fact, they assessed penalties which was not paid by Mr. Pate; correct?
A. Correct.
Q. He sent in this document saying return for value -- accepted for value in return for value; correct?
A. Right.
Q. But that's meaningless, isn't it? It doesn't have any value.
A. No. It's fraudulent. There's no validity to it.
Q. Right. As far as you're aware, has the IRS ever paid him any money at all during the last five years?

A. For an erroneous refund. Did you say anyone?

Q. Any refund -- has the IRS paid him anything?

A. Not to my knowledge.

Q. Okay. And he certainly wouldn't have gotten a refund for the years prior to 2015 because he didn't file a return; correct?

A. Correct.

Q. Okay. So for 2013 and '14 he did not file a return; is that correct?

A. Correct.

Q. So from 2013 through 2018 he has never received any money from the IRS?

A. Not to my knowledge, no.

Q. And money from the IRS is actually issued from the Department of Treasury?

A. Yes.

Q. Okay. Because the IRS is a part of the Department of the Treasury; correct?

A. Yes.

Q. Okay. And you never had it detailed -- and you indicated that for people that file frivolous returns you don't have the manpower to engage in a detailed discussion about why a return is frivolous?

A. Regarding frivolous correspondence, not frivolous returns of tax.

Q. Okay. So the letters that he sent, you did not respond to him point by point, whatever absurd points he wants to make?
A. Correct.
Q. Okay. And the only thing on his returns that's bizarre is the fact that it's claiming withholdings of millions of dollars; correct?
A. Yes, and the handwritten 1099-OIDs.
Q. Right. Have you ever called a taxpayer engaged in this type of activity directly to tell them over the phone what they're doing is fraudulent or fictitious?
A. No.
Q. You only send a letter; correct?
A. Yes.
Q. And that's the standard procedure for the IRS?
A. Correct.
Q. Okay. Do you have any idea about what Mr. Pate's educational background was?
A. I do not.
Q. Okay. Do you know anything about his experience and knowledge about our tax code?
A. No.
MR. MAINES: Okay. Thank you.
THE COURT: Any redirect?
MR. HOWARD: No, Your Honor.
THE COURT: Can this witness be excused?

MR. HOWARD: Yes, Your Honor.

MR. MAINES: No objection.

THE COURT: All right, ma'am. You're excused. You may step down. Thank you.

THE WITNESS: Thank you.

MR. McCOOL: Your Honor, the government would call Denise Davis.

THE CLERK: Please raise your right hand.

DENISE D. DAVIS, being first duly sworn, testified as follows:

THE WITNESS: So help me God. Thank you.

THE CLERK: Thank you. You can have a seat. If you will, please state your full name for the record.

THE WITNESS: I am Denise D. Davis.

THE CLERK: Thank you. Spell your last name for us.

THE WITNESS: D-A-V-I-S.

THE CLERK: Thank you.

MR. McCOOL: May I proceed, Your Honor?

THE COURT: You may.

MR. McCOOL: Thank you.

DIRECT EXAMINATION

BY MR. McCOOL:

Q. Good afternoon, ma'am. Ma'am, where are you currently employed?

A. I'm currently employed at the Internal Revenue Service.

Q. And how long have you been employed with the Internal Revenue Service?
A. I've been employed with the Internal Revenue Service for 31 years.
Q. What is your current position with the Internal Revenue Service?
A. My current position is the Director of Return Integrity Verification Program Management.
Q. And how long have you held that title?
A. Since June of 2019.
Q. Can you tell the members of the jury what your responsibilities are in that position?
A. In my current position I am the director that has oversight of our integrity verification programs, which is essentially a lot of our refund filtering processes to detect people that, you know, have misreported or manufactured documentation for their tax returns. And we also have a key component where we look and help prevent victims of identity theft in our processes.
Q. And as the director of that program, do you supervise employees in your department?
A. I do. In my current position I have 94 employees.
Q. Prior to being the director of that position before June of 2019, what was your position with the IRS during that time?
A. I was the Director of the Return Integrity Verifications

Operation.
Q. How do those two agencies within IRS work, ma'am?
A. Well, in June of 2019 we had a reorganization that split my directorate, which was the return integrity verification operation, which was actually very similar to the job that I hold now, except for I had 650 employees, and that included all of the operational components, which means the tax examiners and the employees that review correspondence and wrote correspondence were actually a direct report to me.
Q. And as the director of the return integrity operations unit, how long were you the director of that?
A. I was the director of that when that particular organization was created in June of 2017 until the reorganization in June of 2019.
Q. And what type of responsibilities did you have when you were the director of return integrity operations?
A. I managed both the policy and the procedures associated with our identity theft program. I also worked a lot with some of our what we call prerefund, which means before the refund goes out, that we take a look at certain compliance aspects. And a lot of it has to do with fraud where wages and withholdings have all been manipulated to pump up a taxpayer's refund. Also under that particular program I also worked what we call the frivolous filer program.
Q. Did the frivolous filer program fall within or underneath

your organization?
A. That is correct.
Q. All right. Can you tell the members of the jury about what the frivolous filer program is?
A. Frivolous filer program is taxpayers that file various claims with the government that are what we call frivolous, but they're not founded in law; and often the refunds are outrageous in nature, and those taxpayers are not entitled to those refunds, and we execute a process, you know, to inquire, make sure to affirm that that's their position, that they want to continue to hold a frivolous position, or they can file a valid return. And if they do not file a valid return, we'll have to take necessary legal steps to retain refunds that are not payable.
Q. So for taxpayers that file for tax returns that are -- seem frivolous, how do you correspond with that individual taxpayer?
A. Well, I personally don't correspond with an individual, but we have a unit of employees that both review the information provided by the taxpayer. If it is deemed frivolous, they will send a series of notices to the taxpayer to make sure that they understand that they appear to have taken a frivolous position. They have an opportunity to file a valid return, which means a return that, you know, has the correct items reported on it, they have not altered the statement on the return, what we call

the jurat, under penalty of perjury, and we correspond back and forth. We may have to notice the taxpayer that if they do not correct their position of a frivolous argument, they may be subject to a $5,000 penalty.

Q. And are you familiar with the IRS Letter 105C?

A. I am familiar with that letter.

Q. What -- that letter, that designation 105C, what does that mean?

A. Well, the 105C letter is a claims disallowance notification. And so in the course of tax administration, you have to provide taxpayer final determination regarding a claim. In this particular case -- in a case such as a frivolous filer case, the taxpayer has made a claim for a refund when they filed a frivolous return, and that -- their position is not allowable by law, and so we bring finality to that particular issue with the issuance of a 105C letter.

Q. And is your name -- during the time period when you were the director of return integrity operations, would your name have been on the 105C letter?

A. That is correct.

Q. And does that mean that you individually look at and review each one of these 105C letters?

A. I do not.

Q. And why is that?

A. Because we have the ability to delegate that to our case

workers to issue those notices based on the policies and procedures that we have, and my name goes on those notices.

Q. And, ma'am, when you were the director of return integrity operations, where did you work out of?

A. I worked out of Atlanta, Georgia.

Q. You indicated that you supervised over 600 employees during that time period?

A. That is correct.

Q. Where were your -- the employees that worked under you, where did they work out of?

A. I have employees that work in 10 of our campus locations, one of which is the Ogden, Utah, campus, which is where the frivolous filer operation is.

Q. All right. Ma'am, I want to show you what's been moved into evidence as Government's Exhibit 1-21. And if we could go to Page 3 of that exhibit. Can you see that on the screen, ma'am?

A. I can.

Q. And do you recognize it?

A. I do.

Q. What do you recognize it to be?

A. It is the 105C letter, also known as a claims disallowance letter.

Q. And it's dated February 14, 2018, addressed to an individual named Timothy J. Pate. Is that accurate?

A. That is correct.

Q. And just going to the Page 4 of this exhibit just for one second, is that your signature on Page 4 of this document?

A. That is correct.

Q. And, again, you would not have -- or I'll let you answer it. Would you have reviewed this letter before it was sent to Mr. Pate?

A. I would not. That particular signature is available to the employees in the frivolous filer program, and they would request that signature overlay on this systematically generated notice.

Q. Okay. If we could go back to Page 3 of the exhibit. Ma'am, can you tell the members of the jury basically what this correspondence was that was sent to Mr. Pate on February 14, 2018?

A. Okay. So if you don't mind, I can start at the very top where it says the IRS. So the IRS Department of the Treasury, it tells me that the frivolous return program in our Ogden, Utah, is the organization that's generating this letter. It also says that it's sent to a Timothy J. Pate at an address in Augusta, Georgia.

In this particular letter there was a claim on a frivolous return of $1,153,008 for the 2016 tax year. After review of the information provided, the frivolous return program would have made a determination in this case that they disallowed his claim

for credit for the 2016 tax period based on the frivolous position. And the paragraph that was selected for this particular taxpayer is, "You, based on the claim of a frivolous position that isn't supported by law, the federal courts have consistently ruled against these arguments and may impose substantial fines for taking frivolous positions."

This is an effort for us to bring finality to the open issue of the 1.1 million dollars that this taxpayer was claiming that is not -- that he is not entitled.

Q. So in order for this letter to have been generated and sent to Mr. Pate, what would have happened up until this point?

A. There would have been some correspondence before this giving the taxpayer the opportunity to clarify their position, or to file a complete and accurate return without the frivolous arguments.

Q. Ma'am, I want to ask you now after this letter was generated February 14th, 2018. After that, did you become aware that Mr. Pate filed a lien against you on May 1st, 2018?

A. I became aware.

Q. How did you become aware?

A. I was actually contacted by the Federal Bureau of Investigation.

Q. And, again, Mr. Pate; is that somebody that you had ever met as far as you know?

A. No.

Q. Ever spoken to on the telephone?
A. No.
Q. Ever corresponded with through mail or email?
A. I personally did not correspond with mail or email.
Q. Is there any reason that you ever gave to Mr. Pate that would indicate that you owed him 15 million dollars?
A. No.
Q. All right. After this lien was filed against you on May 1st, 2018, did you become aware that Mr. Pate filed another lien against you on May 7th of 2018?
A. I was not aware of the second lien.
Q. And, again, did you -- is there any reason that you provided to Mr. Pate that would indicate to him that you -- that he -- that you owed him 15 million dollars?
A. No. There is no cause for me to owe anybody 15 million dollars.
Q. And were you aware that on May 21st, 2018, Mr. Pate, who's known also as Akenaten Ali, tried to put you into involuntary bankruptcy?
A. No, I did not know that.
Q. All right. Ma'am, as the director of the -- as the director of the return integrity operations unit with the IRS, holding that position for several years, did anyone, any taxpayers ever try to put liens against you or file liens against you in relation to your duties in that position?

A. No.

Q. Did any taxpayer ever try to put you into involuntary bankruptcy?

A. No.

Q. In your 30 years of service with the IRS, has anyone tried -- has anyone ever filed liens against you?

A. No.

Q. Has anyone ever tried to put you into involuntary bankruptcy?

A. No.

Q. Can you tell the members of the jury about the effects -- once you became aware of these liens that were filed against you, what kind of effect did that have on you?

A. Well, first and foremost, I was concerned about, you know, my credit and my credit history. My husband and I work very hard on our credit, like anybody that's an American citizen tries to do. So I was concerned about that part of my life. But I was also concerned because at the time I am working on what we considered senior executive service certification, which is basically my migration into -- from normal federal government to senior executive service, which does include intensive background checks. It includes background checks, credit checks, and also I get a full audit of all my tax returns at that point. So it is a very intensive process, and when these types of activities happened, I was concerned that my career and

my ambitions and as -- and increasing roles and responsibility at the Internal Revenue Service was at risk.

Q. Did you believe that one of these liens could have affected that background investigation?

A. It could have. It could have represented all kinds of things. It could represent that I'm at risk, either financially irresponsible or taking on incredible amounts of debt that makes no sense or even vulnerable for bribes and other types of activities that people in debt get involved with in my level, in my position in the organization.

MR. McCOOL: Ma'am, that's all the questions I have for you. Thank you very much.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. MAINES:

Q. Ms. Davis, good morning. I'm J. D. Maines. When did you -- I'm sorry. Good afternoon. When did you learn about these liens and the involuntary bankruptcy position?

A. I learned about the liens from a call from the Federal Bureau of Investigation, that they had called and made an inquiry about my awareness of these liens, and I was informed at that time liens had been filed.

Q. Yes, but when did that occur?

A. Had to be around June of 2018.

Q. And between the time that you learned about these liens,

or even prior to and to date, have you been denied any credit?
A. I have not.
Q. Have you discovered an entry on your credit report with any of the credit bureaus?
A. In reference to?
Q. This -- these liens and involuntary bankruptcy petition.
A. No.
Q. So the -- the impact that this has had on your financial background, you would agree, is -- is nothing?
A. I wouldn't say there's -- there is no impact.
Q. Where -- in what way has this impacted your financial background?
A. I've missed multiple days of work to be in trial over these liens.
Q. As far as your financial background, as your credit history, you were saying that the fact that you had to come to court impacts your credit history?
A. No. It's an impact to me and an inconvenience.
Q. I'm not asking about that. I'm just asking about your credit.
A. No.
Q. Do you know Mr. Pate at all?
A. No.
Q. Do you know what his educational background, what his thought process was during all this?

A. No.

Q. You would agree with me that Mr. Pate never received any money in relation to these claims and IRS returns; correct?

A. In reference to the 2016 tax return, no.

Q. Or any other returns that he filed, that you're aware of.

A. That I'm aware of, no.

MR. MAINES: Thank you.

THE COURT: Redirect?

MR. McCOOL: Just very briefly, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. McCOOL:

Q. Ma'am, you had indicated that you became aware of these liens in June of 2018. Is that what you had said?

A. That is correct.

Q. And so at that time you were informed through the FBI? Is that how you were notified?

A. That is correct.

Q. And they notified you that the liens were filed both on May 1st, 2018, as well as May 7th of 2018?

A. I did not have all the specifics of the details around the liens when the FBI contacted me, other than the FBI did say that those liens would be expunged.

Q. So at some point in time did you become aware of -- that two liens were filed against you?

A. Yes.

Q. And you had talked about the impact that this -- that these liens had on you personally and professionally. How about other IRS employees in terms of -- what kind of impact would these liens have on other members of your organization?

MR. MAINES: Your Honor, I'm going to object to that. I don't think that's relevant to the case we're here to decide.

THE COURT: Sustained. Ma'am, you don't need to answer that question.

MR. McCOOL: That's all I have for you. Thank you very much.

THE COURT: Any followup, Mr. Maines?

MR. MAINES: No, Your Honor.

THE COURT: May this witness be excused?

MR. McCOOL: Yes, Your Honor.

MR. MAINES: No objection.

THE COURT: Thank you, ma'am. You're excused. You may step down.

MR. HOWARD: Your Honor, the government calls Brianna Taylor.

THE CLERK: Please raise your right hand.

BRIANNA TAYLOR, being first duly sworn, testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. You can have a seat, please. If you will, ma'am, please state your full name for the record.

THE WITNESS: Brianna Taylor.

THE CLERK: Spell your last name.

THE WITNESS: T-A-Y-L-O-R.

THE CLERK: Thank you.

THE COURT: Go ahead, Counsel.

MR. HOWARD: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. Ms. Taylor, how are you employed?

A. I'm an attorney with the Office of Chief Counsel for the IRS.

Q. And how long have you worked at the IRS's Office of Chief Counsel?

A. I've been there almost 18 years now.

Q. What responsibility does the IRS's Office of Chief Counsel have?

A. The Office of Chief Counsel, our primary responsibility is to represent the IRS in the United States Tax Court.

Q. And what are some of your responsibilities and duties as counsel there?

A. Well, the IRS Tax Court is based in Washington, D.C., and they travel to Atlanta where my office is about six times a year. So we have trials while the Tax Court is here. Otherwise during the year we file answers to petitions that the taxpayers file in the Tax Court. We file pleadings, other motions in the

cases to try and resolve them, and we also settle probably 95 percent or more of the cases. So we file settlements with the Tax Court in most of the cases.

Q. And you're an attorney; correct?

A. That's correct.

Q. How long have you practiced law?

A. 19 years now.

Q. And with the IRS you primarily litigate in U. S. Tax Court; correct?

A. That's correct. I also -- previously there was a program where my office would represent the IRS in Bankruptcy Court as well, but that program ended about five years ago.

Q. Okay. And just about all of your job is tax litigation. Fair to say?

A. I'd say that's 80-plus percent of my job. We also advise the IRS examination, which are the revenue agents; and then the revenue officers who do collection if they have legal questions, we kind of act as their in-house counsel and answer any questions that they might have.

Q. Ma'am, did you get involved with a litigant named Timothy Jermaine Pate a/k/a Akenaten Ali?

A. Yes. His Tax Court case was assigned to me after he filed the petition.

Q. Okay. And where did Mr. Pate file that petition?

A. He would have mailed it to the Tax Court in Washington,

D.C.
Q. And you were the attorney assigned to represent the IRS in that case?
A. Yes. When he would have filed his petition, he would have selected a place of trial, and he must have selected Atlanta, and, therefore, it would have come to my office, and it was assigned to me.
Q. What is the United States Tax Court?
A. The Tax Court is a special court that was set up by Congress. Again, it's based in Washington, D.C.; and the judges there are some of the few judges left that do what's called ride the circuit. So their offices are up there, and they conduct most of their business up there, but when they have trials, they go around the United States to different cities. Normally there's about one city in each state that they go to. So in Georgia they come to Atlanta.
Q. And what filing begins a case in Tax Court?
A. A petition begins a Tax Court case, and a petition is always filed by a taxpayer. So the IRS is always the respondent and is always answering the case.
Q. Okay. So these are disputes between taxpayers and the IRS?
A. That's correct.
Q. Did Mr. Pate file a petition?
A. He did file a petition with the Tax Court.

Q. Did you review that petition?
A. I did review the petition and was charged with filing an answer to it.
Q. What was his dispute with the IRS?
A. Well, he really didn't have a valid dispute with the IRS as far as I could determine.
Q. And generally did his dispute concern his 2015 and 2016 tax returns?
A. Yes. He did select 2015 and 2016 as the years in dispute.
Q. And did his petition reference various 1099-OIDs that he filed?
A. It did.
Q. If we could pull up Government's Exhibit 55. Ms. Taylor, I'll ask you to look at the first page of Exhibit 55. Do you recognize that?
A. Yes. This is the petition that he would have filed with the Tax Court.
Q. And how do you recognize that?
A. His name is at the top left-hand corner in the caption of the case, and on the right-hand side it bears the stamp of the U. S. Tax Court showing that the petition was filed and the date that it was filed.
Q. And this was filed August 15th, 2017, as reflected on that stamp; correct?
A. That's correct.

Q. Now, moving ahead from August 2017 to September of 2017 and specifically September 19th in 2017, did you call Mr. Pate?
A. I did call Mr. Pate. I believe -- I believe September 19th was the day I filed a motion to dismiss his case for lack of jurisdiction, and the Tax Court rules require a party to call the opposing party before they can file a motion. So before I was allowed to file that motion, I needed to call Mr. Pate, let him know that I was going to be filing a motion and explained the motion to him and then asked him whether he had an objection or not, because in my motion I would need to reference whether he objected to it. If he -- generally if taxpayers don't object to the motions we file, the Court will just automatically grant them. And if a taxpayer does object to the motion, then the Tax Court will give them an amount of time, normally 30 days or so, to file a response, and they can file a written response saying what it is that they object to in the motion and why they disagree with it.
Q. Okay. And, specifically, that phone call, did you actually speak with Mr. Pate twice that day?
A. Yes. I think -- I believe I called him the day before and left him a voicemail stating that I needed to talk to him about his case and about the motion I was going to file. And then he called me back the next day to -- to find out about the motion. And I explained to him that he -- I could not find something that would give the Tax Court jurisdiction in his case.

The Tax Court is granted jurisdiction only in very limited cases. Congress basically requires that they have received a certain kind of notice from the IRS, and if they receive a notice from the IRS, then they can dispute that in the Tax Court. But it's only very specific notices. And I couldn't find any record in his account that he had been issued one of those notices. So I explained the procedures to him and asked him if he had received either what was called a Notice of Deficiency, which was where the IRS would say that he owed a certain amount of money of taxes, or if he had received a Notice of Determination where the IRS might have made some other determination that he was, for example, not entitled to innocent spouse relief if he had requested it, or that he was not entitled to relief from certain collection actions. And I explained that to him, and he did not have any such notice. So I told him I would be filing the motion.

Q. Okay. And so you alerted him that you were going to be filing a motion and seeing if he was opposed on that first call; correct?

A. That's correct.

Q. And then did he call you back?

A. Yes. Probably about 20 or 30 minutes after we spoke he called back and had questions and said that he just wanted to, I guess, check on the basic status of his case; and he was wondering why the IRS hadn't processed his returns and when he

would be receiving his money.
Q. And when he asked you and wanted to know where his refunds were, did you explain to him anything?
A. Yes. So I told him that it looked like, based on his transcripts, that the IRS had received his return and had processed it in some manner, but that he would not be receiving any type of a refund. And when he asked why this was the case, I explained to him that -- I believe the refund he was asking for was in the range of several million dollars. So I explained to him that for a refund of several million dollars, that money would have generally needed to have been paid to the IRS in some form first for him to be entitled to a refund back if he did not owe it, and that there was no evidence that any money or like a cash equivalent such as a check had been mailed to the IRS with either a voluntary payment on the account or some kind of tax withholdings on the account that would entitle him to a refund of that amount.
Q. So he was asking for multi-million-dollar refunds, and you're explaining to him that there was no money paid to the IRS. Correct?
A. That's correct.
Q. Did you also mention to Mr. Pate the issue about the 1099-OIDs?
A. Yes. We discussed the 1099-OIDs, and I informed him that the courts had found those arguments to be frivolous for many

years. There are multiple cases out there and multiple releases that the IRS had issued, probably some as old as a decade before. So that was well-established law and well-established authority that was out there that these 1099-OID refunds were not a valid thing.
Q. And when you had called him, did you identify yourself as counsel with the IRS?
A. Yes, I did.
Q. And so he's hearing now from an attorney with the IRS an explanation of why he's not getting his refunds; correct?
A. That's correct.
Q. And that those 1099s have been held to be frivolous?
A. Yes. I explained that to him.
Q. And this was back in September of 2017; right?
A. Yes, that's right.
Q. What was Mr. Pate's response when you explained to him the frivolity of what he was doing?
A. He hung up on me.
Q. Now, after you notified him that you were going to file that motion to dismiss and I guess he indicated that he was opposed to that; correct?
A. Yes. He did tell me he was opposed to the motion, but I did file it; and I noted with the Court his opposition, and the Court did give him a chance to respond to that.
Q. If we could pull up Exhibit 56. Do you recognize that?

A. Yes. This is the motion to dismiss for lack of jurisdiction that I filed in the case.
Q. And looking at the middle of that page, the paragraph that is numbered 1, if you could read that paragraph.
A. Yes. "The petition in this case raises frivolous arguments with regards to Mr. Pate's 2015 and 2016 tax years."
Q. And after you described his arguments to Mr. Pate both over the phone as frivolous and then in writing as frivolous, did Mr. Pate respond to this motion?
A. He did file a response to this motion with, I believe, more frivolous arguments.
Q. And did the Tax Court rule on your motion in October of 2017?
A. The Tax Court did grant the motion to dismiss the case and did dismiss the case.
Q. And Mr. Pate's case was dismissed from Tax Court; correct?
A. That's correct.
MR. HOWARD: I have no further questions for this witness, Your Honor.
THE COURT: Cross-examination.
MR. MAINES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MAINES:
Q. Good morning, Ms. Taylor. My name is J. D. Maines. Good afternoon. Can't tell what time it is sitting in here.

THE COURT: No windows in this courtroom.

BY MR. MAINES:

Q. Ms. Taylor, so you had a discussion with Mr. Pate about the frivolousness of his arguments about the 1099-OID; correct?

A. That's correct.

Q. And Mr. Pate, did he respond angrily or did he yell at you on the phone when you were having this discussion with him?

A. He -- his response earlier was he told me I have to do what I have to do. And then -- and then he hung up on me at the end of the conversation.

Q. And this -- the Tax Court is a federal court proceeding; correct?

A. That's correct.

Q. And after you explained the basis of this motion and went through the legal requirements for an appeal -- or not appeal, but for a case to be heard in Tax Court, Mr. Pate never filed a lien or anything after the Tax Court dismissed his case, did he?

A. Are you asking if he filed a lien against me? I'm aware that he filed one against someone else that I became aware of after the Tax Court dismissed his case, but none were filed against me.

Q. Okay. He never filed a lien with the Tax Court; correct? He filed -- let me just go back in time, and I'll try to move along in the case timeline that'll help you keep track of where I'm going with my questions. September 19th, 2017, that was the

date that you filed the motion to dismiss the Tax Court petition that Mr. Pate had filed; correct?

A. Correct.

Q. All right. And after that, within the context of that Tax Court case, Mr. Pate filed a frivolous objection in response to that; correct?

A. He did. He filed several --

Q. Right.

A. -- responses with the Court. Not only to my motion, but also to some of the Court's orders that he ratify his petition.

Q. Okay. And you as an attorney prior to that motion explained to him the basis of the motion; correct?

A. Yes, I did.

Q. And he obviously disagreed with that?

A. Yes, he did.

Q. And you noted that disagreement in your motion?

A. Yes. That's correct.

Q. And Mr. Pate never filed any liens in that case, never filed anything styled as a lien in that Tax Court case; correct?

A. I don't remember what he attached. I think he attached possibly some UCC statements. But I'm not sure what was attached. Nothing -- not a valid lien. He did not file anything that would have been construed as a valid lien in that case.

Q. You don't recall any -- do you recall whether or not he

ever filed a -- well, anything captioned as a lien in that Tax Court case?
A. I do not recall exactly, because his attachments were long, and he filed several.
MR. MAINES: That's all the questions I have. Thank you.
THE COURT: Redirect?
MR. HOWARD: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. HOWARD:
Q. Ma'am, by the time you got involved in this case, his tax returns had already been determined frivolous by the IRS; correct?
A. Yes. That's what it appeared based on the transcripts that I saw.
Q. And they had rejected issuing him any money for his refunds; correct?
A. That's correct. I think they had also filed penalties, civil penalties against him for frivolous arguments.
Q. They had notified him that his tax returns were frivolous?
A. That's correct. Somewhat of what was attached to his petition were, in fact, the notices he received for making frivolous arguments on his tax returns.
Q. And then in September of 2017, after that's happened, September of 2017, you tell him over the phone and explain to

him that it's frivolous; correct?
A. That's correct.
Q. And then you filed the motion, again explaining that his position is frivolous?
A. Yes.
Q. That's September of 2017. And after his case was dismissed in Tax Court, did he alert you in writing that he was going to go file a federal civil case?
A. I believe he called me and told me he was going to file a case in the district court, and then I became aware later that he did, in fact, file a district court case.
Q. And if we could look at Exhibit 1-1, this federal civil complaint was filed in October of 2017; correct?
A. That's correct.
Q. After all of the times that he's been advised that his position is frivolous.
A. Yes. The date appears to be correct after I had advised him of that.
Q. Including by you, an attorney with the IRS, who's worked with the IRS for a lengthy period of time; correct?
A. Yes.
Q. October of 2017, defense counsel also asked you about the date of certain liens. We'll look at Exhibit 24. If you could pull that up. This is May of 2018; correct?
A. That's correct.

Q. So we're talking several months after you had spoken with him and explained that it's frivolous.
A. Yes. I mean almost a year later.
Q. And after the IRS had notified him in multiple letters that his position was frivolous; correct?
A. Correct.
Q. And after the Tax Court had dismissed his case; correct?
A. Yes. That's correct.
Q. He's now at this point filing liens. And if we could pull up Exhibit 25. This is also May 2018; correct?
A. Yes, that's correct.
Q. Exhibit 26. May in 2018; correct?
A. Correct.
Q. Exhibit 27. June of 2018 he's filing liens against people; correct?
A. Correct.
Q. Exhibit 28. June of 2018; correct?
A. Correct.
Q. After all of these people with the IRS and as you, an attorney, and as the Tax Court, everybody is telling him these are frivolous positions and then he's filing these liens; correct?
A. That's correct.
MR. HOWARD: I have no further questions for this witness, Your Honor.

THE COURT: Any recross, Mr. Maines?

MR. MAINES: Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. MAINES:

Q. Ms. Taylor, you actually took the time to call Mr. Pate to speak to him on the phone about his petition to the Tax Court; correct?

A. That's correct.

Q. You spoke to him professionally and cordially, I'm sure.

A. Yes.

Q. That's part of our job as attorneys, to speak to people that way; correct?

A. That is, yes.

Q. Even when we disagree; right?

A. Yes. That's correct.

Q. And Mr. Pate never filed a lien against you; correct?

A. No. He never filed a lien against me.

Q. The Tax Court judge, Mr. Pate never filed anything against him, did he?

A. I'm not aware of any liens against the Tax Court judge.

Q. And, again, you spoke to him professionally and cordially to outline your position and what you were doing; correct?

A. That's correct.

MR. MAINES: No other questions.

THE COURT: Can this witness be excused?

MR. HOWARD: Yes, Your Honor.

THE COURT: Thank you, ma'am. You may step down. You're excused.

MR. HOWARD: Your Honor, in looking at the time, this may be a good time to break for the day. Certainly defer to the Court.

THE COURT: All right. Let's do this. Members of the Jury, let me have you -- we're going to break for the day in a moment, but I just want to get a lineup on what we're looking like for tomorrow so that I can tell you what time we anticipate convening tomorrow morning. So I'm not going to let you go home just yet.

So go ahead back to the jury room, if you would; and then we're going to pull you back out, and I'm going to give us a schedule for tomorrow. Okay?

THE CSO: All rise for the jury.

(Jury out)

THE COURT: Mr. Howard, what are you looking like witness-like for the morning?

MR. HOWARD: Your Honor, I expect there to be only two witnesses, one of which will be very short. The other one also will be relatively short in terms. Neither of them are going to be over an hour long. So I expect we will rest certainly before lunch tomorrow.

THE COURT: Okay. And I'll have the jury get here at

9:15 in the morning. I'm going to have them get here at 9 and then we'll likely go on the record at 9:15.

What I plan to do with you all after I send them home is to disseminate to you copies of the jury charges that we've drafted up. It may take a moment for us to get those printed up, so it may be something that we give to you after we go off the record, but then tomorrow morning, before the jury is -- obviously before the jury comes out I want to go over those jury charges with you, with both of you, so that you have this evening to look over our draft. It'll be very clear that it's still in draft form, but it's basically our compilation of what you've given us thus far. So look over that this evening, and then tomorrow morning we'll go over that.

You all have reached a large amount of agreement on most everything. But at the same time I want to give us time to do that, and, if we need to, to discuss with Mr. Pate his ability to be present and his opportunity to be present. So I'm going to have you all be here at 8:15 in the morning. Okay? Does that give us enough time from everybody's perspective to get everything done that we need to get done?

MR. HOWARD: Yes, Your Honor.

MR. MAINES: Yes, Judge.

THE COURT: So just to recap, I'm going to have you all at 8:15, but I'm going to have the jury here at 9, proposing that we go on the record at 9:15 so that that gives them a

little more time to find some parking and perhaps a little bit of breakfast before we convene in the morning. Okay? All right? Anything else that we need to address before I dismiss the jury?

MR. HOWARD: I don't think so, Your Honor. To the extent there's any -- because I do expect us to get to closing tomorrow, depending on defendant's case, if any. Will there be an opportunity for us to try out, to the extent we have PowerPoint or multimedia for closing?

THE COURT: Do you have it ready today? You need to do it in the morning?

MR. HOWARD: We could do it in the morning.

THE COURT: We're here pretty -- I'm here pretty early; Ms. Hammock is here really early in the morning. So if you can work out with the court staff as to what time the courthouse will be open and when they're here, I'm sure they'll work with you on that and you'll be able to run through it in the morning. Okay?

MR. HOWARD: We appreciate the Court staff's willingness to do that.

THE COURT: Okay. Mr. Maines, looking towards tomorrow -- of course, you don't have to show any of your cards you don't want to to the government, but I know you had one witness on your witness list, and we'll just see how it comes in. But how much time do you expect, if that witness is called,

how much time to take with that witness?

MR. MAINES: I would say for direct, 10, 15 minutes, at most.

THE COURT: Okay.

MR. MAINES: Cross-examination, I couldn't say. I doubt it would be much more than the time I spend on direct.

THE COURT: The other thing that I'll address with you all first thing in the morning, then, is how much time you need for close, because we'll want to go ahead and have that timed out as well, and we'll need to think about -- if I know how much time you need for your close, then I can think about whether we're going to do that, everything before lunch or after lunch. I just need to get some approximations from you. Okay?

MR. HOWARD: And I think we can have that now. We can provide the time.

THE COURT: Okay. Go ahead and tell me.

MR. HOWARD: I think from the government 60 minutes.

THE COURT: Okay.

MR. HOWARD: In total.

THE COURT: And that's for your opening and your rebuttal; is that right?

MR. HOWARD: Correct.

THE COURT: Okay. Mr. Maines.

MR. MAINES: Your Honor, I don't think I'll need any more than that.

THE COURT: Okay.

MR. MAINES: I would be surprised if I went more than 30. Very surprised.

THE COURT: Okay. All right. All right. I got a good idea of how much time you need. But we'll still start early enough in the morning that we're not spending too much of the jury's time. Okay? All right.

MR. HOWARD: And then is it closing and then jury instructions? Is that how Your Honor likes to do it?

THE COURT: That's right. Okay.

MR. HOWARD: Okay.

THE COURT: Let's bring the jury in.

(Jury present)

THE COURT: All right, Ladies and Gentlemen. We are about to break for the day. We're going to go back on the record tomorrow morning at 9:15, so if you all can be here at 9:00 in the morning. Of course, if you want to avail yourselves of some of the refreshments and caffeine that we have in the jury room, you may want to be here a little bit before then. But everybody knows your own schedule and your own rhythm at this point to be able to go on the record at 9:15 in the morning. And, again, please be punctual.

I'll give you the instructions. As I told you, you're going to get sick of these, but the reason I continue to repeat them is because they are so critical to your service as a jury

in the case and to your ability to uphold the oath that you've sworn as a juror.

So please do not discuss the case with anybody. Your family members at this point are going to get curious and they're going to ask you, well, tell me a little bit more about that case, tell me what's going on with that case. Just tell them that you can't. Obviously don't discuss the case with each other either.

Don't read, watch, listen to anything that would in any way pertain to this case at all. Okay. Report to me if anybody tries to talk with you about this case or if you hear anything about this case from outside of this courtroom.

Again, when you return, you all have got in a rhythm now, but sit where you're currently seated. Of course, when you first return, you'll come back to the jury room, and then you'll sit where you're currently seated.

Again, with the availability of electronic devices and internet research and electronic communication, the instruction that you not communicate nor research is even more pertinent than ever, because I know how easy it can be to do that. Make certain that you don't. Don't use any devices that you have, the internet. Don't use the computers; don't use any of your social networking opportunities, et cetera, to communicate, research, post, do anything about this case at all. Okay? No independent research, no visiting any of the locations that you

may have heard of during this trial at all.

I'm certain that you'll all follow those instructions, and I thank you for doing so.

We'll see you in the morning. Again, we'll go on the record at 9:15 in the morning. I hope that you all have a good evening.

Let's rise for the jury, please.

THE CSO: All rise for the jury.

(Jury out)

THE COURT: All right. We went over everything, it seems like, that we need to go over. Is there anything else that either side needs to address before we conclude for the evening? Anything from the government's perspective?

MR. HOWARD: No, Your Honor.

MR. MAINES: Nothing from the defense.

THE COURT: Okay. Obviously, Mr. Maines, you have the opportunity to go talk to Mr. Pate. Please take advantage of that opportunity, see if he wants to be updated on the going-on during the trial today. I know you took advantage of that opportunity during the lunch break, and it appears that even at the lunch break he still did not want to participate in the trial. Correct?

MR. MAINES: That's correct, Judge.

THE COURT: And just continue to let him know it's his right to do so. We have done everything we can technology wise

to give him the opportunity to be able to see and to hear everything that's going on in this courtroom, even while he remains in the holding cell. It's up to him as to whether he wants to avail himself of that opportunity. But just continue to remind him of his opportunity to be present. All right.

MR. MAINES: Yes.

THE COURT: Those jury instructions we'll give you, obviously Mrs. Manly and Mrs. Hammock will be able to distribute those to you. They will be draft jury instructions. Look over them in detail tonight because I want to have a pretty extensive discussion about them in the morning. And then what I anticipate is that we'll have probably two discussions about them tomorrow. First will be the general discussion that we all have to begin the day that I outlined before, and then I'll have a final -- from that discussion I'll make my further decisions on what they should look like, and I'll have what I propose to be the final jury instructions. I will give those to you, and, again, each time we'll go through them page by page, and I'll ask you to assert any objections you have, particularly at that last conference. Everybody understand?

MR. HOWARD: Yes, Your Honor.

MR. MAINES: Yes, Your Honor.

THE COURT: Okay. All right. Ms. Manly, anything else that you need me to address? Ms. Hammock, anything else?

THE CLERK: No, sir.

THE COURT: All right. We'll be adjourned.

(Proceedings concluded at 5:14 p.m.)

- - -

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly A. McKee, Registered Diplomate Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 28th day of April, 2020.

Kelly A. McKee

KELLY A. McKEE, CCR, RMR, CCP, RDR

#2731