IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) CASE NO. 1:18-CR-45
) DAY 3
TIMOTHY JERMAINE PATE, )
)
Defendant. )
----------------------------

TRANSCRIPT OF JURY TRIAL, VOL. III
TESTIMONY
CLOSING ARGUMENTS
FINAL JURY INSTRUCTIONS
VERDICT
**BEFORE THE HONORABLE R. STAN BAKER**
United States Courthouse
600 James Brown Boulevard
Augusta, GA
October 17, 2019

COURT REPORTER: Kelly A. McKee, CCR, RMR, CCP, RDR
United States Court Reporter
P. O. Box 8552
Savannah, GA 31412
912-650-4065

(Proceedings reported by mechanical stenography, transcript produced by computer-aided transcription.)

APPEARANCES OF COUNSEL

FOR THE UNITED STATES OF AMERICA:

CHRISTOPHER HOWARD, Esq.
JOSEPH McCOOL, Esq.
U. S. ATTORNEY'S OFFICE - SAVANNAH
22 Barnard Street, Suite 300
P. O. Box 8970
Savannah, GA 31401
912-652-4422
Email: christopher.howard@usdoj.gov

FOR THE DEFENDANT:

JUSTIN D. MAINES, Esq.
THE NYE LAW GROUP
2008 Whitaker Street
Savannah, GA 31401
912-358-8485
Email: Jd@thenyelawgroup.com

# I N D E X


| | PAGE |
|---|---|
| GOVERNMENT'S WITNESSES | |
| JACOB JOSEPH LEW | |
| Direct Examination by Mr. Howard | 28 |
| Cross-Examination by Mr. Maines | 39 |
| WALLACE TAYLOR | |
| Direct Examination by Mr. Howard | 42 |
| Cross-Examination by Mr. Maines | 56 |
| Redirect Examination by Mr. Howard | 61 |
| Recross-Examination by Mr. Maines | 62 |
| Frthr. Redirect Examination by Mr. Howard | 64 |
| GOVERNMENT RESTS | 65 |
| DEFENSE RESTS | 88 |
| CLOSING ARGUMENTS | |
| By Mr. McCool for the Government | 89 |
| By Mr. Maines for the Defense | 111 |
| By Mr. Howard for the Government | 121 |
| Certificate of Reporter | 173 |

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
| --- | --- | --- | --- |
| No. 1-37 | Affidavit of Lien and Notification of Claim against Jacob Joseph Lew | 32 | Vol. I 136 |
| No. 1-39 | UCC Financing Statement | 33 | 136 |
| No. 19 | Photograph of Timothy Pate | 47 | 136 |
| No. 59 | A Photograph of the three identification cards | 46 | 136 |
| No. 60 | Identification Cards | 45 | 136 |
| No. 61 | Photograph of Antionette Pate | 47 | 136 |
| No. 62 | FBI Consent to Search | 47 | 136 |
| No. 64 | CD with inmate phone calls | 49 | 136 |
| No. 65 | Transcript of phone call from T. J.P. to Thomas Jones | 50 | 136 |
| No. 66-1 | CD of inmate phone calls | 50 | 136 |
| No. 66-2 | CD of inmate phone calls | 50 | 136 |
| No. 67 | Transcript of phone call from T. J.P. to Antionette | 50 | 136 |
| No. 82 | Email between Timothy Pate and Ayana Ali, also known as Antionette Pate, from January 6, 2019 | 54 | 55 |

**P R O C E E D I N G S**

**(8:33 a.m.)**

(In USMS Holding Cell)

THE COURT: We're on the record in *United States of America* --

THE DEFENDANT: I have no business with the Court.

THE COURT: -- *vs. Timothy Jermaine Pate* --

THE DEFENDANT: I have no business with the Court.

THE COURT: -- which is --

THE DEFENDANT: I have no business with the Court.

THE COURT: -- 1:18-CR-45.

THE DEFENDANT: I have no business with the Court. I accept all charges for value and honor in exchange for value and honor.

THE COURT: We have counsel for the United States, Mr. Howard, present.

THE DEFENDANT: I am not a U. S. Citizen.

THE COURT: We have counsel for Mr. Pate, Mr. Maines, present.

THE DEFENDANT: I accept all charges for value and honor in exchange for value and honor.

THE COURT: We are in the United States Marshal's Service --

THE DEFENDANT: I do not have no business with the Court.

THE COURT: -- holding cell area --

THE DEFENDANT: I do not have no business with the Court.

THE COURT: -- at the United States Courthouse in Augusta, Georgia.

THE DEFENDANT: I accept all charges for value and honor in exchange for value and honor.

THE COURT: Mr. Pate --

THE DEFENDANT: I never consented to a trial.

THE COURT: -- we're beginning your trial again today.

THE DEFENDANT: I never consented to a trial. I never consented to a trial.

THE COURT: You have the right to be present during this trial --

THE DEFENDANT: I never consented to a trial.

THE COURT: You've indicated --

THE DEFENDANT: I have no contract with the Court. I have no contract with the Court.

THE COURT: -- throughout the trial and again this morning that you don't want to be present --

THE DEFENDANT: I have no contract with the Court.

THE COURT: We have clothes for you to wear for your trial --

THE DEFENDANT: I have no contract with the Court. I have no contract with the Court.

THE COURT: We have the ability for you, obviously, to be present during your trial --

THE DEFENDANT: I have no contract with the Court. I have no contract with the Court.

THE COURT: If you want to be present during your trial --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- you need to tell me right now --

THE DEFENDANT: I have no contract with the Court. And, sir, you know that my signature was so forged by Benjamin Cheesbro. I have no contract with the Court -- I have no agreement -- (unintelligible).

THE COURT: Mr. Pate, if you want to be present for your trial, you need to tell me right now.

THE DEFENDANT: You said I have an agreement with the Court, and I don't. You a liar.

THE COURT: Okay. It appears that --

THE DEFENDANT: You a liar. You a liar.

THE COURT: -- Mr. Pate does not --

THE DEFENDANT: You a liar. You a liar saying I had an agreement with the Court.

THE COURT: -- want to be present during his trial --

THE DEFENDANT: You forged my signature, sir.

THE COURT: And everybody has made --

THE DEFENDANT: You forged my signature. Let the record

show that the judge forged my signature.

THE COURT: -- every accommodation they can for him to be present, but he's chosen to absent himself --

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: -- from the courtroom.

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: There are clothes prepared for him, et cetera.

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: Now, Mr. Pate --

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: -- if you change your mind --

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: -- and you want to be in the courtroom --

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: -- during the trial today --

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: -- you need to let your attorney know --

THE DEFENDANT: I accept all charges for value and honor in exchange for value and honor.

THE COURT: -- and you need to let the United States Marshal Service know.

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: We will continue to give you the opportunity --

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: -- if the technology works --

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: -- which it has been working, for you to be able to see and hear --

THE DEFENDANT: Let the record show that the judge forged my signature. Let the record show that the judge forged my signature.

THE COURT: -- what is going on in the courtroom via the audio and video feed.

THE DEFENDANT: Let the record show that the judge forged my signature. Let the record show that the judge forged my signature.

THE COURT: Mr. Pate ---

THE DEFENDANT: Let the record show that the judge

forged my signature.

THE COURT: -- tell me right now if you want to be present in your trial.

THE DEFENDANT: Let the record show that the judge forged my signature. I have no trial with that court. I never agreed.

THE COURT: Okay. It appears that Mr. Pate does --

THE DEFENDANT: I have no business with the Court. The judge forged my signature.

THE COURT: -- not want to be present during his trial.

Mr. Maines, of course, you'll have the opportunity to speak with him during the trial --

THE DEFENDANT: The judge forged my signature. Let the record show that the judge forged my signature.

THE COURT: He has not wanted to speak with you, but we'll continue to give the opportunity to meet with him during the trial today just as we have. All right.

MR. MAINES: Yes, Your Honor.

THE COURT: Anything further, Counsel, that you need to put on the record?

MR. HOWARD: Nothing from the government.

THE DEFENDANT: Mr. Maines is not my attorney.

MR. MAINES: Nothing from the defense.

THE COURT: All right. We'll be in recess. Thank you.

(Proceedings stood in recess from 8:33 a.m. until 8:38 a.m.)

(Jury out)

THE COURT: Good morning, everyone.

ALL: Good morning, Your Honor.

THE COURT: Just to recap, once again, this morning, we went back into the United States Marshal holding cell and attempted to speak with Mr. Pate to remind him of his right to attend this trial, to be present during every phase of this trial. He has indicated he doesn't want to be in the courtroom, but we wanted to just be certain that he knows that's his right to be in the courtroom.

I will note that as I tried to speak to him, he continued to speak over me.

Madam Court Reporter, when you're preparing the transcript, obviously the Court's questions to Mr. Pate and information given to Mr. Pate should be included. We should also try to include everything we can regarding Mr. Pate's responses, but I think it's going to be a bit difficult to be able to do that, because he was speaking over the Court. So I just want to make the record clear right now, when he's not in here and he's not speaking over us, of what occurred.

He continued to tell me that he doesn't consent to a trial and other things, and so it was very clear that he was definitely responsive, that he could hear what I was telling him, but that he had no intention to attend the trial or to comply with any other directions from the Court. Okay?

Is that a pretty accurate description of what went on back there, Counsel?

MR. HOWARD: Yes, Your Honor.

MR. MAINES: It is, Your Honor.

THE COURT: And obviously the record will reflect that as well. But I just wanted to be certain. And as I said there and I'll reiterate right now, we have set up an audio-video feed back to the United States Marshal's area back there where he will be able to, if he chooses to, hear and listen to -- excuse me -- hear and watch everything that's going on in this courtroom. The Court staff has gone above and beyond to be able to make that accessible to him.

Okay. The next thing I want to take up is the issue about the transcript and audio instruction. This is the transcript and audio instruction T3, which was the explanatory instruction regarding tape-recorded conversation. I raised it yesterday that when this should be given and filling in some of the blanks and making decisions about the bracketed information.

Mr. Howard, where are we on this one?

MR. HOWARD: Your Honor, this is -- there's two transcripts that we do plan to introduce today. And we'll have two witnesses. I expect that we'll do it with our second witness today.

THE COURT: Okay.

MR. HOWARD: And with respect -- just pulling up that

specific T3 instruction now.
THE COURT: Right.
MR. HOWARD: So just give me a minute.
THE COURT: Take your time.
You've got it as well, Mr. Maines?
MR. MAINES: I do, Your Honor. I have pulled up T3.
THE COURT: Okay.
MR. MAINES: And I think that's going to be referring to Exhibit 65 and 67.
THE COURT: Okay.
MR. HOWARD: That's correct, Your Honor.
THE COURT: So let's first talk about this. Is it counsel's request that I give this trial instruction before the audio is played and the transcripts are offered or after?
MR. HOWARD: I think before, and the transcripts have already been offered and admitted.
THE COURT: And admitted. Right.
MR. HOWARD: So what I plan to do is, you know, kind of lay the factual foundation for it and then hand out the transcripts. And so perhaps while those transcripts are being handed out would be the appropriate time to give that instruction.
THE COURT: Okay. So basically when they're tendered. So when they have the transcripts, and I'll wait till that is done, I'll tell them this instruction.

Now, let's read through the instruction together. What it should say is "exhibits" -- instead of "exhibit," "exhibits." What are the exhibits?

MR. HOWARD: 65 and 67.

THE COURT: "Exhibits 65 and 67 have been" -- let me get our subject-verb agreement right there. "Have been identified as typewritten transcripts of the oral conversations heard on the tape recordings received in evidence as Exhibits" --

MR. HOWARD: It's going to be 64 --

THE COURT: Yep.

MR. HOWARD: -- 66-1 and 66-2.

THE COURT: Okay. Do we need the bracketed information, "The transcript also purports to identify the speakers engaged in the conversation"? Do the transcripts do that?

MR. HOWARD: They do, Your Honor.

THE COURT: Okay. So we'll give that information, or give that instruction. And then we'll state, "I've admitted the transcripts for the limited and secondary purpose of helping you follow the contents of the conversations."

MR. HOWARD: I think we would request to remove the "secondary purpose," because I think that ties in to -- you know, the pattern instruction talks about the translation from Spanish into English. So I think --

THE COURT: Mr. Maines, what's your take on that?

MR. MAINES: I think he's right. I think that is --

THE COURT: Okay.

MR. MAINES: I think that does pertain to a different language translation, and I don't think it's applicable in this case.

THE COURT: So basically just saying, "The limited purpose" --

MR. HOWARD: Yes.

THE COURT: -- "of helping you follow the content of the conversation"?

MR. HOWARD: Yes.

MR. MAINES: Right. I think that would be more helpful to the jury. I think it would be confusing if that --

THE COURT: Okay. "I've admitted the transcripts for the limited purpose of helping you follow the content of the conversations as you listen to the tape recording and also to help you identify the speakers." Is that the way you all want it?

MR. HOWARD: Yes.

MR. MAINES: Yes, Judge.

THE COURT: Okay. And then, "but you are specifically instructed that whether the transcripts correctly reflect the content of the conversations or the identity of the speakers is entirely for you to decide based on your evaluation" -- what about that next bracketed? Do we need that?

MR. HOWARD: No. It's the government's position that

that's not needed.

THE COURT: Do you agree, Mr. Maines?

MR. MAINES: I do.

THE COURT: So, instead, "based on your own examination of the transcript in relation to hearing the tape recordings themselves as the primary evidence of their own contents." Is that the way you all want it to read?

MR. HOWARD: Yes.

MR. MAINES: Yes, Your Honor.

THE COURT: Or it should be "based on your own examination of the transcripts in relation to hearing the tape recordings."

"If you determine that the transcripts" -- I guess we shouldn't say the "transcripts are" -- yeah, I guess that's right. Should this be how it reads? "If you determine that the transcripts are in any respect incorrect or unreliable, you should disregard them to that extent"?

MR. HOWARD: That's acceptable to the government.

MR. MAINES: That's acceptable to the defense. I think that reads correctly, Judge.

THE COURT: All right. So just to be clear, this is what I'm going to tell them after you tender the first transcript to them.

"Exhibits 65 and 67 have been identified as typewritten transcripts of the oral conversations heard on the tape

recordings received into evidence as Exhibits 64, 66-1 and 66-2. The transcripts also purport to identify the speakers engaged in the conversations. I've admitted the transcripts for the limited purpose of helping you follow the content of the conversations as you listen to the tape recordings and also to help you identify the speakers, but you are specifically instructed that whether the transcripts correctly reflect the content of the conversations or the identity of the speakers is entirely for you to decide based on your own examination of the transcripts in relation to hearing the tape recordings themselves as the primary evidence of their own contents. If you determine that the transcripts are in any respect incorrect or unreliable, you should disregard them to that extent." Is that acceptable to everyone?

MR. HOWARD: Yes, Your Honor.

MR. MAINES: Yes, Your Honor.

THE COURT: All right. Now, let's move on to the jury instructions. Yesterday we provided you with a draft, which is a compilation of the instructions that you all have given, and it's a 10-page document. Does everybody have that? Also has some comments on it.

MR. HOWARD: Yes, Your Honor.

MR. MAINES: Yes, Your Honor.

THE COURT: All right. What I'm going to do is, first, specifically just go through it each page, in other words,

starting with Page 1 and then going all the way to Page 10, and you tell me if there's anything you object to on that page. And then we'll have a more general conversation if there's something that's omitted from these pages that you want included. Okay?

The idea being that then after that conversation -- after this discussion this morning, we'll compile the Court's final instructions. I'll give you a draft of that, and then I'll ask you to state any objections you have at that time. Okay?

So obviously speak now to any objections you have, but then I'm going to ask you to restate any objections as well later. Understood?

MR. HOWARD: Understood.

MR. MAINES: Understood, Judge.

THE COURT: Okay. Any objections to anything on Page 1 of this instruction from the government or from the defense?

MR. HOWARD: No, Your Honor. The Court will later -- will have a separate advisement with the defendant about his right to testify later on?

THE COURT: Yes. And we'll have to do that in lockup, but here's the way I handle testifying. I don't get too involved in that, because that's a decision for the defendant to make with his attorney typically.

You know, the Court -- the case law has been pretty specific that the Court shouldn't put the finger on the scales

of that decision one way or the other, but here where we have a defendant who hasn't had great communication, by his own fault, by the defendant's own -- I shouldn't say own fault -- the defendant's own decision, hasn't had much communication, I do think it's imperative for me to go back there and remind him that he has the opportunity to testify. Okay? Everybody understand?

MR. HOWARD: Yes.

MR. MAINES: Yes, Judge.

THE COURT: So if he does not testify, then obviously we'll include that bracketed information. Okay? All right. And that goes on to the top of Page 2.

Anything about Page 2 that either side objects to at all?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor.

THE COURT: How about Page 3? Any objection to anything in Page 3?

MR. HOWARD: Your Honor, I've spoken with defense counsel about the request for B61. We're not opposed to including that instruction.

THE COURT: All right.

MR. MAINES: No objection.

THE COURT: Okay. So nothing about Page 3.

How about Page 4? Anything objectionable about Page 4

from either side?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor.

THE COURT: How about Page 5?

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

THE COURT: Page 6, tell me if you have any objection to anything on there, and then we'll address the comment that we have regarding different definitions of "material." Other than the question about material, any objection to anything on Page 6?

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

THE COURT: Okay. What about this issue about "material"? This is a slightly different definition of "material" as to the prior offense, and maybe that's intentional. You all drafted these, and maybe that's the way you want to leave it. But I just want to be certain that there's not any confusion about "material" there.

Mr. Howard, what's the thought on that from the government's perspective?

MR. HOWARD: Your Honor, I'm inclined to have consistency with respect to the definitions of terms. I think that the second definition or the definition that's in Page 6 is more thorough and I think more accurate. I guess the proposal I

would have is make it consistent with the definition of "material" in Page 5 so that perhaps we could just either take the definition of "material" on Page 6 and use it in Page 5 as well?

THE COURT: Okay.

MR. HOWARD: Since it is more complete?

THE COURT: What do you think, Mr. Maines? Should we take the definition of "material" that's on Page 6 and include that at Page 5?

MR. MAINES: Yes, Judge. That would be the preference of the defense, because I think that is -- Page 6's definition of "material" does seem to be more exhaustive.

THE COURT: Okay. All right. That's what we'll do. But we'll give it twice because, you understand, we're going to leave Count 1 through 10, 16 through 20, those small headings, we're going to leave those in there so that the jury members know that we're talking about those different counts. Everybody understand that?

MR. MAINES: Yes, Your Honor.

MR. HOWARD: Will those be the only headings?

THE COURT: That's right.

MR. HOWARD: Okay.

THE COURT: We've had issues in the past where if you don't include them, then I go on and talk about something else and the jury members are thinking, okay, well, is the definition

of something over here, does that apply to the other count? That way they can keep the counts. Everybody agree with that?

MR. HOWARD: Yes, Your Honor.

MR. MAINES: Yes, Your Honor.

THE COURT: Okay. All right. So that's Page 6. We'll change "material." Page 7, any objection to anything on Page 7?

MR. HOWARD: Your Honor, the only thing that the government would request -- and, again, we're okay with the good-faith instruction being applied to the bankruptcy fraud charges. I think it would be helpful to make it more explicit, though, that when you say that Counts 11 through 15 require proof of an intent to defraud, to make it explicit that good-faith defense is not available for the remaining 16 counts.

So I think you could say, good faith is a complete defense to a charge that requires intent to defraud. Counts 11 through 15 require proof of intent to defraud. The remaining counts, however, do not require intent to defraud. You should -- therefore, good faith is not a complete defense to those charges, and then continues with the remaining instruction, because it's omitting reference to the remaining counts, sort of leaving it -- it requires an inferential leap that I just want to make it as kind of direct and easy to understand as possible --

THE COURT: Okay.

MR. HOWARD: -- that it does apply to some, doesn't

apply to others.

THE COURT: Okay. Mr. Maines, what's your response to that?

MR. MAINES: Well, I guess, first, I would state that the Eleventh Circuit decision was wrongly decided as to good faith applied to 1521 offense, and I would like to preserve that objection.

THE COURT: So as you have throughout this case, you request a good-faith defense as to not just Counts 11 and 15, but Counts 1 through 10 and 16 through 21; correct?

MR. MAINES: That is correct, Judge.

THE COURT: And I have ruled -- and I am ruling right now -- that I will not give the good faith -- I'm going to give you a ruling on that.

I will not give the good-faith defense charge as to those counts. First, *United States v. Williamson*, which is a Tenth Circuit case, 646 F.3d 987, for the reasons stated by the Tenth Circuit there, I think the good-faith defense is not applicable to those charges; and the Eleventh Circuit, albeit in an unpublished opinion, nonetheless, has cited that case approvingly and the Court -- I agree with the reasoning of the Tenth Circuit there.

Secondly, the good-faith defense here speaks about intent to defraud and fraudulent intent, and it's a definition of intent to defraud, and intent to defraud is not an element of

Counts 1 through 10 or 16 through 21. Okay?

So, Mr. Maines, you've preserved your objection throughout it. I understand it. I know you disagree with the law on that, but that's the ruling there. Okay?

MR. MAINES: Thank you, Judge.

THE COURT: Moving on from that, if -- you know, I am going to give you a good-faith defense instruction as to Counts 11 through 15. Mr. Howard requests that it be explicit that the remaining counts do not require intent to defraud, and, therefore, that's not a defense. You heard his proposal. What's your response to that?

MR. MAINES: Your Honor, I think there's a more narrow, streamline approach that preserves that defense for the false bankruptcy petition, or the involuntary bankruptcy petition. And that is the -- the Court can simply say that the -- this good-faith defense only applies to Counts 11 through 15.

So on the line here it says, Here, Counts 11 through 15, which charges defendant, the Court can simply say good faith is a complete defense only to Charges 11 through 15. So, Here, only as to Counts 11 through 15, which charge defendant with violations of Title 18 United States Code Section 152, Paragraph 3, good faith is only a complete defense to that charge. As opposed to going through -- specifically saying does not apply to these other counts, the Court can simply say, this defense only applies to Counts 11 through 15.

THE COURT: Mr. Howard, what do you think about that?

MR. HOWARD: I think that's better than my recommendation, Your Honor.

THE COURT: Okay. Obviously, Mr. Maines, you're making that recommendation while still preserving your argument that you would -- what you would like for me to instruct them is that it's 1 through 10 and 16 through 20, but you're saying, given my ruling, that's a better way to do it.

MR. MAINES: Yes, Judge.

THE COURT: Okay. I understand your argument. All right. We'll look at that and we'll craft the language and then we'll get it to you. All right. Anything else on Page 7?

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

THE COURT: All right. Anything on Page 8?

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

THE COURT: Okay. How about Page 9? The character evidence at the top.

MR. HOWARD: Right. We would object to that, and obviously there may be character evidence that comes in later, but as of right now, we haven't -- there's no evidentiary support for that instruction.

MR. MAINES: Your Honor, I agree with Mr. Howard that S12 should be withdrawn.

THE COURT: It's just not in the case?

MR. MAINES: It's just not going to be the case in this case.

THE COURT: Okay. All right. The remainder of Page 9, any objection?

MR. HOWARD: None from the government.

MR. MAINES: None from the defense.

THE COURT: And how about Page 10?

MR. HOWARD: None from the government.

MR. MAINES: None from the defense.

THE COURT: Okay. We'll get those drafted up appropriately, and then we'll get you a complete copy. And we'll give you time -- again, this is an important part of the case. I don't want to rush through jury instructions, and that's why we've been so deliberate about it all along.

All right. Anything else we need to address before we bring the jury in?

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

THE COURT: All right. We're going to bring them in at 9:15 because that's when I told them we'd bring them in, and some of them have not had the opportunity to get into the jury room yet, get their morning coffee and snack and then come out. So we'll be in recess till 9:15, and then we'll bring the jury in at 9:15. Okay?

MR. MAINES: Yes, Your Honor.

(Proceedings stood in recess from 9:00 a.m. until 9:27 a.m.)

(Jury out)

THE COURT: Anything we need to address before we bring in the jury, Counsel?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor.

THE COURT: All right. Let's bring in the jury.

(Jury present)

THE COURT: Good morning, Ladies and Gentlemen. I trust that everybody had a good evening. I'm certain that everybody followed the Court's instructions, recess instructions that I gave you yesterday evening and I've given you throughout the case and everybody woke up this morning to an actual crisp, cool day. It almost felt like fall outside. With that, we're going to get right back into it.

Mr. Howard, you can call your next witness.

MR. HOWARD: Thank you, Your Honor. The government calls Jacob Lew.

THE CLERK: Please raise your right hand.

JACOB JOSEPH LEW, being first duly sworn, testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. You can have a seat, please. If you will, sir, please state your full name for the record.

THE WITNESS: My name is Jacob Lew.

THE CLERK: Spell your last name.

THE WITNESS: L-E-W.

THE CLERK: Thank you.

MR. HOWARD: Your Honor, may I proceed?

THE COURT: You may.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. Mr. Lew, what's your middle name?

A. Joseph.

Q. And in what state do you live?

A. New York.

Q. Do you work in New York as well?

A. Yes, I do.

Q. How are you currently employed?

A. I am currently working in finance at a private equity firm, and I teach at Columbia University School of International Public Affairs.

Q. And what is your position at that private equity firm?

A. I'm a partner.

Q. And what type of work do you do at that private equity firm?

A. I work on investments in family-owned, mostly, businesses that we invest in. I work with our investors. I travel around the world because we have investors in many countries who have

pension funds and the like.
Q. And you mentioned you're also a visiting professor at Columbia University as well?
A. I am.
Q. And what do you teach?
A. I teach a course in economic policy making for Master's students.
Q. Now, before joining the private equity firm and also Columbia University as a professor, what job did you hold?
A. My immediate prior job was the Secretary of the Treasury for four years.
Q. And under whom did you serve?
A. I served under President Obama.
Q. And what years did you serve as our country's Treasury Secretary?
A. I was confirmed by the Senate in, I believe, February 2013, and I served until the end of the administration on January 20th, 2017.
Q. As part of being the Treasurer of the Secretary (sic) department, does your signature appear on United States Currency?
A. Yes, it does.
Q. Before your service as a Treasury Secretary, did you serve in various other positions in our federal government?
A. Yes. I served for 25 years in public service. I served

in the cabinet of two Presidents, a total of four times. I was the Director of the Office of Management and Budget in the Clinton Administration. I was, again, the Director of Office Management and Budget in the Obama Administration. I was then the White House Chief of Staff, and ultimately I was the Secretary of the Treasury.
Q. Did you also work in the State Department as well for a time?
A. Yes. I was Deputy Secretary of State for the first year, year and a half of the Obama Administration.
Q. And you mentioned you worked in several presidential administrations, including a cabinet-level official?
A. Correct.
Q. Can you talk to the jury a little bit about the different bureaus and offices that make up the Treasury Department?
A. Treasury is a large agency. It oversees the tax system through the Internal Revenue Service. But it's also the principal economic agency. It serves the Executive Branch with responsibilities that range from working with foreign countries on trade and economic policy to representing the United States in international forums like the International Monetary Fund, the G7 and the G20. You're responsible for overseeing the regulation of the regulatory structure that supervises the financial system. You chair the Financial Stability Oversight Council.

I'm leaving out a lot, but that gives a sense of the scope of the task. The Internal Revenue Service is a somewhat unique responsibility where the responsibility you have as Secretary of the Treasury is really over policy and not so much over the day-to-day administration of tax cases. It would be very unusual for a Secretary of the Treasury to have any knowledge about specific tax cases because it's considered to be more of an independent function of the IRS.

Q. And there's somewhat of a firewall in place; correct?

A. There really is a firewall. There are very strict legal restrictions on the sharing of personal tax information, even between the IRS and Treasury and Congress, certainly with the public. And I was never engaged on individual tax matters.

Q. Approximately how many employees served at the Treasury Department while you oversaw that administration?

A. My recollection may be a little off, but I think it was around 90,000, and the vast majority of the employees are in the IRS. The policy offices are in the single-digit thousands. The IRS is probably 70-plus thousand.

Q. And as the Treasury Secretary, you were at the top of that department that included the IRS; correct?

A. Correct.

Q. Did you know Commissioner Koskinen?

A. I did know Commissioner Koskinen, and I actually have known Commissioner Koskinen for quite a long time. In the

Clinton Administration when I was first Deputy Director, then Director, he was the other Deputy Director. I was the Deputy for budget; he was the Deputy for management, and then I became the head of the agency. You know, I worked very closely with him then. I stayed in touch with him over the years.

And when I was Secretary of the Treasury, there were some problems in the IRS, and there needed to be a new commissioner, and I recommended that John Koskinen would be the right person to fix a problem that existed at the time. And I introduced him to President Obama, and President Obama quickly made the judgment that he was the right choice, and he served with great distinction there.

Q. And you mentioned it before, but you were not getting involved in individuals' tax refunds; correct?

A. Correct.

Q. In the course of this case, did you come to learn that an individual had filed liens against you?

A. I came to learn of this case when I got a call from your office, and I had no prior knowledge of this.

Q. If we could pull up Exhibit 1-37. If we could go to Page 2 of that document. Secretary, looking at the screen in front of you, we've displayed Exhibit 1-37, Page 2. Do you recognize your name there?

A. I do.

Q. Have you ever heard of the U. S. M/V JACOB JOSEPH LEW?

A. I didn't know what M/V meant, or U. S. M/V.
Q. Are you aware of any vessel out there that is named the JACOB JOSEPH LEW?
A. Not that I'm aware of. I certainly have never seen one.
Q. If we could pull up Exhibit 1 dash --
A. Is that what it stands for? Is it an actual vehicle?
Q. Motor vessel.
A. A motor vessel.
Q. If we could go to Exhibit 1-39 and go to Page 4 of that document. Looking on the screen in front of you at Exhibit 1-39, Page 4, if you'd review that. And do you recognize your name there?
A. I do.
Q. And your full name written there; correct?
A. Correct.
Q. Do you recognize that address under your name of 15 (sic) Pennsylvania Avenue?
A. It's the Treasury Department.
Q. Have you been there a time or two?
A. A few times, yes.
Q. Staying on that same page, if you'd look above your name, do you see the names Timothy Jermaine Pate and Akenaten Ali?
A. Yes, I do.
Q. Mr. Secretary, do you recognize those names?
A. I only recognize the names because they were brought to my

attention when this matter was brought to my attention by your office.

Q. And before the U. S. Attorney's Office reached out to notify you of your status as a victim, had you ever heard the name Akenaten Ali before?

A. No, I had not.

Q. Had you ever heard the name Timothy Jermaine Pate before?

A. No, I had not.

Q. Had you ever spoken with that person?

A. No, I had not.

Q. Mr. Secretary, how much money do you owe Timothy Jermaine Pate, also known as Akenaten Ali?

A. None.

Q. Have you ever corresponded with him?

A. No, I have not.

Q. Have you ever -- has he ever loaned you any money?

A. No.

Q. Have you done anything at all to suggest that you owe him 15 million dollars?

A. Certainly not.

Q. Now, you mentioned that the U. S. Attorney's Office reached out and contacted you and alerted you that you were a victim in this case. I'd like to talk about the effect that that has had.

In your time in public service, the different

administrations that you served in, the different offices that you served in, has anyone ever filed a lien against you personally?

A. I wasn't aware of liens. I was aware that there were some fraudulent transactions where people pretended to be me, but they were never matters I was brought into while they were pending. I actually learned about them on Google Alerts when I found out that somebody was convicted, and I had somebody then look back and find out what the matter was.

Q. But the act of actually filing a lien against you personally, this isn't something that's happened before; correct?

A. No, it has not.

Q. Has anyone ever tried to put you into bankruptcy against your will?

A. No.

Q. Now, after learning about the liens that were filed against you and after learning about the attempt to put you into bankruptcy against your will, what are some of the steps that you've had to take in response?

A. Well, I became concerned that there might be some impact on my personal background or credit. In the professional work that I do, when investors do due diligence on a firm that they're investing in, there's often, for a state pension fund, questionnaires, that one of the questions is, are you subject to

any legal proceedings, are you subject to any liens. I've had to consult with our firm's attorneys to make sure that I answered those questions correctly, even though this was not something that in my view had any merit to it.

I certainly never want to be in a position where I'm not answering questions like that accurately and honestly. So I've had to on a number of occasions consult with our counsel and figure out how to respond.

You know, I have not been in the position where I've had to, since learning about this, go for any kind of security clearance, but, in fact, I may have to because of a role that I'm undertaking. And it's been on my mind that I'm going to have to answer the question differently than I've ever answered it before when asked have you been subject to a lawsuit or lien.

I'm sure I can work my way through it, but it's something that I now know is just another thing that I'm going to have to manage when these kinds of situations arise.

Q. It's taken time away from your work. Is that fair to say?

A. Yeah. There have been a number of conversations with lawyers. I've had to pull other people at the firm into it, because what I say and represent has implications for the firm's truthfulness and reputation. So I would not do something in an area like this without having it be kind of understood and everyone agreeing it's being addressed in the appropriate manner.

I don't -- I haven't counted how much time has gone into it, but it's not an insignificant number of conversations, you know, like the one I've just described.

Q. And your employer has incurred a legal expense?

A. I haven't inquired about it, but the firm -- outside firm that represents our firm has been answering questions as they arise, yes.

Q. In addition, have you also checked your credit report and monitored your --

A. So I did. I actually subjected myself to the same scrutiny that we would subject an investor to make sure that they did not have anything in their background that would make us not want them as a client, because I wanted to know what somebody would find if they were doing that kind of a screening on me. I was pleasantly surprised that this lien did not show up in that search. But I can't tell you I know why it didn't show up.

Q. And did you learn through the U. S. Attorney's Office and through counsel that those liens had been expunged after being filed?

A. Yes, I did, but I actually did the search before being notified that they'd been expunged. So it may have been that the two crossed.

Q. Excellent. You mentioned the fact of taking time away from your work and your other obligations. You voluntarily

agreed to come down to Augusta, Georgia, from New York; correct?
A. Yes, I did.
Q. And you traveled yesterday?
A. I came in last evening.
Q. Okay. Spent a night away from your family?
A. Yeah. I left my work at 2 in the afternoon, and I'm going to lose all of today.
Q. You weren't subpoenaed or required to come down here; correct?
A. No, I was not.
Q. And did you have a number of meetings, business meetings with investors and other relations that were impacted by this proceeding?
A. I had a number of professional obligations that I had to decline or absent myself from yesterday afternoon and today.
Q. And being in public service for so long, does this have a real effect on a public official's ability and distraction from doing their job?
A. It certainly doesn't help. When you go into public service, you kind of know that you're going to be responsible for the things that you do. You're not really thinking about the things that will be done to you that have no basis in your mind in any facts or things that you've ever had anything to say or do about.

I -- I think there are a lot of reasons that people have

questions about whether they want to subject themselves to the kind of treatment that public officials sometimes get. But things like this aren't helpful.

MR. HOWARD: Thank you. I have no further questions for this witness, Your Honor.

THE COURT: Cross-examination, Mr. Maines.

MR. MAINES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MAINES:

Q. Good morning, Secretary Lew.

A. Good morning.

Q. Secretary Lew, I only have a few brief questions for you. Thank you for coming down. In your testimony you indicated that you performed a credit -- you checked your own credit report; correct?

A. Well, I didn't do it myself. I asked for someone who does those things to do it.

Q. Okay. Do you recall when you asked whoever it was to do that?

A. It was probably six to nine months ago.

Q. And when you indicated you checked your own -- you checked on the status of those liens, how did you go about checking whether those liens were still --

A. Well, it was during a credit search. They didn't show up in a background or credit search. There is an agency that does

that for us when we are doing background checks on potential investors; and, you know, I didn't -- I didn't ask them what process they went through. I figured it was at a high enough standard that it would serve the purpose.

I really just wanted to know whether this was something that was out there in the -- in plain sight and if I ever needed to apply for credit, whether it's something that would be an obstacle. And since I haven't had any need for credit, I had to create a credit -- a search that was what you would have if you were applying for credit.

Q. Okay. Thank you. And you indicated that you, especially during your time in service with the Obama Administration, that you had a Google Alert or some process to alert you about events that involved yourself?

A. Yeah, I just -- I had set it up many, many years ago, and when things show up that their filter picks up that have my name, I just get an alert, and I'll go and check and see if it's something that I knew about or not.

Q. I understand. And you served with great distinction; and you occupied a very high profile, very important office in this country. You would agree with me on that; right?

A. Well, it's -- it's a very high position. It's, you know, right up there in terms of in line for the Presidency if anything unfortunate happens.

Q. And that attention is often the focus of conspiracy

theorists and, you know, bizarre internet trafficking of ideas and ideations; correct?

A. There are a lot of internet sites that target people because of their position, their ethnic identity, their views; and, you know, it's a pretty dark world.

Q. And yourself occupying such a high-profile position, your name would have been -- been very commonly used by conspiracy theorists or other people running bizarre websites?

A. I don't know how frequently, but I certainly -- I certainly saw that it was out there as something that happened from time to time.

MR. MAINES: Thank you, Secretary.

THE COURT: Redirect?

MR. HOWARD: Nothing from the government, Your Honor.

THE COURT: May this witness be excused?

MR. HOWARD: He may.

MR. MAINES: No objection.

THE COURT: Thank you, sir. You're excused.

THE WITNESS: Thank you.

MR. HOWARD: Your Honor, the government calls Wallace Taylor.

THE CLERK: Please raise your right hand.

WALLACE TAYLOR, being first duly sworn, testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. You can have a seat, please. If you will, please state your full name for the record.

THE WITNESS: Wallace Taylor.

THE CLERK: Spell your last name.

THE WITNESS: T-A-Y-L-O-R.

THE CLERK: Thank you.

MR. HOWARD: Your Honor, may I proceed?

THE COURT: You may.

DIRECT EXAMINATION

BY MR. HOWARD:

Q. Mr. Taylor, how are you employed?

A. I am a supervisory special agent with the FBI.

Q. Where do you work?

A. I work in our Crisis Management Unit in Quantico, Virginia.

Q. Are you typically based out of the Augusta, Georgia, region?

A. I am. I'm temporarily assigned to our unit in Quantico.

Q. And what do you do with that unit in Quantico right now?

A. So our Crisis Management Unit has two functions. We provide support to our field officers during a critical incident, such as a mass shooting or a terrorist attack. We deploy out to that field office and provide operation support and kind of investigative guidance. We also help them with additional resources if it's beyond their capabilities of what

they typically have.

Our second mission is special events, which we consider the three that we have coming up are the Super Bowl, Republican National Convention and Democratic National Convention. Again, we go out to the field office that's handling that event, assist them in getting the additional resources they need for that event.

In my instance, I'm the lead for the Democratic National Convention that's going to be held in Milwaukee. So right now we're working with that field office. We'll deploy several hundred FBI personnel. We'll also employ a bunch of headquarters assets to help them and support them during that event.

Q. And before that detail, again, you were assigned in the Augusta, Georgia, region; correct?
A. Yes, that's correct.
Q. And as part of FBI's work, do they investigate crimes against public officials and government employees?
A. We do.
Q. And how long have you been a special agent with FBI?
A. Almost 17 years.
Q. Are you familiar with the case of Timothy Jermaine Pate a/k/a Akenaten Ali?
A. Yes, sir, I am.
Q. Can you talk to the jury about how you got involved in

that case?
A. I think we were initially notified by the U. S. Marshals, the Deputy Marshals that are here in the courthouse. They had been notified by the Clerk of Court's office that some of these filings -- Timothy Pate had filed some documents against some of these government officials.
Q. And in the course of your investigation, did you obtain various documents as well as conduct various interviews in this case?
A. I did.
Q. Did you obtain Mr. Pate's credit report?
A. Yes.
Q. And what did that show?
A. It showed a number of student loan defaults that had been turned over to collections.
Q. And did you participate in the investigation that led to the grand jury's return of an indictment in this case?
A. I did. I was the lead case agent at the time.
Q. And after the grand jury returned an indictment in this case, did you arrest Timothy Jermaine Pate?
A. I did.
Q. And was that arrest conducted pursuant to an arrest warrant?
A. It was, yes, sir.
Q. Do you recall approximately when you arrested Mr. Pate?

A. It was towards the end of August, maybe August 29th.

Q. Where did you find him?

A. Found him in a hotel on the lower end of Broad Street, America's Best. I'm not exactly sure of the name.

Q. Was he alone?

A. No, sir.

Q. Who was with him in that hotel room?

A. His daughter, Antionette Pate.

Q. And this is an adult daughter?

A. Yes, she is.

Q. After you arrested Mr. Pate, did Ms. Antionette Pate consent to a search of that hotel room?

A. She did.

MR. HOWARD: Your Honor, if I could have permission to approach the witness.

THE COURT: You may.

BY MR. HOWARD:

Q. Sir, I've handed you a number of different file folders. We'll go through those. Let's start with Exhibit 60. If you could take a look at the file folder marked as Exhibit 60. Do you recognize what's that?

A. I do. This is a -- three identification cards that we seized from the room that Mr. Pate was living in. The first card, the top card here, is an Augusta State University student I.D. It has the name Timothy J. Pate, and it has a picture of

him on that. This I.D. here is a Georgia Identification Card. Again, it's got Mr. Pate's picture and his name and other identifiers, such as date of birth.
Q. If we could -- and, Special Agent, we have a photograph. We're going to pull up Exhibit 61.
A. Okay.
Q. And we can have you walk the jury through exactly what we're seeing here. I'm sorry. If we could do Exhibit 59. Thank you. Looking at Exhibit 59, is this a photograph of the identifications which you were just discussing?
A. Yes, it is.
Q. So starting at the top left-hand side of the screen, what is that?
A. That is the student I.D. from Augusta State University. And, again, it's got his picture and his name.
Q. And that is an identification issued to students of that university; correct?
A. It is, yes.
Q. Looking at the bottom left-hand part of that screen, what is that?
A. So that's a Georgia Identification Card. Again, it has Mr. Pate's picture, his name and other identifiers, date of birth, those sorts of things.
Q. And then there's also an identification card in the bottom right; correct?

A. Yes.
Q. Where he's identifying as a Moorish American?
A. That's correct.
Q. It is the same individual in all three of those identifications?
A. It is. The picture is the same.
Q. If we could pull up Exhibit 19. Do you recognize that individual?
A. Yes. That's Mr. Timothy Pate.
Q. And that's the picture from his driver's license that we just saw; correct?
A. Yes.
Q. If we could pull up Exhibit 62. Do you recognize that?
A. Yes. That's a FBI Consent to Search form.
Q. And this was signed by Ms. Antionette Pate; correct?
A. Yes, down at the bottom is her signature.
Q. If we could pull up Exhibit 61. Do you recognize that individual?
A. That is Antionette Pate.
Q. Now, after defendant's arrest, where was he taken?
A. He was initially transported by Richmond County Sheriff's Office to the courthouse here. He was briefly held in Marshal's custody here until he was transported to Lincoln County Detention Center.
Q. And does that facility at the Lincoln County Detention

Center, does that facility have telephones for inmates to use?
A. It does.
Q. Are the calls recorded by the Lincoln County Jail?
A. They are.
Q. Does that telephone system notify inmates that their calls are being recorded?
A. Absolutely. There's a prelude before each call begins that's a recorded message that warns the caller and then whoever that he's calling that that call is recorded and subject to review.
Q. And does Lincoln County maintain records of the number dialed?
A. Yes, they do.
Q. And did you obtain Timothy Pate's inmate calls from the Lincoln County Jail from August 29th, 2018, the date of his arrest?
A. We did.
Q. And did those calls occur after he was arrested and that day, that evening of his arrest?
A. Yes.
Q. And were several of those calls put onto disks?
A. They were.
Q. If you'd please take a look at the folder marked as Government's Exhibit 64.
A. We don't have that one.

Q. I imagine it would be very difficult for you to see that then.

Your Honor, may I approach?

THE COURT: You may.

BY MR. HOWARD:

Q. Special Agent, I've now handed you what's been marked as Government's Exhibit 64. If you'd please review that.

A. I'm sorry.

Q. Do you recognize that?

A. Yes. It was a disk with the calls on it.

Q. And does that contain a disk with a jail call between Mr. Pate and a Thomas Jones?

A. Yes, it does.

Q. And did you get the subscriber information for the number dialed on that call?

A. Yes.

Q. And to whom was that number subscribed?

A. It was subscribed to Thomas Jones.

Q. And does Exhibit 64 contain an excerpt of the call between Timothy Pate and Mr. Jones?

A. Yes, it does.

Q. Was a transcript made of the call on Exhibit 64?

A. It was.

Q. Now, did Mr. Pate place other jail phone calls after his arrest?

A. He did.
Q. Did he speak with his daughter?
A. Yes, Antionette.
Q. I trust that I've handed to you file folders marked as 66-1, 66-2. Are those up there?
A. I have those.
Q. Excellent. If you'd take a look at those and let me know if you recognize them.
A. Okay. Again, these are disks containing the phone calls.
Q. And do those contain excerpts of a phone call between Timothy Pate and Antionette Pate?
A. Yes, sir.
Q. And was a transcript made of the call excerpts on Exhibit 66-1 and 66-2?
A. Yes, it was.
Q. Have you reviewed the transcripts of those jail calls?
A. I have.
Q. Do the transcripts identify the speakers and substance of the calls?
A. They do.
Q. I also previously handed you tabbed pages that are marked Exhibits 65 and 67 representing the transcripts. Do you see those?
A. I do.
Q. Do you recognize that?

A. I do.
Q. What is that?
A. This is a transcript of the calls that we just spoke about on these disks.
Q. And were copies of those transcripts made for the jury?
A. I assume so.
MR. HOWARD: Your Honor, at this time I would ask that we be permitted to hand a copy of the transcripts out to the jury before playing the calls.
THE COURT: You may. Those are Exhibits 65 and 67; is that right?
MR. HOWARD: That's correct, Your Honor.
THE COURT: All right. Go ahead and hand them out, and then I'll explain to the jury my instruction on those.
Members of the Jury, Exhibits 65 and 67 have been identified as typewritten transcripts of the oral conversations heard on the tape recordings that have already been received in evidence as Exhibits 64, 66-1 and 66-2. The transcripts also purport to identify the speakers engaged in the conversations.
Now, I've admitted the transcripts for the limited purpose of helping you follow the content of the conversations as you listen to the tape recording and also to help you identify the speakers, but I'm going to specifically instruct you that whether the transcripts correctly reflect the content of the conversations or the identity of the speakers is entirely

for you to decide based upon your examination of the transcripts in relation to hearing the tape recordings themselves as the primary evidence of their own contents. So if you determine that the transcripts are in any way or in any respect incorrect or unreliable, you should disregard them to that extent. Okay?

Mr. Howard, you may proceed.

MR. HOWARD: Thank you, Your Honor.

BY MR. HOWARD:

Q. Special Agent, before we play the excerpt of the first call which is Exhibit 64, is the transcript for this call and the tab number 65 of the transcript that the jury has?

A. Yes, it is.

Q. And are parts of the call that are unintelligible listed as UI?

A. Yes.

MR. HOWARD: If we could play Government's Exhibit 64.

(Audio playing.)

BY MR. HOWARD:

Q. Special Agent, there was a suggestion in there of destroying evidence. Did you destroy any evidence in this case?

A. No.

Q. The transcript in Exhibit 67, does that correspond to the call in Exhibit 66 with his daughter, Ms. Pate?

A. Yes, it does.

Q. And can the jury find the transcript for that call in tab

of Exhibit 67?
A. Yes.
Q. If you could turn to the tab to 67, and if we could play Exhibit 66-1.
(Audio playing.)
BY MR. HOWARD:
Q. Special Agent, is the other excerpt from the same call we just listened to in Exhibit 66-2?
A. Yes.
Q. And can the jury find this transcript by turning the page in the folder that they have?
A. That's correct.
MR. HOWARD: If we could play Exhibit 66-2.
(Audio playing.)
MR. HOWARD: Your Honor, if we could collect those transcripts.
THE COURT: Members of the Jury, if you would, just pass those in to the end of the line, and the court security officer will grab those from you.
BY MR. HOWARD:
Q. Now, Special Agent, we've just heard a call between Timothy Pate and Antionette Pate. Before the trial in this case in January 2019, was Mr. Pate held in the Federal Bureau of Prisons facility?
A. Yes, he was.

Q. And did he have access to email at that facility?
A. He did.
Q. And have you reviewed a number of those emails?
A. Yes, I have.
Q. If we could pull up on the witness's screen Exhibit 82. Are you able to see on the screen in front of you?
A. I am.
Q. Do you recognize that document?
A. Yes. It's an email.
Q. And do you recognize the name Ayana Ali?
A. I do. That's another alias that Antionette Pate went by.
Q. And is this an email between Timothy Pate and Ayana Ali, also known as Antionette Pate, from January 6, 2019?
A. Yes, it is.
Q. And is this from the Federal Bureau of Prisons?
A. Yes, sir, it is.
Q. Other than the redaction for Ms. Ali's email address, does this exhibit fairly and accurately depict an email string from the defendant to Ms. Pate on January 6, 2019?
A. Yes, sir, it does.
MR. HOWARD: We would move to admit Government's Exhibit 62 (sic).
THE COURT: Any objection?
MR. MAINES: No, Your Honor.
THE COURT: It's admitted without objection.

MR. HOWARD: Permission to publish Government's Exhibit 82.

THE COURT: I think you just said "move to admit Government's Exhibit 62" and permission to publish 82.

MR. HOWARD: I apologize, Your Honor. Move to admit Exhibit 82.

THE COURT: Any objection to admitting 82?

MR. MAINES: No, Your Honor.

THE COURT: 82 is admitted. Any objection to publishing it?

MR. MAINES: No, Your Honor.

THE COURT: It's published without objection.

BY MR. HOWARD:

Q. If we could pull up Government's Exhibit 82. And looking at this top email, Special Agent, if we could look at that, zoom in on that, perhaps the top half of that email. Perfect.

Who is the sender on this email, Special Agent?

A. The sender is Timothy Pate.

Q. And, again, Ayana Ali is Antionette Pate?

A. That's correct.

Q. If you would, please look at the first paragraph, the ninth line down. There is a sentence that begins, "Every time I have an issue with any government person." Do you see that?

A. I do.

Q. Could you please read that sentence and the four that

follow it?
A. "Every time I have an issue with any government person I will file a claim/lien. I can be just as petty as them. Next court date will be fun. They think this detention center bothers me, but it doesn't."
Q. Can you continue reading the next sentence?
A. Never gonna sign any of their bitch ass paperwork, and that attorney and judge may get curse the F out the next time I go to court.
Q. And, Special Agent, it doesn't just say "F" there, does it?
A. It does not, no, sir.
Q. Does it say "fuck"?
A. It does.
MR. HOWARD: No further questions for this witness, Your Honor.
THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. MAINES:
Q. Agent Taylor, is that your proper title? Agent?
A. That's fine.
Q. I just want to make sure I am being as respectful to you as possible.
A. That's quite all right.
Q. My name is J. D. Maines. It's very nice to meet you.

A. Good morning.
Q. Now, Mr. Pate is on that first call, and I think that was Exhibit Number 65. Do you have that exhibit in front of you?
A. I do, yes, sir.
Q. And this is the -- this is the transcript of the conversation between Mr. Thomas Jones and Timothy Pate; correct?
A. Yes, it is.
Q. All right. And on Page 4 of that transcript -- and this is an accurate rendition of the phone call that we heard; correct?
A. Yes. I believe so.
Q. Are you at Page 4 now?
A. I am.
Q. Okay. Mr. Jones, Thomas Jones -- let me -- before we go into the exact language Mr. Jones uses, you've investigated this case pretty thoroughly; correct?
A. I have, I think.
Q. And so you've investigated who Mr. Thomas Jones is?
A. Somewhat, yes.
Q. Okay. Now, Mr. Jones, he resides at 2980 Glenn Hills Road?
A. He does.
Q. You investigated that and determined that's his address?
A. We went to that house and spoke to him, yes.
Q. Okay. So you actually went physically to Mr. Jones's

house at 2980 Glenn Hills Road?
A. I did.
Q. Mr. Pate does not live there, does he?
A. No. He gets his mail there.
Q. Okay. And so he's speaking with Mr. Jones, and it would be fair to characterize it as someone sympathetic to his ideations about liens and things like that?
A. I would say he's an acquaintance of Mr. Pate. I don't know about Mr. Jones's beliefs.
Q. Well, the reason you went over there to talk to Mr. Jones was because you thought he might be -- he was likely a co-conspirator in all this; correct?
A. That's not correct.
Q. Okay. You approached Mr. Jones and you wanted to see what his involvement was in this same fantastical belief system that Mr. Pate appears to be engaged in?
A. That's incorrect.
Q. Okay. And Mr. Jones actually says in this transcript on the fourth page, Mr. Jones says, "naw. Well, I gave you every piece that came here"; correct?
A. Yes.
Q. You think it was -- did you -- the reason -- let me back up here and rephrase my question. If you weren't concerned about Mr. Jones being a co-conspirator in all this, why did you go over there to interview him?

A. We went over there to arrest Mr. Pate. That was the address that was on the documents that Mr. Pate had filed. That was where he got his mail from, so that was our first logical step, to go effect the rest on Mr. Pate. Once we got there, we encountered Mr. Jones and made contact with him.

Q. And did you ever follow up with Mr. Jones after Mr. Pate's arrest?

A. I personally did not, no.

Q. Did any other agent?

A. I believe he was interviewed.

Q. He was interviewed again after Mr. Pate's arrest?

A. I believe so, yes.

Q. Even though your statement to the jury is that Mr. Jones's only connection to this case is that's where Mr. Pate got his mail; correct?

A. That's correct.

Q. So it is true that the FBI did believe Mr. Jones was somewhat more involved in this case than just somewhere where Mr. Pate got his mail.

A. I don't think that's correct, no, sir.

Q. Well, there's no other explanation for why the FBI would continue to try to interview Mr. Jones.

A. Again, I wasn't part of that interview, so I was at headquarters by that point, so I can't say what the purpose of that interview was.

Q. Mr. Jones -- or, I'm sorry. Mr. Pate was a full-time resident at that hotel; correct? He'd been staying there for a long period of time.
A. He had.
Q. And you interviewed the owner of that property, a Mr. Patel?
A. We did, yes.
Q. Okay. And Mr. Pate had been living there for a few years; is that correct?
A. Yes.
Q. Okay. And this America's Best is kind of a -- or not America's Best. What was it called? America Suites?
A. I think America's Best, I think is -- it had changed names a couple of times. So I believe it was America's Best at that time.
Q. They're kind of like short-term residences, so to speak? They had a kitchenette or something to that effect?
A. No. It was basically a basic hotel room. It's just on the, I guess, the lower end of hotels as far as quality and that sort of thing, value.
Q. All right. So these were not expensive hotel rooms?
A. I would not think so, no.
Q. As far as you're aware, in the course of your investigation, Mr. Pate was never successful in obtaining any money from the IRS as part of this scheme; correct?

A. Not that I'm aware of.
Q. Can you tell it's the third day and my hands are not working? All of the liens that Mr. Pate filed -- and you had copies of those before you executed that arrest warrant; correct? The liens that Mr. Pate filed, the affidavits --
A. We did. I don't know that we had all of them, but we had a --
Q. A substantial number?
A. -- a substantial amount, I would say, yes.
Q. And you would agree with me that virtually all of those documents had the address 2980 Glenn Hills Road?
A. I would think most of them did, yes.
Q. In fact, most -- a lot of them used the abbreviation C forward slash O on a lot of those documents. Correct?
A. I'd have to look at one to be sure. That's been -- been a little bit.
Q. C/O -- you would agree with me that C/O refers to something as into the care of; correct?
A. Yes.

MR. MAINES: Okay. Thank you. No more questions.

REDIRECT EXAMINATION

BY MR. HOWARD:
Q. If we could pull up Government's Exhibit 59. Looking at the identification in the bottom left-hand corner, that address of 2980 Glenn Hills Road, that's the address that Timothy

Jermaine Pate had on his driver's license; correct?
A. That's correct.
Q. As he held himself out as living there; correct?
A. Everything that we saw indicated that, yes.
Q. And that's what led you to go to that residence; correct?
A. Yes, sir.
Q. In the course of your investigation, did Thomas Jones ever file any liens against federal officials?
A. Not that I'm aware of.
Q. In fact, he was never identified as a target of this investigation, was he?
A. No.
Q. Was he a witness?
A. He was a witness.
MR. HOWARD: I have no further questions, Your Honor.
THE COURT: Any followup on that, Mr. Maines?

RECROSS-EXAMINATION

BY MR. MAINES:
Q. Agent Taylor, Mr. Jones specifically asks Mr. Pate what they had on him, didn't he, in that conversation?
A. What they had on --
Q. What they had on Mr. Pate.
A. Is that in the transcript here?
Q. Well, let's take a moment and -- first page, towards the bottom of the page, the transcript reads, Thomas Jones speaking

to Timothy Pate: "Ah, man, what did they tell you that they got on you?" Correct?
A. Yes.
Q. And you being an experienced investigator, that would naturally lead you to believe that somehow Mr. Jones may be involved in whatever scheme Mr. Pate was involved in.
A. I don't --
Q. Wouldn't it? A statement like that?
A. No. I would strongly disagree with that.
Q. Well, don't co-conspirators usually want to know what the government has on each other, especially before they've been charged?
MR. HOWARD: Your Honor, I'm going to object to the relevancy. He's already testified that it's not a co-conspirator.
THE COURT: Overruled.
BY MR. MAINES:
Q. Isn't it true in your -- you've had a lot of investigations. You've reached a very high level in your career as a law enforcement officer. Isn't it true in conspiracies that co-defendants often want to know what the government has on them, especially before that co-conspirator is charged?
A. I think it's a bit of a stretch for this statement. I think if he was more concerned that he was involved, he might ask what do they have on me.

Q. Uh-huh. He asked what they recovered; correct? "What they got on you?" So that's the distinction you're making?
A. That's the way I would interpret it, yes.
MR. MAINES: Thank you. No more questions.
THE COURT: Any followup, Mr. Howard?
MR. HOWARD: Very briefly, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. HOWARD:
Q. You reviewed security footage regarding the investigation in this case; correct?
A. Yes.
Q. From the Court?
A. I did.
Q. And you spoke with a number of witnesses?
A. Yes, I did.
Q. In your review of the security footage and a review and speaking with the witnesses, when Timothy Pate came into court and filed the paperwork and filed the liens, was anybody else with him?
A. No. He was always by himself.
MR. HOWARD: I have no further questions, Your Honor.
THE COURT: Mr. Maines?
MR. MAINES: No, Your Honor.
THE COURT: Can this witness be excused?
MR. HOWARD: He may, Your Honor.

THE COURT: All right, sir. You may step down. You're excused.

MR. HOWARD: Your Honor, at this time the government rests.

THE COURT: All right. Members of the Jury, the government rests at this time, so it's a natural moment for us to take a bit of a break. We may be a little bit longer at this point because the Court needs to take care of a couple things, from our typical break.

But I will remind you that even though the government has rested now, the instructions that I've given you still apply. Don't discuss the case with each other. Don't try to do any research on the case. Don't try to communicate about the case with one another.

Of course, you'll be in the jury room. You can talk with each other about anything, just nothing about this case at all. And continue to keep the open mind that I know that you've kept the entire time until I tell you to deliberate. Okay?

So, again, I just implore you, please don't speak to each other at all about this case. All right?

Let's rise for the jury as they return to the jury room.

(Jury out)

THE COURT: All right, Counsel. What we're going to do is go back to the holding cell to remind Mr. Pate, as I know Mr. Maines has already told him, but to remind him that he has

the right to testify should he choose to do so and to give Mr. Maines an opportunity to speak with Mr. Pate regarding that right to testify and to determine if he wants to.

And then we'll come -- we'll also -- the other thing that we're going to do is give you a copy of these jury charges. We're printing them up right now. We'll give those to you.

We'll give you a copy of the jury charges, and then I want to go ahead and have another conference with you as we go over those charges to see if there's anything that you object to them. We worked out a couple of the things that we were talking about this morning. Before I come on the bench to ask you about all that, I'll give you a chance just to read over them. I don't want to rush you through them. So I'll give you a chance to read over them. Okay?

MR. HOWARD: Will we get a copy of the verdict form as well?

THE COURT: Yes. Jury charges and a verdict form.

MR. MAINES: Your Honor, also I have a directed verdict motion at the appropriate time. I think that would be better to take it before inquiring with the defendant, but --

THE COURT: Do you want to take it up now?

MR. MAINES: It's up -- I leave it to the Court's --

THE COURT: Well, the government's rested, so now would be the time. Go ahead and bring it up.

MR. MAINES: Respectfully, the defendant moves for directed verdict as to Counts 1, 5, 6 and 8, the grounds being that the federal official alleged in those counts, former Commissioner Considine (sic), and former Secretary Jack (sic) Lew, were not public officials at the time that the allegation involving false lien was filed.

They were both not in their official capacity as a government employee or agent at the time those liens were filed against them, respectively. They left at the expiration of the previous administration's term; therefore, at the time Mr. Pate filed these liens in 2017, they were not government officials as required by the statute, Title 18 Section 1521. And a government employee as described in Title 18 Section 1114 does not designate any delineation to include a former public official. It simply says an employee or government -- or a person employed or acting as an agent of the government.

So, therefore, Your Honor, I respectfully move for a directed verdict on those respective counts.

THE COURT: Any other motion at this time?

MR. MAINES: No, Your Honor.

THE COURT: Mr. Howard, I'll hear from you.

MR. HOWARD: Thank you, Your Honor. The Fifth Circuit has addressed a very similar issue in *United States vs. Raymer*. I have a copy of that case, regarding the retired officials.

THE COURT: What's the case cite on *Raymer?*

MR. HOWARD: Sure. It is 876 F.2d 383. I have a copy printed out if the Court would like it as well.

THE COURT: Please bring it forward.

MR. HOWARD: Thank you.

THE COURT: Give me a moment. Let me look over it.

All right. Go ahead, Mr. Howard.

MR. HOWARD: Thank you, Your Honor. So there's not, first of all, a great deal of case law regarding 1521. There just aren't a lot of cases. But there is this case which has looked at that same cross-reference in 18 U.S.C. 1114, that definition, and have expressly held that the retired federal officials do fall under its penumbra. It clearly covers an official not only while he's in the performance of his duties, but also against retaliation after his duties were completed. It compares it there to an off-duty official; and it says, it's reasonable to conclude that a retired official subject to retaliation because of his previous performance of duties is in the same position as an official who's currently employed by the government, but is off duty.

I think, clearly, the statute was meant to cover a case like Mr. Pate's here. If you look at the facts of this case, each of those officials, even if they were not currently employed by the government at the time of the filing of the liens, they were targeted by Mr. Pate because of their status as federal officials.

If you look at the liens themselves, the address that is written is to the Treasury Department, the IRS, and we've elicited that in testimony.

We've also brought out the fact that the only relationship between Mr. Pate and these high-ranking government officials that he's targeted is their status as federal -- is their status as federal officials. So there's no other basis to believe he would be targeting them other than their protected status.

It's also, as a factual matter, the idea -- you could imagine the scenario in which it would produce somewhat of a ridiculous result if federal officials were not protected, such that if I -- if somebody threatens a judge to do this or else, the judge says this is the last straw, I'm retiring, and then the next day carries out that threat, the idea that that judge somehow loses the protection because he stepped down out of the threat would somehow not be protected really cuts against the whole idea of 1521, which is protecting people who are targeted on account of the performance of their official duties.

So, again, I think looking at *Raymer*, looking at certainly the other cases that have talked about the broad definitions that are to be given to 1521, not only when it talks about constructing a lien, when we talk about what is a lien. And so these are to be read broadly, and so we think that it is covered.

THE COURT: Any followup, Mr. Maines?

Let me ask you this first, Mr. Howard. You know -- I appreciate you providing us with this Fifth Circuit opinion. Is there anything from -- obviously you would have provided me something if the Eleventh Circuit had addressed this issue.

Has any other circuit or District Court that you know of addressed this issue?

MR. HOWARD: Not that I could find, Your Honor. And, specifically, the Eleventh Circuit, and I specifically was looking in the 1521 context. But I simply haven't -- that doesn't -- I don't want to represent that it doesn't exist. I just wasn't able to find it.

THE COURT: Okay. Response, Mr. Maines.

MR. MAINES: Your Honor, I had reviewed that. I did surprise Mr. Howard, who I have a lot of respect for with this, so it's really a testament that he was prepared with this case.

Your Honor, I think that *Raymer* actually cuts the other way. In *Raymer* the Court specifically looked at the language of Section 115(a)(2), which incorporates by reference the family members who previously served in a government capacity. There is no similar provision in 1521. 1521 does not include any reference to those who previously served.

*Raymer* court specifically said it would be absurd to think that any person who -- that would be related, a family member of those government officials would be included under

Section 115, but not the former government officials themselves, which does have a lot of logic to it. There's no such language in 1521 or Section 1114 regarding family members of those prior government officials. It simply says the government officials in their official capacity.

So, therefore, Your Honor, I think it cuts the other way. There's no such language in 1521 or in 1114. Thank you.

THE COURT: Thank you. Anything further, Mr. Howard?

MR. HOWARD: No, Your Honor, only to note that *Raymer* is, again, looking to the same statutory definition in 1114. The statute there was the 115. The statute here is 1521. They're looking at the same cross-reference, though, being 1114.

THE COURT: All right. We'll take a look at it. I'll take it under advisement, and I'll get a ruling to you. I'll come out on the bench; we'll do that, and then we will address Mr. Pate. It will be more appropriate for me to address this motion before we go tell Mr. Pate about his right to testify.

In the meantime, you all will get a copy of our jury instructions. After we speak with Mr. Pate, we'll come back out; we'll take a look at those. You'll tell me if you have any objections to anything in the jury instructions, and then we'll take a look at what our time looks like as to whether it makes more sense to delve right into instructions and close then or whether it makes more sense for everybody to get lunch. Okay?

MR. HOWARD: Understood.

MR. MAINES: Yes, Your Honor.

THE COURT: Anything further that we need to address at this time from the government or from the defense?

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

THE COURT: All right. We'll be in recess.

(Proceedings stood in recess from 10:39 a.m. until 11:41 a.m.)

(Jury out)

THE COURT: All right. Thank you, everybody, for your patience. We had to take a look at a couple of things.

Let me address first Mr. Maines's motion for directed verdict on Counts 1, 5, 6 and 8.

Mr. Maines, as expected, you raise a good argument and not by any stretch a frivolous argument at all of statutory interpretation here.

And, Mr. Howard, it's impressive that you were prepared to respond to it with the case you gave us, the *Raymer* case from the Fifth Circuit.

We had to do a little more research, because let me just state that Section 1114, which is the cross-reference that our offense statute here goes towards, has been amended significantly since the decision by the Fifth Circuit. And let's just state that the statutes themselves as they interact are not necessarily artful.

Nonetheless, since that time, albeit in a nonpublished

opinion, the Tenth Circuit has addressed this issue. *United States vs. Wolff*. The cite on that is 370 Fed.Appx. 888. It's a 2010 case from the Tenth Circuit.

Very similar argument was raised as Mr. Maines has raised here regarding application to a retired official. The Tenth Circuit cited *Raymer* approvingly and as well as the Tenth Circuit's decision in *United States v. Martin* and came out on the same side that *Raymer* came out on.

Let me read from that opinion because I think it's pertinent to this argument.

The Tenth Circuit stated that Section 1114 covers the officer or employee of the United States Government, quote, while such officer or employee is engaged in or, and then in emphasized text, on account of the performance of official duties. The statute that the defendant was convicted of violating of Section 876(c) incorporates the Section 1114's definition of a government official or employee.

"The logic of *Martin* and *Raymer* compels us to agree with the district court that Section 876(c)'s offense of addressing threatening communications to a government official applies to threatening communications sent to retired government officials on account of the performance of their official duties. Consequently, the district court did not err as a matter of law in submitting to the jury the question of whether" the employee there "or former employee received defendant's threatening

communication while he was a government official or employee engaged in or on account of his performance of official duties."

Given that Bass was an IRS officer assigned to defendant's tax collection matter, we also conclude that sufficient evidence appears in the record for a reasonable jury to find beyond a reasonable doubt that Bass received defendant's threatening communication on account of the performance of official governmental duties.

So 1114 does have this inartful description that's the cross-reference, and that description of the individuals does include this language "on account of the performance of official duties."

So based on that description, here, the individuals who the liens were filed against, Mr. Lew and Mr. Koskinen, in other words, the subjects of Counts 1, 5, 6 and 8, while they had retired or left those offices at the time of the alleged acts, nonetheless, there is sufficient evidence from which the jury may conclude that the liens were filed, quote, on account of the performance of official duties. So I think they fall within the ambit of the cross-reference there. Okay?

Everybody clear about the Court's ruling? I'm going to deny the motion.

MR. HOWARD: Understood, Your Honor.

MR. MAINES: Understood, Judge.

THE COURT: All right. Next thing we're going to do is

I'm going to bring the jury in, since we spent a little bit of time, go ahead and send them to lunch. Last thing I would want to do is make you have to give closing arguments and me instructions to a hungry jury. So we're going to bring them in. I'm going to send them to lunch.

Mr. Maines, have you had the opportunity to speak with your client regarding whether he would like to testify?

MR. MAINES: Your Honor, I did attempt to communicate with my client in the holding cell just moments ago and informed him that he has the right to testify; and he, again, refused to engage in any meaningful response to me, which I interpreted as his refusal, continued refusal to participate in any of these proceedings. And that was just moments ago, Your Honor.

THE COURT: Okay. Well, what we'll do, I'm going to send the -- actually, I'm going to bring the jury in. Do you intend to call any witnesses at all?

MR. MAINES: No, Your Honor.

THE COURT: Okay. What I'll do is I'll bring the jury in. I'll say, Mr. Maines, anything? And you can say the defense rests, if that's the position of the defense at this time.

Actually, let's not do that. I always want to think thoroughly through something here. I haven't had the chance yet to, as we discussed earlier, given the refusal to communicate by your client, I need to also go back there and advise him of his

right to testify. So we can do that during the break, and you don't have to rest in front of the jury yet. And when the jury comes back after the lunch break, you can rest in front of the jury, and then we'll proceed to instructions. Obviously while they're on their lunch break, we're also going to discuss instructions. Okay?

MR. MAINES: Yes, Your Honor.

THE COURT: Is that agreeable, Mr. Howard?

MR. HOWARD: Yes, Your Honor.

THE COURT: All right. Let's bring the jury in.

THE CSO: All rise for the jury.

(Jury present)

THE COURT: Members of the Jury, thank you for your patience during that lengthy recess. I assure you that we're not wasting your time. Sometimes I need to bring up some things and deal with things outside of your presence, not because I or the lawyers or anybody else are trying to hide from you. It's just sometimes we have to delve through some legal matters that, frankly, probably you'd be unduly bored with, to be honest with you. But, also, it's important that we deal with those with just the attorneys. Okay?

That being said, we're prepared at this time to proceed into any witnesses that the government intends to call. As I told you at the beginning, the government doesn't have to produce any witnesses -- or, excuse me, the defense doesn't have

to produce any witnesses; they have no burden to prove anything in this case, but we're prepared to proceed with that, and then after that perhaps jury instructions and closing arguments. But I don't want you all to have to listen to all of that on an empty stomach.

So we're going to recess for lunch at this time. I apologize that you're following up a mid-morning recess with a lunch recess, but that's just how the clock ticks today. Okay. So we're going to recess for lunch.

Please be back here at 1:00. That'll give you a good full hour for lunch. Be back here at 1:00, and we'll commence promptly thereafter with the rest of today's proceedings. Okay?

Again, I remind you of my instructions to please do not discuss this case with anyone at all, including with your fellow jury members. Do not watch, listen, communicate, do any type of communication whatsoever or any research whatsoever about this case.

Don't call anybody about the case; don't text anybody; don't post anything. Don't put anything on Instagram, Facebook or any other social media about this case at all. Don't attempt to do any research electronically or otherwise about the case. Don't attempt to go visit any of the locations that have been discussed in this case at all.

Just get yourselves some lunch, think about and talk about anything you want to other than this case, and then we'll

see you back at 1:00. Okay? Thank you for following those instructions, and we'll see you soon.

THE CSO: All rise for the jury.

(Jury out)

THE COURT: All right, everybody. Understand what we're going to do now and then you all will have a lunch recess as well. Okay? We'll be in recess.

(Proceedings stood in recess from 11:51 a.m. until 11:59 a.m.)

THE COURT: We're back on the record in 1:18-CR-45.

THE DEFENDANT: Let the record show I have no business with the Court.

THE COURT: We have Mr. Howard present.

THE DEFENDANT: Let the record show that the judge forged my signature.

THE COURT: We have Mr. Maines present.

THE DEFENDANT: I accept all charges for value in exchange for value.

THE COURT: We are in the holding cell with Mr. Pate.

THE DEFENDANT: I have no contract with the Court.

THE COURT: Mr. Pate, the purpose of me --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- coming back is to let you know --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- that the government has rested.

THE DEFENDANT: I have no contract with the Court.

THE COURT: You have no obligation --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- to testify.

THE DEFENDANT: I have no contract with the Court.

THE COURT: You have the right to remain silent.

THE DEFENDANT: I have no contract with the Court.

THE COURT: You don't have to present any evidence --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- but if you choose to do so --

THE DEFENDANT: I have no contract with the Court.

THE COURT: If you want to do so --

THE DEFENDANT: I have not done any business with the Court. I am not a U. S. Citizen.

THE COURT: -- you may testify if you want to come testify.

THE DEFENDANT: I am not a U. S. Citizen. I have no contract with the Court.

THE COURT: I know Mr. Maines --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- has attempted to advise you of that right.

THE DEFENDANT: He is not my attorney. I have not applied for an attorney.

THE COURT: Mr. Pate, please stop speaking so that you can hear me.

THE DEFENDANT: I did not sign that not guilty plea. Mr. Maines is not my attorney.
THE COURT: Mr. Pate, please stop speaking.
THE DEFENDANT: You know --
THE COURT: The record will reflect that Mr. Pate refuses to --
THE DEFENDANT: I never applied for an attorney --
THE COURT: -- to follow the Court's instructions to stop speaking.
THE DEFENDANT: I have no business with the Court.
THE COURT: Mr. Pate --
THE DEFENDANT: I have no business with the Court.
THE COURT: -- you have the right to testify --
THE DEFENDANT: I have no business with the Court.
THE COURT: -- but you don't have to testify.
THE DEFENDANT: I have no business with the Court.
THE COURT: If you want to testify, you need to let Mr. Maines know --
THE DEFENDANT: I do not accept the Court's authority.
THE COURT: -- then you can testify, because now is the time --
THE DEFENDANT: I do not accept the jurisdiction of the Court.
THE COURT: -- because the government has rested.
THE DEFENDANT: I do not accept the jurisdiction of the

Court.

THE COURT: Anything further, Counsel?

THE DEFENDANT: I do not accept the jurisdiction of the Court.

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

THE COURT: We'll be in recess.

(Proceedings stood in recess from 12:00 p.m. until 1:05 p.m.)

(Jury out)

THE COURT: All right, Counsel. Thanks for bearing with us. We had a little bit of technical difficulties there. But in the interest of thoroughness, we wanted to be certain that you had time to review these draft instructions to the jury, which we have filed in a restricted manner in this case at Doc. 85. This is, of course, the draft version.

What I'm going to do is exactly what we did previously, which is go through them page by page and tell me if you have any objections to anything on there. Even if it's an objection that you've previously asserted and that I have overruled, I want you to let me know now. And if it's something you didn't previously assert, something you just missed before, that's all right; let me know that you've got a problem with it, and we'll take the time to get it right. It's just that important that we have to do so.

So everybody's got Doc. 85 in front of them, I take it;

is that right?

MR. HOWARD: Yes.

MR. MAINES: Yes, Your Honor.

THE COURT: Okay. Starting on Page 1, any objections by either side to anything on Page 1?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor.

THE COURT: Page 2, obviously the highlighted area there, if the defendant chooses not to testify, we'll take out the bracket and we'll take out the shading and we'll just have that sentence there. But any objection to anything on Page 2?

MR. HOWARD: None from the government.

MR. MAINES: None from the defense.

THE COURT: Any objection to anything on Page 3?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor.

THE COURT: Any objection to anything on Page 4?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor.

THE COURT: Any objection to anything on Page 5?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor.

THE COURT: Any objection to anything on Page 6?

MR. HOWARD: None from the government.

MR. MAINES: None from the defense.

THE COURT: Any objection to anything on Page 7?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor. I'm sorry. Wait.

THE COURT: Mr. Maines, I take it --

MR. MAINES: Yes, the good faith, Your Honor. I did miss that. I would like to renew my objection and ask for good faith to be applied to the remaining counts, not just 11 through 15 of the indictment.

THE COURT: And I understand you've preserved that objection, that you would like a good-faith instruction as to Counts 1 through 10 and 16 through 21, and for the reasons previously stated, the Court overrules that objection and denies that request. I'll only instruct good faith as to Counts 11 through 15. Okay? Anything else as to Page 7?

MR. MAINES: None from the defense.

MR. HOWARD: None from the government.

THE COURT: All right. Any objection to anything on Page 8?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor.

THE COURT: All right. Any objection to anything on Page 9?

MR. HOWARD: None from the government.

MR. MAINES: None from the defense.

THE COURT: All right. Okay. The next document we have

is Doc. 85-1, which is the draft verdict form we used which you all gave us, with just a little bit of editing to put some boxes in there for the guilty and the not guilty. Everything look good to everybody on Page 1?

MR. HOWARD: Yes.

MR. MAINES: Yes, Your Honor.

THE COURT: Obviously we'll take the word "draft" off, but other than that, anything on Page 2?

MR. HOWARD: Nothing from the government.

MR. MAINES: None from the defense.

THE COURT: Okay. How about Page 3?

MR. HOWARD: Nothing from the government.

MR. MAINES: None from the defense.

THE COURT: Well, what I did is added on Page 3 -- and this goes to Counts 11, 12, 13, 14 and 15, and I believe you all have a draft of what I've proposed. 85-1, which we filed based on what you all provided us, just says, "Note: If you find the defendant not guilty as charged in Count 11, you need not consider Paragraph 11A below." And then there's a similar sentence for the appropriate counts following that.

What we've added, just propose to you all is say -- first sentence, say, "If you find the defendant guilty as charged in Count 11, you must proceed to Paragraph 11A below. However, if you find the defendant not guilty as charged in Count 11, you need not consider Paragraph 11A."

Maybe it's a bit redundant. My fear, though, is that we want to be very clear that if they find guilty, they've got to go to Paragraph 11A. I would hate to get a verdict back that they check 11, they don't fully understand that they need not go to 11A -- you know, if they check guilty on 11 and they just go on to 12 and then you don't have a finding on 11A, then we've got a problem. Everybody understand what I'm doing there?

MR. MAINES: Yes, Your Honor.

MR. HOWARD: Yeah. The government understands and agrees with that recommendation.

THE COURT: Okay. So that sentence basically, "If you find the defendant guilty as charged in Count 11, you must proceed to Paragraph 11A below," will be added to the note on the verdict form; and the similar sentence, except for the number, identical sentence, will be added for 12, 13, 14 and 15. Everybody in agreement with that?

MR. HOWARD: Yes.

MR. MAINES: Yes, Your Honor. And just to make sure, so I understand, the additional sentence would come after this sentence as it stands now on those counts for the bankruptcy charge, "If you find the defendant not guilty as charged in Count 14, you need not consider Paragraph 14A below." And then that sentence would be added to the end of that sentence.

THE COURT: Actually, the way I have it -- and you all tell me what you think is best. I have it right now, "Note: If

you find the defendant guilty as charged in Count 11, you must proceed to Paragraph 11A below. However, if you find the defendant not guilty as charged in Count 11, you need not consider Paragraph 11A."

MR. HOWARD: The government agrees with the recommendation of the Court regarding the structure of that paragraph.

MR. MAINES: I would ask that they be swapped, because if -- to me, if the jury reads that sentence, it seems conclusive immediately versus -- well, from the defense standpoint, I think it's more favorable for the defendant to have the first thing the jury considers to not do further deliberations.

THE COURT: I'll swap it.

MR. MAINES: It's just a personal preference, Judge. I don't have any good legal reason for it.

THE COURT: I don't have a problem with swapping it. I'll swap it. It'll just basically say, "If you find the defendant not guilty as charged in Count 11, you need not consider Paragraph 11A. However, if you find the defendant guilty as charged in Count 11, you must proceed to Paragraph 11A below." Is that fine?

MR. HOWARD: No objection from the government.

MR. MAINES: Yes, Your Honor. That's fine.

THE COURT: Okay. As we go forward, that takes care of

11 through 15. Anything about Count 16 through 21 that we need to change or that you see a mistake on at all?

MR. HOWARD: Nothing from the government.

MR. MAINES: None for the defense.

THE COURT: Okay. All right. My next order of business was to bring the jury in, to ask Mr. Maines if he has any witnesses or evidence that he would like to introduce.

Mr. Maines, at that time you can tell us if you do or if you'd like to rest; and if you rest, I was going to give the jury my final argument instructions to them, in other words, just the instructions I give them about how to consider your final argument. Then you'll give your final argument, and then I will give the jury their instructions. Okay? Anything else we need to do?

MR. HOWARD: Nothing from the government.

MR. MAINES: No, Your Honor.

THE COURT: All right. Let's bring in the jury.

THE CSO: All rise for the jury.

(Jury present)

THE COURT: Thank you, Ladies and Gentlemen. I trust that everyone had a good break and that everyone followed the instructions I gave you prior to the break, and I appreciate you doing that, as well as your punctuality. It's sincerely appreciated by the Court as well as, I'm sure, by your fellow jurors.

The government has rested. Mr. Maines, any witnesses or evidence that the defense would like to present at this time?

MR. MAINES: No, Your Honor. Defense rests.

THE COURT: All right. Ladies and Gentlemen, we've reached the point in the case now where the government and defendant have rested their case, which means they have put forth all of their evidence. Counsel at this stage of the case will be making their final arguments to you. After that, I will give you your instructions on the law before you begin your deliberations.

The government will have the opening argument, followed by counsel for the defendant. Then, in conclusion, the government will have an opportunity to reply in rebuttal to argument of defense counsel. This is in accord with the rules, and it's proper, because as you've previously been instructed, the government has the burden of proving the defendant's guilt.

In making these arguments to you, let me tell you that counsel will be commenting upon the testimony that you have heard and the evidence that has been presented. Then they, as you, will be recalling the evidence of the case.

They will not intentionally try to mislead you. I assure you of that. However, if their recollection of the evidence differs from what your recollection is, you must follow your own recollection. The final arguments by counsel are not to be construed by you as evidence in this case or as any

instructions on the law. Nevertheless, the arguments are intended to help you understand the contentions of each side, and you should give them your full and close attention, and I appreciate you doing so.

The government will now proceed with its summation.

MR. McCOOL: Your Honor, thank you.

May it please the Court; Mr. Maines.

Ladies and Gentlemen of the Jury, good afternoon.

Ladies and Gentlemen, 11 -- sorry. 16 false retaliatory liens, five false involuntary bankruptcy declarations filed against some of the highest levels (sic) officials in federal government, filed against judges, filed against career employees with the clerk's office and Internal Revenue Service, filed by the defendant, Timothy Pate.

Ladies and Gentlemen, the defendant, Timothy Pate, used these liens, used these bankruptcy declarations as weapons. He used them against weapons (sic) -- used them as weapons against these officials.

Ladies and Gentlemen, the liens, the declarations, they were false. They were fraudulent. But the effects and the consequences on these officials were very much real. And why? Why did the defendant do this? Why did he file these liens and declarations against these officials? Because these seven victims stood in the way of Mr. Pate from getting that frivolous tax refund money. Each of the victims stood in his way and

prevented him from getting that money. And it was in retaliation for that that the defendant chose to file these liens and file these declarations.

Ladies and Gentlemen, you heard a lot of evidence and testimony about maritime liens and UCC Financing Statements and 105C letters. There's a lot of evidence, a lot of exhibits to consider. But I submit to you, Ladies and Gentlemen, the evidence in this case, it really boils down to your own common sense. I ask you to use your common sense, because all the answers that you have -- all the questions you have, the answers have been given to you through the evidence. You know who did this, why it was done, how it was done, when it was done, where it was done and for what purpose. That's all been provided to you through the evidence in this case.

Ladies and Gentlemen, I want to start with how did we get here? Let's talk about how we got here. The defendant, Timothy Pate, for years didn't file -- several years didn't file tax refunds at all. And then in the year 2015 he begins filing tax refunds with the IRS claiming 2.7 million dollars as a tax refund. 2016, he's claiming 1.1 million dollars as a tax refund. 2017, 3.7 million dollars as a tax refund. And the IRS is sending him letters saying, these positions, this tax return is frivolous. We're not going to give you your tax refund, because this is a frivolous tax return. And that's in July of 2016; and then again in March of 2017, being told by the IRS

these tax returns, these positions, frivolous.

The defendant isn't happy with that, so he goes to Tax Court. In August of 2017 he's filing a petition in Tax Court because he wants his refund money. He thinks he's entitled to these millions of dollars, despite the fact that he doesn't work, despite the fact that he's not reporting any income. He believes he's entitled to these millions of dollars. So he goes to Tax Court, and he doesn't get what he wants from Tax Court. The IRS isn't giving him his money. Tax Court isn't giving him his money. The government's filing a motion to dismiss because of these frivolous positions.

So in October of 2017 the defendant, still unsatisfied, still wants his money, he comes to the Southern District of Georgia, here in Augusta, and he files a lawsuit in this courthouse. He files it against the Commissioner of the IRS, Mr. Koskinen, because he wants his tax money. He wants that refund. This is refund litigation, and he attested he believes he's owed all of these millions of dollars.

Ladies and Gentlemen, you've heard testimony, Judge Epps was assigned the case as a magistrate, and what happens? Well, within short order now, the defendant, becoming pretty frustrated that he's not getting his money, begins filing kind of language in his petitions, in his civil case, in this lawsuit, basically telling the judge, if -- anyone, if you don't give me -- any judge or tax agent doesn't give me these tax

returns, then I'm going to file a lien; begins ramping up these threats. This is now in January of 2018.

He files motions for arrest warrants. He's still not getting what he wants, so he's going to have Mr. Koskinen arrested. He's going to have Mr. -- Judge Epps arrested. Not getting what he wants. He's going to file affidavits of claims. He's going to say you have -- Mr. Lew, Mr. Koskinen, Mr. Thorson, you're going to answer these questions or else I'm going to begin filing liens against you. And that's what we see. That's how we got here.

Ladies and Gentlemen, he then says you have seven days to answer or I'm going to file a lien, keeps ramping up the demands. And then, finally, March 6th, 2018, the defendant, Timothy Pate, files liens against Judge Epps and Mr. Koskinen.

Ladies and Gentlemen, that's how we got here. That's the backstory of how we ended up here, those first liens filed March of 2018.

I want to talk to you about the charge filing a false retaliatory lien and what the government has to prove. And to be clear, His Honor is going to instruct you on the law. He is going to dot every I and cross every T when it comes to the law, and if I say anything that differs from what the judge tells you, rely on what the judge tells you. The judge will give you the law in this case.

But what I believe His Honor will tell you is that in

order for the defendant to be found guilty of retaliating against a federal official by false claim, the government has to prove these four things:

First, the defendant filed or attempted to file a document in a public record or a private record generally available to the public.

The filing has to contain a false lien or encumbrance against the real or personal property of a federal employee or official.

The defendant has to file these documents on account of the federal employee or official's performance of his or her official duty, and the defendant knew or had reason to know that the lien or encumbrance was false or contained any material, false, fictitious or fraudulent representations.

Those are the elements of this offense that the government has to prove. So let's walk through them. Ladies and Gentlemen, I submit to you I'm not going to spend a lot of time on the first two elements because it's pretty self-explanatory.

The defendant filed these liens in a public record. And the filing, they contained false liens against real or personal property of a federal employee or official. Those are the first two elements. I'm going to go through them quickly, but I want to point out one thing to you. And this is very important, Ladies and Gentlemen. His Honor will tell you, I believe, that

these liens, they don't need to be valid. They don't actually have to impair the government employee's property rights or interest. That's very important. Okay. They don't have to be valid.

And a federal employee is defined there, but to be clear, it includes judges. It includes people that work for the IRS, the clerk. It includes the IRS Commissioner and the Treasury Secretary and the Inspector General of the Treasury. Those are all federal employees or officials.

So these liens that were filed on March 6th and May 1st and June 15th, Ladies and Gentlemen, they're all filed in -- maritime liens, were all filed here in the clerk's office. They were filed. And you see on the top of each of those liens they have a case number. Okay. They're filed in public records. The government has met its burden of proof with regard to that first element of this charge.

The maritime liens were all filed in public records. The UCC Financing Statements were filed in the Richmond County Clerk's Office, a public record. Okay. So the 16 false retaliatory liens were all filed in public records. That's element one. The government has met its proof on that.

Ladies and Gentlemen, they were all filed against federal officials. These false liens were all filed against federal officials or employees. And I've already talked about that. Judges, Treasury Secretary, IRS Commissioner, clerk

employees. They're all covered under the statute. The government has met its burden of proof with regard to the second element.

So let's go into the third element, that the defendant filed this document on account of a federal employee or official's performance of his or her official duties.

Ladies and Gentlemen, as you look back at the evidence, it becomes pretty clear why the defendant was doing this. Why was he targeting these seven individuals? Well, Mr. Koskinen was the IRS Commissioner. The defendant wants his tax refund money. Who's he going to go after? Well, the person he sued. Right? The Commissioner of the IRS he believes is going to be the person who can give him his tax money. So he's going to sue Mr. Koskinen in civil court; and when he doesn't get what he wants, he's going to try to arrest him. He's going to give him a warning, I'm going to file a lien against you; and then on -- and then on March the 6th, 2018, he's going to file a lien against Mr. Koskinen.

He filed the lien against Mr. Koskinen because he's the IRS Commissioner, on account of his duties as the Commissioner. That's why he did it. That's why the defendant chose Mr. Koskinen as a victim.

He did the same thing for the other officials. The Treasury Secretary, Mr. Lew. The IRS and Treasury are connected. The defendant believes that Mr. Lew and Mr. Thorson,

these high-ranking federal officials -- Mr. Thorson is the Inspector General of the Treasury, that these folks, because of their duties, are going to be able to give him his tax money, and when they don't, he's going to file a lien against them. And that's why the defendant chose them as victims. He chose them on account of their official performance of their duties.

Ladies and Gentlemen, these are the high-ranking federal officials that the defendant chose, but then he chooses somebody like Judge Epps. And why does the defendant pick Judge Epps? Why is the defendant targeting Judge Epps, sending him warnings and then filing liens against him? Well, because he's the judge that's overseeing the defendant's civil case, and Judge Epps isn't giving the defendant what he wants. So when he doesn't give him what he wants, the defendant targets him on account of his official duties as a federal judge.

Ms. Davis, works for the IRS, is the woman who signs -- from the return integrity operation, signs the letters to Mr. Pate saying that your tax refund is frivolous. Well, when Mr. Pate receives a letter from Ms. Davis on March 27th, 2018, he's none too satisfied with that. And shortly thereafter he decides to target Ms. Davis because of her position with the IRS. He gives her a warning that I'm going to file a lien against you; you have seven days to respond. And when she doesn't, sure enough, on May 1st, 2018, he files a lien against Ms. Davis. Why? Because she sent the defendant a letter in

her position as an IRS director of the frivolous return program. She was targeted because of that. That's why the defendant chose her as a victim.

Ladies and Gentlemen, we're going to talk about the involuntary bankruptcy petitions, but eventually, after the defendant files those involuntary bankruptcy petitions, Judge Susan Barrett gets involved. And Judge Barrett sends Mr. Pate an order on May 25th, 2018, basically saying that this involuntary bankruptcy petition declaration is not valid.

Well, the defendant was none too happy about that. So what happens thereafter? Well, the defendant begins targeting Judge Barrett: I'm going to file a lien against you. I'm going to give you seven days to respond or I'm going to file a lien. And, sure enough, on June 15th, 2018, the defendant files a lien against Judge Barrett. He chose her because of her position as a bankruptcy judge. On account of her duties, the defendant filed a lien against her.

And it goes the same with Ms. Rauback. When the defendant files the involuntary bankruptcy petitions in bankruptcy court and he doesn't get the number for the bankruptcy petition and he's banging his fists on the window, on the clerk's counter, Ms. Rauback's name is on the door as the Clerk of Court. And, sure enough, after he doesn't get the bankruptcy number, he files an affidavit of claim saying to Ms. Rauback, you didn't give me my number, I'm going to file a

lien against you. And, sure enough, on June 15th, 2018, he does. He files a lien against Ms. Rauback on account of her performance of her official duties as clerk of the bankruptcy court.

So, Ladies and Gentlemen, I submit to you that the government has met its burden of proof with regards to the third element of the false retaliatory liens.

So that leaves the fourth element, that the defendant knew or had reason to know that the lien or encumbrance was false or contained any material, false, fictitious or fraudulent representations.

Ladies and Gentlemen, I think His Honor will tell you that under this standard it's what the defendant knew, and it's also what a reasonable person, reasonable person that had all the information that the defendant had would have known or would be able to infer about whether these liens were in fact false or fictitious.

Ladies and Gentlemen, the evidence in this case is overwhelming that these liens were false, that the defendant knew they were false; and any reasonable person, any reasonable person would have known that these are false liens.

Let's start with the obvious. I know it's hard to see, but I -- we have two liens. We have a maritime lien, and we have the UCC financing lien. Well, these maritime liens, Ladies and Gentlemen, we know they're false, because they're

against -- the defendant puts the names of the victims, but puts them down as vessels. Okay. These people are not vessels. Therefore, this is a false lien. It's false. They're not vessels.

He lists the collateral of silver coinage and farm equipment and a whole litany of things that doesn't make any sense. It's very clear with each of these maritime liens that they're false, they're not real.

The UCC Financing Statements, Ladies and Gentlemen, we heard evidence and testimony about what these types of documents are. But this is -- this is very, again, down to common sense. The defendant is choosing these seven victims and filing liens against them for millions of dollars. The defendant has never met any of them, doesn't know them at all. He's never corresponded with them, spoke to them, nothing.

These liens are contracts, right, between debtors and creditors. The defendant's saying he's a creditor, right, on all those tax returns. I'm a creditor, and I'm choosing these seven people as debtors. They don't even know about it. They didn't enter into any contract with the defendant, and they sure enough didn't enter into any contract for 33 million dollars, 15 million dollars. The numbers are absurd. They come out of thin air. They're all false. These are false UCC Financing documents. These are false liens. Nothing about them is real, not the amounts, not the people that were

targeted. There's nothing.

Ladies and Gentlemen, so that on its face we know these are false, and any reasonable person would know that. But there's more, of course. We know the backstory of how we got here. Right? We know that the defendant was constantly being told that his positions were false. The IRS told him: Your refunds are false; your positions are frivolous. This isn't real. You know, these refunds aren't real. You're not getting millions of dollars. You don't even have any income to report. This isn't real. But what these liens are dependent, right, they're based on the refunds; I didn't get my money, I'm filing a lien. Nothing about any of this is real, Ladies and Gentlemen, so they're false. We know that.

He was told by the IRS. He was told in Tax Court. He was told even on the IRS website, right, the information that's disseminated to the public, that these kind of schemes, original issue discount, these little bit of these 1099-OIDs which we heard about, they're schemes; they're frivolous. They're not real. They're false. The defendant was told that. He had every reason to know that. The IRS puts out information about this.

Ladies and Gentlemen, he was even told in federal court here in Augusta in orders that were put out from judges that these positions are frivolous. They're false. They're not real.

There's more, though, Ladies and Gentlemen; right? We know the defendant's actions, what did he do? You know, he basically used these liens as weapons; right? And he threatened the people that he wanted -- that he thought would be able to help him or give him the money, this tax money.

So we know the liens are false because he makes these sort of threats that if you don't give me what I want, I'm going to file a lien against you. Well, Ladies and Gentlemen, the very nature of that behavior, we know these aren't real liens. This isn't a contract between two people. This is the defendant making threats. This is the defendant saying give me what I want or else.

He puts it in emails. If you don't give me what I want, every time I don't get what I want, I'm going to file a lien against a government person. Every time I have an issue with a government person I'll file a claim or lien. Ladies and Gentlemen, those aren't real liens. These are threats. None of this is based in anything that's real. It's all false. And the defendant's own word, his own mindset tells us that. We know that. We know why he's doing this. These are used as bargaining chips and threats.

And then eventually he continues to not get his way, so then he's sending in phone calls, basically telling his daughter or his friends, Mr. Jones, I'll make a deal with the government. If they give me my tax money, I'll drop the liens.

You know, that kind of negotiation. That's not real, Ladies and Gentlemen. None of this -- none of these liens have anything to do with anything that's real. None of this. It's all false.

It's all being used by the defendant for a very specific purpose, to try to get this tax money; and when he doesn't get what he wants, he files liens against the people that turn him down or reject him or make decisions that are against him.

We even know that from the letters to Judge Epps. I mean, the letters are absurd. You know, I'm going to come to the courthouse. You're going to do these things for me, Judge Epps, and in return I'll do these things for you. I'll drop the liens. I'll negotiate with you. You know, I will -- I expect a settlement proposal. And if you don't give me what I want, then I'm going to do the following things. We can work this out.

No. Ladies and Gentlemen, none of this, none of these liens are real. None of it. It's all being used and designed for a specific purpose.

Even after the criminal case is filed against the defendant, he's still filing affidavits of presentment and settlement proposals. If you drop the charges, I'll drop the liens; negotiating, now trying to negotiate on his own criminal case. His own actions and his words all tell us that none of

this, Ladies and Gentlemen, none of these liens are real at all.

So I submit to you that the evidence is obvious not only to the defendant; he knew they were false, none of this is real, but any reasonable person looking at any of those maritime liens or UCC Financing Statements would know, based on everything the defendant knew, that they are false. It's very obvious. And we heard testimony to that from the experts who even took a look at these documents and said these are not real.

Maritime liens, I see those in maybe a couple thousand dollars, right, Mr. Shoemaker said, thousands of dollars. I've never seen a maritime lien for 15 million dollars, because those aren't real.

And the UCC Financing Statements, the collateral. Mr. Smith said these don't look real. This doesn't look like this is the kind of thing I normally see. And, of course, when we all know the backstory to how we got here, then it becomes -- makes even more sense to us that we know that this is all a scam. These are false, fraudulent attempts to try to get frivolous tax money. That's what the defendant is doing.

So let's go into the other charge, the involuntary bankruptcy petitions. As I said, the defendant filed maritime liens; then he filed UCC Financing Statement liens, and then when he didn't get what he wanted, he took even a third drastic

step against five victims, and he tried to put them into involuntary bankruptcy. Five people, five petitions filed in bankruptcy court against a judge, an IRS employee, high-ranking federal officials, trying to put them into involuntary bankruptcy.

And, Ladies and Gentlemen, let's be clear, okay. Every one of the victims that came in here and were asked, have you ever been -- in all your years in federal service, has anyone ever tried to put you into involuntary bankruptcy? No. No. That's an extreme. That's -- that's a little different than some of the other things that some of the folks that sign up for public service and volunteer or get appointed or choose that profession. You know, that's a risk that none of the victims have ever had to deal with.

As I said, Ladies and Gentlemen, these are false, but the effects and consequences very much real to these folks, to the victims in this case.

To prove false bankruptcy declarations, the government has to prove the following five elements. We have to prove there was a bankruptcy proceeding. We have to prove that the defendant made a declaration or a statement under penalty of perjury in relation to that proceeding. We have to prove that the declaration or statement concerned a material fact and that the declaration or statement was false and that the defendant made the declaration or statement knowingly and fraudulently.

So let me walk through those elements with you; and, again, we can move quickly through some of them because it's very obvious. Element one, there was a bankruptcy proceeding. Well, we know that. Judge Barrett came in and told us *In Re: Timothy Jermaine Pate a/k/a Akenaten Ali* is a bankruptcy petition, proceeding. So there was a bankruptcy proceeding in this case, and the government has met its burden.

The defendant made a declaration or statement under penalty of perjury in relation to that proceeding. Well, we know that's also true. The five petitions the defendant actually has to fill out on Part 4, there is a warning level -- a warning that says you're signing this under penalty of perjury in relation to the bankruptcy proceeding. It's very clear, spelled out in each of the petitions, and the government has met its burden of proof with regard to that.

The declaration or statements concerned a material fact. Again, very common sense, so I'm not going to spend a lot of time on this, but the defendant attempted to place these folks in involuntary bankruptcy relying on millions of dollars of false liens. Those are material facts. He also claimed that they were -- that there was no bona fide dispute with any of these liens. Well, we know that's not true. We know that's a material fact. Okay. So material facts in these petitions are very clear. They concern debt that's not real. They concern liens that aren't real. They concern disputes.

So the fourth element is that the declaration was false, that the defendant's -- these declarations were false. So I want to spend a little bit of time talking about this. What I think His Honor will tell you is that when you look at the verdict form, when you receive the verdict form in this case, there will be, with regard to these five charges, involuntary bankruptcy petitions, if you find the defendant guilty of the charge, there will be additional questions regarding this particular element, was the declaration false.

And, Ladies and Gentlemen, the government is alleging that there are two false declarations in these bankruptcy petitions, two false declarations. The first is regarding this bona fide dispute. Okay. Judge Barrett came in here and testified and talked about this. But here, it was very clear, okay, that these liens are, in fact -- they are subject to a bona fide dispute, because none of the debtors know anything about them. They're not being agreed to. None of the debtors have said, yes, I have in fact 33-million-dollar lien filed by me (sic) by the defendant. I agree to that. No, that's -- no one is agreeing to any of this. Those are bona fide disputes. Okay. So the defendant checking that box saying that there is not a bona fide dispute, that's a false statement.

Ladies and Gentlemen, the other thing that the -- the other declaration that is false in these involuntary bankruptcy declarations is the amount of money, the fact that he's

claiming -- he's trying to put these individuals into involuntary bankruptcy for all the millions of dollars that they allegedly owed him, which are also false. And we know that and I've already talked about that.

So when you receive the verdict form, you will see those two separate statements about false declarations. And that's what the government has alleged are the two false declarations that the defendant made in these involuntary bankruptcy petitions.

So the other reason we know that these declarations are false is from what -- the evidence that we heard from Judge Barrett, who came in here and testified that when these involuntary bankruptcy petitions made their way to bankruptcy court and made their way to her and she took a look at them; and she's only seen, right, a handful in over a decade of public service as a bankruptcy judge, very, very rare. The fact that one came in, it kind of -- the lights went off. And they went to the front of the line. Remember? Because they're that important.

When you try -- there can be no more important thing, right, in bankruptcy court than trying to put someone involuntarily into bankruptcy. I mean, could you imagine that? A person can put you into bankruptcy? So she says it. And she testified to it. She talks about it, that when she looked at these involuntary bankruptcy petitions, they were false.

Right? And she described it in her order, and she provided evidence about it.

Ladies and Gentlemen, that leads us to the fifth element. The government has to prove that the defendant made that declaration or statement knowingly and fraudulently. And it's similar, relates -- similar to what I've already talked about, that the defendant knew that the liens were false. He knew that the bankruptcy petitions were false. The government has to prove that he knew that and that they were -- that he did it fraudulently. And it is defined there.

Well, Ladies and Gentlemen, what evidence do we have of that? Well, again, I direct your attention to what Judge Barrett said when she came in here. And she looked at these petitions, and she testified that after reviewing them, she determined that these petitions were frivolous; they were abusive. They were intended to intimidate and harass and injure and damage the five victims and destroy or harm their financial standing. That's why the defendant filed these petitions. He didn't get his tax money. The liens weren't working. UCC Financing liens weren't working. So he took the third step, tried to put these five victims into involuntary bankruptcy. And, Ladies and Gentlemen, he did that knowingly, and he did it fraudulently.

You will hear His Honor tell you about what is called in the law a good-faith defense, and it only -- and I want to

be very clear on this. This defense only relates to the counts involving involuntary bankruptcy petition. It is not a defense to filing a false retaliatory lien. This defense does not apply to that. It only applies to the involuntary bankruptcy petitions.

And what this defense is is, in essence, under the law, it says that if you make a mistake in judgment or an error in management or you're careless, you know, that's not fraudulent intent. That's a defense to the charge. You can rely on that kind of belief, if it's honestly held, to not be found guilty of the charge. And the law goes on to sort of describe both, but what is not good faith is that if you intend to deceive others or if you make representations that you knew were false or fraudulent, that's not a defense.

Ladies and Gentlemen, I've been talking throughout this about how the defendant knew in both the liens and these bankruptcy petitions that this was all false, that none of this was real. And the defendant knew that.

I would ask you, does any of this sound like good faith? I mean, does -- when the judge -- when the defendant sends Judge Epps correspondence that refers to him as property or a slave or a boy, does any of that sound like good faith, that the defendant believes that what he's doing is some sort of honest-held belief, that this is how to go about it?

I mean, when a bankruptcy judge is coming into the

courtroom and testifying and providing you all with evidence about, after she's reviewing these petitions, that they are frivolous and abusive and harass and intimidate and damage the victims and destroy or meant to destroy their financial standing, does any of that sound like good faith to you? I submit to you, Ladies and Gentlemen, that none of what the defendant did in any of this was done in any kind of good faith.

So I finish where I started, which was that the defendant used these liens and bankruptcy petitions as weapons. They were used as weapons against the seven victims. And they were used, and the harm was very much real. Whether it had to do with potential credit problems or trying to get into -- serve in federal government positions because you're worried about the kind of effect that these petitions might have, where you're at such a high level in federal government, that the fact that anyone in the media would report that you have a lien against you could destroy not only your integrity, but your ability to lead, something like the Inspector General's Office of the Treasury Department. These effects are very much real.

You know, when you're applying for security clearances or trying to get to that next position within the federal government and you now have to report this to investigators to say that I have a lien against me; and it's time consuming, and it's costly, and it's meant to harass and intimidate.

That's why -- that's what these liens -- that's what these petitions are meant to do. They were meant to harass the seven victims. That's what the defendant was trying to do here.

Ladies and Gentlemen, "verdict," which you will deliver, comes from the Latin. It means to speak the truth. It means to speak the truth. Ladies and Gentlemen, I submit to you that you have listened to over two-and-a-half days of evidence, and you've seen the truth; you've heard the truth. Now I ask you to return the only verdict that speaks the truth in this case, and that's to find the defendant guilty of the charges. Thank you.

THE COURT: Thank you, Counsel.

Members of the Jury, let's take a bit of a stretch break at this point.

All right. Everybody can have a seat. Thank you.

MR. MAINES: Your Honor, if I could have the government's slide taken down.

THE COURT: We'll get right there. Ms. Hammock is handling something for me down there and she'll get that down.

All right, Mr. Maines.

MR. MAINES: Thank you, Your Honor.

Opposing Counsel, Members of the Jury, I'd like to start by saying how impressed I was with their closing statement, and the reason I say that is because of a lot of the things that I

learned from Mr. Fred Rogers, which was, if we can imagine what our neighborhoods, our real neighborhoods would look like, if we could say one kind word to each other, how much better this world would be; and that's particularly relevant in this case, because even though this did start, from their perspective, from the government's perspective, with that absurd lawsuit against the IRS, which didn't even properly name the defendants, that didn't comply with local rules, there was an event that occurred prior to that. That's when Mr. Pate filed a petition to have his case heard with the Tax Court.

And what happened in that proceeding? Mr. Pate's writings read like an impetuous child. He's an angry, unsophisticated person. And that's really a demeaning term, unsophisticated. There's a better word for that. Inexperienced.

When Mr. Pate went to Tax Court, or his case went to Tax Court, it was dismissed. He actually talked to the other lawyer, Ms. Brianna Taylor. She came to court and testified that she took the time to call Mr. Pate. She did that because, as lawyers, we have to live by some of Mr. Rogers' rules. Doesn't necessarily have to be what the other person wants to hear. But we treat each other with dignity, and we treat each other with respect, and that's what Ms. Taylor did.

And while Mr. Pate obviously disagreed with that decision and told Ms. Taylor that he doesn't agree with her

motion to dismiss, even though it was proper, even though it's exactly the right thing that should have been done, how did Mr. Pate react? He never filed liens in that case. He never sued Ms. Taylor or that Tax Court judge. We don't even know who that Tax Court judge is.

Those are all things he could have done. He could have started filing what he called liens in that case. But he didn't. Someone took the time to talk to him.

Clearly he's gotten a lot of bad information, a lot. No one can just opt out of who we are as a people and how our government works. That's not an option. He may think it's an option, but that doesn't mean, from his perspective, what's going on is an intent to hurt individuals.

Government service is just that, service. It comes with certain things that are inconveniences. You're going to get crazy people out of the woodwork saying crazy, ridiculous things. And at the end of the day these are writings. None of these writings were proper liens. None of these writings went on the credit reports. Only one of the government's witnesses, Secretary Lew, indicated he even checked his credit report.

There's been a lot of bombastic language used to describe the horrible impact of these liens and these recordings, and yet for all of the government's witnesses, one had his people check to see if these things had been reported on his credit history. No one couldn't buy a car. And, yes,

they shouldn't have to suffer through these inconveniences, but some of that's inherent in your position. That's part of service. You get calls from constituents you really don't want to hear from that say the same crazy stuff they always say. They show up to city hall meetings and have ridiculous ideas and absurd criticisms.

As human beings our job partly is to help -- to make sure that other people realize how important they are, each of you. There's something unique and valuable about all of us. And it's pretty easy to understand for Mr. Pate that there's probably not a lot of people saying that to him. He lives in a motel room. He's hearing -- first person he talks to after he gets arrested. What did that sound like? Sounded like someone probably giving him these bad ideas and this paperwork, Mr. Thomas Jones.

And go back and look at that conversation. Mr. Pate is repeating the same ridiculous absurd things that's in his writings, exchange for value. He's sending a Comcast bill to the IRS. No one here really thinks that he's trying -- he reasonably thinks the IRS is going to pay his cable bill. That is absurd. That's not what's going on. That's not what's going on up there in his mind.

I want you to remember how Judge Epps explained his role as a United States Magistrate. It was a very nice explanation. I practice here, and I liked the explanation. He

has a lot of responsibilities and duties. That's part of service. But he never even met Mr. Pate.

If you recall, Marshal Brants (sic), how did he act? As an intermediary. These are just names to someone like Mr. Pate, who's got demented ideas. Marshal Brants (sic) intercepted him, interdiction for people they perceive as frequent fliers -- filers, not fliers. Filers, frequent -- there's even a name for it in this courthouse.

And it's obviously frustrating to Mr. Pate. He believes there's some legitimacy to this stuff. He wants to engage in this process. It's pretty obvious he's probably the world's worst scam artist; and that's how we know it's not really an intent to defraud on his part, because for three years he's never made a dime. Nothing. He's received nothing from the IRS, and he rants and raves in these ridiculous filings about it. There are a lot of easier ways to scam and steal and get money for nothing. The idea that he would continue living in a hotel room and that this is his plan, to make money and then if he doesn't get the money, hurt other people is ludicrous on its face.

The filing of false liens, A, has to be a lien. I'm not going to spend a lot of time talking about that. I think we've all had our fill of what a lien is and is not. There has to be an intent by Mr. Pate to file a false lien. It's not false in his mind.

Judge Epps explained that he doesn't have time to go through point by point Mr. Pate's questions, and if you recall throughout that case, the case that he filed against the IRS, he files what he thinks are liens after the nonresponse from the judge. He thinks he's participating in a judicial process. He's frustrated. He comes by; he wants to be heard. He wants his arguments to come before a judge. He gets intercepted by Marshal Brants (sic). None of it threatening. Never threatened anyone's physical safety. Never engages in that.

The first deputy clerk, the clerk, the young lady that came in and testified that she was the one that primarily dealt with Mr. Pate, she described his clothing as ratty. He's wearing T-shirts, that he was unkept. This was not someone that has any sophistication of how our judiciary works.

She didn't know I was going to ask that. She was ready to volunteer, she dealt with him the most. She was put off by his appearance. Every other witness that come in -- that came in characterized his appearance differently, because that doesn't play into the state's theory that Mr. Pate has this scheme to try to get rich off the United States Government.

He has fanciful ideations that are absurd. He believes they're legitimate. Mr. McCool acknowledged something that's very, very important in this case in his closing statement; and I don't know if he's aware of it, but I made sure to make a note of this. Mr. Pate believed he was owed that money.

It's ridiculous. It's absurd. The government said no. We're here because now the government wants to say no, and we want to convict you of a crime.

There is a sincerity in his filings. He did not file liens on people he met and talked to. Someone like Secretary Lew, before we had the internet, we would not be here today. As Secretary Lew testified, he gets Google alerts when his name comes up in stuff. That's how commonplace this is. These conspiracy theorists, this poison that has infected and informed his decisions about what the law is and what his rights are, infected this man. And he believed he was owed that money, just like the United States Attorney told you.

What does that mean as far as filing false liens? He did not know that they were false, and someone in his position doesn't have reason to know either. These are sincerely held convictions, however wrong they may be. And he will listen to people when they interact with him. He never even met the very distinguished, polished, well-prepared, educated and articulate Judge Barrett. She was a name. The bankruptcy court to him is a glass plexi wall upper half and a counter on the bottom and papers that he files. To Mr. Pate that's what bankruptcy court is. These are just names to him. He doesn't understand what goes behind our processes.

And it couldn't be even more clear that someone like Mr. Pate wouldn't understand that than the fact that Judge

Barrett and Judge Epps came to this courtroom and painstakingly explained to all of you what her job is, how she goes about it, what her function is, what Judge Epps's function is in this courthouse. No one did that for Mr. Pate. Mr. Pate had the Marshal come out and intercede. He was allowed to file paperwork. That's it.

The wonderful explanations we got about our procedures, about the rules we have that govern pleadings and filings and litigation, none of that was explained to him. The Clerk of Court can't do it, which is kind of a cool irony in this case, because if the clerks could have, it may very well have stopped this from happening, just like it didn't happen with Ms. Taylor.

Ms. Taylor explained to him that what he was filing was ridiculous, that it was -- that she was going to make a motion to dismiss. He objected. Life went on. It's an inconvenience. It's part of government.

Part of being a government employee -- part of service -- service is not just I'm done serving as Secretary of the Treasury, so now I'm going to work at a private equity firm in New York City. Part of service is dealing with the consequences that happen of living in this society and having people like Mr. Pate in it and not understanding how our systems of government work.

He does not have intent to defraud; he has poorly

conceived ideas about what liens are, how they function. And it couldn't be even clearer than when he lists a lien as the actual account, the basis for his theory of recovery in the Chapter 11 bankruptcy proceeding. It's calling a goat a horse or a sheep. It makes no sense. It's not a basis for bankruptcy.

Someone with Mr. Pate's sophistication -- and that is a demeaning word, and I apologize for using it -- does not understand the nature of filing these things and their impact. He thinks he's engaged in real litigation. He talks on the phone with Mr. Jones, and you'll see that. I believe it's Exhibit Number 65 and 67. It's the transcript. You'll have the hard copy.

He's talking about how the government got his stuff, but he's got other disks with that information on it. There's the Moorish nation in Florida who's got it. He makes reference to them in that exhibit, and you'll have that back there.

He thinks the government is trying to stop him from whatever hair-brained scheme or idea about his Moorish nation or sovereign citizen or whatever else he thinks is really going on. He doesn't view it as some financial scheme. This is -- this is just the rantings and ravings of someone that probably didn't have a lot of people telling him that he has value, no matter how bad his ideas may be.

He does not have the intent to defraud. He has foolish

ideas about how our government works, about his place in it while living in a hotel room.

Exchange for value, return for value. He repeats it over and over again.

I'm asking you not to find him guilty, not because there weren't liens filed, but because he did not have the intent to defraud, that someone in his position did not have reason to know. Mr. Pate did not have reason to know that what he was filing was fraudulent. He thought this was legitimate. He's getting this from someone else.

A fool doesn't know he's a fool. That's the cruel part about all of this. He says he's not a dummy. He says it in some of the rantings that he writes. He doesn't know what he doesn't know. And that's such a trite expression, but it's true in this case. And so that's why we're here.

He's not charged with perjury. He made these statements under penalty of oath -- of perjury. Think about that. Why is he not charged with that? Because it's obvious he really believes this lunacy. That's why he's not charged with that. He's charged because he had the temerity to come in and file paperwork that was ludicrous. And the witnesses, while inconvenienced -- and they shouldn't be -- not one of them even -- that they were so upset, as the U. S. Attorney said, had such a real impact that for a year and a half they didn't even check their credit report. Not one.

Involuntary bankruptcy, good-faith defense. To Mr. Pate this is a bona fide dispute. He is writing a lot of words in response to these orders that dismiss his case, and just remember when you're deliberating, he's received nothing. He's received no money for three years, going on four years. Only a fool -- only a fool would think that this is -- there is any possibility of recovering money from this, and yet, here he is typing out these absurd responses.

That is the definition of good faith; and the reason we're here is because he did it in this courtroom, or this courthouse, and the United States Government is going to come down with everything they can to stamp it out. I'm asking you to neutralize that and find him not guilty, because he did not have the intent to defraud. In his mind there was a bona fide dispute that he was owed that money, for whatever poisonous reasons that are out there that have infected his thinking and his thoughts and his actions. And remember that he does have value, and that when someone took the time to talk to him like a human being, he didn't do that stuff. Thank you.

THE COURT: Rebuttal, Mr. Howard.

MR. HOWARD: Thank you, Your Honor. When someone takes the time to talk to him like a human being, he doesn't do that stuff. You know what that sounds like to me? That sounds like he's blaming the victims. If they had been nice to me, I wouldn't have done that. If Judge Epps had been nicer to me, I

wouldn't have threatened to put a lien against him. I wouldn't have then put a lien against him for millions of dollars. I then wouldn't have put a hundred-dollar lien against him. I wouldn't have called him my property, my slave boy. It's his fault. I'm blaming the victims.

You don't avoid criminal liability by saying, well, I didn't put a lien against those people. Right? Brianna Taylor isn't charged as a victim in this case. If he had put a lien against her, we would have charged him for that.

You can take that idea of blaming the victim and you can put it exactly where it belongs, far away from the consideration that you're going to give and far away from common sense. And, frankly -- well, I'll let you decide what to do with that idea of blaming the victims.

I'll also let you decide what to do with the idea that this is part of public service, that when you go into public service and serve the government, that this is part of it, that you're going to wake up, that you're going to go to work; you're going to get a phone call from the FBI and you're going to say that there's a lien been placed against you. You heard that that's a part of public service.

That's not. And it shouldn't be; and it isn't, and there's a federal criminal law that says it isn't. And that's what he's been charged with 16 times.

If it was part of public service, there wouldn't be a

criminal law outlawing it. If it was part of public service, we wouldn't be in this courtroom. It's not. Jacob Lew wouldn't have come down all the way from New York to testify if this was just part of public service, the former IRS Commissioner. We brought all of the victims here. Did one of them say, yeah, you know, this is just part of the job? This is, you know, you take the good with the bad?

You can take that idea that this is part of public service and you can put it in that same bucket that you can blame the victims in. There was a lot of blame for a lot of people, but there wasn't any mention of taking his own accountability and responsibility for his own actions.

We're here because Timothy Pate filed ridiculous tax returns, followed it up with ridiculous threats of ridiculous liens and then filed those liens. He carried out his threats. We're here because Timothy Pate is the one that did that. Timothy Pate is the one that filed the liens. Timothy Pate is the one who took those actions. Timothy Pate is the one who is responsible for his own conduct. Not Thomas Jones. Not these other people. Oh, well, Brianna Taylor was nice to him when she talked. And how did he respond to her? He hung up on her.

Talk about there wasn't enough people that were nice to him. And you saw in Exhibit 82 when he writes, "I'm never gonna sign any of their bitch ass paperwork, and that attorney and judge may get curse the fuck out next time I go to court." They

weren't nice enough to him. Right? That's his defense.

It's not false in his mind. You heard that. It's not false in his mind. What did he have to believe that these people were vessels? Right? He filed liens against them claiming they are vessels. What did he have to believe that these people were vessels? None of them floated up to that witness stand. Right? He had no basis to believe that. You can stop that consideration for every one of those maritime liens right there, putting aside that they owe him money, putting aside ridiculous amounts. They are people.

It's not part of public service. You don't blame the victims, and they're not vessels. Okay?

It's not false in his mind. Good-faith defense. Think about -- you're going to get an instruction on good-faith defense; and you're going to hear, I expect, that it'll talk about an honest belief and an honest opinion. From what does he form an honest belief that these people owe him any money?

You heard, and I counted, six times defense counsel say he's unsophisticated. How sophisticated do you need to be to know that this is wrong? How sophisticated do you need to be to know that people don't owe you 33 million dollars when you have no agreement, never talked to them, never seen them, don't know who they are; they haven't promised you anything? How sophisticated do you have to be? A kindergartner? First grade?

He went to Augusta State University. You saw the I.D.s.

You saw the student loan debt. How sophisticated do you have to be? High school graduate? College graduate? He's college educated, and he's claiming he's not sophisticated. Put that in the same bucket that goes with blaming the victims and thinking that he didn't know that they were not vessels.

There was mention of his shirt and his rags and his -- who cares what he's wearing? It doesn't matter. We don't have to show as an element of this offense that he was dressed a particular way while he's committing crimes. It's not an excuse to criminal conduct if you have holes in your shirt. Right? What is he trying to do? Elicit sympathy. There is not a separate criminal code regarding wealth. Lack of wealth is not a defense, has nothing to do with it. And it certainly doesn't excuse his criminal conduct, and he certainly can't blame other people for it.

And think about why -- if he isn't wearing nice clothes, think about that. Again, somebody who went to Augusta State University. What does he spend his time doing? Filing frivolous returns, filing frivolous filings on the docket and threatening people.

He believed he was owed the money. Again, based on what? Right? Somebody who lists their occupation as a creditor would presumably know what it means to extend credit. What credit did he extend to Lucinda Rauback, Denise Davis, Judge Epps, Secretary Lew, Commissioner Koskinen, and Judge Barrett?

What credit did he extend to them? What did they receive? Right?

I stood here a couple days ago, and I gave the example when we were talking about liens of a car loan. The bank gives you money in exchange for the promise to pay them back. What did those victims get from him, other than harassment, other than being retaliated against, other than -- other than having to take time out of their lives to get up on the witness stand, to travel throughout the country to be here? What did they get? What did they get? We don't have to prove that they suffered any harm, but we've done it anyways, because you know why, because it goes into his words; it shows the power of a lien. You heard that in his jail call.

And it's very easy to say, oh, it didn't even affect these people's credit. Must be very easy to say that when it's not your name on these documents, when you're not opening the newspaper and your family and your friends can see that. That's very easy to say, oh, you know, they're public servants. It's part of the job. Do we really want to live in that society when it is? Do we want our public servants, do we want Judge Epps having to worry about is this litigant coming after my family?

He has never had to refer something to the Marshals in a civil case ever. This is the first time. This is the first time all of these victims have been put into -- or attempted to be put into involuntary bankruptcy. This is such an outlier,

and you heard defense counsel get up and say that it's part of public service. Can you imagine if that was part of public service? Who would want to do it? Who? Timothy Pate probably. And do we want Timothy Pate serving as Secretary of the Treasury?

No one was nice to him. So he filed the liens. That was my takeaway from what you just heard from defense counsel.

You know who bent over backwards for Timothy Pate? I'd say the IRS bent over backwards. They gave him an opportunity to cure his frivolous returns before penalizing him. The next year they gave an opportunity to cure before penalizing him. They gave him a phone number to call for questions. The maritime lien center has a phone number that he could call for questions. The clerk's office provided him documents. The attorney at IRS, Brianna Taylor, explained it to him. The Department of Justice filed a motion to dismiss laying out the laws. The IRS put up publications on its website informing him that these were frivolous tax returns. Oh, but nobody was nice to him, so that's why he did it.

Members of the Jury, it would be laughable -- what you have heard and what you have seen regarding these amounts, it would be laughable if you didn't also hear the effect on those people; Lucinda Rauback, wondering if there's any other liens. All the effects that it has on those people.

I'm asking you to find the defendant guilty based on the

evidence, applying the law, but when you go back in that jury room, use your common sense. I want you to find him guilty, and I'm asking you to find him guilty of every single count, because at some point enough is enough, Timothy Jermaine Pate.

At some point he is going to be told enough is enough. Someone -- and I'm asking this jury to make it very clear that this isn't part of public service, that it's not the victims' fault. The fault lies with Timothy Jermaine Pate, and find him guilty. Thank you.

THE COURT: Members of the Jury, it is now my duty to instruct you on the law. We're going to get you written copies of my instructions, but I want you to, of course, listen carefully to me. Let's take a moment to pass those out and then we'll take up one more stretch break after that. Looks like everybody's got a copy. If you wish, you can stretch your legs for a second.

All right. Members of the Jury, as I said, it's now my duty to instruct you on the rules of law. You may feel free to read along with me. It's my duty to instruct you on the rules of law that you must use in deciding this case.

After I've completed these instructions, you will go to the jury room and begin your discussions, what we call your deliberations. You must decide whether the government has proved the specific facts necessary to find the defendant guilty beyond a reasonable doubt.

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against the defendant or the government.

You must follow the law as I explain it, even if you do not agree with the law, and you must follow all of my instructions as a whole. You must not single out or disregard any of the Court's instructions on the law.

The indictment or formal charge against a defendant isn't evidence of guilt. The law presumes every defendant is innocent. The defendant does not have to prove his innocence or produce any evidence at all. A defendant does not have to testify; and if the defendant chose not to testify, you cannot consider that in any way while making your decision.

The government must prove guilt beyond a reasonable doubt. If it fails to do so, you must find the defendant not guilty. The government's burden of proof is heavy, but it doesn't have to prove a defendant's guilt beyond all possible doubt. The government's proof only has to exclude any reasonable doubt concerning the defendant's guilt.

A reasonable doubt is a real doubt based on your reason and common sense after you've carefully and impartially considered all the evidence in the case. Proof beyond a reasonable doubt is proof so convincing that you would be willing to rely and act on it without hesitation in the most

important of your own affairs. If you're convinced the defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

As I said before, you must consider only the evidence that I've admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But anything the lawyers say is not evidence and isn't binding on you. You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts. Your own recollection and interpretation of the evidence is what matters.

In considering the evidence, you may use reasoning and common sense to make deductions and reach conclusions. You shouldn't be concerned about whether the evidence is direct or circumstantial. Direct evidence is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to

say and how important that testimony was. In making that decision, you may believe or disbelieve any witness in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness, I suggest that you ask yourself a few questions. Did the witness impress you as one who was telling the truth? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to accurately observe the things he or she testified about? Did the witness appear to understand the questions clearly and answer them directly? Did the witness's testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact and ask whether there was evidence that at some other time a witness said or did something or didn't say or do something that was different from the testimony the witness gave during this trial. But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may

depend on whether the misstatement was about an important fact or an unimportant detail.

As for the indictment in this case, it charges 21 separate crimes, called counts, against the defendant. Each count has a number. You'll be given a copy of the indictment to refer to during your deliberations. I'll explain these counts to you in a moment.

I like to mention two things about the indictment. First, you'll see the indictment charges that a crime was committed on or about a certain date. The government doesn't have to prove that the crime occurred on an exact date. The government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

Additionally, you should take note that the word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

Now, as to Counts 1 through 10 and 16 through 21, in Counts 1 through 10 and 16 through 21, the government charges the defendant with violating 18 United States Code Section 1521. Under that code section it's a federal crime to file a false lien against a United States employee or official on account of that person's performance of his or her official duties. The defendant can be found guilty of this crime only if all of the following facts are proved beyond a reasonable doubt:

One, the defendant filed or attempted to file a document in a public record or a private record generally available to the public.

Two, the filing contains any false lien or encumbrance against the real or personal property of a federal employee or official.

Three, the defendant filed the document on account of the federal employee or official's performance of his or her official duties.

And, four, defendant knew or had reason to know that the lien or encumbrance was false or contained a materially false, fictitious or fraudulent representation.

A representation is false if it is untrue or is made with a reckless indifference for the truth. A representation can be false if it is half true or omits or conceals a material fact. A fact is material when it has a natural tendency to influence or is capable of influencing the decision of the person or entity to whom or to which it is addressed.

Likewise, a representation that is false, fictitious or fraudulent is considered materially so when it has a natural tendency to influence or is capable of influencing the decision of the person or entity to whom or to which it is addressed. It is irrelevant whether the false, fictitious or fraudulent representation actually influenced or affected the decision-making process. A representation can be materially

false, fictitious or fraudulent even if the decision maker did not actually rely on the representation or even if the decision maker actually knew or should have known that the representation was false.

A lien is a legal right or interest that a creditor has in another's property to secure payment of a debt or performance of an obligation. An encumbrance is a claim or liability that is attached to property and that may lessen its value. For purposes of this instruction, a lien or encumbrance may not be valid nor must you find that it actually impaired the government employee's property rights or interests.

In determining whether defendant had reason to know that a lien or encumbrance was false, you may consider what information the defendant had and what a reasonable person would infer from that information.

A federal employee or official includes judges and employees of the United States District Courts and United States Bankruptcy Courts as well as officials and employees of the Internal Revenue Service and Department of Treasury.

Now, as to Counts 11 through 15, in Counts 11 through 15, the government charges the defendant with violating 18 United States Code Section 152 Subsection 3. Under that code section, it's a federal crime to make a false declaration or statement under penalty of perjury in a federal bankruptcy case. The defendant can be found guilty of this crime only if all of

the following facts are proved beyond a reasonable doubt:

One, there was a bankruptcy proceeding.

Two, defendant made a declaration or statement under penalty of perjury in relation to the proceeding.

Three, the declaration or statement concerned a material fact.

Four, the declaration or statement was false.

And, five, defendant made the declaration or statement knowingly and fraudulently.

The government does not have to prove that a loss was suffered as a result of a false statement made in the course of the bankruptcy proceeding.

A declaration or statement is material when it has a natural tendency to influence or is capable of influencing the decision of the person or entity to whom or to which it is addressed. It is irrelevant whether the false declaration or statement actually influenced or affected the decision-making process. A false declaration or statement can be material even if the decision maker did not actually rely on the declaration or even if the decision maker actually knew or should have known that the declaration was false.

A claim is fraudulently made if it is intended to deceive or to cheat ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to one's self.

Good faith is a complete defense to a charge that requires intent to defraud. Here the good-faith defense only applies to Counts 11 through 15, which charge defendant with violations of 18 United States Code Section 152 Subsection 3, and thus, require proof of an intent to defraud.

A defendant isn't required to prove good faith. The government must prove intent to defraud beyond a reasonable doubt. An honestly held opinion or honestly held belief cannot be fraudulent intent, even if the opinion or belief is mistaken. Similarly, evidence of a mistake in judgment, an error in management or carelessness can't establish fraudulent intent, but an honest belief that a business venture would ultimately succeed doesn't constitute good faith if the defendant intended to deceive others by making representations the defendant knew to be false or fraudulent.

Each count of the indictment charges a separate crime. You must consider each crime and the evidence relating to it separately. If you find the defendant guilty or not guilty of one crime, that must not affect your verdict for any other crime.

I caution you that the defendant is on trial only for the specific crimes charged in the indictment. You're here to determine from the evidence in this case whether the defendant is guilty or not guilty of those specific crimes.

You must never consider punishment in any way to decide

whether the defendant is guilty or not guilty. If you find the defendant guilty, the punishment is for the judge alone to decide later.

The government must prove beyond a reasonable doubt that the defendant was the person who committed the crime. If a witness identifies the defendant as the person who committed the crime, you must decide whether the witness is telling the truth. But even if you believe the witness is telling the truth, you must still decide how accurate that identification is. I suggest that you ask yourself questions.

One, did the witness have an adequate opportunity to observe the person at the time the crime was committed?

Two, how much time did the witness have to observe the person?

Three, how close was the witness?

Four, did anything affect the witness's ability to see?

Five, did the witness know or see the person at an earlier time?

You may also consider the circumstances of the identification of the defendant, such as the way the defendant was presented to the witness for identification and the length of time between the crime and the identification of the defendant.

After examining all the evidence, if you have a reasonable doubt that the defendant was the person who committed

the crime, you must find the defendant not guilty.

You've been permitted to take notes during the trial. Most of you, perhaps all of you, have taken advantage of that opportunity. You must use your notes only as a memory aid during deliberations. You must not give your notes priority over your independent recollection of the evidence, and you must not allow yourself to be unduly influenced by the notes of other jurors. I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

Now, your verdict, whether guilty or not guilty, must be unanimous; in other words, you must all agree. Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement.

While you're discussing the case, don't hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong, but don't give up your honest beliefs just because others think differently or because you simply want to get the case over with. Remember that in a very real way you're judges, judges of the facts. Your only interest is to seek the truth from the evidence in the case.

When you get to the jury room, choose one of your

members to act as foreperson. The foreperson will direct your deliberations and will speak for you in court.

Now, a verdict form has been prepared for your convenience, and you will have this verdict form that I'm holding with you in the jury room.

You'll note that it's fairly straightforward. As to Count 1, we, the jury, find the defendant, and then there's a space for you to indicate guilty or not guilty. And then you can move forward on the verdict form. As you move forward, there are similar questions for all the counts.

Now, in Count 11 there is a question 11A, and there's a note that if you find the defendant not guilty as charged in Count 11, you need not consider Paragraph 11A. However, if you find the defendant guilty as charged in Count 11, you must proceed to Paragraph 11A below.

There's a similar note for the counts that follow, Count 12, Count 13, Count 14 and Count 15 in the subparagraphs below. And then Count 16, 17, 18, 19, 20 and 21 are after those. Okay? So you'll have that verdict form with you.

Take the verdict form with you to the jury room. When you've all agreed on the verdict, your foreperson must fill in the form, sign it, date it and carry it. Then you'll return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the Marshal.

The Marshal will bring it to me, and I'll respond as promptly as possible, either in writing or by talking to you in the courtroom, but I caution you not to tell me how many jurors have voted one way or the other at that time. Okay?

Now, Ladies and Gentlemen, at the beginning of this case, two of you were selected as alternate jurors. We select alternate jurors in every case because we never know what might happen during a case. Whether it's a medical emergency, an accident or a family emergency during the case or some other event, the Court must be prepared to substitute an alternate juror in case we have to -- we lose one juror during the case.

We had that the last trial we had, I believe it was. We had to use an alternate juror because one of the jurors couldn't fulfill the full service during the case, so we replaced with an alternate juror.

Now, we do not identify the alternate jurors at the beginning of the trial because we want all of you to listen to all the evidence and all the instructions in the case in the event one of our alternate jurors will be deliberating. But since we have not used an alternate, at this time the clerk will announce the names of the alternates, and the alternates will remain seated in the courtroom while the rest of the jurors retire to the jury room at this time.

All right, ma'am. If you will, please, Mrs. Hammock, call the alternate jurors.

THE CLERK: Yes, sir. Juror Number 6, Brett Beckmann, and Juror Number 36, Michael Laird.

THE COURT: All right. If the remainder of you will please stand and you will return to the jury room.

THE CSO: All rise for the jury.

(Jury out)

THE COURT: All right. You may have a seat. As to our alternates, I'll tell you once again you're not off the hook yet. We're going to have you stay here, stay around, and I'm sure the court security officer and the clerk will have directions as to where you're supposed to go. So at this point in time we'll direct our alternate jurors to where they are supposed to be, Mrs. Hammock, with the court security officers' assistance.

THE CSO: Do you want them to take their stuff with them?

THE COURT: You may take it with you. Just sit tight, please. Thank you.

(Alternate jurors out)

THE COURT: All right. You may have a seat, Counsel. The jurors are no longer in the courtroom. And the alternates have been placed where we'll have them in case we need to use them.

Counsel, I want to tell both of you on both sides that in an interesting and difficult case, with a very -- some unique

circumstances, both of you -- all three of you handled yourselves very well, comported yourself with the dignity that the Court expects and the collegiality the Court expects. You tried a good case, and I appreciate the way that you handled the case and that you handled it in a professional manner.

Particularly counsel for the defendant, Mr. Maines, you had a difficult situation that you've had to deal with, and I think you've done as well on the case as you could have given the circumstances that you have.

I don't know what the jury will decide, and I don't know when they'll decide it. I've given up trying to predict what juries will do. If I ever began it, it was a fruitless venture.

I do want to tell you, though, it is my practice that if they should send out a question or any message, I respond in writing to that question. So if I get a question or message, I'll have it written down; I'll bring it to you, and I'll read their question to you. I'll tell you what it is that I intend to respond to them in writing with. I'll get your feedback about that response, and then we'll give that to the jury. So you'll be a part of that process. So obviously we need to make sure that Mrs. Hammock knows how to get in touch with you.

I believe that you all need to go through the exhibits with Mrs. Hammock to be sure that they're properly identified to get them to the jury. Okay? So we're going to retire at this time, and we'll wait till we hear from this jury.

THE CSO: All rise.

(Judge exits the bench)

THE CLERK: I'm just going to start from my list and read off the exhibit number and a description of the exhibit. You guys ready?

MR. HOWARD: Yes, ma'am.

THE CLERK: All right. We have Government's Exhibit 1-1, Civil Complaint CV Docket Number 1, marked and admitted without objection. Government's Exhibit 1-2, application to proceed without prepaying fees or costs, CV Docket Number 2, marked and admitted without objection. Government's Exhibit 1-3, motion for court order of tax records, CV Docket Number 7, marked and admitted without objection. Government's Exhibit 1-4, motion for court order of bank records, CV Docket Number 8, marked and admitted without objection.

Government's Exhibit 1-5, order by Judge Epps dated 10/26/2017, CV Docket Number 11, marked and admitted without objection. Government's Exhibit 1-6, United States' motion to dismiss, CV Docket Number 14, marked and admitted without objection. Government's Exhibit 1-7, response to motion to dismiss case, CV Docket Number 15, marked and admitted without objection. Government's Exhibit 1-8, motion for arrest warrant of J. K., CV Docket Number 16, marked and admitted without objection.

Government's Exhibit 1-9, order by Judge Epps dated

1/29/2018, CV Docket Number 18, marked and admitted without objection. Government's Exhibit 1-10, response to order of denial of arrest warrant, CV Docket Number 19, marked and admitted without objection. Government's Exhibit 1-11, affidavit of truth for claim, CV Docket Number 21, marked and admitted without objection.

Government's Exhibit 1-12, motion for default judgment and order for payment, CV Docket Number 22, marked and admitted without objection. Government's Exhibit 1-13, affidavit of truth for claim, CV Docket Number 23, marked and admitted without objection. Government's Exhibit 1-14, affidavit of judgment for claim and notice of lien, CV Docket Number 27, marked and admitted without objection. Government's Exhibit 1-15, affidavit of judgment for claim and notice of lien, CV Docket Number 28, marked and admitted without objection.

Government's Exhibit 1-16, affidavit of notice of presentment, CV Docket Number 32, marked and admitted without objection. Government's Exhibit 1-17, affidavit of lien and notification of lien, CV Docket Number 34, marked and admitted without objection. Government's Exhibit 1-18, affidavit of notice of presentment, CV Docket Number 35, marked and admitted without objection. Government's Exhibit 1-19, affidavit of demand for payment, CV Docket Number 36, marked and admitted without objection.

Government's Exhibit 1-20, affidavit for arrest warrant,

CV Docket Number 37, marked and admitted without objection. Government's Exhibit 1-21, affidavit of response, CV Docket Number 38, marked and admitted without objection. Government's Exhibit 1-22, affidavit of truth and notice of intent, CV Docket Number 39, marked and admitted without objection. Government's Exhibit 1-23, affidavit of judgment for claim and notice of lien, CV Docket Number 40, marked and admitted without objection.

Government's Exhibit 1-24, affidavit warrant of arrest CV Docket Number 41, marked and admitted without objection. Government's Exhibit 1-25, affidavit warrant of arrest, CV Docket Number 42, marked and admitted without objection. Government's Exhibit 1-26, affidavit of notification, CV Docket Number 43, marked and admitted without objection.

Government's Exhibit 1-27, affidavit of claim, CV Docket Number 44, marked and admitted without objection. Government's Exhibit 1-28, order by Judge Epps dated 4/9/2018, CV Docket Number 45, marked and admitted without objection. Government's Exhibit 1-29, motion for court orders, CV Docket Number 46, marked and admitted without objection.

Government's Exhibit 1-30, affidavit notice of tax filing, CV Docket Number 49, marked and admitted without objection. Government's Exhibit 1-31, response to court order, CV Docket Number 54, marked and admitted without objection. Government's Exhibit 1-32, affidavit of judgment for claim and

notice of lien, CV Docket Number 56, marked and admitted without objection. Government's Exhibit 1-33, affidavit of judgment for claim and notice of lien, CV Docket Number 57. Government's Exhibit 1-34, United States' notice of opposition, CV Docket Number 58, marked and admitted without objection.

Government's Exhibit 1-35, affidavit of lien and notification of lien, CV Docket Number 59, marked and admitted without objection. Government's Exhibit 1-36, affidavit of lien and notification of lien, CV Docket Number 60, marked and admitted without objection. Government's Exhibit 1-37, affidavit of lien and notification of lien, CV Docket Number 61, marked and admitted without objection. Government's Exhibit 1-38, response to motion for leave, CV Docket Number 62, marked and admitted without objection. Government's Exhibit 1-39, affidavit proof of claim and proof of lien, CV Docket Number 63, marked and admitted without objection.

Government's Exhibit 1-40, affidavit of claim, CV Docket Number 64, marked and admitted without objection. Government's Exhibit 1-41, affidavit of settlement of case, CV Docket Number 66, marked and admitted without objection. Government's Exhibit 1-42, affidavit of claim, CV Docket Number 70, marked and admitted without objection. Government's Exhibit 1-43, affidavit of claim, CV Docket Number 71, marked and admitted without objection. Government's Exhibit 1-44, affidavit of default judgment and notice of lien, CV Docket Number 74, marked

and admitted without objection.

Government's Exhibit 1-45, affidavit of default judgment and notice of lien, CV Docket Number 75, marked and admitted without objection. Government's Exhibit 1-46, order by Judge Hall dated 6/25/2018, CV Docket Number 79, marked and admitted without objection. Government's Exhibit 1-47, affidavit of response to court order, CV Docket Number 81, marked and admitted without objection. Government's Exhibit 1-48, affidavit of default judgment, CV Docket Number 76, marked and admitted without objection.

Government's Exhibit 2-1, affidavit to accept all charges for value and honor in exchange for value and honor, Criminal Docket Number 20, marked and admitted without objection. Government's Exhibit 2-2, affidavit of default judgment, Criminal Docket Number 25, marked and admitted without objection. Government's Exhibit 2-3, affidavit of presentment of liability, Criminal Docket Number 27, marked and admitted without objection.

Government's Exhibit 3-1, United States' motion for declaratory and injunctive relief, Miscellaneous Docket Number 5, marked and admitted without objection. Government's Exhibit 3-2, affidavit of response, Miscellaneous Docket Number 7, marked and admitted without objection. Government's Exhibit 3-3, complaint, Miscellaneous Docket Number 12, marked and admitted without objection. Government's Exhibit 3-4, affidavit

of response to complaint, Miscellaneous Docket Number 15, marked and admitted without objection. Government's Exhibit 3-5, order by Judge Hall dated 4/2/2019, Miscellaneous Docket Number 16, marked and admitted without objection.

Government's Exhibit 3-6, affidavit of response to court order, Miscellaneous Docket Number 18, marked and admitted without objection. Government's Exhibit 3-7, judgment dated 5/15/2019, Miscellaneous Docket Number 22, marked and admitted without objection. Government's Exhibit 3-8, response to motion to partially unseal, Miscellaneous Docket Number 25, marked and admitted without objections.

Government's Exhibit 3-9, affidavit of presentment of settlement, Miscellaneous Docket Number 31, marked and admitted without objection. Government's Exhibit 4-1, involuntary bankruptcy petition, B.K.E., marked and admitted without objection. Government's Exhibit 4-2, involuntary bankruptcy petition, J.A.K., marked and admitted without objection. Government's Exhibit 4-3, involuntary bankruptcy petition, J.J.L., marked and admitted without objection. Government's Exhibit 4-4, involuntary bankruptcy petition, D.D.D., marked and admitted without objection. Government's Exhibit 4-5, involuntary bankruptcy petition, E.M.T., marked and admitted without objection.

Government's Exhibit Number 5, order by Judge Barrett dated 5/25/2019. Government's Exhibit 6, certificate of

mailing, marked and admitted without objection. Government's Exhibit 7, affidavit of claim regarding L.B.R., marked and admitted without objection. Government's Exhibit Number 8, affidavit of claim regarding S.D.B., marked and admitted without objection. Government's Exhibit 9, affidavit of presentment of taxable income for case filing, marked and admitted without objection.

Government's Exhibit 10, affidavit of response, marked and admitted without objection. Government's Exhibit 11, affidavit of presentment for liability, marked and admitted without objection. Government's Exhibit Number 12, affidavit of presentment for liability, marked and admitted without objection. Government's Exhibit Number 13, court security camera image 6/12/2018, marked and admitted without objection.

Government's Exhibit 14, Augusta Chronicle newspaper ad notice, marked and admitted without objection. Government's Exhibit 15, Augusta Chronicle order records, marked and admitted without objection. Government's Exhibit 16, April 2, 2018, arrest warrant, marked and admitted without objection. Government's Exhibit 17, April 6, 2018, letter for Judge Epps, marked and admitted without objection.

Government's Exhibit 18, April 16, 2018, letter for Judge Epps, marked and admitted without objection. Government's Exhibit 19, picture of Timothy Pate, marked and admitted without objection. Government's Exhibit 20, June 5, 2018, letter for

Judge Epps, marked and admitted without objection.

Government's Exhibit 21, June 25th, 2018, letter for Judge Epps, marked and admitted without objection. Government's Exhibit 22, June 27, 2018, letter for Scott Poff, marked and admitted without objection. Government's Exhibit 23, June 28, 2018, letter, Judge Epps, marked and admitted without objection.

Government's Exhibit 24, UCC Financing Statement 121-2018-000891, marked and admitted without objection. Government's Exhibit 25, UCC Financing Statement 121-2018-000892, marked and admitted without objection. Government's Exhibit 26, UCC Financing Statement 121-2018-000893, marked and admitted without objection.

Government's Exhibit 27, UCC Financing Statement 121-2018-001306, marked and admitted without objection. Government's Exhibit 28, UCC Financing Statement 121-2018-001307, marked and admitted without objection.

Government's Exhibit 29, IRS 2011 account transcript, marked and admitted without objection. Government's Exhibit 30, IRS 2012 account transcript, marked and admitted without objection. Government's Exhibit 31, IRS 2013 account transcript, marked and admitted without objection. Government's Exhibit 32, IRS 2014 account transcript, marked and admitted without objection.

Government's Exhibit 33, IRS 2015 Form 1040, e-filed, marked and admitted without objection. Government's Exhibit

34, IRS 2015 Form 1040 e-faxed, marked and admitted without objection. Government's Exhibit 35, IRS frivolous position notice 2010-33, marked and admitted without objection. Government's Exhibit 36, IRS Truth About Frivolous Tax Arguments, marked and admitted without objection.

Government's Exhibit 37, IRS letter 3176C dated 7/7/2016, marked and admitted without objection. Government's Exhibit 38, IRS CP15 notice dated 9/19/2016, marked and admitted without objection. Government's Exhibit 39, IRS CP504 notice dated 11/14/2016, marked and admitted without objection. Government's Exhibit 40, IRS 2015 account transcript, marked and admitted without objection.

Government's Exhibit 41, IRS 2015 civil penalty account transcript, marked and admitted without objection. Government's Exhibit 42, IRS 2016 Form 1040 e-filed, marked and admitted without objection. Government's Exhibit 43, IRS 2016 Form 1040, marked and admitted without objection. Government's Exhibit 44, IRS letter 3176C dated 3/30/2017, marked and admitted without objection.

Government's Exhibit 45, IRS Form 8278 assessment, marked and admitted without objection. Government's Exhibit 46, IRS letter 105C dated 2/14/2018, marked and admitted without objection. Government's Exhibit 47, IRS 2016 civil penalty account transcript, marked and admitted without objection. Government's Exhibit 48, IRS 2017 Form 1040, marked

and admitted without objection. Government's Exhibit 49, IRS 2017 account transcript, marked and admitted without objection.

Government's Exhibit 50, correspondence to IRS dated 1/14/2015. Government's Exhibit 51, correspondence to IRS dated 3/19/2015, marked and admitted without objection. Government's Exhibit 52, correspondence to IRS dated 3/4/2015, marked and admitted without objection.

Government's Exhibit 53, correspondence to IRS dated 10/20/2017, marked and admitted without objection. Government's Exhibit 54, IRS Frivolous Return Program Database History Report, marked and admitted without objection.

Government's Exhibit 55, U. S. Tax Court petition, marked and admitted without objection. Government's Exhibit 56, IRS Commissioner's motion to dismiss, marked and admitted without objection. Government's Exhibit 57, excite.com account information, marked and admitted without objection. Government's Exhibit 58, Equifax credit file, marked and admitted without objection. Government's Exhibit 59, photo of identification cards, marked and admitted without objection.

Government's Exhibit 60, identification cards, marked and admitted without objection. Government's Exhibit 61, photo of A. Pate, marked and admitted without objection. Government's Exhibit 62, consent to search, marked and admitted without objection. Government's Exhibit 63, Sprint subscriber information, marked and admitted without objection.

Government's Exhibit 64, August 29, 2018, excerpt of Lincoln County Jail Call with T. J., marked and admitted without objection.

Government's Exhibit 65, transcript of August 29, 2018, jail call with T. J., marked and admitted without objection. Government's Exhibit 66-1, August 2, 2018, excerpt of Lincoln County Jail Call with A. Pate, marked and admitted without objection. Government's Exhibit 66-2, August 29, 2018, excerpt of Lincoln County Jail call with A. Pate, marked and admitted without objection. Government's Exhibit 67, transcript of August 29, 2018, jail call with A. Pate, marked and admitted without objection. Government's Exhibit 68, photo of Samsung Galaxy cellphone, marked and admitted without objection. Government's Exhibit 69, Samsung Galaxy cellphone, marked and admitted without objection.

Government's Exhibit 70, excerpt of data extracted from Samsung Galaxy cellphone, marked and admitted without objection. Government's Exhibit 71, photo of Kingstone Flash Drive, marked and admitted without objection. Government's Exhibit 72, Kingstone Flash Drive, marked and admitted without objection. Government's Exhibit 73, notice of opportunity to cure, marked and admitted without objection.

Government's Exhibit 82, BOP email dated 1/6/2019, marked and admitted without objection.

And, Counsel, I've received all of these exhibits

electronically, and that is what will go back to the jury, along with a paper copy, except the physical evidence, which is Government's Exhibit 60, identification cards. Present?

MR. HOWARD: Yes.

THE CLERK: Government's Exhibit 69, Samsung Galaxy cellphone; and Government's Exhibit 72, the Kingstone Flash Drive. That is all physical evidence that will go back to the jury.

MR. HOWARD: So 64 and 66-1, they are disks, so I don't know. They're electronic. You have them electronically, so --

THE CLERK: So the original will be the disk. We'll enter that into the original.

MR. HOWARD: Okay. So it's 64.

THE CLERK: 64 and --

MR. HOWARD: 66-1 and 66-2. Those are disks.

THE CLERK: Okay. I also have those available electronically in addition to the disks. And so that will all go back to the jury.

MR. HOWARD: The transcripts, there is a copy. I guess that will digitally go as well.

THE CLERK: Yes. And the paper binder of the paper copies that will go back to the jury, have we confirmed that it's all in there and nothing extra?

MR. HOWARD: Yes.

THE CLERK: Mr. Maines, are you okay with that?

MR. MAINES: I trust them.

THE CLERK: Unless you would like to sit here and flip through it really quickly.

MR. MAINES: Yeah, just want to make sure 65 and 67 are there.

THE CLERK: Yeah. Please, y'all both go ahead, thumb through, make sure the paper copies are accurate.

Mr. Howard, are we good?

MR. HOWARD: We are good.

THE CLERK: Mr. Maines?

MR. MAINES: We're good.

THE CLERK: Okay. I am going to release the exhibits back. If you could hand the physical evidence to the CSO and the binder of paper.

(Proceedings stood in recess from 3:10 p.m. until 3:42 p.m.)

(Jury out)

THE COURT: All right, Counsel. We're back on the record in 1:18-CR-45. We've gotten a note from the jury. We clearly have a jury who's reading closely.

The note -- excuse me. The question from the jury that I've provided all of you with a copy of and which will be filed as a restricted document in this case says, "Should 'note'" -- and that's in quotation marks -- "for 12-15 refer to Count 11 as written in verdict form?"

I believe what the jury is inquiring of is when we added

the additional sentence to clarify Counts 11 through 15, Count 11 said, "However, if you find the defendant guilty as charged in Count 11, you must proceed to Paragraph 11A below." I believe the verdict form we gave them, that sentence then said, "However, if you find the defendant guilty as charged in Count 11, you must proceed to Paragraph 12A, below, for example, as to Count 12, and that error -- and that is indeed the Court's error. That is nothing that counsel has done. It was the Court's error -- was the same as to 12, 13, 14 and 15. Everybody understand what I think our error was?

MR. HOWARD: Yes, Your Honor.

THE COURT: By "our," I mean my error?

MR. MAINES: Yes, Your Honor.

THE COURT: My proposed solution -- and I want to hear your take on that -- is that, as I have provided you with a revised version of that verdict form, is to bring the jury in, say, I understand this is your note. The Court's response is, "No, it should not refer to Counts 11 and the notes for 12 through 15. I have prepared a corrected verdict form, and you should use this verdict form in your deliberations and disregard the prior verdict form."

Is there any objection to that response or is there any suggestion to doing otherwise?

MR. HOWARD: No objection. The government is fine with that response.

MR. MAINES: No objection from the defense.

THE COURT: Well, the Court regrets the error, but I don't know of any authority that says we can't do that. The verdict form is prepared for their convenience. Obviously, we want them to use it and to follow the notes therein, but I think with that instruction, we would eliminate any confusion that the Court has interjected by the typo. Okay?

All right. So that's what I'm going to say. You know, it should not refer to that; I have prepared a verdict form that you should use, and you should disregard the prior verdict form. Okay. All right. Let's bring in the jury.

THE CSO: All rise for the jury.

(Jury present)

THE COURT: Ladies and Gentlemen, I received a note from you all that asked as follows: "Should 'note,'" quotation marks, "for 12 through 15 refer to Count 11 as written in the verdict form?"

The response is, no, it should not have. That's the Court's error. That's my error. Okay. So what I have done is I have prepared a verdict form for you to use that corrects the errors that I made. Okay? You should disregard that prior verdict form.

The only change in this verdict form is to correct the error that you identified. Use this verdict form. Disregard the prior verdict form, and use only this verdict form in

returning your verdict. Okay? Let's rise for the jury.

THE CSO: All rise for the jury.

(Jury out)

THE COURT: Counsel, anything else you need to bring up with the Court?

MR. HOWARD: Your Honor, did the Court retrieve the old verdict form?

THE COURT: No, and this is why. I don't know what they've put on it, and I don't want to know what they've put on it. They're going to keep that -- it's going to be just like if they had been making jury notes back there and drafts and any notes they had. It will be treated as jury notes, and I did not retrieve it because I don't want to know anything they've written on it.

MR. HOWARD: And my other question was going to be whether we should mark in some way the new verdict form, but Mr. Maines points out the very good point of you'll be able to see the new verdict form because it'll be corrected.

THE COURT: It'll be corrected. It'll be materially different. And when I receive the verdict from the jury, if and when we get a verdict, that'll be one of the first things I check is that they used the right form.

MR. HOWARD: Okay.

THE COURT: Anything further, Counsel?

MR. HOWARD: Nothing from the government.

MR. MAINES: Nothing from the defense.

(Proceedings stood in recess from 3:48 p.m. until 4:07 p.m.)

THE COURT: I'm told we have a verdict. Let's bring the jury in.

THE CSO: All rise for the jury.

(Jury present)

THE COURT: Madam or Mr. Foreperson, has the jury reached a verdict?

JUROR FOREPERSON: Yes, Your Honor.

THE COURT: Is the verdict unanimous?

JUROR FOREPERSON: Yes.

THE COURT: Would you please hand it to the Marshal. You may have a seat. Thank you.

Ms. Hammock, please publish the verdict.

THE CLERK: In the United States District Court for the Southern District of Georgia, Augusta Division, *United States of America vs. Timothy Jermaine Pate, also known as* Akenaten Ali, Case Number CR 1:18-CR-45, Count 1, we, the jury, find the defendant guilty of Count 1 of the superseding indictment.

Count 2, we, the jury, find the defendant guilty of Count 2 of the superseding indictment.

Count 3, we, the jury, find the defendant guilty of Count 3 of the superseding indictment.

Count 4, we, the jury, find the defendant guilty of Count 4 of the superseding indictment.

Count 5, we, the jury, find the defendant guilty of Count 5 of the superseding indictment.

Count 6, we, the jury, find the defendant guilty of Count 6 of the superseding indictment.

Count 7, we, the jury, find the defendant guilty of Count 7 of the superseding indictment.

Count 8, we, the jury, find the defendant guilty of Count 8 of the superseding indictment.

Count 9, we, the jury, find the defendant guilty of Count 9 of the superseding indictment.

Count 10, we, the jury, find the defendant guilty of Count 10 of the superseding indictment.

Count 11, we, the jury, find the defendant guilty of Count 11 of the superseding indictment. 11A, we, the jury, find the defendant made the following false statement or declaration: Debtor J.A.K. owed defendant 33 million dollars. Such debt was not the subject of a bona fide dispute as to liability or amount.

Count 12, we, the jury, find the defendant guilty of Count 12 of the superseding indictment. 12A, we, the jury, find the defendant made the following false statement or declaration: Debtor J.J.L. owed defendant 15 million dollars. Such debt was not the subject of a bona fide dispute as to liability or amount.

Count 13, we, the jury, find the defendant guilty of

Count 13 of the superseding indictment. 13A, we, the jury, find the defendant made the following false statement or declaration: Debtor B.K.E. owed defendant 15 million dollars. Such debt was not the subject of a bona fide dispute as to liability or amount.

Count 14, we, the jury, find the defendant guilty of Count 14 of the superseding indictment. 14A, we, the jury, find the defendant made the following false statement or declaration: Debtor D.D.D. owed defendant 15 million dollars. Such debt was not the subject of a bona fide dispute as to liability or amount.

Count 15, we, the jury, find the defendant guilty of Count 15 of the superseding indictment. 15A, we, the jury, find the defendant made the following false statement or declaration: Debtor E.M.T. owed defendant 15 million dollars. Such debt was not the subject of a bona fide dispute as to liability or amount.

Count 16, we, the jury, find the defendant guilty of Count 16 of the superseding indictment.

Count 17, we, the jury, find the defendant guilty of Count 17 of the superseding indictment.

Count 18, we, the jury, find the defendant guilty of Count 18 of the superseding indictment.

Count 19, we, the jury, find the defendant guilty of Count 19 of the superseding indictment.

Count 20, we, the jury, find the defendant guilty of Count 20 of the superseding indictment.

Count 21, we, the jury, find the defendant guilty of Count 21 of the superseding indictment.

So say we all, this 17th day of October, 2019, signed by the foreperson.

THE COURT: Thank you, Ms. Hammock. Would you please poll the jurors.

THE CLERK: Yes, sir. Please stand as I call your name.

THE COURT: Just the juror whose name is called.

THE CLERK: As I call your name. I'm sorry.

Carlos Lewis, Juror Number 38. Mr. Lewis, was the verdict as published your verdict?

JUROR LEWIS: Yes.

THE CLERK: Is it now your verdict?

JUROR LEWIS: Yes.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR LEWIS: Yes.

THE CLERK: Thank you. You can have a seat.

Juror Number 29, Trinetta Harden. Ms. Harden, was the verdict as published your verdict?

JUROR HARDEN: Yes.

THE CLERK: Is it now your verdict?

JUROR HARDEN: Yes.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR HARDEN: Yes.

THE CLERK: Thank you. You can have a seat.

Juror Number 33, Timothy Jenkins.

Mr. Jenkins, is the verdict as published your verdict?

JUROR JENKINS: Yes, ma'am.

THE CLERK: Is it now your verdict?

JUROR JENKINS: Yes, ma'am.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR JENKINS: Yes, ma'am.

THE CLERK: Thank you. You can have a seat.

Juror Number 68, Sherid Wynn. Ms. Wynn, was the verdict as published your verdict?

JUROR WYNN: Yes.

THE CLERK: Is it now your verdict?

JUROR WYNN: Yes.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR WYNN: Yes.

THE CLERK: Thank you. You can have a seat.

Juror Number 59, Michael Smith. Mr. Smith, was the verdict as published your verdict?

JUROR SMITH: Yes, ma'am.

THE CLERK: Is it now your verdict?

JUROR SMITH: Yes, ma'am.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR SMITH: Yes, ma'am.

THE CLERK: Thank you. You can have a seat.

Juror Number 66, Billy Wilson. Mr. Wilson, was the verdict as published your verdict?

JUROR WILSON: Yes, ma'am.

THE CLERK: Is it now your verdict?

JUROR WILSON: Yes, ma'am.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR WILSON: Yes, ma'am.

THE CLERK: Thank you. You can have a seat.

Juror Number 56, Michelle Rooney. Ms. Rooney, was the verdict as published your verdict?

JUROR ROONEY: Yes.

THE CLERK: Is it now your verdict?

JUROR ROONEY: Yes.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR ROONEY: Yes.

THE CLERK: Thank you. You can have a seat.

Juror Number 11, Nancy Calhoun. Ms. Calhoun, was the

verdict as published your verdict?

JUROR CALHOUN: Yes.

THE CLERK: Is it now your verdict?

JUROR CALHOUN: Yes.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR CALHOUN: It was. Yes.

THE CLERK: Thank you. You can have a seat.

Juror Number 51, Whitney Newton. Ms. Newton, was the verdict as published your verdict?

JUROR NEWTON: Yes, ma'am.

THE CLERK: Is it now your verdict?

JUROR NEWTON: Yes.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR NEWTON: Yes.

THE CLERK: Thank you. You can have a seat.

Juror Number 25, Carolyn Free. Ms. Free, was the verdict as published your verdict?

JUROR FREE: Yes.

THE CLERK: Is it now your verdict?

JUROR FREE: Yes.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR FREE: Yes.

THE CLERK: Thank you. You can have a seat.

Juror Number 34, Laura Kadlewicz. Ms. Kadlewicz, was the verdict as published your verdict?

JUROR KADLEWICZ: Yes.

THE CLERK: Is it now your verdict?

JUROR KADLEWICZ: Yes.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR KADLEWICZ: Yes.

THE CLERK: Thank you. You can have a seat.

Juror Number 37, Cindy Lavengood. Was the verdict as published your verdict?

JUROR LAVENGOOD: Yes.

THE CLERK: Is it now your verdict?

JUROR LAVENGOOD: Yes.

THE CLERK: Was this verdict freely and voluntarily entered by you?

JUROR LAVENGOOD: Yes.

THE CLERK: Thank you. You can have a seat.

THE COURT: Thank you, Members of the Jury. That concludes your official service to the Court, and we sincerely appreciate your service to the Court. I have emphasized throughout this trial, and I'll emphasize again now, how vital of a role that you all play in not just the Court's administration of justice and the conduct of our business, but

in the operation of our republic, and I thank you all for the service that you have rendered.

Now, while it's the end of your official duty, I'd like to informally thank all of you in the jury room, have the opportunity to, with just me, not lawyers present, just me, to shake your hands. And obviously I won't discuss anything with you about the substance of this case, but if you've got any ideas about how we can make our future jurors' lives a little easier, then certainly I'll be willing to hear that from you. And the alternates are welcome to go with your fellow jury members as well. You also are vital members.

What we're going to do in a second is we're going to stand for the jury. We do that as a sign of deep and sincere respect for the role that you have played in our business this week and the role that you have played in the business of your republic.

So one last time, if you would, please stand for the jury.

THE CSO: All rise for the jury.

(Jury out)

THE COURT: Marshal, I'll be right there. They can close the door. You can have a seat.

Counsel, typically this would be the point at which we ask the defendant to come to the podium with counsel and I would notify the defendant that I'm entering the conviction and

pronouncing the defendant guilty based on the jury's verdict.

Obviously the defendant is not present in the courtroom, but the defendant is present in the holding cell. Rather than literally dragging the defendant into the courtroom, what I propose to do is for us to do what we've been doing when we need to communicate something to Mr. Pate, is we're going to go back to the Marshal's holding cell, and I'm going to advise him that the jury has found him guilty of all of the counts and that that verdict will be made the judgment of the Court.

I'll advise him of his time period in which he can file a motion for new trial or judgment of acquittal, advise him of the sentencing process, the presentence investigation report and his time for appeal after that and advise him as well he's going to be remanded to the custody of the United States Marshal's Service.

Does anybody disagree with following that procedure? Mr. Howard?

MR. HOWARD: No, Your Honor.

MR. MAINES: No, Your Honor.

THE COURT: All right. That's what we're going to do. As you just heard me tell the jury, I'm going to go back there, and, again, not discuss any substance with them, but give the Court's sincere thanks to them for their service. You all can be at ease while I do that, and then when we're done, we'll go back on the record, but we'll be back in the holding cell.

Okay? We'll be in recess.

(Proceedings stood in recess from 4:19 p.m. until 4:32 p.m.)

THE COURT: All right. We're back on the record --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- in the matter of *United States of America* --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- *vs. Timothy Jermaine Pate* --

THE DEFENDANT: I do not accept the jurisdiction of the Court.

THE COURT: We are in the holding cell --

THE DEFENDANT: I have no contract with the Court.

THE COURT: Mr. Pate, please be quiet.

THE DEFENDANT: I have no contract with the Court.

THE COURT: We are in the holding cell of the United States Marshal Service --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- at the Augusta Courthouse.

THE DEFENDANT: I have no contract with the Court.

THE COURT: Mr. Pate, the jury has found you guilty --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- of all counts against you in the indictment.

THE DEFENDANT: I have no contract with the Court.

THE COURT: The verdict will now be made the judgment of

the Court.

THE DEFENDANT: I have no contract with the Court.

THE COURT: You have a period of 14 days from today --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- within which to file a motion for new trial --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- or judgment of acquittal.

THE DEFENDANT: I have no contract with the Court.

THE COURT: Should you desire to do that --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- you're entitled to the assistance of counsel --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- in making those motions.

THE DEFENDANT: I have no contract with the Court.

THE COURT: If you cannot afford an attorney --

THE DEFENDANT: That man is not my attorney. Mr. Maines is not my attorney.

THE COURT: -- one will be appointed to represent you at no charge --

THE DEFENDANT: I never made any contract with the Court.

THE COURT: -- if you demonstrate you cannot afford counsel.

THE DEFENDANT: I never made any contract with Mr. Maines.

THE COURT: At some time in the future --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- after you have met with the United States Probation Office --

THE DEFENDANT: I have no contract with the Court.

THE COURT: -- and after they prepare a presentence report --

THE DEFENDANT: I made no contract with you.

THE COURT: -- you will come before me for the purpose of being sentenced.

THE DEFENDANT: I do not consent.

THE COURT: After I pronounce your sentence and if you are dissatisfied with it, you can file a notice of appeal within 14 days of the date you are sentenced.

THE DEFENDANT: I do not accept the jurisdiction of the Court.

THE COURT: Likewise, if you decide to file an appeal --

THE DEFENDANT: I do not accept the jurisdiction of the Court.

THE COURT: -- you're entitled to the assistance of an attorney in taking such an appeal.

THE DEFENDANT: I do not accept the jurisdiction of the Court.

THE COURT: If you demonstrate you cannot afford counsel --

THE DEFENDANT: I do not accept the jurisdiction of the Court.

THE COURT: -- the Court will appoint counsel to assist you at no charge to you.

THE DEFENDANT: I do not accept the jurisdiction of the Court.

THE COURT: In fact, the Clerk of Court can assist you in filing an appeal.

THE DEFENDANT: I do not accept the jurisdiction of the Court.

THE COURT: I remand you at this time to the custody of the United States Marshals --

THE DEFENDANT: I do not accept the jurisdiction of the Court.

THE COURT: -- where you will remain until your sentencing hearing. Court is concluded.

(Proceedings concluded at 4:33 p.m.)

- - -

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly A. McKee, Registered Diplomate Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 28th day of April, 2020.

Kelly A. McKee

KELLY A. McKEE, CCR, RMR, CCP, RDR

#2731