IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) CASE NO. 1:18-CR-45
)
TIMOTHY JERMAINE PATE, )
)
Defendant. )
----------------------------

TRANSCRIPT OF SENTENCING HEARING
**BEFORE THE HONORABLE R. STAN BAKER**
United States Courthouse
600 James Brown Boulevard
Augusta, GA
January 28, 2020

COURT REPORTER: Kelly A. McKee, CCR, RMR, CCP, RDR
United States Court Reporter
P. O. Box 8552
Savannah, GA 31412
912-650-4065

(Proceedings reported by mechanical stenography, transcript produced by computer-aided transcription.)

APPEARANCES OF COUNSEL

FOR THE UNITED STATES OF AMERICA:

CHRISTOPHER HOWARD, Esq.
U. S. ATTORNEY'S OFFICE - SAVANNAH
22 Barnard Street, Suite 300
P. O. Box 8970
Savannah, GA 31401
912-652-4422
Email: christopher.howard@usdoj.gov

FOR THE DEFENDANT:

JUSTIN D. MAINES, Esq.
THE NYE LAW GROUP
2008 Whitaker Street
Savannah, GA 31401
912-358-8485
Email: Jd@thenyelawgroup.com

**P R O C E E D I N G S**

**(In the USMS Holding Cell)**

**(2:04 p.m.)**

THE COURT: Good afternoon, everyone. We're on the record in the *United States of America* --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: -- *vs. Timothy* --

THE DEFENDANT: I do not consent. I have no contract with the Court. I do not consent. I have no contract with the Court.

THE COURT: -- *vs. Timothy Jermaine Pate* --

THE DEFENDANT: I do not consent. I have no contract with the Court. I do not consent. I have no contract with the Court.

THE COURT: Today is Mr. Pate's --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: Madam Court Reporter --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: -- try to get my statements instead of Mr. Pate's statements right now.

Mr. Pate, please be quiet so she can take down what I'm saying.

THE DEFENDANT: I do not consent. I have no contract with the Court.

(Simultaneous speaking)

THE COURT: Mr. Pate, today is your sentencing hearing.

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: You have the right to be present for this sentencing hearing.

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: One of the rights you have at your sentencing hearing will be --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: -- to provide what we call allocution.

THE DEFENDANT: I do not consent --

THE COURT: You have the right to make a statement to me at your sentencing hearing before I determine your sentence and to provide any evidence in mitigation of your sentence.

THE DEFENDANT: I do not consent, I have --

THE COURT: But to participate in the hearing, you have to come into the courtroom.

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: Mr. Pate, unless you tell me that you want

to come into the courtroom and you do so when the Marshals come to get you, you will not participate in your sentencing hearing.

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: Mr. Pate, are you refusing to come to your sentencing hearing?

THE DEFENDANT: I do not consent. I have no contract with the Court. I do not consent. I have no contract with the Court.

THE COURT: Mr. Pate --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: -- do you want to come to your sentencing hearing?

THE DEFENDANT: I do not consent. I have no contract with the Court. I do not consent. I have no contract with the Court. I do not consent. I have no contract with the Court.

THE COURT: Mr. Pate --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: -- you have the right to come to your sentencing hearing.

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: Are you going to come do that?

THE DEFENDANT: I do not consent. I have no contract with the Court. I do not consent. I have no contract with the Court.

THE COURT: All right. Mr. Pate --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: -- since you have told me --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: -- that you do not consent because you're indicating by your actions that you do not want to come to your sentencing hearing --

THE DEFENDANT: I do not consent to be sentenced by a man. I have no contract with the Court.

THE COURT: -- we are going to proceed without you.

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: Do you understand that, sir?

THE DEFENDANT: I do not consent. I have no contract with the Court. I do not consent. I have no contract with the Court.

THE COURT: Mr. Pate --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: -- you've heard everything that I've said.

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: Mr. Pate, do you have any questions about anything that I have said?

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: Mr. Pate --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: -- do you have any objections to the presentence investigation report in this case?

THE DEFENDANT: I do not consent. I have no contract with the Court. I do not consent. I have no contract with the Court.

THE COURT: All right. Mr. Pate, do you want to participate in your sentencing hearing?

THE DEFENDANT: I do not consent. I have no contract with the Court. I do not consent. I have no contract with the Court.

THE COURT: All right. It appears, Counsel, --

THE DEFENDANT: I do not consent. I have no contract with the Court.

THE COURT: -- that Mr. Pate does not want to participate.

THE DEFENDANT: I do not consent. I have no contract

with the Court.

THE COURT: Is there anything that we need to put on the record before we go back in the courtroom?

THE DEFENDANT: I do not consent. I have no contract with the Court.

MR. HOWARD: None from the government.

MR. MAINES: Nothing from the defense.

THE COURT: We'll go back into the courtroom.

THE DEFENDANT: I do not consent. I have no contract with the Court.

(Proceedings stood in recess from 2:04 p.m. until 2:10 p.m.)

THE COURT: Good afternoon, Ladies and Gentlemen.

Ms. Hammock, please call our case.

THE CLERK: Yes, sir. Case Number 1:18-CR-45, *United States of America vs. Timothy Jermaine Pate*. We have Christopher Howard for the government, Justin Maines for the defendant.

MR. HOWARD: Government's ready to proceed, Your Honor.

MR. MAINES: Your Honor, I'm here for the defendant; I'm ready to proceed.

THE COURT: Thank you, Mr. Maines. The record will reflect that we began this afternoon back in the United States Marshal's cell block holding area here in the Augusta Courthouse. The Marshals informed me that Mr. Pate was given every opportunity to enter the courtroom and to participate in

this sentencing hearing, but he refused to do so.

To be certain that Mr. Pate understood his right to attend his sentencing hearing, his right to allocution in particular, and his -- the consequences of refusing to attend his sentencing hearing, I went back to the holding cell area with counsel for the government and counsel for the defense; and, obviously, we had Ms. McKee, my court reporter, back there as well to take down everything that was said.

I attempted to explain Mr. Pate's rights to him regarding the sentencing hearing and to explain to him his right to be present, his right to allocute, and to explain to him the consequences for not attending. He vociferously told me that he did not have a contract with the Court, and he repeatedly stated something to the effect of I do not consent; I do not have a contract with the Court.

Any errors which there may be in the transcription of our discussion are due to Mr. Pate's refusal to be quiet while I was attempting to explain his rights to him. But he made it very evident to me, not only through his words to me, but also through his demeanor, that he had no interest in attending this hearing. He laid down on the bench with his back to me, and he refused to look at me.

Have I accurately described the interaction that we had back in the cell block holding area, from the government's perspective?

MR. HOWARD: Your Honor, the only thing I would add is he did make a comment to the effect of I refuse to be sentenced by a man. I think that was a statement he made in addition to the other sort of repetitive nonsense that he was talking about.

THE COURT: Thank you. I didn't hear that. I appreciate that addition.

Mr. Maines, do you disagree that he said that?

MR. MAINES: No, Your Honor. I agree with the Court and Mr. Howard, that both of those things are true.

THE COURT: Okay. Anything else that we need to put on the record about that interaction?

MR. MAINES: Not from the defense.

THE COURT: Okay. Nonetheless, what we've attempted to do is to provide Mr. Pate the ability to hear and to see this proceeding. We have through a video teleconferencing system put a monitor and speaker into the cell block holding area so, if he so chooses, he could listen to and watch this sentencing hearing from that area. We are able to observe him on the screen should he so choose to be there as well. Now, we can't hear him, because as just happened in the holding area, as it happened with other hearings with Mr. Pate, he will not be silent while I and others attempt to speak.

So he has voluntarily absented himself from this sentencing hearing despite every effort that we have made to get him here, and we have made every reasonable accommodation and

then some for him to have meaningful participation in this hearing.

I want him to be present. I wish he was. But he's just refused to be here. Mr. Pate can hear my words that I'm speaking right now, if he chooses to hear them.

Mr. Pate, we really wanted you to be here for your sentencing hearing, just like I wanted you to be here for your entire trial, and you have just refused to participate.

And we're not going to allow his refusal to participate grind the wheels of justice to a halt. We have to proceed with the sentencing hearing.

Any objection to doing that from either the government or the defense?

MR. HOWARD: None from the government.

MR. MAINES: None from the defense.

THE COURT: Okay. Anything else we need to put on the record before we move into the sentencing hearing?

MR. HOWARD: Nothing from the government.

MR. MAINES: Your Honor, just to put on the record, to further establish that -- why the defense is consenting to the Court's proposed way of dealing with this matter, so if it comes up again. My strategy as defense counsel in this matter is that it is more -- it is better for the defendant himself, regardless of whatever he expresses to the Court, to not be forcibly dragged in the courtroom and sentenced. That kind of theatrics,

I think, would only prejudice him.

So, Your Honor, that's the reason why I'm stipulating to the Court's decision to conduct the hearing in this way and am in complete agreement with the way the Court is handling it.

THE COURT: Thank you, Counsel. I've also considered the option of forcibly dragging him into the courtroom. One, it poses a physical risk to not only Mr. Pate, but also to the officers that would have to drag him into the courtroom. Additionally, he would likely disrupt the hearing, because at every instance he has spoken over everyone. So then we would run into the issue of having to gag him, and not only is that, I suppose, less humane than the solution that we've provided, it's in no way more effective.

He's able to listen to us right now. And these are his decisions. He's chosen to voluntarily absent himself from this hearing. And there need be no more accommodation than what we've already done. Okay. All right.

So with that, Mr. Pate appeared before this Court on October the 15th, 2019, accompanied by his counsel, Mr. Maines, for a jury trial. On October the 17th, 2019, he was found guilty, Mr. Pate was found guilty of Counts 1 through 10 and 16 through 21 of the indictment charging him with filing false retaliatory lien against a federal official, in violation of 18 United States Code Section 1521, and Counts 11 through 15 of the indictment charging him with false bankruptcy declaration in

violation of 18 United States Code Section 152(3).

Subsequent to the jury's verdict, I directed the United States Probation Office to prepare a presentence investigation report after, of course, a presentence investigation and to disclose that report to counsel for the government and counsel for the defense.

It appears that that has been done. I have a very thorough presentence investigation report in front of me. As the report itself notes, that some of the information we would ordinarily have in a presentence investigation report, we don't have because the defendant himself refused to participate in the presentence investigation.

Nonetheless, the United States Probation Office has done its level best to give us a very thorough presentence investigation report in this case. It appears from the record that neither the government nor the defendant have any objections to the presentence investigation report, but I want to be certain that what appears from the record is what is actually occurring.

So, first, from the United States' perspective, Mr. Howard, have you had the opportunity to read and to discuss this presentence investigation report and any addendum thereto?

MR. HOWARD: Yes, Your Honor.

THE COURT: Any objections to the presentence investigation report, and specifically, as to either the factual

accuracy of the report or to the probation officer's application of the Sentencing Guidelines?

MR. HOWARD: No, Your Honor.

THE COURT: Okay. Thank you. Mr. Maines, have you had the opportunity to read and to discuss this presentence investigation report and any addendum thereto?

MR. MAINES: I have, Your Honor.

THE COURT: Were you able to discuss it with Mr. Pate?

MR. MAINES: No, Your Honor. I attempted to communicate with Mr. Pate regarding this matter. Mr. Pate refuses to see me or be in the vicinity of myself, and so, Your Honor, I was not able to discuss the presentence report with him, only because of his refusal.

THE COURT: But I take it you've done everything you can to determine if there are any objections to this report despite his lack of participation?

MR. MAINES: Yes, Your Honor, I have. And I've indicated to the U. S. Probation Office that I agreed with their mechanical application of the United States Sentencing Guideline.

I did file a memorandum asking for additional factors to be considered at sentencing. But, Your Honor, I believe the U. S. Probation Office did an accurate job of applying the United States Sentencing Guidelines to the facts.

THE COURT: And I have read your sentencing memorandum

that you filed -- bless you, Ms. McKee. I have read your sentencing memorandum that you filed. But it appears even from that memorandum that you don't have any actual objections to the probation officer's factual statements or to his conclusions as to the applicable advisory Guidelines contained in the presentence investigation report. Is that correct?

MR. MAINES: That is correct, Judge.

THE COURT: Okay. There being no objections to the factual statements or to the probation officer's conclusions as to the applicable advisory Guidelines contained in the presentence investigation report, and the Court having thoroughly reviewed the presentence investigation report and concurred with all the conclusions contained therein, the Court adopts those facts and those conclusions. Accordingly, I determine that the applicable advisory Guidelines are as follows:

The total offense level is 37. The defendant's criminal history category is IV. That results in a guideline range of 292 to 365 months of imprisonment, one to three years of supervised release as to each count, a $40,000 to a $250,000 fine. Restitution is not applicable, but the $2,100 special assessment is mandatory.

I'll now hear testimony from any victims who are present and wish to make a statement regarding the impact, financial or otherwise, that the instant offense has had on them.

Are there any witnesses that intend to testify today, Mr. Howard?

MR. HOWARD: There are not, Your Honor. We have notified the witnesses (sic), afforded them the opportunity to be here, and I understand there was a victim impact statement that was submitted, but there are no victims present.

THE COURT: And I have reviewed the victim impact statement. That was from --

MR. HOWARD: Commissioner Koskinen, I believe.

THE COURT: Thank you. Does either side intend to call any witnesses during this hearing at all?

MR. HOWARD: None from the government.

MR. MAINES: None from the defense.

THE COURT: Okay. What I'll do at this time, then, unless there's an objection to this procedure, I'll first hear from the government's counsel as to any argument regarding the appropriate sentence, and then I'll hear from defense counsel as to any argument regarding the appropriate sentence.

Ordinarily I would provide the defendant with a right to make a personal statement, but, of course, Mr. Pate is not present; and as I informed him, since he's not present, he would not be allowed to allocute -- or he would not be able to allocute because he's voluntarily absented himself from the hearing.

So without further ado, Mr. Howard, let me hear from you

first.

MR. HOWARD: Thank you, Your Honor. May I approach the podium?

THE COURT: You may.

MR. HOWARD: Your Honor, may I proceed?

THE COURT: You may.

MR. HOWARD: As Your Honor has already noted, the defendant is looking at a significant amount of time. I think when we think of paper cases, fraud cases, harassment cases, this is a sentence that is more in line with a significant drug trafficker, someone who has done significant financial or significant physical harm to someone.

That notwithstanding, I think the amount of time that the defendant is looking at he's earned. We're asking for a sentence of 300 months. It is a significant sentence. It's in agreement with probation's recommendation, which I think is well founded. We're asking for that sentence because he's earned every day of that, and he's earned it when he really engaged and waged a multi-year, deliberate, tactical, strategic scheme to get millions of dollars from the government through lies, through threats, through fear and through documents.

You look at other cases and how both in the media and other courts have described this behavior of the retaliatory liens as paper terrorism, and I think that's an accurate description. When you talk about the intent behind it, it's not

to extract the 33 million dollars that's listed in the liens or the 100 million dollars. It is to harass, to intimidate public officials, government officials. It is to impose terror on them for you to get what you want.

I think it's also a direct challenge to good governance. So when you talk about -- and defense counsel has put in the sentencing memorandum that these figures are divorced from reality. Of course they are. If they weren't, then they wouldn't be criminal. But he chose those numbers for a deliberate reason, to impose the maximum harassment on these victims. Numbers that he chose, not made up. We're not bringing in kilos of cocaine as relevant conduct. This is entirely his own conduct, his own decisions that he's made.

And I think when you talk about the purposes behind retaliatory liens, less so with the false bankruptcy, but certainly with the retaliatory liens, the harm there is it's a direct attack on good governance. When public servants, government officials are making decisions based on fear or based on reasons anything other than what's in the best interest of the public, that hurts us all. It doesn't just hurt the victim, of which there are numerous, seven victims in this case, but it hurts every person in this United States, because, then, whether it be that judge, whether it be that IRS employee, whether it be that clerk, they're not making decisions based on what's in the best interest of the people that they are constituents of, but

rather, their own fear, their own harm.

And I think I would ask the Court to consider that when we're talking about the seriousness of the offense, because it's much more than just documents that have no meaning. Think of the intent behind them, the purpose behind those.

And Mr. Pate may not think that he's subject to the laws of this country. He may not even want to be a citizen of this country, but when we talk about the governance of this country and the IRS, which serves an incredibly important role in collecting revenue, when we're talking about the judiciary, which has an incredibly important role of meeting and administering justice, these are government institutions that are the envy of millions of people throughout the world. They're the envy of hundreds of countries. And the more people who take these sort of deliberate attacks on public servants, one, have a chilling effect on those who want to go into public service; and Your Honor heard about that from the testimony of high-ranking officials. But those high-ranking officials are admittedly in some way insulated from the conduct. Right? They're not the ones like Denise Davis at IRS who was targeted because her name was on it. She wasn't appointed by any President, nominated by any -- or confirmed by any Congress. She's doing her job, interacting with the public every day in a position that is not -- or that is often subject to harassment.

And so when we have these individuals who take it far

beyond any measure of appropriateness, we have direct attacks on those people personally. And when we talk about the seriousness of the offense, it's not just talking about government as a whole or in the abstract. We're talking about people who were victims.

Judge Epps wakes up, opens the newspaper in his house and has articles in the Augusta Chronicle, a place where we heard testimony that he grew up; this is his community. He's lived here; he resides here. He works here. And he's opening the paper in his home and sees that somebody has put out a claim that's saying he's owed millions of dollars, that Judge Epps owes him all that money; Judge Epps is basically a deadbeat. And that is put in the paper for his family to read, for his friends to read. It's personal at that point. Right. It's not just a government official. These are people that are being victimized by Mr. Pate's direct attacks.

When we're talking about the loss amount, obviously 33 million dollars is a significant amount of money, but in some ways it sort of under-represents the total harm that he's caused. If you look in 2A6.1, which is the provision regarding retaliatory liens, there's actually an upward departure that the Guidelines put in there if there's substantially more than two communications to the same victim, which there was here; a prolonged period of harassment, which there was here; more than two false liens, which here there was 15, all of which would

actually warrant an upward departure.

It has been noticed that the probation officer rightly noted the 5K2.0 upward departure that would be available. But I would note that the Guidelines themselves envision someone like Mr. Pate and also envision that the conduct that's prescribed in the Guidelines doesn't adequately capture all of his terrible conduct.

It's worse -- right -- his Guidelines would be the same essentially if he had done three liens, not 15. So what he did is substantially worse than someone who just filed a couple false liens.

So not only -- that's the seriousness of the offense for the false liens. But when we talk about the seriousness of the offense for the bankruptcy fraud, I think Judge Barrett in her order that was introduced into evidence and which she testified about makes it crystal clear the seriousness of what happens when you are trying to put someone into bankruptcy against their will. She put in the order that there is no more serious order or legal avenue in the law than an involuntary bankruptcy petition. It is putting someone into bankruptcy against their will. And here he did it as part of an escalation.

It started when he was filing these false tax returns, claiming over 7 million dollars. When he doesn't get those, we go to Tax Court. Doesn't get that, he goes to the federal civil court, and then the threats and then the liens and then the

bankruptcy, false bankruptcy declarations. You have an escalation of this paper terrorism that gets absolutely as high as it could go with Judge Barrett when she describes that being one of the most serious things one can do in court.

And then when we're looking at the characteristics of the defendant, nothing in his background mitigates his culpability. Judge Wood in her sentencing is often fond of saying you take the good with the bad, and thinking about Timothy Pate, it's hard to think of something that is good. You have a college-educated person, who elects not to use his education for gainful employment, but elects to spend his time, his resources on frivolous filings.

The volume of the filings with the IRS, you're talking about taking resources away from lawful taxpayers at IRS. You're talking about then going to Tax Court and taking resources, filing frivolous documents in the federal civil court, civil case taking resources, taking resources not only from IRS, but from TIGTA, from FBI, from the bankruptcy office. He's diverting federal officials' attention and drawing resources away from those government officials who could use those time and that money in better ways.

You also have an absolute elephant when you're talking about the personal characteristics of Timothy Pate, in Paragraph 25 regarding his relationship with his daughter. It's in the PSR. I think this Court can rightly consider it when you're

talking about -- when you're talking about looking at this individual as a whole. So that not only does he think he's not bound by the laws of this country, but he clearly does not feel bound by any sort of moral decency when it comes to his personal behavior. And I think that also speaks to what he is as a person when he engages in that type of behavior with his own daughter.

And then the need for deterrence, you have somebody here who obviously has taken not only zero accountability for their actions, zero acceptance of responsibility, zero explanation for his own conduct, other than greed, other than malice, other than this idea that he is owed and not subject to this Court, to this building, even to this government. There's a need to deter him, and there's a need to deter the broader community in which he operates.

The ideas he got were not his own. He was playing according to a playbook that he carried out, that he chose to carry out and that he chose to escalate all the way as high as he could possibly go when trying to put somebody into bankruptcy against their will. He made those choices. And we're asking the Court to consider that a 300-month sentence will speak volumes to other people who are considering engaging in this; other people who think, hey, I got this idea to make millions of dollars; there is this theory out there, what have I got to lose. Well, you have 300 months in prison to lose if you engage

in this behavior.

I think Timothy Pate could be a role model and could be a tremendous deterrent for others considering going down this ridiculous path.

There's also discussion in the sentencing memorandum of his acts as being imbicile. They're not. This is a smart, educated person, who took all of these choices for strategy, for tactics. He was evaluated. It's in there that he's not suffering from any sort of mental defect. That's not an excuse that I think can rightly be considered. This is somebody who knew exactly what he was doing, and he took choices over several years in order to carry out this pattern.

Lastly, I think in looking at defendant's sentencing memorandum, there is this idea of, well, you just disregard the 33 million dollars and consider more the retaliatory liens. I don't think there's any support -- and there is no support in the Guidelines for just sort of casting aside what the -- what is properly calculated under the Guidelines and just consider something else. If we start doing that, then we get into the sort of purpose of what's the role of the Guidelines if we're just going to apply some sort of vague application.

I think if this Court were to apply any other application or to look at any other loss amount, I think one proposal would be to look at the tax refunds which he fraudulently claimed. If you were to calculate from that amount

over three years from 2016, 2017 and 2018, he claimed false refunds a little over 7 million. If you look at that loss amount of a little over 7 million, the difference under 2B1.1 in the loss amounts between the 33 million and the 7 million, it's only four levels and produces a range of 188 to 235, which is not significantly different than what we're asking for, which is the low end of his current range at 300 months. It's not significantly different because you take all of the other aggravating facts, all of his other source of willful disobedience of this Court, and I think you arrive at what we believe is an appropriate sentence of 300 months.

The one thing I would disagree with probation on is probation has recommended a term of supervised release to follow. My reading of that is I think the language of the statute for these offenses are "may;" these are not mandatory supervised release terms. I'm not asking -- or I'm requesting that the Court impose no supervised release to follow, and here's why: Because I don't think there is any likelihood that he's going to comply with any terms of supervised release. This is not somebody who's going to report to the probation officer as directed. This is not somebody who is going to comply with any other terms. There has been nothing throughout this whole prosecution that has led this Court or could lead the government to think that he is going to abide by or comply with any order or any term that's imposed by them. So all we would be doing is

devoting more federal resources -- as soon as he gets out, he would be violating; we'd be taking time away from probation officers, taking time away from the government, and I think it would be a fruitless exercise. So we're requesting 300 months, to be followed by no term of supervised release.

THE COURT: A question about the supervised release issue, Mr. Howard. He spends years in prison and then he gets out, and we just don't know where he is. You take somebody who's demonstrated the disturbing conduct that he's demonstrated in this case, and then he's released from BOP and we have no way or no real avenue by which to keep track of him. Does that achieve the statutory purposes of sentencing? I agree with you that he would be a very difficult releasee to supervise, but just because it's difficult, do we still owe a duty to try to do it?

MR. HOWARD: Your Honor, at that point -- I think it's beyond difficult. I think in all likelihood we're not going to know where he is anyways, because he's going to be gone. And this is also someone who has not pranced around the country. He was -- resided in this area for the bulk of his life. Two, I don't think he's going to comply, so the idea that we're going to be able to go out there and pick him up whenever we want; three, he's 43 years old. We're asking for a 25-year sentence, so we're looking at somebody who would be right around 70 years old at the time. So the likelihood of flight, I think, is less

when you're at that age.

But I think it -- I think we owe a duty to society to use government resources, which are in many ways limited, to maximize those for those who would serve the most value of supervised release. Right? If he commits new laws -- new violations, he's going to properly be arrested for those and handled those accordingly. But the idea that he's going to meet with a probation officer and talk about finding employment or, you know, life skills, I don't see a lot of value in that. So that's the purpose why we're not asking for it.

THE COURT: Let me ask you this. First, while he's incarcerated, is the government recommending -- and even if the government is not, what is the Court's authority to direct restrictions on his communications, including mail, internet and telephone, so that he does not participate in similar conduct in the future?

MR. HOWARD: Yeah.

THE COURT: Obviously, the crimes he committed here and the tactics that he employed did not always -- now, obviously he came to the clerk's office for some of it. But you can file things at clerks' offices with mail. To physically restrain his liberty may not adequately protect the public. So what if I directed that while he's incarcerated, his mail, internet and telephonic communications be monitored and restricted to the extent necessary to ensure that he does not file any false liens

against federal officials or any false bankruptcy declarations. Would that be appropriate?

MR. HOWARD: Your Honor, it would. And just to add a couple things with that. One, I think Judge Hall has entered an order in the civil case barring him from filing any liens.

Now, that, I think, would be in the Southern District of Georgia. I'm not sure of its application outside. So he is already at this very moment barred from filing liens.

I'm uncomfortable with the language that's been proposed about filing any frivolous liens, because it requires somebody making some determination whether the lien is frivolous or not. I would think at this point there should be a presumption that every lien he files is frivolous.

THE COURT: What if we say, instead of frivolous, I say, essentially, the charging document in this case, which the jury has found him guilty of, filing false liens against any federal officials or filing false bankruptcy declarations?

MR. HOWARD: Your Honor, we wouldn't be opposed to that. It's my understanding also that the --

THE COURT: I share your concern about frivolity. The prison officials would have to conduct some type of frivolity test.

MR. HOWARD: Right. And I understand, I had made a motion in the course of this case for a restriction of his mail, and in that I think I cited to some BOP regulations that allows

the warden, even without this, to restrict inmates' mail, but I think this is necessary, and I hope that the wardens are aware of this also. But the concern would also be access to mail. So it's not just liens, but also this is someone who's engaged in sort of using the mail for threatening, threatening to file liens. So I think any correspondence to any government employee that threatens to or purports to be a lien instrument would be restricted and rejected, I think. I just want to get language that adequately captures all the conduct which he's engaged in.

THE COURT: Let me ask about this, then. What if we directed that while incarcerated, the Court directs the defendant's communications, including mail, electronic, internet and telephonic communications, be monitored and restricted to the extent necessary to ensure the defendant does not file, attempt to file or threaten to file any false liens against any federal officials or file any false bankruptcy declarations?

MR. HOWARD: The government has no problem with that language. I think that's appropriate.

THE COURT: Okay. We'll see what Mr. Maines says.

The next thing would be if I do put him on supervised release, which I understand you're arguing that we shouldn't, would it be appropriate to put some language in his supervised release regarding filing of liens?

MR. HOWARD: Sure. I think the standard conditions are that you are filing no -- that you're committing no new law

violation.

THE COURT: Right. I mean, there's obviously a standard condition that you commit no further violation of law.

MR. HOWARD: Sure.

THE COURT: But something that would give the Court some -- you know, rather than waiting on a finding that he has indeed violated the law, give the probation office some ability to monitor his filings. I take your point that it may be that, well, he's not going to comply with any conditions you give him, but if he doesn't, then that gives me the ability to revoke his supervised release.

MR. HOWARD: Sure. No. I think that would be appropriate, and I think the language that is already in Judge Hall's order can sort of be adapted to comply with that condition, because I think Judge Hall's order even has a sort of preclearance that before he files -- it may even say before he files anything with the Court, that he has to so notify the Court of that order and get approval before doing that, because, again, this is a crime that started with him filing ridiculous civil complaints, ridiculous tax complaints. So I don't know if there's a provision that we can broaden it to prevent him from filing records on -- with the Court that contain any threatening material and/or lien type of documents.

THE COURT: Okay. Thank you, Mr. Howard. Mr. Maines.

MR. MAINES: Yes, Your Honor. May I approach?

THE COURT: You may.

MR. MAINES: Your Honor, I'd like to start with where I agree with opposing counsel. The defense agrees that supervised release would be likely a waste of government resources because he's almost assuredly not going to comply with the Court's conditions, for better or worse.

And, secondly, Your Honor, that, as Mr. Howard said, the intent that Mr. Pate demonstrated was not to extract 33 million dollars from the government through that bankruptcy declaration. And essentially I want to spend my time focusing on how this advisory Guideline range was accelerated into warp-drive by this 33-million-dollar proposed loss amount that has got Mr. Pate in a sentencing range that is extreme for someone that has never been convicted of a felony offense in his life.

In particular, Your Honor, the false bankruptcy declaration, as the Court's aware and the PSR makes a point to say, the base level offense is 6, and when you juxtapose that compared to the false liens where you have a base level offense of 12, it gives you an idea of just a vanilla offense of those respective statutes, what the -- what kind of penalties should be applied by the Court.

And in this particular case especially, the false liens and the bankruptcy are all part of exactly what the government is saying is a pattern of harassment. And, Your Honor, we're asking the Court to look at this from a seriousness approach as

it relates to that harassment.

Mr. Pate engaged in a scheme that was as sophisticated as a bank robber banging his head against a vault to try to get the money inside that vault. That was the sophistication level that he engaged in. He's using handwritten documents, handwritten, to initially engage in this voucher system, which as the IRS agent testified, they know when they get that kind of voucher for imputed interest when it's handwritten that it's part of that scheme.

Mr. Pate, foolishly, stupidly, persists in this idiotic claim, with no hope, nor did he ever receive nor can anyone reasonably expect someone engaged in this pattern of conduct to receive money from the government. It is beyond stupid. It is -- it is as stupid as a defendant that tries to rob a bank by banging his head against the wall to get through to the money inside the safe.

The value of deterrence of a long sentence like that is minuscule because no reasonable person would think that this is a viable way to defraud the government. When you compare lengthy sentences imposed for people that engage in mass corruption by abusing their relationship to the victims, instances such as lawyers stealing money from their clients in their trust accounts as fiduciary, when you have systemic fraud by con men that engage in Ponzi schemes to take money away from the elderly people and victimize them and ruin their life's

savings. For instance, 33 million dollars would represent the average household income retirement savings of 33 households. That adjustment to his base level offense on bankruptcy is divorced from the conduct that actually occurred in this case, Your Honor.

No, I'm not asking the Court to be in any way lenient, and nor should the Court in any way think that by this argument I'm in any way condoning his reprehensible behavior, because it's not. I'm asking the Court to look at his behavior as a pattern that's consistent, the false bankruptcy declaration was an extension of the false liens. In fact, the false bankruptcy declaration in the indictment doesn't even require that intent to defraud the government of 33 million dollars.

It was a pattern of harassment, and we're asking the Court to sentence him as part of that pattern of harassment consistent with what the Guidelines impose.

It's notable that the Guidelines don't impose an offense adjustment based on the dollar amount through the false lien statute. It doesn't matter if a defendant files a 100-million-dollar lien or a 10-million-dollar lien, and I think that's notable because the Guidelines do not include that adjustment based on the value, or the amount listed in that lien, because it's the nature of the harassment.

Mr. Pate, foolishly, stupidly, writes ridiculous numbers that are completely divorced from all reality, and it's the same

effect whether it's 33 million dollars or 6 million dollars or 3 million dollars. It's just harassment against these individuals.

The intended loss, Your Honor, the deterrent effect of a 30-year -- or, I'm sorry, 25-year sentence against Mr. Pate for what he has done would potentially have the exact opposite effect on individuals. He might be considered a martyr, someone that the government fears: The reason that the Court imposed such a lengthy sentence where no one lost any money, the government never paid any claims -- and consider all the claims, the Medicare fraud cases that the Court hears. It would make a martyr of him, someone that the government obviously fears to receive such a substantial sentence, that as if somehow we were as a society afraid of his ideas. It's preposterous.

He's nothing but a two-bit hack filing ridiculous paperwork, harassing, creating real -- real terror in his victims, yes. But we're asking the Court to measure this sentence as it relates to the amount of terror that he has inflicted, not this abstract 33-million-dollar intended loss amount that even Mr. Howard says at the beginning of his -- of his statement and argument that there was not an intent to extract 33 million dollars from the government.

Your Honor, while the Guidelines would, from a very mechanicalistic approach, permit a guideline range sentence of an extremely large sentence, I'm asking the Court to do

something that Mr. Pate did not do, which was to exercise restraint and to show some mercy and to look at the totality of what his conduct is and sentence him as a harasser, as a paper terrorizer, but not consistent with what we see in lengthy sentences for people that engage in conduct that really does take people's homes away, that really does take their life's savings away, because that's what the Court would be doing if it applied that 33 -- I'm sorry, the base level adjustment for a 33-million-dollar loss to just that bankruptcy statute, which themselves each carry only five years' incarceration.

So when you look at his conduct, it's exactly the same. Whether it's the false bankruptcy declaration or it's the false liens, it's harassment. Thank you.

THE COURT: Mr. Maines, let me state first that it's been said that there's no more difficult obligation of an attorney than to represent an innocent man. That's probably true. I think a close second must be representing Timothy Jermaine Pate. You've done an exceptional job, in a very difficult circumstances to at every stage of the case fulfill your duty with candor to the Court while still zealously advocating on behalf of your client, and the Court appreciates that.

Enough of the kudos. Let me ask you this.

Regarding the restraint on his mail and other communications while he is in prison, I understand you may state

that he can't -- that the Court shouldn't do that, but can the Court do that? Do you have any take on that at all?

MR. MAINES: I think the Court's authorized to restrict his mail in this particular case, Your Honor, yes. I think the Court's -- I know the Court's already done that, and I referenced that in my memorandum, while the defendant was incarcerated while waiting for trial.

Yes, I believe the Court -- and I would ask the Court to do that, in part, to -- so that Mr. Pate cannot further -- not just terrorize those people, but also --

THE COURT: Harm himself.

MR. MAINES: -- harm himself.

THE COURT: Get himself in more difficult circumstances.

MR. MAINES: Right. Just like the bank robber --

THE COURT: In other words, you're asking for it to protect himself from himself.

MR. MAINES: That's exactly what I'm asking for, Your Honor. I mean, this is a case where we're looking at a figurative person banging their head against the wall, and we're all looking at each other in this courtroom saying, well, we don't have a diagnosis, so we can't say he's mentally ill, but we can do things to structure it so that he doesn't further hurt himself from a criminal liability standpoint in that way.

THE COURT: Okay. Thank you, Mr. Maines.

MR. MAINES: Thank you.

THE COURT: Ordinarily I would have the defendant come to the lectern to receive his sentence with counsel. Obviously, with the defendant not being present, we're not going to do that. He's absented himself from the hearing, as I've said numerous times now. So rather than go through with that, I'm going to pronounce the sentence.

Mr. Pate can hear me. He's in his cell back there, and he can hear this sentence. And the sentence will be no less effective just because he's not here to personally receive it.

I've listened to counsel for the government and counsel for the defense. They've both made, as I expected, very compelling, very thoughtful arguments to the Court regarding the appropriate sentence in the case. Mr. Pate has elected not to make a statement to the Court, though given the opportunity to do so.

I've reviewed this very thorough presentence investigation report. I have reviewed the sentencing memorandum in this case. I've considered all of the sentencing factors in this case that are set forth at 18 United States Code Section 3553(a).

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Timothy Jermaine Pate, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a total term of 300 months. This term of imprisonment consists of terms of 120 months as to each of

Counts 1 through 10, to be served concurrently with each other, but consecutively to a term of 60 months as to each of Counts 11 through 15, to be served concurrently with each other, but consecutively to a term of 120 months as to each of Counts 16 through 21 to be served concurrently with each other, but consecutively to all other terms imposed. And that will produce a total term of 300 months' imprisonment.

I do recommend that the defendant be given credit towards his federal sentence for all the time that he has served in custody since August the 30th, 2018, that is not credited toward another sentence.

Mr. Maines has made a very strong argument of why the Court should depart from the Sentencing Guidelines in this case. However, I find no reason to depart or vary from the sentence called for by application of the advisory Guidelines in this case. These are the facts -- the type of facts here are the type of facts contemplated by the Sentencing Commission when coming up with the Guidelines for these offenses.

I do note that the range exceeds 24 months, so I'll provide you with some reasons why I'm imposing the sentence that I've imposed. The defendant attempted to file unsubstantiated tax refunds from the Internal Revenue Service. Those requested refunds totaled millions of dollars, despite there being no evidence whatsoever that the defendant had paid any amounts into the tax system.

When the refunds were denied, he was not deterred. The defendant began to file liens against the United States Tax Commissioner, Mr. John Koskinen, in an effort to bully his way into receiving the funds and to harass the Tax Commissioner.

He then attempted to file a criminal complaint against the Tax Commissioner in hopes of having him arrested. When the criminal complaint was dismissed, that did not deter him either. Instead, he filed liens against United States Magistrate Judge Brian Epps.

He then continued his harassment by filing liens against other federal officials, and at each turn he was not deterred. Instead, his conduct escalated. These federal officials included Denise Davis, the Director of the Integrity Return Management for the IRS; Eric Mines Thorson, the Inspector General of the United States Treasury; and Jacob Lew, the Secretary of the Treasury, among many others.

Anyone that Mr. Pate came in contact with who worked for the government risked being threatened by Mr. Pate with unsubstantiated harassing liens or other filings. Essentially, he attempted to bully governmental officials to not do their job by filing fraudulent liens against them, by filing bankruptcy declarations with the goal of either obtaining millions of dollars of United States tax money that was never owed to him or bullying the individuals out of the positions they were in and harassing them.

He threatened governmental officials who sought to do nothing more than faithfully execute their solemn oaths of office. As the victims all testified, his conduct, if left undeterred, would shield others from taking similar oaths in the future and ultimately would threaten the good governance of this country.

Now, as for the seriousness of his conduct, Mr. Maines has done his level best to minimize Mr. Pate's conduct. That's his job as his attorney. However, the facts that I heard at the trial unquestionably prove that this was a calculated and disturbing scheme which he designed and carried out over several years.

I take Mr. Maines's point about the futility of Mr. Pate's scheme. However, perhaps it was not sophisticated or ultimately successful monetarily, but that does not change Mr. Pate's vindictive intent or the harassment the victims actually suffered.

He unquestionably -- Mr. Pate unquestionably poses an escalating threat to governmental officials. At every turn his conduct and his vitriol behind it became heightened. His tactics used were, in essence, no less threatening, no less disturbing, no less harassing than threats of violence. He threatened these individuals' livelihood, their good standing in their communities. He clearly is intent on taking, now and in the future, actions to disturb the operation of this

nation's government. A slap on the wrist will not deter him or protect the public from him.

So this sentence is obviously necessary to specifically deter Mr. Pate from such dangerous conduct, for all the reasons that Mr. Howard outlined in his presentation. It's also necessary to generally deter other individuals who may be tempted to take similar actions to intimidate governmental officials. If we don't give him a significant sentence for this type of significant conduct, then others will think what do they have to lose, and they'll go down this same path of threatening violence.

I've heard the calls for mercy from his counsel, but this is one of those cases that proves out the ancient maxim that mercy to the guilty would be cruelty to the innocent.

Mr. Pate -- I've looked deeply to see if there's any redeeming history or personal characteristics in his background. I always take all of the Section 3553(a) factors when fashioning a sentence. I've looked at all of them. I've looked deeply to find some redeeming history, some redeeming characteristics. I have found none. The only familial relationship that we have any evidence of in this case is, frankly, sickened. There's no reason to extend mercy to this individual, who extended only vindictiveness to others who were just simply trying to do their job.

So considering the totality of his conduct and the

circumstances of his offense, I've imposed a sentence within the guideline range.

I direct that while he's incarcerated, his communications, including mail, electronic, internet and telephonic, will be monitored and restricted, to the extent necessary to ensure that he does not file, attempt to file or threaten to file any false liens against any federal officials or file any false bankruptcy declarations. I find that I have the inherent authority to impose this restriction during his incarceration and that it is necessary that I do so to achieve the statutory purposes of sentencing based on the facts proven during the trial of this case.

I have the inherent authority to enter such an order to prevent him from carrying out additional crimes while serving the prison sentence that I have imposed. Courts that have found that the Court has such inherent authority include the following:

The Southern District of New York, in *United States vs. Felipe*, which is an April 29th, 1997, case. There, the Court said, "Whereas, here the need for the special conditions arises from the nature of the defendant's criminal activity, which was proved at trial, the Court is clearly in the best position to determine what conditions are necessary to protect the public from the defendant."

*United States v. Holloway* is a Sixth Circuit 1984 case,

740 Federal 2d 1373. And *Chapman vs. P-A-C-H-O-L-K-E*, which is an Eastern District of Washington case, November the 12th, 2013, all support the Court's inherent authority.

From what I've seen and heard in this case, it's necessary to impose this restriction to protect the public and also to achieve the other statutory purposes of sentencing. And he would be able to frustrate those purposes if we did not restrict and monitor his mail while he is incarcerated. Okay? And I'm in the best position to determine that because these are -- these restrictions are directly related to the crimes that I heard about at the trial.

I do recommend that he be evaluated by Bureau of Prisons officials to establish his participation in an appropriate program of substance abuse treatment and counseling and mental health treatment and counseling, including the RDAP program, and any other mental health program, during his term of incarceration.

After considering the factors set forth in the Guidelines, I've determined he does not have the ability to pay a fine, so I won't order that he pay a fine. He does have to pay to the United States a special assessment of $100 as to each count, for a total of $2,100, which shall be due immediately.

Upon release from imprisonment, he shall be placed on supervised release for a term of three years as to each count,

to be served concurrently. While on supervised release, he shall comply with the standard conditions of supervision adopted by the Court and the mandatory conditions required by the statute. Those will include things like urine testing. He can't possess a firearm or other dangerous weapon. He cannot violate any law, and he shall cooperate in the collection of a DNA sample.

While on supervised release, he shall comply with certain special conditions. I have considered the factors and the statutes and relevant policy statements issued by the Sentencing Commission, and I've determined that the special conditions that I will impose involve no greater deprivation of liberty than is necessary to achieve the statutory purposes of sentencing. So in addition to the mandatory conditions and standard conditions, he'll have special conditions.

He's going to submit to substance abuse testing to determine if he's used a prohibited substance, and he cannot attempt to obstruct or tamper with the testing method. He must provide the probation officer with access to any requested financial information and authorize the release of any financial information, and the probation office may share financial information with the United States Attorney's Office.

He must not communicate or otherwise interact with any victim in this case, either directly or through someone else, without first obtaining permission of the probation officer.

He must not file any lien or bankruptcy declaration without first notifying the United States Probation Officer of his intent to file that lien or that bankruptcy declaration, and the probation officer is given discretion in carrying out that specific condition.

He must submit his person, property, house, residence, office, vehicle, papers, computers, and other electronic communications or data storage devices, and other things, to a search conducted by the United States Probation Office upon certain conditions, which will be set forth in his conditions of release.

I'll direct the United States Probation Office to attempt to provide him a written statement that sets forth all the conditions of his supervised release.

Mr. Pate, I know you can hear me. Let me be clear. I want you to comply with your conditions of release when you are on supervised release. However, if you fail to do so, I will revoke your supervised release and I will require you to serve more time in prison.

I order that he'll be remanded to the custody of the United States Marshal. I recommend that he be housed as far away from Augusta, Georgia, as the United States Bureau of Prisons can house him during his period of incarceration. He clearly has threatened and harassed individuals in this area, and getting him out of Georgia would be the best thing

for the BOP, because perhaps that will lead him to a road of rehabilitation rather than just further harassment. So I recommend -- now, the Bureau of Prisons doesn't have to follow my recommendation. They may designate him somewhere close by. But I recommend that he be housed as far away from Augusta, Georgia, as possible, and certainly outside the State of Georgia.

Mr. Pate, you're now advised -- and you can hear me, sir. You're advised that it's your right to appeal from the sentence within 14 days from today's date. Failure to appeal within the 14-day period shall be a waiver of your right to appeal. The government may likewise file an appeal.

Mr. Pate, you're advised that you're entitled to the assistance of counsel in taking an appeal, and if you are unable to afford a lawyer, one will be provided for you. If you so request, the Clerk of Court will prepare and file a notice of appeal on your behalf, but you have to appeal within 14 days or it's a waiver of your right to appeal. In the event of appeal, it will be the obligation and responsibility of counsel to continue his representation on appeal, unless and until relieved by order of the United States Court of Appeals.

Mr. Maines, you have your notice of post-conviction obligation to consult with your client. Make your best effort to review it with him. If he refuses to review it with you, acknowledge that on the form and file it with the Court, but

make your best effort to consult with him about his desire to file an appeal.

MR. MAINES: Yes, Your Honor.

THE COURT: Thank you, Counsel. All right. The sentence has now been pronounced. Other than any objections which have been previously stated for the record, does anyone have any objections to the Court's findings of fact or conclusions of law or to the manner in which I have pronounced the sentence? Anything from the government?

MR. HOWARD: No, Your Honor.

THE COURT: Mr. Maines?

MR. MAINES: No, Your Honor, other than previously stated.

THE COURT: All right. Counsel, you are excused with the Court's sincere appreciation. Both of you have done your level best to represent your clients diligently and with the candor, intelligence and collegiality that this Court expects. We appreciate both of you. You're excused with the Court's appreciation. This Court is adjourned.

(Proceedings concluded at 3:11 p.m.)

- - -

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly A. McKee, Registered Diplomate Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 28th day of April, 2020.

Kelly A. McKee

KELLY A. McKEE, CCR, RMR, CCP, RDR

#2731